# EXHIBIT A

| | |
|---|---|
| **UPS Tracking # :** | 1ZX212780100167118 |
| **Created By :** | BATCH BATCH |
| **Created On :** | 10/01/2024 04:31 PM |
| **Recipient :** | |

| **Joseph Mullins** | |
|---|---|
| Title : | Us Corporate Counsel Secretary |
| Customer : | ILUKA Resources Inc. |
| Address : | 12472 Saint John Church Rd |
| Email : | joe.mullins@iluka.com |
| Phone : | 904-505-9241    Fax :    904-284-4006 |

**Package Type :** Envelope

**Items shipped :** 1

| Log # | Case # | Entity Name |
|---|---|---|
| 547443002 | 24STCV25090 | Iluka Resources Inc. |

 **Wolters Kluwer**

## Service of Process Transmittal Summary

**TO:**   Joseph Mullins, Us Corporate Counsel Secretary
ILUKA Resources Inc.
12472 Saint John Church Rd
Stony Creek, VA 23882-3239

**RE:**   **Process Served in Florida**

**FOR:**   Iluka Resources Inc. (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Laurence J. Graham and Betty Patrick Graham vs. DuPont de Nemours, Inc. |
| **CASE #:** | 24STCV25090 |
| **PROCESS SERVED ON:** | C T Corporation System, Plantation, FL |
| **DATE/METHOD OF SERVICE:** | By Process Server on 10/01/2024 at 14:45 |
| **JURISDICTION SERVED:** | Florida |
| **ACTION ITEMS:** | SOP Papers with Transmittal, via UPS Next Day Air , 1ZX212780100167118 |
| **REGISTERED AGENT CONTACT:** | C T Corporation System
1200 South Pine Island Road
Plantation, FL 33324
877-467-3525
SmallBusinessTeam@wolterskluwer.com |

The information contained in this Transmittal is provided by CT for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the included documents and taking appropriate action, including consulting with its legal and other advisors as necessary. CT disclaims all liability for the information contained in this form, including for any omissions or inaccuracies that may be contained therein.

Page 1 of 1

Wolters Kluwer

# PROCESS SERVER DELIVERY DETAILS

**Date:**                               Tue, Oct 1, 2024
**Server Name:**                        Carlos Pardo

| Entity Served | ILUKA RESOURCES INC. |
|---|---|
| Case Number | 24STCV25090 |
| Jurisdiction | FL |

| Inserts | | |
|---|---|---|
| | | |



SUM-100

# SUMMONS
## *(CITACION JUDICIAL)*

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

DuPont de Nemours, Inc. (see attachment)

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

Laurence J. Graham and Betty Patrick Graham

CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles

SEP 3 0 2024

David W. Slayton, Executive Officer/Clerk of Court

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is: *(El nombre y dirección de la corte es):* Los Angeles Superior Court<br><br>111 N Hill St, Los Angeles, CA 90012 | CASE NUMBER: *(Número del Caso):*<br>**24STCV25090** |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
4647 Kingswell Ave., Suite 105 Los Angeles, CA 90027

Laurence J. Graham and Betty P. Graham

| | | | |
|---|---|---|---|
| DATE: SEP 3 0 2024 *(Fecha)* | David W. Slayton | Clerk, by *(Secretario)* G. Robinson | , Deputy *(Adjunto)* |

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED: You are served**
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☒ on behalf of *(specify):* Iluka Resources, Inc., a Delaware Corporation
    under: ☒ CCP 416.10 (corporation)   ☐ CCP 416.60 (minor)
    ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
    ☐ CCP 416.40 (association or partnership)   ☐ CCP 416.90 (authorized person)
    ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
*www.courts.ca.gov*

Carlos Pardo
SPS # 519
2024/10/01  14:45:44

SUM-200(A)

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Laurence J. Graham and Betty Patrick Graham vs. DuPont de Nemours, Inc. et al. | |

**INSTRUCTIONS FOR USE**

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

List additional parties *(Check only one box. Use a separate page for each type of party.)*:

[ ] Plaintiff   [x] Defendant   [ ] Cross-Complainant   [ ] Cross-Defendant

DuPont de Nemours, Inc., a Delaware Corporation; and,
The Dow Chemical Company; a Delaware Corporation; and,
Dow, Inc., a Delaware Corporation; and,
Corteva, Inc., a Delaware Corporation; and,
The Chemours Company, a Delaware Corporation;
and, Occidental Petroleum Corporation, a Delaware Corporation; and,
Iluka Resources, Inc., a Delaware Corporation; and,
Iluka Resources Limited, an Australian public company; and,
Tronox, LLC, a US limited liability company; and,
Tronox Holdings plc, an Australian company; and,
Tronox Limited, an Australian public company; and,
Huntsman Corporation, a Delaware Corporation; and,
Kronos (US), Inc., a Delaware Corporation; and,
Kronos Worldwide, Inc., a Delaware Corporation; and,
National Industrialization Company, a limited company organized, existing, and doing business under, and by virtue of, the laws of the Kingdom of Saudi Arabia; and,
Venator Materials, LLC, a US limited liability corporation; and, Venator Materials, plc, a United Kingdom company; and, Ineos Limited, a United Kingdom private limited company; and, Titanium Metals Corporation, a Delaware Corporation; and, Precision Castparts Corp., a Delaware Corporation; and, Ineos Pigments USA Inc., a Delaware Corporation Ineos Pigments USA Inc., a Delaware Corporation; and, Ineos Enterprises, LLC, a limited liability corporation organized in Delaware; and, INEOS Joliet US Holdco, LLC, a Delaware company; and, Kinder Morgan, Inc., a Delaware Corporation; and, Hunton Andrews Kurth, LLP, a Limited Liability Partnership with offices in California and Florida and a citizen of both California and Florida; and, JM Eagle, a Delaware Corporation and citizen of California; and, and, DOES 1-25, inclusive.
Defendants.

Page ___ of ___
Page 1 of 1

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| Laurence J. Graham; and, Betty Patrick Graham<br>4647 Kingswell Ave Ste 105, Los Angeles, CA 90027<br>TELEPHONE NO.: 415-800-4483      FAX NO.:<br>EMAIL ADDRESS: courtcase.la@yahoo.com<br>ATTORNEY FOR *(Name):* Pro se | **CONFORMED COPY**<br>**ORIGINAL FILED**<br>Superior Court of California<br>County of Los Angeles<br><br>**SEP 30 2024**<br><br>David W. Slayton, Executive Officer/Clerk of Court |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Los Angeles
STREET ADDRESS: 111 N Hill St, Los Angeles, CA 90012
MAILING ADDRESS: 111 N Hill St, Los Angeles, CA 90012
CITY AND ZIP CODE: Los Angeles, CA 90012
BRANCH NAME: Stanley Mosk Courthouse

CASE NAME:

| CIVIL CASE COVER SHEET | | Complex Case Designation | CASE NUMBER: |
|---|---|---|---|
| ☒ Unlimited<br>(Amount<br>demanded<br>exceeds $35,000) | ☐ Limited<br>(Amount<br>demanded is<br>$35,000 or less) | ☐ Counter    ☐ Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | **24STCV25090**<br><br>JUDGE:<br>DEPT.: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☐ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
☐ Business tort/unfair business practice (07)
☐ Civil rights (08)
☐ Defamation (13)
☐ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)
**Employment**
☐ Wrongful termination (36)
☐ Other employment (15)

**Contract**
☐ Breach of contract/warranty (06)
☐ Rule 3.740 collections (09)
☐ Other collections (09)
☐ Insurance coverage (18)
☒ Other contract (37)
**Real Property**
☐ Eminent domain/Inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)
**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)
**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Mass tort (40)
☐ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
☐ Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition *(not specified above)* (43)

2. This case ☐ is  ☒ is not  complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties
   b. ☐ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. ☐ Substantial amount of documentary evidence
   d. ☐ Large number of witnesses
   e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. ☐ Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. ☒ monetary  b. ☐ nonmonetary; declaratory or injunctive relief  c. ☒ punitive
4. Number of causes of action *(specify):* Complaint for relief under Cal. Civil code Sec. 1692 for rescission of ten mining leases based
5. This case ☐ is  ☒ is not  a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*
Date: 9/29/2024

Laurence J. Graham; and, Betty Patrick Graham
(TYPE OR PRINT NAME)                                        (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET
CM-010

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you must complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check one box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the primary cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property
Damage/Wrongful Death
Uninsured Motorist (46) (if the
case involves an uninsured
motorist claim subject to
arbitration, check this item
instead of Auto)

**Other PI/PD/WD (Personal Injury/
Property Damage/Wrongful Death) Tort**
Asbestos (04)
Asbestos Property Damage
Asbestos Personal Injury/
Wrongful Death
Product Liability (not asbestos or
toxic/environmental) (24)
Medical Malpractice (45)
Medical Malpractice–
Physicians & Surgeons
Other Professional Health Care
Malpractice
Other PI/PD/WD (23)
Premises Liability (e.g., slip
and fall)
Intentional Bodily Injury/PD/WD
(e.g., assault, vandalism)
Intentional Infliction of
Emotional Distress
Negligent Infliction of
Emotional Distress
Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
Practice (07)
Civil Rights (e.g., discrimination,
false arrest) (not civil
harassment) (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
Legal Malpractice
Other Professional Malpractice
(not medical or legal)
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
Breach of Rental/Lease
Contract (not unlawful detainer
or wrongful eviction)
Contract/Warranty Breach–Seller
Plaintiff (not fraud or negligence)
Negligent Breach of Contract/
Warranty
Other Breach of Contract/Warranty
Collections (e.g., money owed, open
book accounts) (09)
Collection Case–Seller Plaintiff
Other Promissory Note/Collections Case
Insurance Coverage (not provisionally
complex) (18)
Auto Subrogation
Other Coverage
Other Contract (37)
Contractual Fraud
Other Contract Dispute

**Real Property**
Eminent Domain/Inverse
Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
Writ of Possession of Real Property
Mortgage Foreclosure
Quiet Title
Other Real Property (not eminent
domain, landlord/tenant, or
foreclosure)

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) (if the case involves illegal
drugs, check this item; otherwise,
report as Commercial or Residential)

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
Writ–Administrative Mandamus
Writ–Mandamus on Limited Court
Case Matter
Writ–Other Limited Court Case Review
Other Judicial Review (39)
Review of Health Officer Order
Notice of Appeal–Labor Commissioner
Appeals

**Provisionally Complex Civil Litigation (Cal.
Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims
(arising from provisionally complex
case type listed above) (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
Abstract of Judgment (Out of County)
Confession of Judgment (non-domestic
relations)
Sister State Judgment
Administrative Agency Award
(not unpaid taxes)
Petition/Certification of Entry of
Judgment on Unpaid Taxes
Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint (not specified above) (42)
Declaratory Relief Only
Injunctive Relief Only (non-
harassment)
Mechanics Lien
Other Commercial Complaint
Case (non-tort/non-complex)
Other Civil Complaint
(non-tort/non-complex)

**Miscellaneous Civil Petition**
Partnership and Corporate
Governance (21)
Other Petition (not specified above) (43)
Civil Harassment
Workplace Violence
Elder/Dependent Adult Abuse
Election Contest
Petition for Name Change
Petition for Relief From Late Claim
Other Civil Petition

| SHORT TITLE | CASE NUMBER |
|---|---|
| Laurence J. Graham and Betty Patrick Graham vs. DuPont de Nemours, Inc., et al. | 24STCV25090 |

# CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION

## (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

**This form is required pursuant to Local Rule 2.3 in all new civil case filings in the Los Angeles Superior Court**

**Step 1:** After completing the Civil Case Cover Sheet (Judicial Council form CM-010), find the exact case type in Column A that corresponds to the case type indicated in the Civil Case Cover Sheet.

**Step 2:** In Column B, check the box for the type of action that best describes the nature of the case.

**Step 3:** In Column C, circle the number which explains the reason for the court filing location you have chosen.

| Applicable Reasons for Choosing Courthouse Location (Column C) | |
|---|---|
| 1. Class Actions must be filed in the Stanley Mosk Courthouse, Central District. | 7. Location where petitioner resides. |
| 2. Permissive filing in Central District. | 8. Location wherein defendant/respondent functions wholly. |
| 3. Location where cause of action arose. | 9. Location where one or more of the parties reside. |
| 4. Location where bodily injury, death or damage occurred. | 10. Location of Labor Commissioner Office. |
| 5. Location where performance required, or defendant resides. | 11. Mandatory filing location (Hub Cases – unlawful detainer, limited non-collection, limited collection). |
| 6. Location of property or permanently garaged vehicle. | |

| | A<br>Civil Case Cover Sheet Case Type | B<br>Type of Action<br>(check only one) | C<br>Applicable Reasons (see Step 3 above) |
|---|---|---|---|
| Auto Tort | Auto (22) | ☐ 2201 Motor Vehicle – Personal Injury/Property Damage/Wrongful Death | 1, 4 |
| | Uninsured Motorist (46) | ☐ 4601 Uninsured Motorist – Personal Injury/Property Damage/Wrongful Death | 1, 4 |
| Other Personal Injury/ Property Damage/ Wrongful Death | Other Personal Injury/ Property Damage/ Wrongful Death (23) | ☐ 2301 Premise Liability (e.g., dangerous conditions of property, slip/trip and fall, dog attack, etc.) | 1, 4 |
| | | ☐ 2302 Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, battery, vandalism, etc.) | 1, 4 |
| | | ☐ 2303 Intentional Infliction of Emotional Distress | 1, 4 |
| | | ☐ 2304 Other Personal Injury/Property Damage/Wrongful Death | 1, 4 |
| | | ☐ 2305 Elder/Dependent Adult Abuse/Claims Against Skilled Nursing Facility | 1, 4 |
| | | ☐ 2306 Intentional Conduct – Sexual Abuse Case (in any form) | 1, 4 |

| SHORT TITLE | CASE NUMBER |
|---|---|
| Laurence J. Graham and Betty Patrick Graham vs. DuPont de Nemours, Inc., et al. | |

| | A<br>Civil Case Cover<br>Sheet Case Type | B<br>Type of Action<br>(check only one) | C<br>Applicable<br>Reasons (see<br>Step 3 above) |
|---|---|---|---|
| **Provisionally Complex Litigation (Continued)** | Construction Defect (10) | ☐ 1001 Construction Defect | 1, 2, 3 |
| | Claims Involving Mass Tort (40) | ☐ 4001 Claims Involving Mass Tort | 1, 2, 8 |
| | Securities Litigation (28) | ☐ 2801 Securities Litigation Case | 1, 2, 8 |
| | Toxic Tort Environmental (30) | ☐ 3001 Toxic Tort/Environmental | 1, 2, 3, 8 |
| | Insurance Coverage Claims from Complex Case (41) | ☐ 4101 Insurance Coverage/Subrogation (complex case only) | 1, 2, 5, 8 |
| **Enforcement of Judgment** | Enforcement of Judgment (20) | ☐ 2001 Sister State Judgment | 2, 5, 11 |
| | | ☐ 2002 Abstract of Judgment | 2, 6 |
| | | ☐ 2004 Administrative Agency Award (not unpaid taxes) | 2, 8 |
| | | ☐ 2005 Petition/Certificate for Entry of Judgment Unpaid Tax | 2, 8 |
| | | ☐ 2006 Other Enforcement of Judgment Case | 2, 8, 9 |
| **Miscellaneous Civil Complaints** | RICO (27) | ☐ 2701 Racketeering (RICO) Case | 1, 2, 8 |
| | Other Complaints (not specified above) (42) | ☐ 4201 Declaratory Relief Only | 1, 2, 8 |
| | | ☐ 4202 Injunctive Relief Only (not domestic/harassment) | 2, 8 |
| | | ☐ 4203 Other Commercial Complaint Case (non-tort/noncomplex) | 1, 2, 8 |
| | | ☐ 4204 Other Civil Complaint (non-tort/non-complex) | 1, 2, 8 |
| **Miscellaneous Civil Petitions** | Partnership Corporation Governance (21) | ☐ 2101 Partnership and Corporation Governance Case | 2, 8 |
| | Other Petitions (not specified above) (43) | ☐ 4301 Civil Harassment with Damages | 2, 3, 9 |
| | | ☐ 4302 Workplace Harassment with Damages | 2, 3, 9 |
| | | ☐ 4303 Elder/Dependent Adult Abuse Case with Damages | 2, 3, 9 |
| | | ☐ 4304 Election Contest | 2 |
| | | ☐ 4305 Petition for Change of Name/Change of Gender | 2, 7 |
| | | ☐ 4306 Petition for Relief from Late Claim Law | 2, 3, 8 |
| | | ☐ 4307 Other Civil Petition | 2, 9 |

LASC CIV 109 Rev. 01/23          CIVIL CASE COVER SHEET ADDENDUM          LASC Local Rule 2.3
For Mandatory Use                     AND STATEMENT OF LOCATION

| SHORT TITLE | CASE NUMBER |
|---|---|
| Laurence J. Graham and Betty Patrick Graham vs. DuPont de Nemours, Inc., et al. | |

| A. Civil Case Cover Sheet Case Type | | B. Type of Action (check only one) | C. Applicable Reasons (see Step 3 above) |
|---|---|---|---|
| Other Personal Injury/ Property Damage/ Wrongful Death | | ☐ 2307 Construction Accidents | 1, 4 |
| | | ☐ 2308 Landlord – Tenant Habitability (e.g., bed bugs, mold, etc.) | 1, 4 |
| | Product Liability (24) | ☐ 2401 Product Liability (not asbestos or toxic/ environmental) | 1, 4 |
| | | ☐ 2402 Product Liability – Song-Beverly Consumer Warranty Act (CA Civil Code §§1790-1795.8) (Lemon Law) | 1, 3, 5 |
| | Medical Malpractice (45) | ☐ 4501 Medical Malpractice – Physicians & Surgeons | 1, 4 |
| | | ☐ 4502 Other Professional Health Care Malpractice | 1, 4 |
| Non-Personal Injury/Property Damage/Wrongful Death Tort | Business Tort (07) | ☐ 0701 Other Commercial/Business Tort (not fraud or breach of contract) | 1, 2, 3 |
| | Civil Rights (08) | ☐ 0801 Civil Rights/Discrimination | 1, 2, 3 |
| | Defamation (13) | ☐ 1301 Defamation (slander/libel) | 1, 2, 3 |
| | Fraud (16) | ☐ 1601 Fraud (no contract) | 1, 2, 3 |
| | Professional Negligence (25) | ☐ 2501 Legal Malpractice | 1, 2, 3 |
| | | ☐ 2502 Other Professional Malpractice (not medical or legal) | 1, 2, 3 |
| | Other (35) | ☐ 3501 Other Non-Personal Injury/Property Damage Tort | 1, 2, 3 |
| Employment | Wrongful Termination (36) | ☐ 3601 Wrongful Termination | 1, 2, 3 |
| | Other Employment (15) | ☐ 1501 Other Employment Complaint Case | 1, 2, 3 |
| | | ☐ 1502 Labor Commissioner Appeals | 10 |
| Contract | Breach of Contract / Warranty (06) (not insurance) | ☐ 0601 Breach of Rental/Lease Contract (not unlawful detainer or wrongful eviction) | 2, 5 |
| | | ☐ 0602 Contract/Warranty Breach – Seller Plaintiff (no fraud/negligence) | 2, 5 |
| | | ☐ 0603 Negligent Breach of Contract/Warranty (no fraud) | 1, 2, 5 |
| | | ☐ 0604 Other Breach of Contract/Warranty (no fraud/ negligence) | 1, 2, 5 |
| | | ☐ 0605 Breach of Rental/Lease Contract (COVID-19 Rental Debt) | 2, 5 |
| | Collections (09) | ☐ 0901 Collections Case – Seller Plaintiff | 5, 6, 11 |
| | | ☐ 0902 Other Promissory Note/Collections Case | 5, 11 |
| | | ☐ 0903 Collections Case – Purchased Debt (charged off consumer debt purchased on or after January 1, 2014) | 5, 6, 11 |
| | | ☐ 0904 Collections Case – COVID-19 Rental Debt | 5, 11 |
| | Insurance Coverage (18) | ☐ 1801 Insurance Coverage (not complex) | 1, 2, 5, 8 |

| SHORT TITLE | CASE NUMBER |
|---|---|
| Laurence J. Graham and Betty Patrick Graham vs. DuPont de Nemours, Inc., et al. | |

| | A Civil Case Cover Sheet Case Type | B Type of Action (check only one) | C Applicable Reasons (See Step 3 above) |
|---|---|---|---|
| **Contract (Continued)** | Other Contract (37) | ☐ 3701 Contractual Fraud | 1, 2, 3, 5 |
| | | ☒ 3702 Tortious Interference | 1, 2, 3, 5 |
| | | ☐ 3703 Other Contract Dispute (not breach/insurance/fraud/ negligence) | 1, 2, 3, 8, 9 |
| **Real Property** | Eminent Domain/ Inverse Condemnation (14) | ☐ 1401 Eminent Domain/Condemnation Number of Parcels _____ | 2, 6 |
| | Wrongful Eviction (33) | ☐ 3301 Wrongful Eviction Case | 2; 6 |
| | Other Real Property (26) | ☐ 2601 Mortgage Foreclosure | 2, 6 |
| | | ☐ 2602 Quiet Title | 2, 6 |
| | | ☐ 2603 Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2, 6 |
| **Unlawful Detainer** | Unlawful Detainer – Commercial (31) | ☐ 3101 Unlawful Detainer – Commercial (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer – Residential (32) | ☐ 3201 Unlawful Detainer – Residential (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer – Post Foreclosure (34) | ☐ 3401 Unlawful Detainer – Post Foreclosure | 2, 6, 11 |
| | Unlawful Detainer – Drugs (38) | ☐ 3801 Unlawful Detainer – Drugs | 2, 6, 11 |
| **Judicial Review** | Asset Forfeiture (05) | ☐ 0501 Asset Forfeiture Case | 2, 3, 6 |
| | Petition re Arbitration (11) | ☐ 1101 Petition to Compel/Confirm/Vacate Arbitration | 2, 5 |
| | Writ of Mandate (02) | ☐ 0201 Writ – Administrative Mandamus | 2, 8 |
| | | ☐ 0202 Writ – Mandamus on Limited Court Case Matter | 2 |
| | | ☐ 0203 Writ – Other Limited Court Case Review | 2 |
| | Other Judicial Review (39) | ☐ 3901 Other Writ/Judicial Review | 2, 8 |
| | | ☐ 3902 Administrative Hearing | 2, 8 |
| | | ☐ 3903 Parking Appeal | 2, 8 |
| **Provisionally Complex Litigation** | Antitrust/Trade Regulation (03) | ☐ 0301 Antitrust/Trade Regulation | 1, 2, 8 |
| | Asbestos (04) | ☐ 0401 Asbestos Property Damage | 1, 11 |
| | | ☐ 0402 Asbestos Personal Injury/Wrongful Death | 1, 11 |

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

| SHORT TITLE | CASE NUMBER |
|---|---|
| Laurence J. Graham and Betty Patrick Graham vs. DuPont de Nemours, Inc., et al. | |

**Step 4: Statement of Reason and Address:** Check the appropriate boxes for the numbers shown under Column C for the type of action that you have selected. Enter the address, which is the basis for the filing location including zip code. (No address required for class action cases.)

| REASON: ☒ 1. ☒ 2. ☒ 3. ☐ 4. ☒ 5. ☐ 6. ☐ 7. ☐ 8. ☐ 9. ☐ 10. ☐ 11 | ADDRESS: 4647 Kingswell Ave Ste 105 Los Angeles, CA 90027 |
|---|---|

| CITY: Los Angeles | STATE: CA | ZIP CODE: 90027 | |
|---|---|---|---|

**Step 5: Certification of Assignment:** I certify that this case is properly filed in the __Central__ District of the Superior Court of California, County of Los Angeles [Code of Civ. Proc., 392 et seq., and LASC Local Rule 2.3(a)(1)(E)]

Dated: 09/30/2024

_Jay Graham and Betty P. Graham_
(SIGNATURE OF ATTORNEY/FILING PARTY)

**PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1. Original Complaint or Petition.
2. If filing a Complaint, a completed Summons form for issuance by the Clerk.
3. Civil Case Cover Sheet Judicial Council form CM-010.
4. Civil Case Cover Sheet Addendum and Statement of Location form LASC CIV 109 (01/23).
5. Payment in full of the filing fee, unless there is a court order for waiver, partial or schedule payments.
6. A signed order appointing a Guardian ad Litem, Judicial Council form CIV-010, if the plaintiff or petitioner is a minor under 18 years of age will be required by Court to issue a Summons.
7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the Summons and Complaint, or other initiating pleading in the case.

LASC CIV 109 Rev. 01/23
For Mandatory Use

**CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION**

LASC Local Rule 2.3

# Superior Court of California, County of Los Angeles

## ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATION PACKAGE

**THE PLAINTIFF MUST SERVE THIS ADR INFORMATION PACKAGE ON EACH PARTY WITH THE COMPLAINT.**

**CROSS-COMPLAINANTS** must serve this ADR Information Package on any new parties named to the action with the cross-complaint.

## What is ADR?

ADR helps people find solutions to their legal disputes without going to trial. The main types of ADR are negotiation, mediation, arbitration, and settlement conferences. When ADR is done by phone, videoconference or computer, it may be called Online Dispute Resolution (ODR). These alternatives to litigation and trial are described below.

## Advantages of ADR

- **Saves Time:** ADR is faster than going to trial.
- **Saves Money:** Parties can save on court costs, attorney's fees, and witness fees.
- **Keeps Control** (with the parties): Parties choose their ADR process and provider for voluntary ADR.
- **Reduces Stress/Protects Privacy:** ADR is done outside the courtroom, in private offices, by phone or online.

## Disadvantages of ADR

- **Costs:** If the parties do not resolve their dispute, they may have to pay for ADR, litigation, and trial.
- **No Public Trial:** ADR does not provide a public trial or decision by a judge or jury.

## Main Types of ADR

1. **Negotiation:** Parties often talk with each other in person, or by phone or online about resolving their case with a settlement agreement instead of a trial. If the parties have lawyers, they will negotiate for their clients.

2. **Mediation:** In mediation, a neutral mediator listens to each person's concerns, helps them evaluate the strengths and weaknesses of their case, and works with them to try to create a settlement agreement that is acceptable to all. Mediators do not decide the outcome. Parties may go to trial if they decide not to settle.

   **Mediation may be appropriate when the parties**
   - want to work out a solution but need help from a neutral person.
   - have communication problems or strong emotions that interfere with resolution.

   **Mediation may not be appropriate when the parties**
   - want a public trial and want a judge or jury to decide the outcome.
   - lack equal bargaining power or have a history of physical/emotional abuse.

LASC CIV 271 Rev. 03/23
For Mandatory Use

## How to Arrange Mediation in Los Angeles County

Mediation for **civil cases** is voluntary and parties may select any mediator they wish. Options include:

a. **The Civil Mediation Vendor Resource List**
   If all parties in an active civil case agree to mediation, they may contact these organizations to request a "Resource List Mediation" for mediation at reduced cost or no cost (for selected cases).

   - **ADR Services, Inc.** Assistant Case Manager Janet Solis, janet@adrservices.com (213) 683-1600
   - **Mediation Center of Los Angeles** Program Manager info@mediationLA.org (833) 476-9145

   These organizations cannot accept every case and they may decline cases at their discretion. They may offer online mediation by video conference for cases they accept. Before contacting these organizations, review important information and FAQs at www.lacourt.org/ADR.Res.List

   **NOTE: The Civil Mediation Vendor Resource List program does not accept family law, probate, or small claims cases.**

b. **Los Angeles County Dispute Resolution Programs.** Los Angeles County-funded agencies provide mediation services on the day of hearings in small claims, unlawful detainer (eviction), civil harassment, and limited civil (collections and non-collection) cases. https://dcba.lacounty.gov/countywidedrp/

   **Online Dispute Resolution (ODR).** Parties in small claims and unlawful detainer (eviction) cases should carefully review the Notice and other information they may receive about (ODR) requirements for their case. https://my.lacourt.org/odr/

c. Mediators and ADR and Bar organizations that provide mediation may be found on the internet.

3. **Arbitration:** Arbitration is less formal than trial, but like trial, the parties present evidence and arguments to the person who decides the outcome. In "binding" arbitration, the arbitrator's decision is final; there is no right to trial. In "nonbinding" arbitration, any party can request a trial after the arbitrator's decision. For more information about arbitration, visit https://www.courts.ca.gov/programs-adr.htm

4. **Mandatory Settlement Conferences (MSC):** MSCs are ordered by the Court and are often held close to the trial date or on the day of trial. The parties and their attorneys meet with a judge or settlement officer who does not make a decision but who instead assists the parties in evaluating the strengths and weaknesses of the case and in negotiating a settlement. For information about the Court's MSC programs for civil cases, visit https://www.lacourt.org/division/civil/CI0047.aspx

Los Angeles Superior Court ADR website: https://www.lacourt.org/division/civil/CI0109.aspx
For general information and videos about ADR, visit http://www.courts.ca.gov/programs-adr.htm

# SUPERIOR COURT OF CALIFORNIA
## COUNTY OF LOS ANGELES

**COURTHOUSE ADDRESS:**
Stanley Mosk Courthouse
111 North Hill Street, Los Angeles, CA 90012

**FILED**
Superior Court of California
County of Los Angeles

09/30/2024

David W. Slayton, Executive Officer / Clerk of Court

By: _____ G. Robinson _____ Deputy

## NOTICE OF CASE ASSIGNMENT

### UNLIMITED CIVIL CASE

**CASE NUMBER:**
24STCV25090

Your case is assigned for all purposes to the judicial officer indicated below.

## THIS FORM IS TO BE SERVED WITH THE SUMMONS AND COMPLAINT

| | ASSIGNED JUDGE | DEPT | ROOM | | ASSIGNED JUDGE | DEPT | ROOM |
|---|---|---|---|---|---|---|---|
| ✔ | Daniel S. Murphy | 32 | | | | | |

Given to the Plaintiff/Cross-Complainant/Attorney of Record  **David W. Slayton, Executive Officer / Clerk of Court**

on _09/30/2024_          By _G. Robinson_          Deputy Clerk
  (Date)

LACIV 190 (Rev 6/18)       **NOTICE OF CASE ASSIGNMENT – UNLIMITED CIVIL CASE**
LASC Approved 05/06

## INSTRUCTIONS FOR HANDLING UNLIMITED CIVIL CASES

The following critical provisions of the California Rules of Court, Title 3, Division 7, as applicable in the Superior Court, are summarized for your assistance.

### APPLICATION
The Division 7 Rules were effective January 1, 2007. They apply to all general civil cases.

### PRIORITY OVER OTHER RULES
The Division 7 Rules shall have priority over all other Local Rules to the extent the others are inconsistent.

### CHALLENGE TO ASSIGNED JUDGE
A challenge under Code of Civil Procedure Section 170.6 must be made within 15 days after notice of assignment for all purposes to a judge, or if a party has not yet appeared, within 15 days of the first appearance.

### TIME STANDARDS
Cases assigned to the Independent Calendaring Courts will be subject to processing under the following time standards:

### COMPLAINTS
All complaints shall be served within 60 days of filing and proof of service shall be filed within 90 days.

### CROSS-COMPLAINTS
Without leave of court first being obtained, no cross-complaint may be filed by any party after their answer is filed. Cross-complaints shall be served within 30 days of the filing date and a proof of service filed within 60 days of the filing date.

### STATUS CONFERENCE
A status conference will be scheduled by the assigned Independent Calendar Judge no later than 270 days after the filing of the complaint. Counsel must be fully prepared to discuss the following issues: alternative dispute resolution, bifurcation, settlement, trial date, and expert witnesses.

### FINAL STATUS CONFERENCE
The Court will require the parties to attend a final status conference not more than 10 days before the scheduled trial date. All parties shall have motions in limine, bifurcation motions, statements of major evidentiary issues, dispositive motions, requested form jury instructions, special jury instructions, and special jury verdicts timely filed and served prior to the conference. These matters may be heard and resolved at this conference. At least five days before this conference, counsel must also have exchanged lists of exhibits and witnesses, and have submitted to the court a brief statement of the case to be read to the jury panel as required by Chapter Three of the Los Angeles Superior Court Rules.

### SANCTIONS
The court will impose appropriate sanctions for the failure or refusal to comply with Chapter Three Rules, orders made by the Court, and time standards or deadlines established by the Court or by the Chapter Three Rules. Such sanctions may be on a party, or if appropriate, on counsel for a party.

This is not a complete delineation of the Division 7 or Chapter Three Rules, and adherence only to the above provisions is therefore not a guarantee against the imposition of sanctions under Trial Court Delay Reduction. Careful reading and compliance with the actual Chapter Rules is imperative.

### Class Actions
Pursuant to Local Rule 2.3, all class actions shall be filed at the Stanley Mosk Courthouse and are randomly assigned to a complex judge at the designated complex courthouse. If the case is found not to be a class action it will be returned to an Independent Calendar Courtroom for all purposes.

### *Provisionally Complex Cases
Cases filed as provisionally complex are initially assigned to the Supervising Judge of complex litigation for determination of complex status. If the case is deemed to be complex within the meaning of California Rules of Court 3.400 et seq., it will be randomly assigned to a complex judge at the designated complex courthouse. If the case is found not to be complex, it will be returned to an Independent Calendar Courtroom for all purposes.

**NOTICE OF CASE ASSIGNMENT — UNLIMITED CIVIL CASE**

Laurence J. Graham
4647 Kingswell Ave Suite 105
Los Angeles, CA 90027
Telephone: (415) 800-4483
E-mail: courtcase.la@yahoo.com
Betty Patrick Graham
c/o Laurence J. Graham
4647 Kingswell Ave Suite 105
Los Angeles, CA 90027
Telephone: (415) 800-4483
E-mail: courtcase.la@yahoo.com

Pro se,

CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles

SEP 30 2024

David W. Slayton, Executive Officer/Clerk of Court

CALIFORNIA SUPERIOR COURT FOR THE COUNTY OF LOS ANGELES

VERIFIED COMPLAINT FOR RESCISSION OF CONTRACTS AND DEMAND FOR JURY TRIAL

LAURENCE J. GRAHAM AND BETTY PATRICK GRAHAM

Plaintiffs,

vs.

DuPont de Nemours, Inc., a Delaware Corporation; and, The Dow Chemical Company; a Delaware Corporation; and, Dow, Inc., a Delaware Corporation; and, Corteva, Inc., a Delaware Corporation; and, The Chemours Company, a Delaware Corporation; and, Occidental Petroleum Corporation, a Delaware Corporation; and, Iluka Resources, Inc., a Delaware Corporation; and, Iluka Resources Limited, an Australian public company; and, Tronox, LLC, a US limited liability company; and, Tronox Holdings plc, an Australian company; and, Tronox Limited, an Australian public company; and, Huntsman Corporation, a Delaware Corporation; and, Kronos (US), Inc., a Delaware Corporation;

Case No.: Case No: **24STCV25090**

COMPLAINT FOR RELIEF UNDER CAL. CIVIL CODE SEC. 1692 FOR RESCISSION OF CONTRACTS BASED ON BREACH OF FIDUCIARY DUTIES

1

and, Kronos Worldwide, Inc., a Delaware Corporation; and, National Industrialization Company, a limited company organized, existing, and doing business under, and by virtue of, the laws of the Kingdom of Saudi Arabia; and, Venator Materials, LLC, a US limited liability corporation; and, Venator Materials, plc, a United Kingdom company; and, Ineos Limited, a United Kingdom private limited company; and, Titanium Metals Corporation, a Delaware Corporation; and, Precision Castparts Corp., a Delaware Corporation; and, Ineos Pigments USA Inc., a Delaware Corporation Ineos Pigments USA Inc., a Delaware Corporation; and, Ineos Enterprises, LLC, a limited liability corporation organized in Delaware; and, INEOS Joliet US Holdco, LLC, a Delaware company; and, Kinder Morgan, Inc., a Delaware Corporation; and, Hunton Andrews Kurth, LLP, a Limited Liability Partnership with offices in California and Florida and a citizen of both California and Florida; and, JM Eagle, a Delaware Corporation and citizen of California; and; and, DOES 1-25, inclusive,

Defendants.

II

Laurence J. Graham
4647 Kingswell Ave Ste 105
Los Angeles, CA 90027
Telephone: (415) 800-4483
E-mail: courtcase.la@yahoo.com
4647 Kingswell Ave Ste 105
Los Angeles, CA 90027
Telephone: (415) 800-4483
E-mail: courtcase.la@yahoo.com
Pro se,

## SUPERIOR COURT OF CALIFORNIA FOR THE
## COUNTY OF LOS ANGELES

Case No:

## VERIFIED COMPLAINT FOR RESCISSION OF CONTRACTS AND DEMAND FOR JURY TRIAL

Complaint for relief under Cal. Civil code Sec. 1692 for rescission of ten mining leases based on breach of fiduciary duties

Laurence J. Graham (also known as: Laurence John Graham, Laurence Graham, and Larry Graham) on behalf of himself, and as attorney-in-fact for Betty P. Graham (also known as: Betty Patrick Graham, Betty Graham, and Betty Pat Graham), and as Agent for Betty P. Graham); and, Betty Patrick Graham (also known as: Betty P. Graham).
Pro Se,

Plaintiffs,

vs.

DuPont de Nemours, Inc., a Delaware Corporation (hereinafter "Dupont"); and,
The Dow Chemical Company; a Delaware Corporation (hereinafter "Dow"); and,
Dow, Inc., a Delaware Corporation (hereinafter "Dow Chemical"); and,
Corteva, Inc., a Delaware Corporation (hereinafter "Corteva, Inc."); and,
The Chemours Company, a Delaware Corporation (hereinafter "Chemours"); and,
Iluka Resources, Inc., a Delaware Corporation (hereinafter "Iluka"); and, Iluka Resources Limited, an Australian public company (hereinafter "Iluka AUS"); and, Tronox Limited is a

1

public company organized, existing, and doing business under, and by virtue of the laws of Western Australia, with its executive offices located in, Stamford, Connecticut; and, Tronox, LLC, a US limited liability corporation; and, Tronox Holdings plc, a public company organized, existing, and doing business under, and by virtue of the laws of Western Australia, with its executive offices located in, Stamford, Connecticut (hereinafter "Tronox"); and, Huntsman Corporation, a Delaware Corporation (hereinafter "Huntsman"); and, Kronos (US), Inc., a Delaware Corporation (hereinafter "Kronos US"); and, Kronos Worldwide, Inc., a Delaware Corporation (hereinafter "Kronos Worldwide"); and, Titanium Metals Corporation, a Delaware Corporation (hereinafter "TIMET"); and, Precision Castparts Corp., a Delaware Corporation (hereinafter "Precision Castparts Corp."); and, Venator Materials, LLC, a limited liability company organized in Delaware (hereinafter "Venator LLC"); and; Venator Materials, plc, an entity organized and existing under the laws of the United Kingdom (hereinafter "Venator plc"); and, Occidental Petroleum Corporation, a Delaware Corporation (hereinafter "OXY"); and, Ineos Limited, a private limited company organized under the laws of the United Kingdom (hereinafter "Ineos"); and, Ineos Pigments USA Inc., a Delaware Corporation (hereinafter "Ineos Pigments"); and, Ineos Enterprises, LLC, a limited liability company organized in Delaware; and; INEOS Joliet US Holdco, LLC, a Delaware company; and, Kinder Morgan, Inc., a Delaware Corporation (hereinafter "KM"); and, Hunton Andrews Kurth, LLP, a limited liability partnership with offices in California and Florida and a citizen of both California and Florida (hereinafter "HAK"); and, National Industrialization Company is a limited company organized, existing, and doing business under, and by virtue of, the laws of the Kingdom of Saudi Arabia (hereinafter "TASNEE"); and, JM Eagle, a Delaware Corporation and Los Angeles California citizen (hereinafter "JM"); and, DOES 1-25, inclusive,

Defendants.

_____/

## VERIFIED COMPLAINT FOR RESCISSION OF CONTRACTS
## AND DEMAND FOR JURY TRIAL

Plaintiffs Laurence J. Graham (also known as Laurence John Graham), Betty Patrick Graham (also known as Betty P. Graham), Laurence J. Graham as Agent for Betty P. Graham (also known as: attorney-in-fact for Betty P. Graham), and Laurence J. Graham as attorney-in-fact for Betty P. Graham ("Plaintiffs") are informed and believe and on that basis allege as follows:

1.  Iluka Resources, Inc. ("Iluka") is already in receipt of a copy of Betty P. Graham's durable power of attorney titled: FLORIDA GENERAL DURABLE POWER OF ATTORNEY dated 7/18/2014 which was executed in Massachusetts; I, Laurence J. Graham, am Betty P. Graham's Agent (also known as her attorney-in-fact); I, Laurence J. Graham, have the powers to bring, prosecute, and settle all claims held by

2

Betty P. Graham. Betty P. Graham may be referred to as ("Betty") herein. I may be referred to as ("Laurence") herein. The 9/29/03 Settlement Agreement attached hereto as ("Exhibit A") is also written authorization for Laurence to act on Betty's behalf which he does in this amended complaint. Furthermore, we hereby change the venue for all disputes arising out of the 9/29/03 Settlement Agreement to the Stanley Mosk Courthouse in Los Angeles, CA and all interpleaders involving the 9/29/03 Settlement Agreement.

## GENERAL ALLEGATIONS

2. Whenever reference is made in this VERIFIED COMPLAINT FOR RESCISSION OF CONTRACTS AND DEMAND FOR JURY TRIAL to any act of any corporate or other business defendant, such allegation shall mean that said defendant and its officers, directors, agents, employees, representatives, or aider or abettor did or authorized such acts while engaged in the management, operation, direction, or control of the affairs of such defendant and while acting within the scope and course of their duties.

## NATURE OF ACTION AND BACKGROUND

3. Betty P. Graham and her sisters Julia P. Boyd (also Known as Julia H. Parson), and Ann P, Everett were conveyed title, in equal shares, to tangible real property minerals of every kind and character located below the surface of ten parcels of land totaling more than 1,150 acres of land by a certain Deed of Gift dated the 19th Day of May 1997 which is recorded in the Clerk's Office of Sussex County, VA in Deed Book 155 Page 637 and the Clerk's Office of Dinwiddie County, VA in Deed Book 410 Page 204, (hereinafter "the 97 Deed") attached as ("Exhibit B") which, by its written language, is said to be drafted by one attorney who, although we did not know it at the time, had a history of performing work for RGC (USA) Minerals, Inc. (hereinafter, "RGC"); but, we did know that he was working on the 97 Deed with RGC and that the McGuire Woods law firm was involved.

4. With the conveyance of title to more than 1,150 acres of subsurface minerals located below ten parcels of land, without limitation, the physical, tangible, real property,

subsurface mineral estate was conveyed with the inherent right of priority use over the surface estate including the rights of (ingress and egress), and possession at all times for the purpose of mining[1], drilling, and operating for said minerals and the maintenance of facilities and means necessary or convenient for producing, treating and transporting such minerals; furthermore, the 97 Deed transferred all of Betty's parents' royalties due under ten certain October 13, 1989 Deeds of Mining Lease and lessor rights in the Leases to Betty P. Graham, Julia P. Boyd, and Ann P. Everett except for the next two annual advance royalty payments; said ten certain October 13, 1989 Deeds of Mining Lease were signed by Betty's father George Lee. Parson, Jr. and Betty's mother Mary E. Parson and RGC and are intertwined; therefore, they are one contract and are also known as the 1,169.86 acre lease by Betty, her parents, and RGC since the recording of the 97 Deed, memorandums of said leases being of record in the Clerk's Office of the Circuit Court of Sussex County, Virginia and the Clerk's Office of the Circuit Court of Dinwiddie County, Virginia (hereinafter "the Leases") attached as ("Exhibit C"). The 97 Deed severed the 1,169.86 acre lease from the 1,196.61 acre lease that Betty's parents and RGC entered into. E.I. Du Pont De Nemours and Company ("DuPont") drilled into the subsurface minerals located below the ten parcels of land listed in the 97 Deed totaling more than 1,150 acres of land and tested the quality of the minerals therefrom and made representations about the tonnage of minerals contained below the surface of those acres of land to Betty's father George L. Parson, Jr. which he relied upon while signing the Leases that RGC prepared. Iluka claims that Laurence J. Graham was transferred the majority of Betty's royalties due under the Leases by a certain 10/23/2000 Deed of Gift.

5.  Accordingly, Betty P. Graham, Julia P. Boyd, and Ann P. Everett were each conveyed title to a separate one-third share of the tangible real property minerals located below the surface of ten parcels of land totaling more than 1,150 acres of land

---

[1] Mining is the process of extracting the subsurface minerals conveyed by the 97 Deed.

4

by the 97 Deed together with the inherent right of ingress and egress, and possession

at all times for the purpose of mining, drilling and operating for said minerals and the

maintenance of facilities and means necessary or convenient for producing, treating

and transporting such minerals, and each of them also received one-third of the

royalties due under the Leases by the 97 Deed except for the next two annual advance

royalty payments.

6.    Venue is proper in Los Angeles California because defendant Iluka sent a

representation of royalties due under the Leases into California thereby subjecting

Iluka to California venue for rescission of the Leases; and, because 4647 Kingswell

Ave Ste 105 Los Angeles, CA 90027 is our address for receipt of the rescission

money; and, because each of the Defendants, except for Kinder Morgan, Inc. ("KM")

and Hunton Andrews Kruth LLP ("HAK") shipped products to and sold products in

Los Angeles County California containing saleable minerals recovered from the ore

that was extracted from the ten parcels of land listed in the 97 Deed and such products

included, but are not limited to, titanium dioxide pigment and things that were made

with titanium dioxide pigment such as paint, PVC pipe, plastics, etc.  Each such

defendant sold products containing saleable minerals recovered from the ore that was

extracted from the ten parcels of land listed in the 97 Deed in the stream of commerce

within Los Angeles County California; and, venue is proper because the Defendants

engaged in the underreported production price-fixing scheme alleged in the

paragraphs below that resulted in Iluka's failure to deliver fair and equitable

consideration to us for the one-third share of the minerals conveyed to Betty P.

Graham by the 97 Deed and later recovered, as saleable minerals, from the ore that

was extracted from the ten parcels of land listed in the 97 Deed in Los Angeles

County, CA. Venue in Los Angeles County, CA is also proper because the market for

the saleable minerals recovered from the ten parcels of land listed in the 97 Deed was

suppressed within Los Angeles, CA. Venue is also proper in Los Angeles County

California at the Stanley Mosk Courthouse because Defendant JM Eagle ("JM") is a

California citizen with its principal place of business in Los Angeles County

California and HAK and Plaintiffs are also California citizens; therefore diversity

5

jurisdiction does not exist. For all these reasons, the Defendants are subject to California law for rescission of Leases pertaining to at least a share of the minerals conveyed by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and a jury trial for a bare money judgement and the punitive damages for said rescission; therefore, venue is proper in the Los Angeles County California Superior Court at the Stanley Mosk Courthouse.

7. I, Laurence John Graham, hereby allege that I spoke with the head geologist employed by Iluka who explained that there were 30 to 35 million tons of heavy minerals left to be mined in the Old Hickory Heavy Mineral Reserve and that 80% to 85% of those tons would be recovered as saleable minerals and confirmed that 24 million tons of saleable minerals would be sold and I questioned Iluka's officer about Iluka's geologist's representations and Iluka's officer denied them and he also represented Iluka to notify me that the owners of minerals and royalties were not allowed to know such information at that time and not allowed to know it until the end of Iluka's undertaking of extracting and receiving payment for the minerals conveyed to Betty P. Graham, Julia P. Boyd, and Ann P. Everett by the 97 Deed and not allowed to know it before Iluka determined who was to receive all of Betty P. Graham's royalty payments; Iluka's officer explained to me that the minerals conveyed to Betty P. Graham, Julia P. Boyd, and Ann P. Everett by the 97 Deed would be mined from the ten parcels with simultaneous mining and that the minerals from those parcels would be comingled.

8. We allege that by letters served and/or sent to Iluka by certified mail in December of 2022 and in 2023 we demanded that Iluka disclose to us how many tons of each kind of mineral that it had extracted from the acres of land described in the 97 Deed and the location of each of those tons; and, those letters include, but are not limited to the ((12/30/22, 1/3/2023, 1/5/2023, and 1/27/2023 letters ("Exhibit D")).

9. We allege that by demanding that Iluka disclose to us how many tons of each kind of mineral that it has extracted from the acres of land described in the 97 Deed and the

6

location of each of those tons that we thereby demanded that Iluka disclose to us how many tons of each kind of mineral that it has extracted from the ten parcels of land listed in the 97 Deed and the location of each of those tons.

10. We allege that by demanding that Iluka disclose to us how many tons of each kind of mineral that it has extracted from the acres of land described in the 97 Deed and the location of each of those tons and the per ton fair market value of each kind of mineral that it extracted from the acres of land described in the 97 Deed that we thereby demanded that Iluka disclose to us how many tons of each type of mineral that it has extracted from the ten parcels of land listed in the 97 Deed and the location of each of those tons and the per ton fair market value of each type of mineral that it extracted from the ten parcels of land listed in the 97 Deed.

11. In response to our demands for Iluka to disclose to us how many tons of each kind of mineral it has extracted from the acres of land described in the 97 Deed, the location of each of those tons, and the per ton fair market value of each kind of mineral extracted from the acres of land described in the 97 Deed, Iluka concealed all the information that we demanded it disclose to us but delivered its royalty statement into California.

12. RGC wrote the royalty rate into the Leases at 8% and there were also land lease payments to be disbursed that RGC wrote into the Leases.

13. With Iluka concealing the number of tons of each kind of mineral that it has extracted from the acres of land described in the 97 Deed, the location of each of those tons, and the per ton fair market value of each kind of mineral that it has extracted from the acres of land described in the 97 Deed and the with the report of slightly over 2.5 million dollars of royalties delivered by Iluka into California, Laurence John Graham calculated that ore containing a sum total of 28.125 million short tons (2000 pounds per ton) of zircon mineral tons and titanium mineral tons was extracted from the ten parcels of land listed in the 97 Deed and that a sum total of 22.5 million saleable short tons of minerals were recovered from that ore including, and limited to, tons of

7

saleable zircon and titanium minerals and he calculated the value of those 22.5 million short tons of saleable minerals at $67,275,000,000.00 (67.275 billion dollars).

14. Iluka also concealed the dollar amount disbursed for the minerals conveyed by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and Laurence John Graham calculated that the sum total amount in dollars disbursed to Betty's parents, their three daughters, and their grandchildren for the minerals conveyed by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed is less than 28.2 million dollars and now clarifies that less than 27 million dollars of royalties were disbursed for the minerals conveyed by the 97 deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and that less than 1.2 million dollars of land lease payments were disbursed which adds up to less than 28.2 million dollars that has been disbursed; accordingly, less than 27 million dollars of consideration was disbursed for the 22.5 million short tons of saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed.

15. Laurence John Graham also calculated that the value of a one-third share of the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed is $22,425,000.00 (22.425 billion dollars).

16. Plaintiffs further allege that the number of allegations in this complaint exceeds the number of paragraphs in this complaint and that each of the allegations stands individually as legal basis for rescission of the Leases under California law.

17. We allege that within close proximity to but prior to October 13, 1989, DuPont drilled into the subsurface minerals located below the ten parcels of land listed in the 97 Deed and tested the quality of the minerals therefrom and knowingly made fraudulent and misleading representations to Betty P. Graham's father regarding the number of tons of minerals located below the surface of the ten parcels of land listed in the 97 Deed.

8

18. We allege that E.I. Du Pont De Nemours and Company merged with The Dow Chemical Company "Dow" to form DowDuPont.

19. We allege that Corteva, Inc. "Corteva, Inc." was formed by a spinoff from DowDuPont.

20. We allege that Dow, Inc. "Dow Chemical" was formed by a spinoff from DowDuPont

21. We allege that DowDuPont changed its name to DuPont de Nemours, Inc. "Dupont" after the Dow Chemical spinoff.

22. We allege Kerr-McGee Corporation ("Kerr-McGee") spun off its titanium dioxide manufacturing business into Tronox, plc and then sold its remaining business to Anadarko Petroleum Corporation with the assumption of liabilities related to its business and we allege that Anadarko Petroleum Corporation was acquired by Occidental Petroleum Corporation ("OXY") with the assumption of liabilities related to its business.

23. We allege that the National Industrialization Company ("TANSEE") obtained Millennium Inorganic Chemicals, Inc. and Millennium Chemicals, Inc. (collectively "Millennium") with the assumption of liabilities related to its business.

24. We allege that Tronox Holdings, plc is also known at Tronox Limited and that it owns and controls multiple entities, one of which is Tronox, LLC and that they are all collectively and hereinafter referred to as ("Tronox"). Tronox was formed by spinoff from Kerr-McGee Corporation. Tronox remained a closely related entity to Kerr-McGee Corporation after its spinoff. Tronox also acquired what was called the North American titanium dioxide business of the National Titanium Dioxide Company Limited, a subsidiary of the National Industrialization Company ("TANSEE").

25. We allege that Tronox and TANSEE are closely related entities by the Tronox-Tansee TANSEE owns more than 10% of Tronox and exerts significant control over Tronox and is a member of Tronox and that service of TASEE can be made c/o Tronox.

9

26. We allege that Ineos Limited ("Ineos") acquired the Ashtabula, OH titanium dioxide pigment plants from Tronox Limited by a settlement agreement found at: https://www.ftc.gov/system/files/documents/cases/171_0085_tronox_cristal_do.pdf ("Tronox-Tansee ") and the FTC entered an order found at: https://www.ftc.gov/system/files/documents/cases/d09377_tronox_decision_and_order.pdf and we request that the Court take judicial notice of the settlement agreement, order, and the docket. Ineos owns several US subsidiaries and entities including, INEOS Joliet US Holdco, LLC, a Delaware company, and Ineos Enterprises, LLC, a Delaware company and Ineos Pigments (USA), Inc. a Delaware corporation.

27. We allege that Iluka Resources Limited is an Australian public company and the owner of Iluka Resources, Inc. and conducts business in Los Angeles California.

28. We allege that Precision Castparts Corp. is the owner of Titanium Metals Corporation and conducts business in Los Angeles California.

29. We allege that the ten October 13, 1989 Deeds of Mining Lease identified hereinabove, involving the ten parcels of land listed in the 97 Deed, are intertwined; therefore, they are one contract.

30. We allege that the ten October 13, 1989 Deeds of Mining Lease identified hereinabove are intertwined; therefore, they are one contract and we allege that performance is not divisible.

31. We allege that the ten October 13, 1989 Deeds of Mining Lease identified hereinabove are intertwined; therefore, they are one contract and we allege that the royalty payments are not divisible.

32. We allege that we demanded that Iluka disclose to us how many tons of each kind of mineral that it has extracted from the ten parcels of land listed in the 97 Deed, the location of each of those tons, and the per ton fair market value of each kind of mineral that it has extracted from the ten parcels of land listed in the 97 Deed and that Iluka is concealing all of this information from us.

10

33. We allege that Reed Mayo, Esq., as attorney for Iluka, sent several letters containing Iluka's representation of royalties due under the Leases into California, see attached (2/12/2023, 4/12/2023, and 4/26/2023 letters ("Exhibit E")), which notified of slightly over 2.5 million dollars of royalties thereby subjecting Iluka to California law for rescission of the Leases.

34. We allege that the slightly over 2.5 million dollars of royalties reported by Iluka into California was a final royalty calculation.

35. We allege that Iluka was the extractor of the ore from the ten parcels of land listed in the 97 Deed from which the sum total of 22.5 million saleable short tons of zircon and titanium minerals were recovered.

36. We allege that less than 27 million dollars of royalties for the 22.5 million short tons of saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed is severely insufficient consideration and therefore is a failure of consideration to us by Iluka.

37. We allege that the land lease payments were consideration for the right to have priority use over the surface of the land in preparation for extracting minerals and priority use while extracting minerals; therefore, payment of land lease payments was not consideration for the saleable minerals recovered from the ore that was extracted from the ten parcels of land 97 Deed; however, we had included the land lease payments with the estimated 27 million dollars of royalties into our offers to restore Iluka with 28.2 million dollars because Iluka's failure of consideration for the minerals conveyed by the 97 Deed and later recovered as 22.5 million short tons of saleable minerals from the ten parcels of land listed in the 97 Deed is so severe, that 28.2 million dollars is not fair and equitable consideration for said saleable minerals either; therefore, returning money to Iluka is not applicable. Iluka is also concealing the amount of royalties disbursed for the saleable minerals recovered from the ten parcels of land listed in the 97 Deed.

11

38. We allege that we relied on the production information that Iluka reported to the DMME.

39. We allege that Iluka breached a fiduciary duty by not delivering fair and equitable consideration to us for the 22.5 million short tons of saleable minerals recovered from the ore that it extracted from the ten parcels of land listed in the 97 Deed. The elements of a cause of action for breach of fiduciary duty are the existence of a fiduciary relationship, its breach, and damage proximately caused by that breach. (Knox v. Dean (2012) 205 Cal.App.4th 417, 432–433 [140 Cal.Rptr.3d 569].) No fraudulent intent is required. (See Civ. Code, § 1573 (defining "constructive fraud").) (""Whether a fiduciary duty exists is generally a question of law. Whether the defendant breached that duty towards the plaintiff is a question of fact." (Marzec v. Cal. Public Employees' Retirement System (2015) 236 Cal.App.4th 889, 915 [187Cal.Rptr.3d 452], internal citation omitted.)""). We further allege that this breach of a fiduciary duty is basis for rescission of the Leases and the relief that we seek under Cal Civil Code Section 1692.

40. We also allege that DuPont, Dow, Chemours, Dupont, and Dow Chemical aided and abetted Iluka's breach of a fiduciary duty to deliver fair and equitable consideration to us for the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed by knowingly receiving tons of saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed while knowing that Iluka was underreporting the number of tons of saleable minerals recovered from the ten parcels of land listed in the 97 Deed and the entire Old Hickory Heavy Mineral Reserve to the Virginia Department of Mines Minerals and Energy ("DMME"), while knowing that this underreported production price-fixing scheme designed by DuPont would cause Iluka to not deliver fair and equitable consideration to us for the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed and by giving encouragement and substantial assistance to Iluka in its breach of a fiduciary duty to deliver fair and equitable consideration to us for the saleable minerals recovered from the ore that was

extracted from the ten parcels of land listed in the 97 Deed and we allege that financial gain motivated DuPont to aid and abet Iluka in its breach of a fiduciary duty to deliver fair and equitable consideration to us for the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed and that DuPont benefited financially from aiding and abetting Iuka's breach of a fiduciary duty to deliver fair and equitable consideration to us for the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed. The substantial assistance that DuPont provided Iluka in its breach of a fiduciary duty to deliver fair and equitable consideration to us for the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed includes, but is not limited to, DuPont knowingly receiving many more tons of saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed than the number of tons of saleable minerals that Iluka reported producing from the entire Old Hickory Heavy Mineral Reserve to the DMME and concealing the receipt of these tons from the DMME and its other US regulators including, but not limited to the Environmental Protection Agency ("EPA"), as part of a price-fixing scheme after DuPont encouraged and designed said underreported production price-fixing scheme pertaining to saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed as the architect of it, and DuPont converted said tons of saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed into titanium dioxide pigment some of which DuPont sold as titanium dioxide pigment and some of which DuPont sold in products containing titanium dioxide pigment while DuPont underreported the production of titanium dioxide pigment to its US regulators including, but not limited to, the EPA and we allege that this underreported production of titanium dioxide pigment was part of the underreported production price-fixing scheme for saleable minerals recovered from the ten parcels of land listed in the 97 Deed and also thwarted competition and that both financial gain and the exclusion and elimination of competition motivated DuPont's conduct and we allege that DuPont did a spinoff of its titanium dioxide pigment

13

manufacturing business into Chemours in an effort to conceal this conduct but continued to receive more tons of titanium dioxide pigment and titanium dioxide pigment containing products from Chemours than it and Chemours were reporting to their US regulators including, but not limited to, the EPA and received them at extremely low prices while disguising and concealing payment to Chemours and while knowing that said titanium dioxide pigment and titanium dioxide pigment containing products were made with saleable minerals recovered from the ore that Iluka extracted from the ten parcels of land listed in the 97 Deed and while knowing that Iluka was underreporting the tons of saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed and the entire Old Hickory Heavy Mineral Reserve to the DMME as part of the underreported production price-fixing scheme designed by DuPont and that Iluka would not deliver fair and equitable consideration to us for the tons of saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed and we allege that Dow was the largest purchaser of titanium dioxide pigment from DuPont and Chemours and knew that DuPont and Chemours were underreporting production of titanium dioxide pigment and receiving the tons of saleable minerals to make said titanium dioxide pigment from the Old Hickory Heavy Mineral Reserve and that Dow provided substantial assistance to DuPont and Chemours by receiving millions of tons of titanium dioxide pigment and products containing titanium dioxide pigment from DuPont and Chemours while knowing that they were underreporting production of it to their US regulators including, but not limited to the EPA; and, by knowingly concealing the number of tons of said titanium dioxide pigment and products containing titanium dioxide pigment that it received from DuPont and Chemours, Dow knowingly participated in the concealment of the number of tons of saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed and Dow engaged in accounting practices to disguise and conceal payment to DuPont and Chemours for titanium dioxide pigment and titanium dioxide pigment containing products in the furtherance of this underreported production price-fixing scheme, and we allege that Dow benefited financially by receiving said

14

tons of titanium dioxide pigment and titanium dioxide pigment containing products at extremely low prices and later merged with DuPont thereby forming DowDuPont to conceal the underreported production price-fixing scheme for saleable minerals recovered from the ore that Iluka extracted from the ten parcels of land listed in the 97 Deed and we allege that DowDuPont aided and abetted Iluka in its breach of a fiduciary duty to deliver fair and equitable consideration to us for the 22.5 million short tons of saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed by conduct that includes, but is not limited to, providing substantial assistance to Chemours by receiving more tons of titanium dioxide pigment and products containing titanium dioxide pigment from Chemours than Chemours was reporting that it produced to its US regulators including, but not limited to, the EPA while receiving said tons of titanium dioxide pigment from Chemours at below market prices while knowing that Chemours was making those tons of titanium dioxide pigment with saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed, while knowing that Iluka was underreporting the number of tons of saleable minerals that it was recovering from the ore that was extracted from the ten parcels of land listed in the 97 Deed and the entire Old Hickory Heavy Mineral Reserve to the DMME while knowing that this conduct was part of a price-fixing scheme for saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed, and while knowing that Iluka would not deliver fair and equitable consideration to us for the tons of saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed, and we allege that the payment from DuPont and Chemours to Iluka for the tons of said saleable minerals that they received was a small percentage of the fair market value of said tons of saleable minerals and that it was their intention to cause loss and damage to us by this underreported production price-fixing scheme and that they knowing and maliciously caused us loss and harm and that the succeeding entities of Dupont, Dow Chemical, Chemours, and Corteva, Inc. each has liability to us for it.

15

41. We also allege that the managers in the seed and crop protection businesses within DuPont and Dow were aware of the underreported production price-fixing scheme of alleged herein and that revenues from the titanium dioxide pigment manufacturing business, PVC plastics business, and other products that used large amounts of titanium dioxide pigment were being disguised and concealed within the seed and crop protection business segments and other business segments within DuPont and Dow. The development and growth of the seed and crop protection businesses was funded with profits from the underreported production price-fixing scheme and DowDuPont did a spinoff of the seed and crop protection businesses into Corteva, Inc. to conceal this conduct. The Corteva, Inc. managers are aware of the accounting fraud within the prior seed and crop protection businesses of DuPont, Dow, and DowDuPont and after the spinoff Corteva, Inc. has engaged in fraudulent transactions to conceal and disguise fraudulent accounting and continues to reinvest the profits made from the unreported production price-fixing scheme for saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed. We further allege that DuPont's operational consulting and training businesses were part of the ongoing underreported production price-fixing scheme and that DuPont encouraged large titanium dioxide pigment purchasers to participate in fraudulent transactions for these operational consulting and training services and that DuPont delivered significant quantities of titanium dioxide pigment and products containing titanium dioxide pigment to these large customers and received consideration for it booked as the sale of operational consulting and training services. The customers that engaged in these accounting practices and knew about them knew that DuPont was underreporting the production of titanium dioxide pigment. We also allege that, in addition to the outright sale of titanium dioxide pigment produced with saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed, many of the products sold by DuPont contained large amounts of titanium dioxide pigment including, but not limited to, paint and coatings and that the titanium dioxide pigment in these products was produced with saleable minerals recovered from the ore that was extracted from the ten parcels of land listed

16

in the 97 Deed.  DuPont sold several products that were essentially batches containing large weight-percentages of titanium dioxide pigment that customers needing titanium dioxide pigment could have mixed internally in their manufacturing processes and such products were utilized by DuPont to disguise the sale of titanium dioxide pigment produced with saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed.

42. We also allege that the conduct complained of in this complaint is also common law conversion however, we only choose the bases for and remedies **available for a jury trial about the proportional liability of each defendant for the 22.4181 billion dollar value of the one-third share of the saleable miners recovered from the 10 parcels** of land listed in the 97 Deed and the punitive damages due from each defendant for rescission under California law which include a jury trial for a bare money judgement for the value of the one-third share of the minerals conveyed to Betty P. Graham by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and the punitive damages for said rescission as determined by a jury and each of the Defendants has liability to us in the jury trial for rescission due to their participation in the underreported production price-fixing scheme which caused Iluka's failure of consideration to us for the one-third share of the minerals conveyed to Betty P. Graham by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed.

43. We allege that Kerr-McGee Corporation knowingly received tons of saleable minerals recovered from the ore that Iluka extracted from the ten parcels of land listed in the 97 Deed while engaging in price-fixing with Iluka to obtain said saleable minerals at below fair and equitable prices while knowing that Iluka was underreporting the tons of saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed and the entire Old Hickory Heavy Mineral Reserve to the DMME while knowing that Iluka would not deliver fair and equitable consideration to us for the tons of saleable minerals recovered from the ore

17

that was extracted from the ten parcels of land listed in the 97 Deed while it underreported production of titanium dioxide pigment to the DMME.

44. We also allege that DuPont, its officers and directors, Dow, its officers and directors, Chemours, its officers and directors, Dow Chemical, its officers and directors, Dupont, its officers and directors, each of the other named defendants and their officers and directors, and other unnamed companies referred to herein as DOES have been engaged in and the remaining entities continue to participate in the underreporting of titanium dioxide pigment production and are motivated by such conduct to conceal the number of tons of saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed used to make titanium dioxide pigment that they received from Iluka and the payment made to Iluka for it and that this conduct was and continues to be anticompetitive and part of a price-fixing scheme.

45. We allege that Dupont and its officers, and directors are actively participating in an ongoing fraudulent scheme to deprive Betty P. Graham and her family of fair and equitable consideration for the one-third share of the minerals conveyed by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed.

46. We allege that Dow Chemical and its officers and directors are actively participating in an ongoing fraudulent scheme to deprive Betty P. Graham and her family of fair and equitable consideration for the one-third share of the minerals conveyed by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed.

47. We allege that Chemours and its officers and directors are actively participating in a fraudulent scheme to deprive Betty P. Graham and her family of fair and equitable consideration for the one-third share of the minerals conveyed by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed.

18

48. We allege that Corveta, Inc. and its officers and directors are actively participating in a fraudulent scheme to deprive Betty P. Graham and her family of fair and equitable consideration for the one-third share of the minerals conveyed by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed.

49. We allege that Iluka and its officers and directors are actively participating in a fraudulent scheme to deprive Betty P. Graham and her family of fair and equitable consideration for the one-third share of the minerals conveyed by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed.

50. We allege that Dupont, Dow Chemical, Corteva, Inc., and Chemours are collectively the largest financial beneficiary of Iluka's failure of consideration to us for the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed and continue to actively conceal the underreported production price-fixing scheme that deprived Betty P. Graham and her family of fair and equitable consideration for the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed.

51. We allege that Tronox knowingly engaged in price-fixing to obtain tons of saleable minerals that were recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed at below fair and equitable prices while knowing that Iluka was underreporting the tons of saleable minerals recovered from the ore that it extracted from the ten parcels of land listed in the 97 Deed to the DMME, as part of the underreported production price-fixing scheme, while knowing that Iluka would not deliver fair and equitable consideration to us for the saleable minerals recovered from the ore that it extracted from the ten parcels of land listed in the 97 Deed while it underreported production of titanium dioxide pigment produced with said at its Savanna, GA and Hamilton, MS titanium dioxide plants to its US regulators including, but not limited to, the EPA as it used said saleable minerals to produce titanium dioxide pigment at its Hamilton, MS and Savanna GA titanium dioxide

19

plants; and, we allege that Tronox sold some of said titanium dioxide pigment in Los
Angeles County California while concealing the volume of these sales.

52. We allege that Millennium Inorganic Chemicals, Inc., and Millennium Chemicals,
Inc. knowingly engaged in price-fixing to obtain tons of saleable minerals that were
recovered from the ore that was extracted from the ten parcels of land listed in the 97
Deed at below fair and equitable prices while knowing that Iluka was underreporting
the tons of saleable minerals recovered from the ore that it extracted from said parcels
to the DMME as part of the underreported production price-fixing scheme while
knowing that Iluka would not deliver fair and equitable consideration to us for the
saleable minerals recovered from the ore that it extracted from the ten parcels of land
listed in the 97 Deed while it underreported its Baltimore Maryland and Ashtabula
Ohio titanium dioxide plants' production to its US regulators including, but not
limited to the state of Maryland EPA; and, we allege that Mellienium sold some of
said titanium dioxide pigment in Los Angeles County California while concealing the
quantity of these sales.

53. We allege that the National Industrialization Company ("TANSEE") knowingly
engaged in price-fixing to obtain tons of saleable minerals that were recovered from
the ore that was extracted from the ten parcels of land listed in the 97 Deed at below
fair and equitable prices while knowing that Iluka was underreporting the tons of
saleable minerals recovered from the ore that it extracted from said parcels to the
DMME as part of the underreported production price-fixing scheme while knowing
that Iluka would not deliver fair and equitable consideration to us for the saleable
minerals recovered from the ore that it extracted from the ten parcels of land listed in
the 97 Deed while it underreported its production of titanium dioxide pigment to its
US regulators including but not limited to the EPA; and, we allege that TANSEE sold
some of said titanium dioxide pigment in Los Angeles California while concealing
the quantity of these sales.

54. We allege that the National Titanium Dioxide Company Ltd. knowingly engaged in
price-fixing to obtain tons of saleable minerals that were recovered from the ore that

20

was extracted from the ten parcels of land listed in the 97 Deed at below fair and equitable prices while knowing that Iluka was underreporting the tons of saleable minerals recovered from the ore that it extracted from said parcels to the DMME as part of the underreported production price-fixing scheme while knowing that Iluka would not deliver fair and equitable consideration to us for the saleable minerals recovered from the ore that it extracted from the ten parcels of land listed in the 97 Deed while it underreported its production of titanium dioxide pigment to its US regulators including, but not limited to the EPA; and, we allege the National Titanium Dioxide Company Ltd sold titanium dioxide pigment containing some of said titanium dioxide pigment California while concealing the quantity of these sales.

55. We allege that North American business of the National Titanium Dioxide Company Ltd. ("Cristal") was acquired by Tronox with the assumption of liabilities related to its business while Tronox knew that Cristal knowingly received tons of saleable minerals that were recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed while knowing that Iluka was underreporting production to the DMME, as part of the underreported production price-fixing scheme, while knowing that Iluka would not deliver fair and equitable consideration to us for the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed while it underreported production of titanium dioxide pigment to its US regulators including, but not limited to, the EPA; and, we allege that Cristal sold some of said titanium dioxide pigment in Los Angeles California while concealing the quantity of these sales.

56. We allege that Tronox is not solvent for its liability to us.

57. We allege that Ineos acquired the Ashtabula Ohio titanium dioxide plants and that Ineos engaged in price-fixing to obtain tons of saleable minerals that were recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed at below fair and equitable prices while knowing that Iluka was underreporting the tons of saleable minerals recovered from the ore that it extracted from said parcels to the DMME, as part of the underreported production price-fixing scheme, while knowing

21

that Iluka would not deliver fair and equitable consideration to us for the saleable minerals recovered from the ore that it extracted from the ten parcels of land listed in the 97 Deed while Ineos underreported production of titanium dioxide pigment at its Ashtabula, OH titanium dioxide plant to its US regulators including, but not limited to the state of Ohio and the EPA; and, that it sold some of said titanium dioxide pigment in Los Angeles California while concealing the quantity of these sales.

58. We allege that Huntsman Corporation ("Huntsman") and Kronos Worldwide, Inc. ("Kronos Worldwide") formed a joint venture named Louisiana Pigment Company, L.P. and knowingly engaged in price-fixing to obtain tons of saleable minerals that were recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed at below fair and equitable prices while knowing that Iluka was underreporting the tons of saleable minerals recovered from the ore that it extracted from said parcels to the DMME, as part of the underreported production price-fixing scheme, while knowing that Iluka would not deliver fair and equitable consideration to us for the saleable minerals recovered from the ore that it extracted from the ten parcels of land listed in the 97 Deed while they underreported Louisiana Pigment LP's production of titanium dioxide pigment to their US regulators including, but not limited to the state of Louisiana and the EPA while they used said saleable minerals to produce titanium dioxide pigment at their Louisiana Pigment LP titanium dioxide plant in Lake Charles Louisiana and that they sold some of said titanium dioxide pigment California, while concealing the volume of said sales, and knowingly used some of said titanium dioxide pigment in Los Angeles California to make other products that contained some of said titanium dioxide pigment in and sold products in Los Angeles California that contained some of said titanium dioxide pigment, while concealing the volume of said sales; and, we allege that Huntsman spun off its titanium dioxide manufacturing business and its share of Louisiana Pigment into Venator Materials plc which owns and controls several entities and subsidiaries including Venator Materials LLC. Venator Materials plc and Venator Materials LLC are collectively ("Venator")) and that after said spinoff Huntsman knowingly purchased and used titanium dioxide pigment produced from saleable minerals that

22

were recovered from the ore that was extracted from the ten parcels of land listed in
the 97 Deed to make other products in Los Angeles, California and elsewhere while
knowing that Louisiana Pigment LP and Venator Materials plc, and Kronos
Worldwide were underreporting their Lake Charles Louisiana titanium dioxide
pigment plant's production to their US regulators including, but not limited to, the
state of Louisiana and the EPA, as part of the underreported production price-fixing
scheme, while knowing that Iluka would not deliver fair and equitable consideration
to us for the saleable minerals recovered from the ore that Iluka extracted from the ten
parcels of land listed in the 97 Deed; and, we allege that Venator sold some of said
titanium dioxide pigment in Los Angeles California while concealing the volume of
these sales.

59. We allege that OXY is a large producer of PVC plastics and participated in the
underreported production price-fixing scheme for saleable minerals recovered from
the ore that was extracted from the ten parcels of land listed in the 97 Deed while
knowing that Iluka would not deliver fair and equitable consideration to us for the
saleable minerals recovered from the ten parcels of land listed in the 97 Deed; and,
we allege that OXY sold products containing some of said saleable minerals in Los
Angeles California. We further allege that Oxy inherited Kerr-McGee Corporation's
liabilities and has certain assets in the US that may be liquidated to pay for its liability
to us.

60. We allege that Precision Castparts Corp. acquired Titanium Metals Corporation with
the assumption of liabilities related to its business. Precision Castparts Corp. and
Titanium Metals Corporation are collectively referred to as ("TIMET-PCP"). TIMET-
PCP knowingly engaged in price-fixing to obtain tons of saleable minerals that were
recovered from the ore that was extracted from the ten parcels of land listed in the 97
Deed at below fair and equitable prices while knowing that Iluka was underreporting
the tons of saleable minerals recovered from the ore that it extracted from said parcels
to the DMME, as part of the underreported production price-fixing scheme, while
knowing that Iluka would not deliver fair and equitable consideration to us for the

saleable minerals recovered from the ore that it extracted from the ten parcels of land listed in the 97 Deed and sold products containing some of said saleable minerals in Los Angeles California.

61. We allege that Kinder Morgan, Inc. ("KM") has been the operator of warehouses used to store the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed while knowingly participating in the underreported production price-fixing scheme for saleable minerals recovered from the ore that Iluka extracted from the ten parcels of land listed in the 97 Deed while knowing that Iluka would not deliver fair and equitable consideration to us for the saleable minerals recovered from the ten parcels of land listed in the 97 Deed; and that KM stored some of said saleable minerals and products containing some of said saleable minerals in Los Angeles California.

62. We allege that DuPont was the architect of the underreported production price-fixing scheme for saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed and knowingly engaged in price-fixing to obtain tons of said saleable minerals at below fair and equitable prices while knowing that Iluka was underreporting the tons of saleable minerals recovered from the ore that it extracted from said parcels to the DMME, as part of the underreported production price-fixing scheme, while knowing that Iluka would not deliver fair and equitable consideration to us for the saleable minerals recovered from the ore that it extracted from the ten parcels of land listed in the 97 Deed while DuPont underreported its De Lisle Mississippi, Edge More Delaware, New Johnsonville Tennessee, and Altamira Mexico plants' production of titanium dioxide pigment to its regulators including, but not limited to, their state regulators and the EPA as it used said saleable minerals to produce titanium dioxide pigment at its at its De Lisle Mississippi, Edge More Delaware, Altamira Mexico, and New Johnsonville Tennessee plants; and, we allege that DuPont sold some of said titanium dioxide pigment and other products containing some of said titanium dioxide pigment in Los Angeles California while concealing the volume of and revenue from these sales.

24

63. We allege that Chemours knowingly engaged in price-fixing to obtain tons of said saleable minerals that were recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed at below fair and equitable prices while knowing that Iluka was underreporting the tons of saleable minerals recovered from the ore that it extracted from said parcels to the DMME, as part of the underreported production price-fixing scheme while knowing that Iluka would not deliver fair and equitable consideration to us for the saleable minerals recovered from the ore that it extracted from the ten parcels of land listed in the 97 Deed while Chemours underreported its De Lisle Mississippi, Edge More Delaware, Altamira Mexico, and New Johnsonville Tennessee plants' production of titanium dioxide pigment to its US regulators including, but not limited to, their state regulators and the EPA while it used said saleable minerals to produce titanium dioxide pigment at its at its De Lisle Mississippi, Edge More Delaware, Altamira Mexico, and New Johnsonville Tennessee plants; and, we allege that Chemours sold some of said titanium dioxide pigment and other products containing some of said titanium dioxide pigment in Los Angeles California while concealing the volume of and revenue from these sales.

64. We allege that Dupont, Dow Chemical, Chemours, Corveta, Inc., Oxy, Huntsman, KM, Kronos Worldwide, Venator, HAK, TIMET-PCP, Ineos, JM, and other unnamed companies referred to herein as DOES are actively participating in a fraudulent scheme to deprive Betty P. Graham and her family of fair and equitable consideration for the one-third share of the minerals conveyed by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and that each of these entities and other unnamed companies referred to herein as DOES has liability to us for their evil and malicious participation in the underreported production price-fixing scheme alleged above that caused loss and harm to us and the liability is equal to one-third of the present fair market value of the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed plus punitive damages.

25

65. We allege that JM has used thousands of tons of titanium dioxide pigment per year containing saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed to manufacture PVC pipe and obtained said titanium dioxide pigment from some of the titanium dioxide pigment producers that have been named as defendants in this action while knowing that they were engaged in the underreported production of titanium dioxide pigment while JM provided substantial assistance to said titanium dioxide pigment producers and Iluka as it ancaided and abetted the underreported production of titanium dioxide pigment and the underreported production price-fixing scheme for the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed while knowing that Iluka was underreporting the production of saleable minerals obtained from the Old Hickory Heavy Mineral Reserve to the DMME and would not deliver fair and equitable consideration for said saleable minerals. JM is engaged in secret meetings and communications to aid and abet and the underreported production price fixing-scheme alleged herein from which JM financially benefited by obtaining thousands of tons of titanium dioxide pigment per year made with the saleable minerals recovered from the ore that was extracted from the 10 parcels of land listed in the 97 Deed at below market prices while knowing that the underreported production of titanium dioxide pigment by the titanium dioxide pigment producing defendants was part of the underreported production price-fixing scheme; and, we allege that JM sold products containing some of said saleable minerals in Los Angeles California while participating in the underreported production price-fixing scheme.

66. We allege that Dupont, Dow Chemical, Chemours, Corveta, Inc., Oxy, Huntsman, KM, Kronos Worldwide, Venator, Iluka, HAK, TIMET-PCP, and Ineos, JM, and the officers and directors of these entities and other unnamed companies referred to herein as DOES and their officers and directors continue to actively participate in a fraudulent scheme to conceal the failure of consideration by Iluka to us for the minerals conveyed by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed.

67. We request that the Court take judicial notice of
https://www.lawyerdb.org/lawyer/kenneth-reed-mayo/ and all other directories of
lawyer credentials regarding Kenneth Reed Mayo's prior employment as proof that
he was an associate in Hunton & Williams and Hunton & Williams LLP, collectively
and hereinafter ("HW"). The firms of Hunton & Williams LLP and Andrews Kurth
Kenyon LLP merged to form Hunton Andrews Kurth LLP ("HAK") and HAK
provided substantial assistance to Iluka by advising Iluka to aid and abet Iluka in its
breach of its fiduciary duty to deliver fair and equitable consideration to us for the
saleable minerals recovered from the ten parcels of land listed in the 97 Deed and on
how to breach its fiduciary duty to disclose how many tons of each kind of mineral
that it has extracted from the acres of land described in the 97 Deed and the location
of each of those tons to us in Los Angeles County California and Santa Clara County
California which was done with malice and evil intent towards each of us, see
attached letter from Iluka to Los Gatos, CA dated 6/12/2023 which included the
MEMORANDUM OF TERMINATION OF MINING LEASE prepared by HAK
("Exhibit F") as evidence of HAK's evil and malicious conduct of aiding and abetting
Iluka to deprive us of fair and equitable consideration for the saleable minerals
recovered from the ten parcels of land listed in the 97 Deed and evidence of HAK's
liability for its evil and malicious conduct of aiding and abetting Iluka's breach of its
fiduciary duties to deliver reporting to us about the saleable minerals in California
and aiding and abetting fraud to conceal information about the saleable minerals from
us in California and aiding and abetting fraud to not deliver fair and equitable
consideration to us for the saleable minerals in California.

68. We also allege an ongoing conspiracy to commit and conceal fraud by Dupont, its
officers and directors, Dow Chemical, its officers and directors, Chemours, its
officers and directors, Iluka, its officers and directors, each of the other named
defendants and their officers and directors, and other unnamed companies referred to
herein as DOES with secret meetings and communications between these defendants
to conceal the failure of consideration for the minerals conveyed by the 97 Deed and
later recovered, as saleable minerals, from the ore that was extracted from the ten

27

parcels of land listed in the 97 Deed and that such conduct amounts to an enterprise engaged to commit fraud.

69. We also allege that Iluka, Iluka Aus, Dupont, Chemours, Kerr-McGee Corporation, Millennium, Huntsman, Kronos Worldwide, Venator, TANSEE, Tronox, Ineos, and TIMET-PCP, were engaged in ongoing price-fixing for the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed and are now engaged in ongoing price-fixing to suppress the market prices of minerals similar to the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed to conceal the prior price-fixing of said saleable minerals, the failure of consideration to us for said saleable minerals, and reduce the value received by us for the rescission of the Leases pertaining to the one-third share of the minerals conveyed by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and this this conduct suppressed the prices of said saleable minerals and similar saleable minerals in CA, and elsewhere.

70. We also allege that Dupont, Chemours, Kerr-McGee Corporation, Millennium, Huntsman, Kronos Worldwide, Venator, TANSEE, Tronox, Ineos, and TIMET-PCP, were engaged in ongoing price-fixing for the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed and are now engaged in ongoing price-fixing to suppress the market prices of minerals similar to the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed to conceal the prior price-fixing of said saleable minerals, the failure of consideration to us for said saleable minerals, and reduce the value received by us for the rescission of the Leases pertaining to the one-third share of the minerals conveyed by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and this this conduct suppressed the prices of said saleable minerals and similar saleable minerals in Los Angeles California and elsewhere.

28

71. We also allege that the above alleged underreported production price-fixing scheme for saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed is tortious interference with the Leases and that Dupont, Dow Chemical, Chemours, Corveta, Inc., Oxy, Huntsman, KM, Kronos Worldwide, Venator, Iluka, HAK, TIMET-PCP, and Ineos and the officers and directors of these entities and other unnamed companies referred to herein as DOES caused us harm by their evil and malicious act of engaging in said tortious conduct and each of these Defendants and other unnamed companies referred to herein as DOES has liability to us for the loss and damage caused to us by said conduct.

72. We also allege that the underreported production price-fixing scheme for saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed is tortious interference with contract expectations as the fair and equitable consideration that we expected under the Leases was not delivered to us by Iluka and each of Defendants and the other unnamed companies referred to herein as DOES caused us harm by their evil and malicious act of engaging in said tortious conduct and each of the Defendants and other unnamed companies referred to herein as DOES has liability to us for the loss and damage caused to us by said conduct.

73. We allege that none of the Defendants were a party to the Leases when signed; therefore, none of the defendants have a right to compel arbitration and the unavailability of punitive damages and legal fees is a surprise.

74. We allege that Iluka did not exist in 1989.

75. We allege that the leases were fraudulently induced in 1989 but neither Betty nor Laurence nor Betty's other son Luke P. Graham ("Luke") was in Virginia in 1989.

76. We allege that by concealing the number of tons of each kind of mineral that it extracted from the acres of land described in the 97 Deed that Iluka concealed the number of tons of each kind of saleable mineral recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed.

29

77. We also allege that Iluka breached a fiduciary duty by its concealment of the number of tons of each kind of mineral that it extracted from the acres of land described in the 97 Deed that included the ten parcels of land listed in the 97 Deed. We further allege that this breach of a fiduciary duty is basis for rescission of the Leases and the relief we seek under Cal Civil Code Section 1692.

78. We also allege that Iluka breached a fiduciary by its concealment of the number of tons of each type of mineral that it extracted from the acres of land described in the 97 Deed that included the ten parcels of land listed in the 97 Deed and the fair market value of each of those tons. We further allege that this breach of a fiduciary duty is basis for rescission of the Leases and the relief that we seek under Cal Civil Code Section 1692.

79. We also allege that Iluka breached a fiduciary by its concealment of the number of tons of each kind of mineral that it has extracted from the acres of land described in the 97 Deed that included the ten parcels of land listed in the 97 Deed and the fair market value of each of those tons. We further allege that breach of a fiduciary duty is basis for rescission of the Leases and the relief that we seek under Cal Civil Code Section 1692.  We further allege that this breach of a fiduciary duty is basis for rescission of the Leases and the relief that we seek under Cal Civil Code Section 1692.

80. We also allege further malicious and evil conduct which includes, but is not limited to, the manipulative and tortious use of undue influence by Iluka's officers, Reed Mayo, HW, and other rogue attorneys to induce Betty and Luke into a 2002 Sussex County Virginia court case that contained 02-26 in the case number; and, your manipulation of Betty's parents is also appalling. Bringing you to justice with guilty pleas from your officers, Reed Mayo, and other attorneys that aided and abetted you is an important part of this. You know that the Sussex County, VA 02-26 contested deed litigation ("02-26 lawsuit") was life threateningly stressful and harmful to Betty and tremendously stressful and harmful to Laurence and that it was motivated by the furtherance of a fraudulent scheme.  HW provided substantial assistance to Iluka in

30

planning and implementing the tortious inducement of Betty and Luke into the 02-26 lawsuit. The severe undue influence that put Betty and Luke under duress included, but is not limited to, Iluka's threatening not to mine over Laurence's inquiries about the minerals that elicited the instruction not to mine from Betty and quickly turned into threats to sue Betty and destroy her financial security from Iluka and its agents **all while Iluka and its agents sought to deprive Betty of her rights.** In 2001 or 2002 HW was brought in to help Iluka gain access to the minerals conveyed by the 97 Deed and advised Iluka to continue with threats to sue Betty that Iluka had been making since early in 2001 and also provided substantial assistance to Iluka by drafting the complaint for the 02-26 lawsuit that was designed to gain access to the minerals conveyed by the 97 Deed, which Laurence and Betty had denied by telling Iluka not to mine; and, HW advised Iluka in the recruitment of Harry Benjamin Vincent, Esq. ("Mr. Vincent") (now deceased) and helped Iluka gain his loyalty to help Iluka file and prosecute the 02-26 lawsuit. I, Laurence J. Graham, spoke with luka's officer by telephone in 2002 and he threatened to sue me to set aside Betty's 10/23/200 Deed of Gift explaining that HW had drafted a complaint to set aside Betty's Deed of Gift to me and my brother Luke based on undue influence and that Iluka's attorney Mr. Vincent would file it if I kept requesting information about the minerals. I, Laurence J. Graham, spoke with Iluka's officer multiple times and he was commonly evasive and aggressive and I fear for my safety after enduring the duress leading up to, during, and since the 02-26 lawsuit. Iluka and its agents had destroyed Betty's free will before the filing of the 02-26 lawsuit with evil and malicious intent to do so and HW was aware of it and participated in it with evil and malicious intent. The evil and malicious treatment of Betty by Iluka and its agents caused Betty to be admitted into a mental health hospital for several days in and she was later admitted into an assisted living facility. Iuka, HW, and Mr. Vincent proceeded to effect the filing of the 02-26 lawsuit with Iluka as a defendant, then HW advised Iluka to delay the resolution of the 02-26 lawsuit and directed the litigation with Iluka by instructing Mr. Vincent to take actions to prolong the 02-26 lawsuit and thwart settlement. HW knew before it joined in the design and implementation of the 02-26 lawsuit, that after

31

gaining access to the minerals conveyed by the 97 Deed was achieved, depriving us of fair and equitable consideration for the saleable minerals recovered from the ten parcels of land listed in the 97 Deed would be the objective and that Iluka would not deliver fair and equitable consideration to us for the saleable minerals recovered from the ten parcels of land listed in the 97 Deed although it knew that Iluka had a fiduciary duty to do so which is aiding and abetting the breach of a fiduciary duty.

81. We also allege that, in the operation of your fraudulent scheme, you have committed numerous unlawful and criminal acts in attempt to deprive Betty of her rights which is an ongoing source of harm to Betty and Laurence, therefore rescinding the Leases became an emergency.

82. We allege that each of the Defendants participated in the under reported production price-fixing scheme and helped to conceal the underreported volume of products sold in California that contained the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed and therefore the volume of said saleable minerals consumed in products in California which is aiding and abetting Iluka's breach of a fiduciary duty to deliver fair and equitable consideration to us for the one-third share of said saleable minerals.

83. We also allege that Iluka has been concealing the amount of consideration that it disbursed for the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed in attempt to thwart and obstruct the rescission of the Leases but, with Iluka's final representation of royalties due for the saleable minerals recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed, Laurence calculated that the total amount disbursed for the minerals conveyed by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed at less than 27 million dollars and there were land lease payments disbursed that Laurence calculated to be less than 1.2 million dollars.

32

84. Virginia is not a convenient venue for either of us and we have never appeared in court there and we hereby notify you that we object to any legal proceedings in Virginia. I, Betty Patrick Graham, hereby notify you that I fear that Iluka seeks to weaponize Virginia courts to harm by the use of unethical and unlawful tactics intended to delay and deprive and that it is a threat to me to ever have to appear in any legal proceeding in Virginia, therefore I object to it. We object to any legal proceedings in Virginia because, among other reasons, it is an inconvenient venue; and, we reserve the right to assert other bases to determine Virginia courts inappropriate for any litigation involving us which may include, but is not limited to, you perpetrating frauds in and upon Virginia courts. Furthermore, it is important to note that the delay tactics used by Iluka are enormously harmful and have taken so much of our lives and its efforts to delay and try to avoid wire fraud charges and likely prosecution for other criminal charges is also part of the furtherance of a fraudulent scheme.

85. I, Laurence John Graham, believe that you have spent millions trying to deprive Betty P. Graham of her rights. It may be discovered that the amount of questionable payments made to rogue lawyers and others acting unlawfully to influence the outcome of litigation involving us is many times more than the 6.445 million dollar payment that DuPont made to the law firm of Friedman, Rodriguez, Ferraro, and St. Louis that was alleged to have influenced a Miami, FL Benlate case. Betty and I empathize with the Benlate victims who valiantly sought justice against DuPont. The reported sum total that DuPont paid out for judgments and settlements in Benlate litigation seems unconscionably low as are the PFAS settlements and we intend to set forth a plan for all the cancer victims and their survivors as the insolvency of the succeeding DuPont entities becomes evident.

86. As was required by California law, prior to rescinding the Leases, I, Laurence John Graham, first offer to return the sum total of all royalties disbursed for the minerals conveyed by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed. By the powers that I

33

have, to bring, prosecute, and settle all claims involving the one-third share of the minerals conveyed to Betty by the 97 Deed, **which include, but are not limited to, the powers and authority to represent Betty's interests and Luke's interests which were awarded to me in the settlement of the 02-26 lawsuit by the 9/29/03 settlement agreement,** I hereby offer to return 9 million dollars of royalties to Iluka which is the maximum amount that was disbursed for the one-third share of the minerals conveyed to Betty by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and I also offer to return $400,000.00 dollars of the land lease payments; and, by such powers, I hereby offer to return 9 million dollars of royalties to Iluka which is the maximum amount that was disbursed for the one-third share of the minerals conveyed to Julia P. Boyd, (also known as Julia H. Parson) by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and I also offer to return another $400,000.00 dollars of the land lease payments; and, by such powers, I hereby to return 9 million dollars of royalties to Iluka which is the maximum amount that was disbursed for the one-third share of the minerals conveyed to Ann P. Everett by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and I also offer to return another $400,000.00 of the land lease payments.

87. Although I offered to restore Iluka the total amount in dollars that was disbursed to Betty's parents, their three daughters, and their grandchildren for the minerals conveyed by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed which I, Laurence John Graham, calculated to be less than 27 million dollars of royalties that were disbursed as consideration for said saleable minerals and I also calculated that less than $1,200,000.00 of land lease payments were disbursed although they aren't consideration for the saleable minerals and I offered to restore Iluka those land lease payments in addition to 27 million dollars of royalties but the $22,425,000.00 (22.425 billion dollars) value of a one-third share of the minerals recovered, as saleable

34

minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed exceeds 28.2 million dollars; therefore, returning money to Iluka is not applicable and a jury must determine the value of the punitive damages; and, I believe that the applicable punitive damages under California law for rescission of the portion of the Leases pertaining to the one-third share of the minerals conveyed to Betty by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed exceeds 22.425 billion dollars; therefore, returning money to Iluka is not applicable and, a jury must determine the punitive damages.

88. I, Laurence J. Graham, have the powers to bring, prosecute, and settle all claims involving the minerals conveyed to Betty by the 97 Deed, **which include, but are not limited to, the powers and authority to represent Betty's interests and Luke's interests which were awarded to me in the settlement of the 02-26 lawsuit by the 9/29/03 settlement agreement,** and based upon a failure of consideration for the minerals conveyed to Betty P. Graham by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and each separate allegation made hereinabove, I hereby rescind the portion of the Leases pertaining to 60% of the one-third share of the minerals conveyed to Betty by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and the other 40% of the one-third share of the minerals conveyed to Betty P. Graham by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed; and, by such powers, and based upon a failure of consideration for the one-third share of the minerals conveyed to Julia P. Boyd (also known as Julia H, Parson) by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and the other separate allegations made herein above, I hereby separately rescind the portion of the Leases pertaining to the one-third share of the minerals conveyed to Julia P. Boyd (also known as Julia H. Parson) by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels

35

of land listed in the 97 Deed; and, by such powers, and based upon a failure of consideration for the one-third share of the minerals conveyed to Ann P. Everett by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and the other separate allegations listed above, I hereby separately rescind the portion of the Leases pertaining to the one-third share of the minerals conveyed to Ann P. Everett by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed. Now, I demand that you immediately pay $22,418,100,000.00 (22.4181 billion dollars) to us by sending a check c/o Laurence J. Graham to 4647 Kingswell Ave Ste 105 Los Angeles, CA 90027 as this is the address for payment of the rescission money although the California Superior Court for the County of Los Angeles is the repository for any necessary court deposits of funds. Also, said 9/29/03 Settlement Agreement is governed by California law.

89. Immediate proof that you have the money to pay $67,273,819,000.00 is demanded from you and I reserve the right to demand proof of additional liquid funds. Recovering these funds is the avenue that I choose as having a bankruptcy court dissolve your companies is not the relief sought; however, I reserve all rights to recover the money judgement that is sought herein together with punitive damages.

90. I, Betty Patrick Graham, believe that the sum total of royalties disbursed for the one-third share of the minerals that were conveyed to me by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed is severely insufficient and therefore a failure of consideration for the one-third share of the minerals conveyed to me by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed; therefore, I, Betty Patrick Graham hereby offer to return 9 million dollars of royalties to Iluka which is the maximum sum total amount that was disbursed for the one-third share of the minerals conveyed to me by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and I also hereby offer to return

$400,000.00 of land lease payments; and, I hereby offer to return the remaining 18 million dollars of royalties to Iluka which amounts to a total of 27 million dollars of royalties that I hereby offer to return to Iluka which is the maximum sum total amount of royalties that were disbursed as consideration for all the minerals conveyed by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and I also offer to return an additional $800,000.00 of land lease payments to Iluka which amounts to a total of $1,2000.000.00 of land lease payments that I also hereby offer to restore Iluka in addition to 27 million dollars of royalties.

91. Although I offered to restore Iluka the total amount in dollars that was disbursed to my parents, their three daughters (one of which is me Betty), and their grandchildren for the minerals conveyed by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed which Laurence calculated to be less than 27 million dollars of royalties and, Laurence John Graham also calculated that less than $1,200,000.00 of land lease payments were made which I also offered to restore Iluka but the $22,425,000.00 (22.425 billion dollars) value of the one-third share of the minerals conveyed to me by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed exceeds the 28.2 million dollars that I offered to restore Iluka; therefore, returning money to Iluka is not applicable and a jury must determine the value of the punitive damages; and, I believe that the applicable punitive damages under California law for rescission of the portion of the Leases pertaining to the one-third share of the minerals conveyed to me by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed exceeds 22.425 billion dollars; therefore, returning money to Iluka is not applicable.

92. Now, based upon a failure of consideration and each separate allegation made hereinabove and the other separate allegations made herein above, I hereby rescind the portion of the Leases pertaining to 60% of the one-third share of the minerals

37

conveyed to me by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and the other 40% of the one-third share of the minerals conveyed to me by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels land listed in the 97 Deed; and, if rescinding a portion of the Leases is not possible, I hereby rescind the Leases pertaining to all the minerals conveyed by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed based upon Iluka's failure of consideration for all the minerals conveyed by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels land listed in the 97 Deed and each separate allegation made hereinabove; now, I demand that you immediately pay $22,418,100,000.00 (22.4181 billion dollars) to us by sending a check c/o Laurence J. Graham to 4647 Kingswell Ave Ste 105 Los Angeles, CA 90027 as this is the address for payment of the rescission money and the California Superior Court for the County of Los Angeles is the repository for any necessary court deposits of funds. The 9/29/03 Settlement Agreement is governed by California law.

93. I, Laurence J. Graham, as Agent for Betty P. Graham (also known as attorney-in-fact for Betty P. Graham) believe that the royalties disbursed for the one-third share of the minerals conveyed to Betty P. Graham by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed is severely insufficient and therefore a failure of consideration for the one-third share of the minerals conveyed to Betty P. Graham by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed; now, I, Laurence J. Graham, as Agent for Betty P. Graham (also known as attorney in-in-fact for Betty P. Graham) hereby offer to return 9 million dollars of royalties to Iluka which is the maximum amount that was disbursed for the one-third share of the minerals conveyed to Betty by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and I also offer to return $400,000.00 dollars of the land lease payments; and, by such powers, I hereby offer to return 9 million

38

dollars of royalties to Iluka which is the maximum amount that was disbursed for the one-third share of the minerals conveyed to Julia P. Boyd, (also known as Julia H. Parson) by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and I also offer to return another $400,000.00 dollars of the land lease payments; and, by such powers, I hereby to return 9 million dollars of royalties to Iluka which is the maximum amount that was disbursed for the one-third share of the minerals conveyed to Ann P. Everett by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and I also offer to return another $400,000.00 of the land lease payments.

94. Although we offered to restore Iluka the total amount in dollars that was disbursed to Betty P. Graham parents, their three daughters (one of which is Betty), and their grandchildren for the minerals conveyed by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed which I, Laurence J. Graham, as Agent for Betty P. Graham (also known as attorney-in-fact for Betty P. Graham), calculated to be less than the 27 million dollars of royalties disbursed as consideration for said minerals and I calculated that less than $1,200,000.00 of land lease payments were also disbursed which I also offered to restore Iluka for but the 22,425,000.00 (22.425 billion dollars) value of the one-third share of the minerals conveyed to Betty P. Graham by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed exceeds 28.2 million dollars; therefore, returning money to Iluka is not applicable and a jury must determine the value of the punitive damages; and, I believe that the applicable punitive damages under California law for rescission of the portion of the Leases pertaining to the one-third share of the minerals conveyed to Betty P. Graham by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed exceeds 22.425 billion dollars; therefore, returning money to Iluka is not applicable.

95. Now, based upon a failure of consideration and each separate allegation made hereinabove, I, Laurence J. Graham, as Agent for Betty P. Graham (also known as attorney in-in-fact for Betty P. Graham) hereby rescind the portion of the Leases pertaining to 60% of the one-third share of the minerals conveyed to Betty P. Graham by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and the other 40% of the one-third share of the minerals conveyed to Betty P. Graham by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed; and, if rescinding a portion of the Leases is not possible, I, Laurence J. Graham, as Agent for Betty P. Graham (also known as attorney-in-fact for Betty P. Graham) hereby rescind the Leases pertaining to all the minerals conveyed by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed based upon Iluka's failure of consideration for all the minerals conveyed by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed and each separate allegation made hereinabove and, I demand that you immediately pay $22,418,100,000.00 (22.4181 billion dollars) to us by sending a check c/o Laurence J. Graham to 4647 Kingswell Ave Ste 105 Los Angeles, CA 90027 as this is the address for payment of the rescission money although the Superior Court for the County of Los Angeles is the repository for any necessary court deposits of funds. The 9/29/03 Settlement Agreement is governed by California.

96. I, Betty Patrick Graham, emphasize that my son Laurence J. Graham is my Agent (also known as my attorney-in-fact) and that he is the only person authorized to bring, prosecute, and settle claims for me; accordingly, my son, Laurence J. Graham has the authority to do all things necessary to prosecute this rescission and recover the value of the minerals conveyed to me by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed plus the punitive damages determined by a jury. My son Laurence J. Graham

40

1   also has the authority to donate the majority of the 22.4181 billion dollars plus the
2   punitive damages to charity.

3   WHEREFORE, Plaintiffs pray for an order from the Court determining that the portion of
4   the Leases pertaining to the one-third share of the minerals conveyed to Betty P. Graham by the
5   97 Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten
6   parcels of land listed in the 97 Deed, for which a full recovery can be made, have been rescinded
7   and ordering a jury trial for bare money judgments against each of the Defendants as follows:

8   For a jury trial to determine the monetary value of both (60% of the one-third share of the
9   minerals conveyed to Betty P. Graham by the 97 Deed and later recovered, as saleable minerals,
    from the ore that was extracted from the ten parcels of land listed in the 97 Deed and the punitive
10  damages for rescission of the portion of the Leases pertaining to said 60% of the one-third share
11  of the minerals conveyed to Betty P. Graham by the 97 Deed and later recovered, as saleable
12  minerals, from the ore that was extracted from the ten parcels of land listed in the 97 Deed) and
13  (the other 40% of the one-third share of the minerals conveyed to Betty P. Graham by the 97
14  Deed and later recovered, as saleable minerals, from the ore that was extracted from the ten
15  parcels of land listed in the 97 Deed and the punitive damages for rescission of the portion of the
16  Leases pertaining to the other 40% of the one-third share of the minerals conveyed to Betty P.
17  Graham by the 97 Deed and later recovered, as saleable minerals, from the ore that was extracted
18  from the ten parcels of land listed in the 97 Deed); and,

19  For punitive damages; and,
    A jury trial for punitive damages; and,

20  For a jury trial to determine each defendant's separate proportional liability for the value
21  of the one-third share of saleable minerals that was recovered from the ore that was extracted
22  from the ten parcels of land listed in the 97 deed and the punitive damages due from each
23  separate defendant; and, for a jury to determine any affirmative defenses raised by any of the
24  Defendants; and,

25  For the costs incurred herein; and,
26  For post judgement interest; and,
27  For attorneys' fees incurred herein; and,
    For interest on the 22.4181 billion dollars due for delays by the Defendants; and,
28

41

For such other and further relief that the Court deems proper including, but not limited to, ordering the return to us of any tons of saleable minerals, that were recovered from the ore that was extracted from the ten parcels of land listed in the 97 Deed, that the Court determines are not subject to the Leases; accordingly, we demand that the Defendants return any tons of said saleable minerals, that are not subject to the Leases, c/o Laurence J. Graham in front of the Los Angeles Superior Court in front of the Stanley Mosk Courthouse or, if said tons of saleable minerals are not available, pay the present fair market value of all such tons of saleable minerals by sending payment for it c/o Laurence J. Graham to 4647 Kingswell Ave Ste 105 Los Angeles, CA 90027.

Dated: September 29, 2024

We now sign this VERIFIED COMPLAINT FOR RESCISSION OF CONTRACTS AND DEMAND FOR JURY TRIAL in Los Angeles, CA.

Respectfully Submitted,

Betty Patrick Graham for Betty Patrick Graham: *Betty Patrick Graham*

Betty P. Graham for Betty P. Graham: *Betty P. Graham*

Laurence J. Graham as attorney-in-fact for Betty P. Graham: *Larry Graham*

Laurence J. Graham as Agent for Betty P. Graham: *Larry Graham*

Laurence John Graham as Agent for Betty P. Graham: *Larry Graham*

Laurence J. Graham for Laurence J. Graham: *Larry Graham*

Laurence John Graham for Laurence John Graham: *Larry Graham*

42

SETTLEMENT AGREEMENT AND MUTUAL RELEASE

THIS SETTLEMENT AGREEMENT AND MUTUAL RELEASE (the "Settlement Agreement") is made this _29_ day of September, 2003, by and among Betty P. Graham ("Betty"), Luke P. Graham ("Luke") and Laurence J. Graham ("Laurence").

Recitals.

    A.   WHEREAS, Betty is the mother of Luke and Laurence;

    B.   WHEREAS, G. L. and Mary Elizabeth Parson (the "Parsons") are the parents of Betty and the grandparents of Luke and Laurence;

    C.   WHEREAS, the Parsons were the owners of certain real estate interests in the Counties of Sussex and Dinwiddie, Virginia, including valuable minerals (including titanium) in, on and under the surface of the real property identified on Exhibit "A" attached hereto (hereinafter the "Real Property");

    D.   WHEREAS, the Parsons entered into with RGC (USA) Minerals, Inc. ("RGC") certain Deeds of Mining Lease dated October 13, 1989, (the "Leases"), wherein the Parsons granted to RGC the right to explore for, mine and remove the minerals on and below the Real Property;

    E.   WHEREAS, Iluka Resources, Inc. now claims to be the successor in interest to RGC (USA) Minerals, Inc.;

    F.   WHEREAS, the Parsons executed a Deed of Gift dated May 19, 1997, and which is recorded in the Office of the Circuit Court of Dinwiddie County, Virginia at Deed Book 410, Page 204 and in the Office of the Clerk of the Circuit Court of Sussex County, Virginia at Deed Book 155, Page 626 (the "Parsons' Deed of Gift"), a copy of which is attached hereto as Exhibit "B";

    G.   WHEREAS, the Parsons' Deed of Gift conveyed all right, title and interest in and to the minerals of every kind and character, in, on and under the Real Property and their Lessor management power and rights and all other title interest in the Leases to the Parsons' three (3) daughters, including Betty, as tenants in common, in equal one-third (1/3) parts, reserving only to themselves the next two "advance royalty payments" that remained due and payable under the Leases at that time and the annual "Rental Payments" under the Leases;

    H.   WHEREAS, Betty executed a Deed of Gift dated October 23, 2000, and which is recorded in the Office of the Clerk of the Circuit Court of Dinwiddie County, Virginia in Deed Book 493 at Page 152 and in the Office of the Clerk of the Circuit Court for Sussex County, Virginia in Deed Book 175 at Page 181 (the "Graham Deed of Gift"), a copy of which is attached as Exhibit "C";

    I.   WHEREAS, the Graham Deed of Gift conveyed all of the interests conveyed to Betty by the Parsons' Deed of Gift, including but not limited to the interests in the mineral rights in, on and under the surface of the Real Property and her Lessor management power and rights, and all other title interest in the Leases (all of such interests are hereinafter referred to as the "Property"), to Luke and Laurence with Luke receiving forty percent (40%) of Betty's interests and Laurence receiving sixty percent (60%) of Betty's interests;

    J.   WHEREAS, it was the intent of Betty that Laurence was to have control over the Property conveyed to Luke and Laurence;

    K.   WHEREAS, a dispute has arisen regarding the validity of the Graham Deed of Gift;

    L.   WHEREAS, Betty and Luke filed a Bill of Complaint in the

Page 1

Circuit Court of the County of Sussex (the "Circuit Court"), styled Betty P. Graham and Luke P. Graham v. Laurence J. Graham and Iluka Resources, Inc., Chancery No. 02-26 as well as a Bill of Complaint in the action styled Betty P. Graham and Luke P. Graham v. Laurence J. Graham in the Circuit Court for the County of Sussex, Virginia, Chancery No. 02-1033 (collectively, the "Actions");

 M. WHEREAS, pursuant to the Decree entered by the Circuit Court on April 16, 2002, the Clerk of the Circuit Court is holding as of September 29th, 2003, $513,358.63 made up of funds paid to the Clerk by Iluka and interest (the "Court Held Funds");

N. WHEREAS, in lieu of further litigation, Betty, Luke and Laurence each desire to compromise, resolve and settle all claims, causes, disputes or other issues among them arising out of or relating to the Actions, the Leases, the Parson's Deed of Gift, the Graham Deed of Gift and any other issues among them relating thereto.

 NOW, THEREFORE, for and in consideration for the mutual covenants and agreements set forth herein and other good and valuable consideration, the mutual receipt and legal sufficiency of which are hereby acknowledged, the Parties expressly agree as follows:

1. All of the foregoing "WHEREAS" clauses are hereby incorporated by reference as if fully set forth herein.

2. Except for the rights and obligations set forth in this Settlement Agreement and in consideration of the terms and conditions of this Settlement Agreement, Betty, Luke and Laurence, each on their behalf and on behalf of their respective heirs, executors, estate administrators, successors, and assigns does hereby and unconditionally forever waive, release, remise, discharge and covenant not to sue each other, from and against any and all liabilities, claims, lawsuits, causes of action, demands, actions, appeals, costs, expenses, interest on money, and attorney's fees which they now have or may hereinafter have against each other, whether known or unknown, arising out of, possibly arising out of or relating in any way to the Actions, the Leases, the Parson's Deed of Gift, the Graham Deed of Gift, any allegation raised in the Actions or which could have been raised in the Actions by any party to this Settlement Agreement, or any other issues among them relating thereto with respect to any of the foregoing, arising or accruing prior to the date hereof.

3. Betty and Luke hereby acknowledge and confirm the validity of the Graham Deed of Gift as of the date of its execution of October 23, 2000, and forever waive, release and relinquish any claim of duress, undue influence, mental illness or incompetence as a defense to the Graham Deed of Gift or as a basis for setting aside, challenging or avoiding the Graham Deed of Gift. All parties represent, acknowledge and agree that by virtue of the Parson's Deed of Gift and the Graham Deed of Gift, Laurence and Luke are the owners, as tenants in common, of the Property conveyed to Betty, with Luke owning 40% of the interests in the Property and Laurence owning 60% of the interests in the Property conveyed to Betty. Laurence and Luke have the sole right to receive all royalty payments and all income due on account of the Property including, but not limited to revenues derived from the sale of the Property and royalty payments under the Leases (including any amendment, renewal, extension or renegotiation payments they are entitled to receive as Lessors) with Luke receiving 40% of any such payments and Laurence receiving 60% of any such funds; however Laurence shall allow the Court Held Funds to be disbursed 50% to him and 50% to Luke with Luke reimbursing Laurence for taxes on the Larry to Luke portion of such disbursement being approximately $50,000.00.

4. The parties agree that this Settlement Agreement does not constitute an assignment of any of Laurence's rights under the Graham Deed of Gift to Betty and/or Luke and shall not be construed as such. Similarly this Settlement Agreement does not constitute an assignment of any of Luke rights under the Graham Deed of Gift to Betty. This Settlement Agreement shall not be construed as a ratification of any Lease or conduct by Iluka or a waiver of any claims and rights against Iluka.

5. The parties agree that should any third party contest or challenge that Laurence and Luke

Page 2

are the owners, as tenants in common or otherwise, of the Property including the Leases, or assert, allege, seek declaratory relief, claim, question or testify that Betty by the Parsons' Deed of Gift or that Laurence and Luke by the Graham Deed of Gift received only an assignment of the royalties to be paid under the Leases or less than lessor and title interest in the Leases (hereinafter collectively referred to as a "Tenancy in Common Challenge"), that they will each contest any such Tenancy in Common Challenge and not take any position contrary to paragraphs 3, 4 and 5 of this Settlement Agreement. For the purpose of fulfilling the obligations contained in this paragraph 5, Betty hereby grants a power of attorney to Laurence and appoint Laurence as her true and lawful attorney-in-fact, with full authority to act on their behalf with respect to a Tenancy in Common Challenge, including, but not limited to, the right to commence, prosecute, discontinue, defend and settle any or all actions or other legal proceedings related thereto. The power of attorney contained in this paragraph 5 is a durable power of attorney coupled with an interest and is irrevocable.

6. Betty hereby assigns, transfers and conveys to Laurence any and all claims she may have, known or unknown, against Iluka and/or RGC relating to the Leases, including, but not limited to, all fraud claims or breach of contract claims, if any. To the extent any of such claims are personal and not assignable, Betty hereby grants a power of attorney to Laurence and appoints Laurence as her true and lawful attorney-in-fact, with full authority to act on her behalf with respect to any such claim, including, but not limited to, the right to commence, prosecute, discontinue, defend and settle legal actions or other legal proceedings, and further assigns, transfers and conveys to Laurence any settlement or recovery from such claims. The power of attorney contained in this paragraph 6 is a durable power of attorney coupled with an interest and is irrevocable.

7. Betty shall, within 60 days of the full execution of this Settlement Agreement, transfer her assets, real and personal (excluding her personal residence in Naples, Florida, personal affects and household goods) to the Trustee of The Graham Family Trust Agreement, dated September 29, 2003, a copy of which is attached hereto as Exhibit "D" (hereinafter the "Graham Trust"), to be held and administered pursuant to the terms of the Graham Trust.

8. Within 60 days of receiving and at his discretion choosing to accept any money, royalty or other payment from or relating to the Real Property, the mineral rights below the surface of the Real Property and the Leases (including as the Lease may be modified, amended, changed or extended) (hereinafter "Laurence's Mineral Proceeds"), Laurence shall pay to Luke, by certified or bank check, a sum of money equal to one-sixth or 16.67% of Laurence's Mineral Proceeds after deducting estimated taxes which may be owed or due on account thereof as determined by a certified public accountant (the "Larry-to-Luke Payment"). With respect to disbursement of the Court Held Funds, Laurence hereby authorizes the direct payment to Luke of the gross Larry to Luke payment, and Luke shall, at his expense, retain a CPA to determine the applicable gift and income taxes due by Laurence for the 16.67% Larry to Luke payment ( approximately $50,000.00) given by Laurence, and refund Laurence said amount for taxes within 60 Days. Thereafter, within 60 days of receiving and at his discretion choosing to accept Laurence's Mineral Proceeds, Laurence shall pay of sum of money equal to 33.33% of Laurence's remaining Mineral Proceeds to the Trustee of the Graham Trust, to be held and administered pursuant to the terms of the Graham Trust. Laurence shall make such payment to the Trustee of the Graham Trust until such time as Laurence has paid an aggregate total of $350,000.

9. Within 60 days of receiving and at his discretion choosing to accept any money, royalty or other payment from or relating to the Property, the mineral rights below the surface of the Property and the Leases (including as the Lease may be modified, amended, changed or extended) (hereinafter "Luke's Mineral Proceeds") and receipt of the Larry-to-Luke Payment, Luke shall pay a sum of money equal to 33.33% of Luke's Mineral Proceeds after deducting any estimated taxes which may be owed or due on account thereof as determined by a certified public accountant to the Trustee of the Graham Trust, to be held and administered pursuant to the terms of the Graham Trust. Luke shall make such payment to the Trustee of the Graham Trust until such time as Luke has paid an aggregate total of $350,000.

10. The discretion referenced in 8 and 9 above is only applicable in the event that a lessee including, but not limited to Iluka makes a payment accompanied by the assertion or requirement that Laurence and/or Luke ratify the Leases or waive any claims or rights against the lessee. In the event that such payment is tendered by a Lessee and Larry or Luke refuse to accept then

Page 3

Luke or Laurence shall have 180 days to resolve the dispute out or court or initiate litigation over the same. Neither Laurence or Luke can interfere with the others ability to exercise discretion.

11.    Notwithstanding anything contained herein, the parties agree that Laurence has the right, at his own cost and expense, to commence, prosecute, discontinue, defend and settle legal actions, claims and other legal proceedings against any lessee, including, but not limited to, Iluka and/or RGC, relating to the Property or the Leases including, but not limited to, breach of contract claims and the right to have the Leases set aside or rendered invalid; and Luke and Betty agree that they will not intentionally interfere with or take positions contrary to such claims. Commensurate with this right, Laurence shall have the right to negotiate the resolution of those claims and/or a sale or transfer of all or a portion of this interests and Luke's interests in the Property or Leases to a third party, including, but not limited to Iluka.  Luke shall be bound by such resolution and/or contract to sell or transfer and shall transfer his interests in the Property or Leases  to such third party provided:  (1) Laurence also transfers or sells the same share of his interests in the Property or Leases to such third party as Luke transfers or sells (2) Laurence and Luke receive the same amount of money  from the transfer or sale of their interests in the Property; and (3) Luke receives for his interests a cashiers check, bank check or immediate entitlement to escrowed funds in an amount  equal to the greater of: (a) an amount equal to the present value of Luke's share of the estimated royalty payments to be paid under the Leases (as estimated by Iluka and shown on Exhibit "E" attached hereto), after deductions for all advance royalty payments and royalty payments paid through such time, and (b) the net proceeds paid for Luke's interest, after deducting 50% of reasonable compensation earned by attorneys and costs and expenses incurred by Laurence in pursuing and resolving claims relating to the Property and Leases.  Upon satisfaction of the conditions set forth in this paragraph, Luke agrees to simultaneously execute the appropriate documentation to transfer or sell his interests in the Property to a third party within fourteen (14) calendar days of receipt of written demand (the "Written Demand") by Laurence or such third party.  The parties agree that a copy of the Written Demand shall be sent at the same time counsel for Luke.  Should and only upon satisfaction of the conditions set forth in this paragraph and Luke's failure to executed the appropriate documentation to transfer or sell his interests in the Property within fourteen (14) calendar days of receipt of the Written Demand, Luke hereby grants a power of attorney to Laurence and appoints Laurence as his true and lawful attorney-in-fact, with full authority to act on his behalf for the limited purpose of transferring or selling Luke's interests in the Property.

12.    Without ratifying the Leases, reserving all rights, without prejudice to any rights and without waiving or altering the rights granted to Laurence in paragraph 11 above, and reserving all such rights, the parties agree that in accordance with the Graham Deed of Gift, Laurence is entitled to receive 60% of the Court Held funds and Luke is entitled to receive 40% of the Court Held funds.

13.    Luke and Laurence represent and warrant to each other that they have not assigned nor are there any liens against or affecting any of their rights relating to the Property, including the mineral rights below the surface of the Real Property and the Leases.  Betty represents and warrants that she transferred all of her interests in the Property and Leases by the Graham Deed of Gift free and clear of any liens against or affecting any of the rights relating to the Property and the Leases, and other than the Graham Deed of Gift, she did not make, and has not made, any other assignment or transfer of such interests.

14.    It is the intent of the parties to this Settlement Agreement that this agreement and the actions to be taken hereunder, are not intended to and shall not ratify the Leases, is entered into with full reservation of all rights and claims under the Leases and without prejudice to those rights.  Subject to the rights and obligations set forth in this Settlement Agreement, Laurence and Luke further recognize and agree that they hold the Property as tenants in common with neither party having control over the Property nor control over nor ability to act on behalf of the other's interest in the Property.  The parties further agree that any transfer, exchange or payment of rights, interests or amount of money under this Settlement Agreement has been made for the sole purpose of settling the Actions and resolving all disputes between the parties.

15.    The parties agree to the entry by the Circuit Court of the order in the form attached as Exhibit "G" (1) directing the Clerk of the Circuit Court of Sussex County to disburse the Court Held Funds; and (2) dismissing with prejudice the Actions and all claims related thereto. The

Page 4

parties shall cooperate and take all necessary and appropriate action to accomplish the same without delay. In the event the Circuit Court will not enter the order as presented, the settlement of the Actions and this Settlement Agreement will stand as binding upon the parties, and the parties agree to endorse a new order that encompasses the covenants and agreements within this Settlement Agreement.

16.    The parties shall bear their own costs and legal fees in connection with the Actions.

17.    The parties agree that the execution of this Settlement Agreement and the release of any claims hereunder shall not constitute nor be deemed an admission of liability or wrongdoing by any party.

18.    This Settlement Agreement and the respective covenants, provisions, terms, conditions and agreements contained herein shall inure to the benefit of, and be binding upon, the parties hereto and their respective heirs, executors, estate administrators, successors and assigns. Notwithstanding the foregoing, Iluka, RGC and their successors cannot be beneficiaries, third-party or otherwise, of any of the releases contained in this Settlement Agreement.

19.    The parties agree and affirm that they have each sought the advice of legal counsel with respect to the Settlement Agreement and by signing each party certifies that he or she has reviewed the terms of the Settlement Agreement with counsel of his or her choice, has had all questions and concerns regarding the Settlement Agreement answered or resolved to his or her complete satisfaction and fully understands and agrees to such terms.

20.    In entering into this Settlement Agreement, each party represents that he or she has relied exclusively on his or her own judgment, investigation and analysis of the facts, and has not relied on any representations or conditions not included in this Settlement Agreement.

21.    In the event legal action is commenced to enforce or interpret this Agreement or for declaratory relief with respect thereto, the prevailing party or parties in such action shall be entitled to recover from the  non-prevailing party or parties the reasonable attorneys fees and costs incurred by the prevailing party in such action, in such amount as determined by the Court.

22.    The parties agree to act in good faith to carry out the terms and intent of this Agreement. The parties shall also, at all times in the future, upon the reasonable request of the other or, others, execute and delivery to the others, or to cause the execution and delivery of, all additional documents which may be reasonably necessary to fully consummate and carry out the terms and intent of this Settlement Agreement. However, nothing contained in this section shall require any party or other entity to assume any liability, expense, obligation or duty not expressly required by the terms of this Settlement Agreement.

23.    The parties agree that this Settlement Agreement and the Graham Trust shall constitute the entire agreement among the parties relating to the subject matter hereof and the obligations set forth hereunder may not be altered, amended, or modified in any respect except by and in writing, duly executed by all parties. This Settlement Agreement supercedes any and all prior oral or written understandings, agreements, guarantees, contracts and arrangements between the parties, with the exception of the Graham Deed of Gift.

24.    The parties agree that no presumption of construction exists against either party based upon the drafting of the Settlement Agreement.

25.    Each provision of this Settlement Agreement is a separate and independent clause. If any provision of this Settlement Agreement is held invalid, such invalidity shall not invalidate the entire agreement, and the remainder of the Settlement Agreement will not be affected.

26.    The terms and conditions of this Settlement Agreement are confidential, and the parties agree that they will not disclose to or discuss with others the nature, terms and amount of the settlement which has been reached among the parties, except as may be necessary for the compliance with the terms and conditions contained herein, as may be required by law or with the prior written approval of the party not seeking to disclose such information.

27.    The execution of this Settlement Agreement shall include four (4) duplicate original copies, including exhibits, each initialed on each page by each of the parties and signed by each of the parties and notarized.

28.    The Settlement Agreement shall be governed and construed in accordance with the laws of

Page 5

the Commonwealth of Virginia.

29.    The parties agree that any litigation arising out of a dispute over the Settlement Agreement shall occur in Collier County, Circuit Court in the State of Florida, without regard to the conflict of laws.  The parties agree that they will mediate any such dispute arising out of this Settlement Agreement prior to initiating litigation.

BETTY P. GRAHAM; {SEAL} _Betty P. Graham_

COMMONWEALTH OF FL

CITY/COUNTY OF Naples, FL, to wit:

The foregoing was acknowledged before me this 29 day of Sept ~~August~~, 2003, by Betty P. Graham.

_Nancy D. Long_
Notary Public

My commission expires:

NANCY D. LONG
Notary Public, State of Florida
My comm. expires Mar. 9, 2007
No. DD 178836

LUKE GRAHAM: {SEAL}

COMMONWEALTH OF FL

CITY/COUNTY OF Naples, FL, to wit:

The foregoing was acknowledged before me this 29 day of Sept ~~August~~, 2003, by Luke Graham.

_Nancy D. Long_
Notary Public

My commission expires:

NANCY D. LONG
Notary Public, State of Florida
My comm. expires Mar. 9, 2007
No. DD 178836

LAURENCE GRAHAM: {SEAL}

COMMONWEALTH OF FL

CITY/COUNTY OF Naples, FL, to wit:

The foregoing was acknowledged before me this 29 day of Sept ~~August~~, 2003, by Laurence Graham.

_Nancy D. Long_
Notary Public

NANCY D. LONG
Notary Public, State of Florida
My comm. expires Mar. 9, 2007
No. DD 178836

My commission expires: March 9, 2007

Page 6

Deed #97-1974

This Document Prepared By:
Thomas H. Rose, Jr.
Attorney at Law
P. O. Drawer B
Stony Creek, Virginia 23882-0075
(804-246-4941)

Grantees' Address:
Betty P. Graham
6157 Westwood Terrace
Norfolk, Virginia 23508

Ann P. Everett

Julia P. Boyd

THIS DEED IS EXEMPT FROM RECORDATION TAXES PURSUANT TO
SECTION 58.1-811D OF THE CODE OF VIRGINIA, 1950, AS AMENDED.

THIS DEED OF GIFT, made this 19th day of May, 1997, by
and between George Lee PARSON, Jr. and Mary Elizabeth
PARSON, his wife, Parties of the First Part and hereinafter
styled "Grantors", and Betty P. GRAHAM, Ann P. EVERETT, and
Julia P. BOYD, Parties of the Second Part and hereinafter
styled "Grantees".

W I T N E S S E T H

That for and in consideration of the sum of Ten Dollars
($10.00) cash in hand paid by the Grantees to the Grantors,
the receipt of which is hereby acknowledged, the Grantors do
hereby give, grant and convey unto Betty P. Graham, Ann P.
Everett and Julia P. Boyd, in equal shares, all of their
right, title and interest in and to the minerals of every
kind and character in, on and under those certain tracts of
parcels of land situate in Stony Creek Magisterial District,
Sussex County, Virginia, and Sapony District, Dinwiddie
County, Virginia, containing a total of 1169.86 acres, more
or less, being shown and described on Exhibits A thru J
attached to this Deed of Gift, together with the right of
ingress and egress, and possession at all times for the
purpose of mining, drilling and operating for said minerals
and the maintenance of facilities and means necessary or
convenient for producing, treating and transporting such
minerals.

This conveyance is made subject to certain Deeds of
Mining Lease dated October 13, 1989, between the Grantors
and RGC (USA) Minerals, Inc., a Delaware Corporation, the
First Amendments to Deeds of Mining Lease dated June 30,
1994, and the Second Amendments to Deeds of Mining Lease
dated February 23, 1996, but, for the same consideration
hereinabove mentioned, the respective Grantees, their heirs,
successors or assigns, all of the royalties accruing or to
accrue under said leases for the above described land except
as hereinafter reserved.

The Grantors reserve and except from the conveyance the
advance royalty payments from RGC (USA) Minerals, Inc. as

The Grantors further reserve and except the annual rental payments from RGC (USA) Minerals, Inc., as set forth in the Deeds of Mining Lease dated October 13, 1989.

WITNESS the following signatures and seals:

_George Lee Parson, Jr_ (SEAL)
George Lee Parson, Jr.

_Mary Elizabeth Parson_ (SEAL)
Mary Elizabeth Parson

STATE OF VIRGINIA
CITY/COUNTY OF _Sussex_____, to-wit:

The foregoing instrument was acknowledged before me this 30th day of June_____, 199_, by George Lee Parson, Jr. and Mary Elizabeth Parson.

My term expires: _August 31  1997_

_____ (SEAL)
Notary Public

George Lee Parson, Jr. and Mary Elizabeth Parson

Exhibit A

That same tract or parcel of land conveyed to G. L. Parson, Jr. by Warranty Deed, dated December 18, 1972, and recorded in Deed Book 160 at page 61, in Clerk's Office of Circuit Court of Dinwiddie County, Virginia. To Wit: All of that certain tract, piece or parcel of land lying and being situate in Sapony District, Dinwiddie County, Virginia, South of what is called Dover Spring Branch, containing one hundred and forty (140) acres, more or less, and bounded on the North by the said Dover Spring Branch, on the East by the land of Charlie Pride and the land of Lee Parson, on the South by the land of S. T. Rideout and on the West by the land of Mrs. C.C. Rideout; and being the same land described in and conveyed by deed dated July 20, 1896, from Thomas J. Crowder and wife to Mary H. Carraway, duly recorded in the Clerk's Office of the Circuit Court of Dinwiddie County, Virginia, in Deed Book 20, No. 1 at page 317; and being in all respects the same real estate conveyed to G. Lee Parson from W. Potter Sterne, Special Commissioner, by deed dated the 13th day of May, 1938, and recorded in the aforesaid Clerk's Office in Deed Book 62, at page 24.

LESS and EXCEPT: That same tract or parcel of land conveyed to Lance V. Everett and Ann P. Everett; Husband and wife, by Warranty Deed, dated December 18, 1976, and recorded in Deed Book 182 at page 259, in the Clerk's Office of Circuit Court of Dinwiddie County, Virginia. To Wit: All that certain lot, piece or parcel of land lying and being situate in Sapony District, Dinwiddie County, Virginia, containing 2.68 acres, more or less, as shown on a plat of survey made by W. G. Chappell, C.L.S., dated December 10, 1976, which plat is attached hereto and made a part hereof, and on which plat said lot is described as follows, to-wit: Beginning at a spike in the center of State Highway Route No. 619, thence N 86° 00' E 638.80 feet to an iron (set); thence S 4° 00' E 189.00 feet to an iron (set); thence S 86° 00' W 638.80 feet to a spike in the center of said Route No. 619; thence N 4° 00' W 189.00 feet along the center of said Route No. 619 to a spike, the point of beginning.

Being in all respects a part or portion of the same real estate conveyed to G. L. Parson, Jr. from G. Lee Parson, also known as G. L. Parson, Sr. and Virgie F. Parson, his wife, by deed dated the 18th day of December, 1972, and recorded in the Clerk's Office of the Circuit Court of Dinwiddie County, Virginia, in Deed Book 160, at page 61.

AND ALSO LESS and EXCEPT 14.63 acres, as described in unrecorded survey, by Kenneth O. Peterson, L.S. 1553 dated 9-19-1989, standing in the name of G.L. Parsons.

Subject property is referred to in the Dinwiddie County tax records as Tax Parcel Number 101-4.

George Lee Parson, Jr. and Mary Elizabeth Parson

Exhibit B

That same tract or parcel of land bequeathed to G. L. Parson, Jr.
by Last Will and Testament of G. Lee Parson, Sr. (also known as G.
L. Parson and also known as G. L. Parson, Sr.), dated May 3, 1966,
recorded March 8, 1973, in Volume 23, page 430 through 436 of the
Clerk's Office of Sussex Circuit Court, Sussex County, Virginia.
To Wit:  The farm that I own, situate near Concord Church in Sussex
County, Virginia, and known as "The Walter Harrison Farm", across
State Road No. 619, from Berry Ridout Farm, the side where the home
part is situated and containing approximately 125 acres.

ALSO, being that same tract or parcel of land conveyed to G. L.
Parson, by Warranty Deed, dated February 8, 1924, and recorded in
Deed Book 28 at page 519, in Clerk's Office of Circuit Court of
Sussex County, Virginia. To Wit:  ...... all that certain tract or
parcel of land situated in the Stony Creek Magisterial District,
County of Sussex, State of Virginia, containing one hundred and
twenty five acres, more or less and bounded as follows:  on the
North and West by the Walker's Mill Road, on the East by the lands
of C. W. Parsons and Willis Roberson, (Willis Robinson) and on the
South by the land of B. Wesley Barns and the public road leading to
Stony Creek, Virginia.

EXEMPTING from this tract of land all mining operations for a
cemetery, situated upon 0.50 acres, more or less and six (6) bulk
barns, situated upon 2.00 acres more or less.

Subject property is referred to in the Sussex County tax records as
Tax Parcel Number 101-7.

George Lee Parson, Jr. and Mary Elizabeth Parson

Exhibit C

That same tract or parcel of land conveyed to G. L. Parson (also known as G. Lee Parson, Sr.), from M. L. Finney, as grantor, by Trustees Deed dated January 25, 1941 and recorded in Book 3B at page 100 in the Clerk's Office of Sussex Circuit Court.

The property is a small part of "The Wesley Barnes Farm", between the parsonage and the two branches down beside the public road and around the grave-yard to the road and back to the branch again, in fee-simple, as found in Deed Book 11, page 464, Deed Book 5, page 613, Deed Book 11, page 196 and Deed Book 22 page 409.

The above stated land bequeathed and devised to George Lee Parson, Jr. (also known as G. L. Parson, G. Lee Parson, Jr. and G. L. Parson, Jr.) from the Will of G. Lee Parson, Sr. deceased, in Will Book 23 at page 430 dated May 3, 1966, recorded March 8, 1973 in the Clerk's Office of Sussex Circuit Court.

EXEMPTING from all mining operations a one acre parcel of land lying in the southerly part of this tract. This parcel of land is presently unsurveyed and is used as a cemetery.

Subject property is referred to in the Sussex County tax records as Tax Parcel Number S-101-6.

George Lee Parson, Jr. and Mary Elizabeth Parson

Exhibit D

That same tract or parcel of land conveyed to G. L. Parson, Jr. by Warranty Deed, dated April 15, 1960, and recorded in Deed Book 59 at page 579, in Clerk's Office of Circuit Court of Sussex County, Virginia. To Wit: All "that certain tract or parcel of land lying and being situate in the County of Sussex and State of Virginia containing sixteen and five tenths acres (16.5) more or less and herein after described as follows: Beginning at an iron stob on the Cabin Point Road, running thence along the said Road South 79° 15' East 983 feet, thence North 32° 00' East 343 feet along the said Road, thence North 7° 00' West 1013 feet to a pine tree, thence South 41° 45' West 1537 feet to the point of beginning.

Subject property is referred to in the Sussex County tax records as Tax Parcel Number 101-13.

George Lee Parson, Jr. and Mary Elizabeth Parson

Exhibit E

That same tract or parcel of land conveyed to G.L. Parson, Jr. by Warranty Deed, dated April 11, 1960, and recorded in Deed Book 59 at page 559, in Clerk's Office of Circuit Court of Sussex County, Virginia. To Wit: ...... all that certain tract, piece or parcel of land lying and being situate in Stony Creek Magisterial District, Sussex County, Virginia, containing, by estimation, two hundred (200) acres, and bounded as follows: On the North by G. Lee Parson; on the East by W. S. Barnes; on the South by the public road leading from Stewart's to Concord Church; on the West by R. C. Chappell and said public road leading from Stewart's to Concord Church and Wesley Barnes, reserving a certain road or passage-way which leads from the house now owned by W. S. Barnes through said tract of land to the public road at the forks of the road, on of which leads to Purdy, as and for an outlet of the occupants of the said house now occupied by W. S. Barnes, with the right or privilege of the purchaser of straightening said road, if he shall so desire."; and being in all respects the identical real estate that was conveyed to G. Lee Parson, Sr., in the name of G. Lee Parson, by deed from John H. Cole, Special Commissioner, dated June 1, 1927, and duly recorded in the Clerk's Office of the aforesaid county in Deed Book 31 at page 244.

Subject property is referred to in the Sussex County tax records as Tax Parcel Number 101-31.

Exhibit F

That same tract or parcel of land conveyed to G. Lee Parson, Jr.
by Warranty Deed, dated February 16, 1970, and recorded in Deed
Book 73 at page 600, in Clerk's Office of Circuit Court of Sussex
County, Virginia. To Wit:  All that certain tract, piece or parcel
of land, lying and being situate in Stony Creek Magisterial
District, Sussex County, Virginia, containing one hundred and
eighty-seven (187) acres, more or less, adjoining the lands of
Markham B. Chappell; Old Eppes Tract; Green Church Road; and Wyatt
Mill Road, being in all respects the same land which was devised
unto Nannie B. Chappell by John E. Stewart, as will be seen by
reference to the first clause of his last will and testament, of
record in the clerk's Office of the Circuit Court of Sussex County,
Virginia, except a portion thereof, containing about twenty-five
(25) acres, which was conveyed to Nannie B. Chappell to Markham B.
Chappell by deed recorded in the aforesaid Clerk's Office in Deed
Book 27, at page 323; and being in all respects the same real
estate conveyed to G. Lee Parson, Sr., in the name of G. Lee
Parson, from John H. Cole, Special Commissioner, by deed dated the
29th day of December, 1934, and recorded in the aforesaid Clerk's
Office in Deed Book 34, at page 283.

EXEMPTING from this tract of land three (3) bulk barns, situated
upon two (2) acres, more or less.

Subject property is referred to in the Sussex County tax records as
Tax Parcel Number S-101-38.

George Lee Parson, Jr. and Mary Elizabeth Parson

Exhibit G

That same tract or parcel of land conveyed to G.L. Parson (also known as G. Lee Parson, Sr.) by Warranty Deed, dated November 14, 1959, and recorded in Deed Book 59 at page 279, in Clerk's Office of Circuit Court of Sussex County, Virginia. To wit: All of that certain track, piece or parcel of land lying and being situate in Stony Creek Magisterial District, Sussex County, Virginia, containing four and seventeen hundredths (4.17) acres by actual survey, and being shown and designated on a certain plat of survey, dated March 1, 1952, made by H.C. Frye, C.E., which said plat of survey is recorded in the aforesaid Clerk's Office in Plat Book 7, at page 26, and reference thereto is hereby invited for a more perfect description of the real estate herein conveyed; and being more particularly described on said plat as follows: Commencing on the West side of State Highway Route No. 619 at the Southeastern corner of a certain lot of land owned by B.J. Rideout, Jr.; thence S. 79° 30' W. 443 ft. to a point; thence South 24° 46' E. 494 ft. to a point; thence N. 62° 30' E. 465 ft. to a point; thence along Route 619 N. 30° 00' W. 370 ft. to the point of beginning; and being in all respects the same real estate that was conveyed to the parties of the first part, as husband and wife, by the entireties, with the right of survivorship as at common law, by deed from B.J. Rideout, Sr. and wife, and dated March 17, 1952, and recorded in the aforesaid Clerk's Office in Deed Book 48 at page 477.

The above stated land bequeathed and devised to Virgie Fraher Parson (also known as Virgie F. Parson) from the Will of G. Lee Parson, Sr., deceased, in Will Book 23 at page 430 dated May 3, 1966, recorded March 8, 1973 in the Clerk's Office of Sussex Circuit Court.

AND ALSO the above stated land bequeathed and devised to George Lee Parson, Jr. (also known as G. L. Parson, G. Lee Parson, Jr. and G. L. Parson, Jr.) from the Will of Virgie F. Parson (also known as Virgie Fraher Parson), deceased, in Will Book 31 at page 314 dated September 25, 1973, recorded October 15, 1982 in the Clerk's Office of Sussex Circuit Court.

Subject property is referred to in the Sussex County tax records as Tax Parcel Number S-101-3.

George Lee Parson, Jr. and Mary Elizabeth Parson

Exhibit H

That same tract or parcel of land conveyed to G. Lee Parson (also known as G. Lee Parson, Sr.), by Warranty Deed, dated December 24, 1947, and recorded in Deed Book 44 at page 126, in Clerk's Office of Circuit Court of Sussex County, Virginia. To wit: All of that certain track or parcel of land, with the appurtenances thereto belonging, containing Three and one-half (3 1/2) acres, more or less, lying, being and situate on both sides of the Milwaukee Road Little Mill Magisterial District, Sussex County, Va., and bounded as follows: On the North, East and West by lands of Lee Parson and on the South by the land of Willis Robinson, the said tract of land hereby conveyed being situate about 300 yards West of the present residence of said G. Lee Parson.

The above stated land bequeathed and devised to George Lee Parson, Jr. (also known as G. L. Parson and G. L. Parson, Jr.) from the Will of G. Lee Parson, Sr., deceased, in Will Book 23 at page 430 dated May 3, 1966, recorded March 8, 1973 in the Clerk's Office of Sussex Circuit Court.

Subject property is referred to in the Sussex County tax records as Tax Parcel Number 101-14.

George Lee Parson, Jr. and Mary Elizabeth Parson

Exhibit I

That same tract or parcel of land conveyed to G.L. Parson Jr., by
Warranty Deed, dated April 11, 1960, and recorded in Deed Book 59
at page 559, in Clerk's Office of Circuit Court of Sussex County,
Virginia.  To Wit:  ......all of that certain tract or parcel of
land sold in bulk and not by acres, said to contain fifty (50)
acres, be it the same more or less, and being in Stony Creek
Magisterial District Sussex County, Virginia, with general
warranty.  Bounded and described as follows, on the North by Public
Road leading from Concord Church to Stony Creek, On the East by the
'Old Man-love Tract' formerly owned by Camp Manufacturing Company,
on the South by a branch and on the West by said public road
leading from Concord Church to Stony Creek, Va."; and being in all
respects the identical real estate that was conveyed to G. Lee
Parson, Sr., in the name of G. Lee Parson, by deed from J. Walter
Harrison and wife, dated April 16, 1915 and duly recorded in the
Clerk's Office of the aforesaid county in Deed Book 24 at page 303.

Subject property is referred to in the Sussex County tax records as
Tax Parcel Number 101-17.

George Lee Parson, Jr. and Mary Elizabeth Parson

Exhibit J

That same tract or parcel of land conveyed to G. Lee Parson, Jr., by Warranty Deed, dated March 22, 1960, and recorded in Deed Book 59 at page 524, in Clerk's Office of Circuit Court of Sussex County, Virginia. To Wit: All that certain tract of land, with all the improvements thereon and the appurtenances thereto belonging, lying, being and situate on the East side of the Nottoway River in Stony Creek Magisterial District, Sussex County, Virginia, containing eight hundred (800) acres, more or less, and bounded as follows: On the north by the lands now or formerly belonging to Slate, C.R. Chappell, Robinson and Camp Manufacturing Company; on the east by the lands now or formerly belonging to Otho Chappell, Henry Poole, G. Lee Parson, Sr. and the Wyatt Mill Road; on the South by the lands now or formerly belonging to J. H. Poole and the Nottoway River; and on the West by said Nottoway River and the land now or formerly belonging to the Camp Manufacturing Company; the land hereby conveyed is the same that was conveyed to G. Lee Parson, Sr. from J. Thompson Wyatt, Special Commissioner, by deed dated June 11th, 1946 recorded in the Circuit Court Clerk's Office of said County in Deed Book 42, at page 180; by deed from Francis E. Wyatt, and others, dated May 3, 1945, and recorded in said Clerk's Office in Deed Book 41 at page 137; by deed from William E. Anderson, unmarried, dated November 7th, 1945, and recorded in said Clerk's Office, in Deed Book 41, at page 365, and by deed from Benjamin G. Anderson, unmarried, dated May 10th, 1945, and recorded in said Clerk's Office, in Deed Book 41, at page 136.

The above described property was resurveyed by J. C. Shearin, dated March 20, 1972, recorded May 30, 1989 in Plat Book 18 at Page 6 in the Sussex County, Virginia records. The above stated deed recites 800.0 acres which is now corrected to recite 933.30 acres which is an increase of 133.30 acres, stated as follows: Tract No. 1 contains 50.0 acres, Tract No. 2 contains 343.0 acres, Tract No. 3 contains 379.0 acres and an open tract of land not presently surveyed containing approximately 161.30 acres, more or less.

LESS and EXCEPT from this tract of land the westerly portion thereof, containing 487.30 acres.

Subject property is referred to in the Sussex County tax records as Tax Parcel Number 101-36.

INSTRUMENT #970197
RECORDED IN THE CLERK'S OFFICE OF
DINWIDDIE ON
JULY 2, 1997 AT 09:47AM

STD 1/89
VA 8/89



**DEED OF MINING LEASE**

THIS DEED OF MINING LEASE including the attached Exhibits which are incorporated herein by this reference ("Lease")
is made and entered into on _____ October 13, _____ 1989 _____ by and
between G. L. Parsons, Jr., AKA George Lee Parson, Jr., AKA G. L. Parson, and AKA
G. Lee Parson, Jr., and Mary Elizabeth Parson, AKA Mary Butterworth Parson, AKA
Mary B. Parson, AKA Mary E. Parson, and AKA Mrs. G. L. Parson, Jr., husband and wife
Route 1, Box 60, Stony Creek, Virginia 23882

("Lessor") and RGC (USA) MINERALS INC., a Delaware corporation whose address is Warner Road, P.O. Box 1307, Green Cove
Springs, Florida, 32043 ("RGC"). In consideration of the mutual promises made in this Lease, and other good and valuable
consideration, the receipt and sufficiency of which are hereby acknowledged, Lessor and RGC agree as follows:

1. **Defined Terms.** Any word or phrase that is capitalized and placed in quotations in this Lease is a defined term
and when it is capitalized will have the same meaning throughout this Lease.

2. **Parsons.** The purpose of this Lease is to allow RGC to explore for and, at RGC's sole discretion, to mine,
remove, concentrate, and sell Minerals from the Property; to use the Property; to mine Minerals from the Property, or other
property, and to conduct related activities. "Minerals" means the following group of minerals and mineral products: Ilmenite,
Leucoxene, Rutile, Zircon, Staurolite, Kyanite, Sillimanite, Monazite, Xenotime, and Garnet, and associated byproducts. Title to
any Minerals mined shall, if not already vested in RGC, pass to RGC as they are severed from the Property.

3. **Grant of Lease.** Lessor hereby leases to RGC the Property (as defined on Exhibit "A") on the terms and
conditions in this Lease.

4. **Grant of Rights.** Lessor grants to RGC the following exclusive rights with regard to the Property:
   (a) To enter the Property, to survey, explore, drill, test, and sample (the foregoing activities are defined as
"Exploration");
   (b) To clear the Property of such buildings (subject to Section 21 (Compensation for Buildings)), other
structures, or obstacles, earth, standing timber, plenty, and such other things of material that RGC, in its
absolute discretion, wishes to clear from the Property; to exercise its rights as set out in the Section; to
construct, relocate, use, or remove roads, power and communication lines, dredge ponds, tailing ponds,
settling ponds, pipelines, buildings, storage facilities, canals, tailings, signs, gates, fences, and other
amenities and facilities on the Property; to take steps to prepare for and conduct Operations; to
develop, mine, re-ore-mine, dredge, remove, concentrate, separate, comminute, stockpile, haul, process,
ship, and sell Minerals (the foregoing activities, whether conducted on the Property or on other property
in Dinwiddie and Sussex Counties, Virginia ("Area"), are defined as "Operations");
   (c) To use the Property to store, transport, or dispose of Minerals, water, tailings, and material resulting from
RGC's Operations;
   (d) To use water from, or appurtenant to, the Property and to drain through and from the Property and to
draw into any course in the Property any water from RGC's Operations;
   (e) To take all steps to accomplish Reclamation (as defined in Section 16) of the Property;
   (f) To use all easements, means of access, and rights-of-way from and to the Property;
   (g) To use the Property for the purposes described in this Section, in conjunction with RGC's Exploration,
Operations and Reclamation on other property.

Notwithstanding the foregoing, RGC is not granted the right under this Lease to construct or operate on the Property a
processing plant for the final separation of the concentrate into saleable Minerals.

5. **Term of Lease.** This Lease will begin on the date first written above and will end 20 years thereafter, unless (a)
the Lease is ended earlier under Section 19 (Termination), (b) the Lease is automatically terminated by RGC's failure, for reasons
other than a temporary inability to obtain through diligent efforts all necessary governmental permits and authorizations, to
commence "Mining" (as defined in the Royalty Policy) in the Area by the eighth anniversary of the Lease, or (c) the Lease is
automatically extended to allow RGC to complete ongoing operations on the Property. If so extended, the Lease shall terminate
upon the earlier of written notice from RGC, pursuant to Section 19 (Termination) for the passage of a period of 180 consecutive
days in which RGC conducts no Operations on the Property. "Term" means the period of time during which this Lease is in
effect, and, in the absence of earlier termination, includes both the initial 20-year term and any extended term.

6. **Initial Payment and Advance Royalty Payments.** Subject to the terms and conditions of this Lease,
RGC will pay to Lessor, during the Term of this Lease, on or before the dates indicate the following lump sum payments and
payments per acre of the Property retained under the Lease at this time of the payment:

| Payment Date | Payment Type | Payment | |
|---|---|---|---|
| Lease Date | Initial Payment | $250 per acre | G.L.P. Jr. GLP DPW |
| Lease Date | Advance Royalty $1,221.88 | $730 per acre | M.E.P. MEP |
| On or before December 31 of each year following the year this Lease is signed | Rental Payment | $15 per acre | |
| Earlier of (a) "Mining" (as defined in Royalty Policy) in Area or (b) Fifth Anniversary | Advance Royalty | $110,370.00 | lump sum, equal to $1000 per acre of "Mineralized Property" (as defined in Royalty Policy) |
| Tenth Anniversary if no Notice of Mining (as defined in Section 9) given | Advance Royalty | $110,370.00 | lump sum, equal to $1000 per acre of Mineralized Property, subject to 70% Limitation (as defined in Royalty Policy) |
| Fifteenth Anniversary if no Notice of Mining given | Advance Royalty | $110,370.00 | lump sum, subject to 70% Limitation |
| Notice of Mining | Advance Royalty | | 70% of Estimated Future Royalty Payments (as defined in Royalty Policy) |

The Initial Payment and all Rental and Advance Royalty Payments paid to Lessor are non-refundable. The Advance Royalty
Payments paid to Lessor will be credited against any Royalty Payments otherwise payable pursuant to Section 7 (Royalty
Payments) and may be prepaid by RGC. Payment to Lessor of the payment required upon Notice of Mining will satisfy in full any
such obligation RGC may thereafter have to pay the Tenth and Fifteenth Anniversary Advance Royalty Payments.

7. **Royalty Payments.** RGC will pay to Lessor quarterly Royalty Payments equal to _____ of the
Sales Values of Minerals attributed to the Property, which RGC mines and sells. The Royalty Payments will be determined and
paid in accordance with Exhibit B, RGC's Royalty Policy for Virginia Operations ("Royalty Policy").

8. **Minimum Royalty.** If the total of all Advance Royalty Payments and Royalty Payments paid to Lessor under
this Lease does not average $3,500 per acre for all of the Property from which RGC removes the topsoil in preparation for Mining
("Minimum Royalty"), RGC will pay to Lessor the amount by which the Minimum Royalty exceeds such total. Any such payment
will be determined and paid in accordance with Clause 11 of the Royalty Policy.

9. **Lessor's Use of the Property.** During Exploration, Lessor and RGC will work together to accommodate
Lessor's normal activities on the Property. RGC will give Lessor at least twelve months notice ("Notice of Mining") if RGC's
Mining will require Lessor to cease activities on the portion of the Property described in the Notice of Mining. Until the end of
the notice period, Lessor will have the right, but not the obligation, to remove any Lessor's account any crops, timber, buildings,
irrigation systems, fixtures or personalty of Lessor from that portion of the Property. From the end of the notice period until RGC
notifies Lessor otherwise, Lessor will cease all activities to cease on that portion of the Property. During Reclamation, RGC will

00\

work with Lessor to allow Lessor to resume Lessor's normal activities on the Property, as soon as reasonably possible and as permitted by governmental reclamation requirements. Lessor will not deal indemnify RGC from and against any claims asserted against RGC arising out of the activities of Lessor on Lessor's in fees. Lessor will be solely responsible for, and will bear all risk of loss related to, any government allotment, subsidy, stabilization or conservation program that may apply to the Property.

**10.   Safety.**   Except as otherwise provided in this Lease, only RGC employee and visitors authorized in writing by RGC will be permitted on the portions of the Property on which Operations are being conducted. All RGC-authorized visitors and their vehicles will carry RGC identification at all times that they are on the Property.

**11.   RGC to Comply With Safety Laws and to Indemnify Lessor.**   RGC will conduct its Exploration and Operations in compliance with all applicable safety laws and regulations. RGC will and does indemnify Lessor from and against any claims (environmental or otherwise) asserted against Lessor arising out of RGC's activities. RGC will also indemnify Lessor from, and pay Lessor for, actual damages caused by RGC to crops, pasture, timber, fences, gates, roads and other improvements not described in Section 21 (Compensation for Buildings) located on any portions of the Property that are not mined but are otherwise used by RGC in its activities; RGC will in no event be liable for special or consequential damages; and any payments made pursuant to the preceding sentence will be deemed full and complete compensation for the damages in question.

**12.   RGC's Right to Determine Whether, When and Where to Mine.**   Nothing in this Lease or in the relationship between Lessor and RGC will constitute or create any expense or implied duty on the part of RGC to perform Exploration or Operations, or to mine the Property at any rate, in any manner, or at all. RGC's Exploration and Operations, if any, will occur only to the extent and at the locations and times, and in the methods and manner that RGC, in its sole discretion, may determine; provided, however, that RGC will not conduct Operations within 200 feet of Lessor's principal residence or any principal residence on property adjoining the Property (in such a way as to deprive any such residence of access to a public road, utilities, and water supply until RGC complies with Section 21(a) (Compensation for Buildings — Principal Residence) (in the case of Lessor's principal residence) or obtains the adjoining property owner's written consent (in the case of an adjoining residence) and provided further that, if RGC engages in Mineral in the Area, then RGC will use its best efforts to mine all of the Mineral that Property that can be mined in a commercially reasonable manner.

**13.   Compliance With Laws.**   RGC's activities on the Property will be conducted in compliance with all applicable Federal, State and local laws and regulations.

**14.   Reclamation.**   RGC agrees to comply with all State and Federal laws, regulations and permits applicable to the Reclamation of the Property. RGC also agrees to return to bond, to the extent required by Virginia law, to ensure that all the Property which RGC mines will be reclaimed in accordance with law. RGC will and does indemnify Lessor from and against any claims by State or Federal regulatory agencies arising from RGC's failure to reclaim in accordance with applicable law, excluding claims accrued in part or in whole by Lessor's failure to cooperate with RGC in accordance with the terms of this Lease. RGC's Reclamation of any Property mined may include, but not be limited to, refilling the mined path with tailings discharged from the wet mill, dyking and eliminating settling ponds, replacing and grading the topsoil, replanting and otherwise complying with all applicable governmental reclamation requirements ("Reclamation").

**15.   Audit.**   Lessor will have the right at Lessor's expense to appoint an independent auditor reasonably approved by RGC (which approval is hereby given if Lessor provides a national firm in the United States of recognized reputation), to audit, not more than once, in any year, RGC's records relating to the determination of Royalty Payments (to "RGC's Fiscal Year (currently July 1 June 30) immediately preceding such audit. Lessor will transmit Lessor's auditor to send a copy of his report to RGC at the same time that he sends his report to Lessor. Also, Lessor will notify RGC in writing of any objections Lessor may have regarding Royalty Payments, within 60 days of Lessor's receipt of Lessor's auditor's report.

**16.   Taxes.**   Taxes will be apportioned and paid as follows:

(a)   RGC will pay the following taxes (or portions thereof): any annual severance taxes (related to RGC's Operations) property taxes, pro-rated for the portion of the Property and the time period in which Lessor is prohibited under this Lease from conducting activities and any increase in property taxes attributable to the Minerals as RGC's Operations.

(b)   Lessor will pay all other taxes related to the Property, including but not limited to any taxes on Released Land (as defined in Section 19 (Termination)) and income, capital levy, estate, gift, succession, inheritance, transfer or franchise taxes and any taxes attributable to Lessor's activities on the Property.

(c)   Lessor will send RGC copies of all assessments, tax bills or other tax notices related to the Property or to RGC's Operations thereon within 14 days of Lessor's receipt of the same or in such shorter time as may be necessary to preserve the rights of RGC and Lessor to protest or appeal the same. Lessor will cooperate with RGC in (any such protest or appeal. [RGC may, in its discretion, pursue such protest or appeal independently of Lessor; RGC will in any event not be obligated to pay (i) any increase in taxes which RGC intends to protest or appeal due to Lessor's failure to comply with this Section 16(c) or (ii) any tax bill which RGC does not receive at least 14 days before the bill is due.

(d)   RGC may, but is not required to, pay any taxes on the Property for which Lessor is responsible under Section 16(b), and deduct such taxes paid from any payments otherwise due to Lessor under this Lease.

**17.   Warranty of Title.**   Lessor warrants as follows:

(a)   Lessor is the sole legal and equitable owner, in undivided fee simple, of the surface and mineral estates that comprise the Property without limitation whatsoever.

(b)   The Property is free, and clear of all leases, liens, encumbrances and outstanding adverse claims and interests, and of record.

(c)   Lessor has full power and authority to execute this Lease;

(d)   RGC shall have the quiet and peaceful possession and enjoyment of the Property, Minerals, and the proceeds thereof (as against all persons or entities who may claim any interest therein);

(e)   There has been no violation of any applicable Federal, State, or local law or regulation relating to zoning, land use, environmental protection or otherwise with respect to the Property or activities relating thereto; and

(f)   This Lease, and RGC's right, title and interest hereunder, shall at all times be superior to, and have priority over, any right, title or interest in the Property created during the Term of this Lease.

**18.   Lessor Interest.**   In entering into this Lease, RGC is relying on Lessor's warranties of title contained in Section 17 (Warranty of Title). Without impairment of those warranties of title, if Lessor owns less than the entire and individual estate in the Property, RGC may (a) proportionately reduce all payments otherwise payable under this Lease; (b) offset any prior payments related to the unowned portion against any future payments payable under this Lease, and (c) exercise any other available rights or remedies.

**19.   Termination.**   RGC will have the right to terminate this Lease with regard to all or any portion of the Property at any time by sending a written notice to Lessor at least 90 days prior to such termination. The termination will take effect upon the date specified in the notice. Upon termination, all of RGC's rights and obligations under this Lease with regard to the Property, or portion thereof specified in the notice (the "Released Land") will terminate except for any Reclamation rights and obligations and any Minimum Royalty or Royalty Payment obligations arising out of mining conducted on the Released Land prior to such termination. In the event of a partial termination, this Lease will continue in effect with respect to all Property except the Released Land, and the Property" will thereafter mean and include only the retained Property and not the Released Land. After termination, RGC will execute, deliver and record a release confirming the relinquishment of the Released Land. Nothing in this Section will negate any obligations RGC has under this Lease with respect to Reclamation of the Property. Notwithstanding the foregoing, RGC will not terminate this Lease in whole or in part at any time prior to the sixth anniversary unless RGC also terminates all of its other mining leases in the Area.

**20.   Title Documents.**   Lessor will promptly provide to RGC copies of all documents which Lessor now or in the future possesses, relating to or affecting title to the Property, including, but not limited to: title insurance policies, deeds, mortgages, trust or security deeds, boundary agreements, judgments, liens, orders, surveys, boundary descriptions, maps, while conveying an interest in the Property, trust instruments, liens, licenses, easements, and rights-of-way. Lessor will give RGC notice whenever Lessor learns of any matter which may affect the title to the Property. At RGC's request, Lessor will sign and deliver to RGC such additional formal assurances or other documents, improper and reasonable form, as may reasonably be necessary to carry out the terms and intent of this Lease. Lessor will inform RGC immediately if Lessor fails to pay or discharge in a timely manner any promissory note, mortgage, tax, or other lien upon the Property. RGC may then pay it and be subrogated to the rights of the holder thereof. Except for any taxes for which RGC is liable under this Lease, RGC will have the right to offset from any payment otherwise payable to Lessor under this Lease, all amounts paid by RGC to discharge any such promissory note, mortgage, tax or other lien.

**21.   Compensation for Buildings.**

(a)   **Principal Residence.**   If RGC proposes to remove Lessor's principal residence on the Property, RGC will give Lessor at least (less than one) year's notice of its intention to do so. At least 180 days prior to such removal, RGC will compensate Lessor by making a payment to Lessor equal to two times the then-present fair market value of such residence (excluding land) as determined by the average of two appraisals; one by an appraiser selected by Lessor and one buy an appraiser selected by RGC, from a list of the HUD or FHA-approved appraisers (compiled by RGC). Lessor may thereafter occupy the residence until the one year notice period expires, at which time Lessor will vacate the residence to allow its removal. No residence will be constructed on the Property during the Term of this Lease without the prior written consent of both Lessor and RGC.

4IBTEMP2

002

(b)    **Other Buildings.** If RGC proposes to remove other buildings on the Property, RGC will give Lessor not less than 90 days' written notice of its intention to do so. At least 90 days prior to such removal, RGC will compensate Lessor by making a payment to Lessor equal to the approximate replacement cost of buildings of that nature, as determined by the average of two appraisals, by appraisers selected in the manner described in Section 21(a). Lessor will cover, using the relevant buildings 30 days prior to the proposed removal and will facilitate removal in all respects.

**22.   Third Party Claims.** If RGC learns that a third party may have a claim of ownership in any portion or percentage of the Property, or any payment under this Lease, RGC may deposit in a special escrow account (with a bank or title insurance company located in Virginia) any amounts otherwise due to Lessor under this Lease and give Lessor written notice of the deposit. The sums deposited will remain in the special escrow account until the claim or controversy is resolved, or until there has been a final determination of the claim or controversy by a court or arbitrator, including any appeals therefrom.

**23.   Additional and After-Acquired Rights.** If, during the Term of this Lease, Lessor acquires any right or interest in the Property, or in any payment under this Lease, which Lessor had in this Lease already warranted to be part of the Property, any such right or interest acquired in the Property, which Lessor had in this Lease already warranted to be part of the Property, will become part of the Property subject to this Lease, without any additional payment by Lessor. (c) RGC may, at RGC's option, at any time, lease any other such right, or interest, on the same terms, as the terms of this Lease; and, (d) Lessor will sign, acknowledge, and deliver any amendments to this Lease and to the Memorandum of this Lease to RGC, so as to include such right or interest.

**24.   Entireties.** If the Property is now, or later, owned in severalty, or in separate tracts, RGC will nevertheless be entitled to treat the Property as an undivided whole, after all this Lease, with all payments payable under this Lease to be paid (either, directly, or, pursuant to Section 25 (Multiple Owners)), to the separate owners of the Property in the proportion that their ownership interest, measured in acres, or percentage ownership of acres, bears to the whole Property, provided, however, that in no event, will RGC's total payment obligations to the separate owners exceed the payment obligations RGC would have incurred under this Lease if the Property were owned in undivided fee simple by a single owner.

**25.   Multiple Owners.** Whenever two or more parties are entitled to receive any payments under this Lease, RGC may withhold any such payments unless and until all of those parties designate (in a recordable instrument an agent empowered to receive those payments, and, to, execute division, and, transfer orders, on behalf of all those parties, and their respective successors in title. Delivery of any payment due under this Lease to the designated agent fulfills RGC's obligation to make that payment to those parties.

**26.   Assignment.** Both parties have the right to assign their rights and obligations under this Lease, in whole or in part, provided, however, that:

   (a)  the party making such an assignment must give the other party prior written notice thereof;

   (b)  The provisions of this Lease will apply to and be binding upon the successors and assigns of the respective parties;

   (c)  Any, change or division in the ownership of the Property, or of the right to receive any payments under this Lease, however accomplished, will not increase RGC's total payment obligations under this Lease or affect RGC's rights to conduct Exploration, Operations or Reclamation on the Property;

   (d)  Notwithstanding Section 26(a), RGC may, without notice or consent, assign any of its rights or obligations to affiliates of RGC, or use the services of independent contractors or agents to perform any of its rights or obligations; and

   (e)  No assignment will relieve the assigning party of any obligations or liability to the other party, unless the other party provides a written release to the assigning party.

**27.   Force Majeure.** Neither party will be deemed in default under this Lease during any period in which its exercise of performance of any of its rights or obligations under this Lease is prevented by any cause reasonably beyond its control. Such an event is referred to in this Lease as "Force Majeure." Force Majeure will include, but is not limited to, the following: fire, floods, storms, hurricanes, tornado, winds, other damage from the elements, declared or undeclared war, strikes, labor disputes, riots, civil unrest, action of governmental authorities, condemnation, eminent domain, crime, failure to receive required governmental approvals, inability to obtain water for Operations, a substantial fall in the market price of Minerals, lack of access, litigation, acts of God, and acts of the public enemy. The Term of this Lease will be extended for a period of time equal to the period of Force Majeure. All such periods will be deemed to begin at the earliest time a party is prevented from exercising or performing any of its rights or obligations by reason of Force Majeure.

**28.   No Broker.** Lessor and RGC represent and warrant to each other that no broker, agent, or finder has acted on its behalf in connection with this Lease and that no commissions, fees, or other monies are due to any broker, agent, or finder. In addition, Lessor and RGC will and do indemnify, each other, from all claims, with respect to any, brokerage, finder's, or leasing commissions in connection with this Lease, or any of the transactions contemplated under this Lease.

**29.   Condemnation.** Lessor will immediately notify RGC of any condemnation proceeding that may affect the Property. Lessor will cooperate with RGC in defending or settling the same. RGC may, in its discretion, defend its rights independently, of Lessor. Any condemnation award will be shared between Lessor and RGC, as provided by law. Any condemned Property will constitute Released Land as of the date of condemnation, and this Lease will continue in effect as to the remaining Property.

**30.   Dispute Resolution.** Subject to the provisions of this Section, any controversy, claim, or dispute arising out of, or related to this Lease, or to the formation, negotiation, or breach thereof, will be settled by binding arbitration in Richmond, Virginia before a single arbitrator, in accordance with the Commercial Arbitration Rules of the American Arbitration Association. Any award of damages will be limited to actual compensatory damages. Judgment upon the award rendered by the arbitrator may be confirmed by, and entered in, any court having jurisdiction thereof. Prior to initiating any arbitration, the initiating party will give the other party written notice of the claim, and (ii) allow the other party 30 days from the date that the notice is received to amicably resolve the claim. If the claim is not resolved within the 30-day period, the initiating party's sole and exclusive remedy will be to submit the dispute to arbitration. The parties will comply with any arbitration award within 30 days of its issuance, or as soon as practicable thereafter, and the Lease will continue in full force and effect. In no event will the existence of any dispute, arbitration, or award suspend or otherwise affect any party's rights or obligations under this Lease, or interfere in any way with RGC's Operations.

**31.   No Interference With RGC's Operations.** Lessor has not, and will not, during the Term of this Lease, take any action or grant any right which would in any way interfere with RGC's exercise of its rights as set out in Section 4 (Grant of Rights) of this Lease.

**32.   No Implied or Continuing Waiver.** If either party waives or does not enforce any provision of this Lease on any occasion, that action will not constitute waiver of: (a) that provision to any other time, event or occurrence; or (b) any other provision.

**33.   Notices.** Any notice given to the other party under this Lease must be in writing, and sent by United States registered or certified mail, return receipt requested; or via Federal Express or similar overnight courier service; addressed to the address set forth on the first page of this Lease. All notices will be deemed to have been given when deposited in the mail (or with the courier as provided above). All notices will be deemed to have been received upon actual receipt by any person at the address listed above. Either, party, may change its address for the mailing of notices by giving the other party notice of such change of address in the manner provided for in this Section.

**34.   Entire Agreement; No Oral Modification.** This Lease constitutes the entire agreement between the parties and supersedes all previous agreements, written or oral. Lessor hereby expressly acknowledges that, in entering into this Lease, Lessor has not relied on any oral or written statements made by RGC, its employees, agents or independent contractors. This Lease may only be modified by a written agreement in recordable form signed by Lessor and an authorized officer of RGC.

**35.   Choice of Law.** This Lease will be construed, interpreted and governed by the laws of Virginia.

**36.   Successors and Assigns.** This Lease constitutes a covenant running with the land and will be binding on, and inure to the benefit of Lessor, RGC, and Lessor's and RGC's heirs, legal representatives, executors, administrators, successors, and assigns, as the case may be.

**37.   Severability.** In the event that any court or duly appointed arbitrator determines that any provision of this Lease is unenforceable, illegal, or in conflict with any, Federal, state, or local law, the parties will petition (or, will hereby be deemed to have petitioned) the court or arbitrator to reform, that provision in such a way, as to carry out the intent of the parties to the extent permissible under law. If the court or arbitrator declines to reform that provision, then that provision will be considered severable from the rest of the Lease, the remaining provisions of the Lease will not be affected, and this Lease will be construed and enforced as if the Lease did not contain the unenforceable or illegal provision.

**38.   Modification to Cure Any Violation of the Rule Against Perpetuities.** Lessor and RGC do not intend that any provision in this Lease will in any way violate the Rule Against Perpetuities or any related rule. If any such violation should occur, it is the intent of Lessor and RGC that the appropriate court or arbitrator will reform the provision in such a way as to approximate most closely the intent of the parties within the limits permissible under such rule, or related rule, and will enforce the Lease as so reformed.

**39.** _Memorandum._ At the time this Lease is signed, the parties will sign a Memorandum of Lease which RGC will record. In the event of a conflict between the terms of the Memorandum of Lease and this Lease, the terms of this Lease will control.

**40.** _Mortgage Consent._ Lessor agrees to use Lessor's best efforts to obtain promptly, and to provide to RGC a copy of, any consent to this Lease required by the terms of any mortgage or other instrument creating rights superior to this Lease with respect to all or any part of the Property. Such consent, however, will neither affect nor be a condition precedent to the effectiveness and enforceability of the Lease as between Lessor and RGC.

**41.** _Headings._ The headings contained in this Lease are for the convenience of the parties only, and will not be used in its interpretation.

**42.** _Obligations That Survive This Lease._ In addition to other obligations that survive this Lease as set forth in this Lease, the parties' obligations under the following Sections of this Lease will remain in full force and effect following the term of this Lease, or the termination of, or expiration of the Term of this Lease: Sections 7-9, 11, 14-15, 17-19, 22, 24-25, 30, 32-38, and 41-43.

**43.** _Good Faith._ During the Term of this Lease, each party will act in good faith to fulfill the intent of this Lease, and will meet with the other party to discuss and to try to resolve amicably any issues that may arise.

IN WITNESS WHEREOF, the parties have executed this Lease under seal as of the date first above written.

OWNER:

_signature_ [SEAL]

G. L. Parson, Jr.
(Print Name)
AKA George Lee Parson, Jr.
AKA G. L. Parson
AKA G. Lee Parson, Jr.

_signature_ [SEAL]

Mary Elizabeth Parson
(Print Name)
AKA Mary Butterworth Parson
AKA Mary B. Parson
AKA Mary E. Parson
AKA Mrs. G. L. Parson, Jr.

RGC (USA) MINERALS INC.:

_signature_

Vice President

(CORPORATE SEAL)
Attest: _signature_
Its _____ Secretary

STATE OF    FLORIDA
COUNTY OF    CLAY

The foregoing instrument was acknowledged before me this 13th day of February 1989 1990 by Daniel P. Wolcott, Vice President of RGC (USA) MINERALS INC., a Delaware corporation, on behalf of the corporation.

_signature_
Notary Public

My Commission Expires: Notary Public, State of Florida
My Commission Expires May 21, 1993

[NOTARIAL SEAL]

STATE OF VIRGINIA

CITY/COUNTY OF _Sussex_

The foregoing instrument was acknowledged before me this 18th day of October 1989, by G. L. Parson, Jr. and Mary Elizabeth Parson, husband and wife

My Commission Expires:

October 28, 1991

_signature_
Notary Public

[NOTARIAL SEAL]

**EXHIBIT A**
**TO**
**MINING LEASE**
**BY AND BETWEEN**


**G. L. PARSON, JR., AKA GEORGE LEE PARSON, JR.,**
**AKA G. L. PARSON, and AKA G. LEE PARSON, JR., and**

**MARY ELIZABETH PARSON, AKA MARY BUTTERWORTH PARSON,**
**AKA MARY B. PARSON, AKA MARY E. PARSON, and**
**AKA MRS. G. L. PARSON, JR., husband and wife**
**(LESSOR)**

**AND**

**RGC (USA) MINERALS INC.**
**(RGC)**

EXHIBIT A

Under the terms of the above-referenced Mining Lease, to which this Exhibit is attached, Lessor has leased to BCC and granted to BCC various rights regarding certain real property (including all mineral rights and minerals) referred to as the "Property", which is situated in the _____ Sapony _____ Magisterial District, _____ Dinwiddie _____ County, State of Virginia, which is hereby represented and warranted by Lessor to amount to 127.68 acres, and which is described as follows:

That same tract or parcel of land conveyed to G. L. Parson, Jr. by Warranty Deed, dated December 18, 1972, and recorded in Deed Book 160 at page 61, in Clerk's Office of Circuit Court of Dinwiddie County, Virginia. To Wit: All of that certain tract, piece or parcel of land lying and being situate in Sapony District, Dinwiddie County, Virginia, South of what is called Dover Spring Branch, containing one hundred and forty (140) acres, more or less, and bounded on the North by the said Dover Spring Branch, on the East by the land of Charlie Pride and the land of Lee Parson, on the South by the land of S. T. Rideout and on the West by the land of Mrs. C.C. Rideout, and being the same land described in and conveyed by deed dated July 20, 1896, from Thomas J. Crowder and wife to Mary R. Carraway, duly recorded in the Clerk's Office of the Circuit Court of Dinwiddie County, Virginia, in Deed Book 20, No. 1 at page 317, and being in all respects the same real estate conveyed to G. Lee Parson from W. Potter Sterne, Special Commissioner, by deed dated the 13th day of May, 1938, and recorded in the aforesaid Clerk's Office in Deed Book 62, at page 24.

LESS and EXCEPT: That same tract or parcel of land conveyed to Lance V. Everett and Ann P. Everett, husband and wife, by Warranty Deed, dated December 18, 1976, and recorded in Deed Book 182 at page 259, in the Clerk's Office of Circuit Court of Dinwiddie County, Virginia. To Wit: All that certain lot, piece or parcel of land lying and being situate in Sapony District, Dinwiddie County, Virginia, containing 2.68 acres, more or less, as shown on a plat of survey made by W. G. Chappell, C.L.S., dated December 10, 1976, which plat is attached hereto and made a part hereof, and on which plat said lot is described as follows, to-wit: Beginning at a spike in the center of State Highway Route No. 619, thence N.86° 00' E.638.80 feet to an iron (set), thence S. 4° 00' E.189.00 feet to an iron (set), thence S. 86° 00' W.638.80 feet to a spike in the center of said Route No. 619, thence N 4°00' W.189.00 feet along the center of said Route No. 619 to a spike, the point of beginning.

Being in all respects a part or portion of the same real estate conveyed to G. L. Parson, Jr. from G. Lee Parson, also known as G. L. Parson, Sr. and Virgie F. Parson, his wife, by deed dated the 18th day of December, 1972, and recorded in the Clerk's Office of the Circuit Court of Dinwiddie County, Virginia in Deed Book 160 at page 61.

AND ALSO LESS and EXCEPT 14.63 acres, as described in unrecorded survey by Kenneth O. Peterson, L.S. 1553 dated 9-19-1989, standing in the name of G. L. Parsons.

EXEMPTING from all mining operations a parcel of land used for a cemetery.

Subject property is referred to in the Dinwiddie County tax records as Tax Parcel Number 101-4.

SPL Roy Pol
VA 8/89

**EXHIBIT B**
**TO**
**MINING LEASE**
**BY AND BETWEEN**
**G. L. Parson, Jr., and Mary Elizabeth Parson,**
**husband and wife**
**(Lessor)**

**AND**

**RGC (USA) MINERALS INC.**
**(RGC)**

**RGC's Royalty Policy for Virginia Operations**

**COPYRIGHT © RGC (USA) MINERALS INC. 1989**

This document sets forth RGC's Royalty Policy for Virginia Operations ("Royalty Policy"), which is referred to in Section 7 (Royalty Payments) of the above-referenced Deed of Mining Lease ("Lease") and which is attached to and incorporated into the Lease by reference.

1. **Definitions.** The terms defined in the body of the Lease anywhere in this Royalty Policy will have the same meanings throughout this Royalty Policy. The following terms will have the following meanings:

   (a)  "Principal Minerals" means Ilmenite, Rutile and Zircon.

   (b)  "Minor Minerals" means Minerals other than Principal Minerals.

   (c)  "Mineralized Property" means that portion of the Property which RGC estimates, using the then most current drilling data or survey information, contains Minerals-bearing sands which have a minimum discoverable depth of 15 feet and which have a cut-off grade of two percent (2%) by weight average Minerals content. All lump sum payments under Section 5 (Initial Payment and Advance Royalty Payments) of the Lease are based on the Mineralized Property as of the Lease Date, and subsequent changes in the acreage of the Mineralized Property will not affect the lump sum payments.

   (d)  "Sales Value per ton of each Mineral" means the dollar value per short ton derived by dividing (i) the actual dollar sales of each Mineral following processing, by that day, plant (net of returns, sales taxes, sales discounts and commissions but not net of settlement discounts) for the calendar quarter ("Quarter") which is the subject of the Royalty Payment calculation, by (ii) the total sales tonnage for each Mineral in that Quarter, subject to the exclusion of sales to Affiliates contained in Clause 9 (Sales to Affiliates) below.

   (e)  "Lessor's Stock Account" means the account maintained by RGC in Lessor's name for the purpose of tracking and reporting production, inventory, and sales allocations made with respect to saleable Minerals attributed to the Property, and for the purpose of calculating and accounting to Lessor through the Stock Report described in Clause 3 below, for any Royalty Payments.

   (f)  "All Stock Accounts" means the Lessor's Stock Account and all other stock accounts maintained by RGC for other properties on which RGC engages in Mining (as defined in Clause 6(b)(i) below).

   (g)  "Recovery Rate" for any treatment of material is the weight of material that is present after that treatment divided by the weight of material before treatment, expressed as a percentage.

2. **Calculating Royalties.** This Royalty Policy sets forth the methodology to be used in determining and reporting the Royalty Payments payable to Lessor under the Lease. By signing the Lease, Lessor agrees to this methodology, including but not limited to (i) RGC's method of attributing Minerals to the Property as set forth in Clause 6 below and (ii) RGC's method of calculating Royalty Payments as set forth in Clause 7 (Royalty Payment Calculations) below.

3. **Stock Account and Stock Report.** From the commencement of Mining (as defined in Clause 6(b)(i) on the Property until such time as RGC's obligation to pay Lessor Royalty Payments has been fulfilled, RGC will establish and maintain Lessor's Stock Account and will send to Lessor within 30 days after the end of each Quarter a written report ("Stock Report") on the status of Lessor's Stock Account. The Stock Report will show:

   (a)  The tons of saleable Minerals attributed to the Property for the Quarter (see Clause 6 below).

   (b)  Sales from the accumulated tons of saleable Minerals referred to in Clause 3(a) above.

   (c)  Any Advance Royalty Payments paid during the Quarter in accordance with Section 5 of the Lease.

   (d)  Any Royalty Payment payable for the Quarter pursuant to Section 7 (Royalty Payments) of the Lease.

   (e)  A reconciliation of Advance Royalty Payments and Royalty Payments to Lessor pursuant to Section 5 (Initial Payment and Advance Royalty Payments) and Section 7 (Royalty Payments) of the Lease.

The Stock Report will be certified as accurate by RGC's Operations manager or a senior financial employee. By signing this Lease, Lessor agrees to preserve the confidentiality of the sales and production information in all Stock Reports.

4. **Royalty Rate.** RGC will pay Lessor a Royalty Payment equal to ███████ of the Sales Value per ton of each Mineral sold that is attributed to the Property, as reflected in the Stock Account reported to Lessor quarterly in the Stock Report.

5. **Royalty Payment.** Any Royalty Payments due for Principal Minerals attributed to the Property will be paid within 30 days after the end of the Quarter in which such Principal Minerals were sold (i.e. invoiced to the purchaser), and, for Minor Minerals attributed to the Property within 30 days of the end of the Fiscal Year (July 1, June 30) in which they were sold.

6. **Saleable Minerals Attributed to the Property.** Saleable Minerals are attributed to the Property and to Lessor's Stock Account as set forth below:

   (a)  RGC will survey, drill, and analyze drill samples from those portions of the Property which it plans to mine, in order to estimate the tons of Principal Minerals located therein.

   (b)  Production of saleable Minerals is achieved by the following three steps in RGC's Operations:

   (i)  "Mining", extracting and delivery of mineral sand ore to the concentrators.

   (ii)  "Concentrating", removal of non-commercial material.

   (iii)  "Processing", removal of further non-commercial sand and separation into saleable Minerals.

   Each of these steps results in recovery and loss of saleable Minerals depending on the efficiency of each step and the nature of the material being treated. The Recovery Rate for each step varies to a small degree on a daily basis and is determined by regular sampling and analysis of the materials at (mass) through each step.

007

(c)    The Recovery Rates for a given Quarter and the estimates and survey information compiled pursuant to Clause 6(c) above are used to estimate the tons of saleable Principal Minerals recovered from the Property in that Quarter. Those tons of Principal Minerals are then entered in Lessor's Stock Account.

(d)    Within 30 days of the end of each Fiscal Year, RGC will apportion its actual production of saleable Minor Minerals for the year among All Stock Accounts. The apportionment will be made in proportion to the attribution of Principal Minerals among All Stock Accounts for the year.

## 7. Royalty Payment Calculations.

(a)    **Principal Minerals Sold**

     (i)    Within 30 days of the end of each Quarter, RGC will deduct the total tons of each Principal Mineral sold during that Quarter from All Stock Accounts.

     (ii)    The tons of Principal Minerals sold will be deducted from All Stock Accounts on a "First-In/First-Out" (FIFO) basis. Where production of saleable Minerals is attributed to several stock accounts on the same date, sales attributable to such production will be deducted from the affected stock accounts in proportion to the tonnage allocated on that date to such stock accounts.

     (iii)    The sales thus attributed to the Property will be entered in Lessor's Stock Account and reflected in the Stock Report.

     (iv)    RGC will calculate the Sales Value per ton for each Principal Mineral for the Quarter.

     (v)    The Royalty Payment payable to Lessor for the Quarter will equal _____ of the Sales Value per ton for each Principal Mineral for the Quarter multiplied by the tons of each Principal Mineral sold which are attributed to the Property for the Quarter as reflected in the Stock Account.

(b)    **Minor Minerals Sold**

     Within 30 days after the end of each Fiscal Year, a calculation similar to that described in Clause 7(a)(v) above, will be made for Minor Minerals, and the result will be reflected in the Stock Report for the last Quarter of the Fiscal Year.

(c)    **Adjustments**

     At the end of each Fiscal Year, RGC will compare its actual annual Mineral production to the total tons of Minerals attributed to All Stock Accounts in that year. If the actual production is less than the attributed production, then the shortfall will be deducted proportionately from All Stock Accounts. If the actual production exceeds the attributed production, then the excess will be allocated proportionately among All Stock Accounts.

## 8. Commingling and Stockpiling. RGC will commingle Minerals from the Property with Minerals from other properties, may engage in Mining on more than one property in a Quarter, and may in RGC's sole discretion from time to time stockpile Minerals depending on market conditions.

## 9. Sales to Affiliates. RGC may in its sole discretion sell part or all of its Minerals to affiliates of RGC. In such event, the Sales Value per ton of each Mineral used in calculating the Royalty Payment will be based only on RGC's non-affiliates. If such non-affiliate sales are less than 30% of RGC's total sales of the Mineral during the Quarter, then the Sales Value used in calculating the Royalty Payment will equal the greater of (a) the Sales Value based only on RGC's sales to non-affiliates or (b) the indexed price for the Mineral, determined by multiplying (i) the Sales Value per ton of the Mineral last used in calculating a Royalty Payment times (ii) the percentage change in the Producer Price Index – Titanium Pigments Index of the Bureau of Labor Statistics, U.S. Department of Labor (Code No. 06220209, 1982=100). Such percentage change will be based on the change in the index from the last month of the Quarter in which the Sales Value referred to in Clause (i) was used to the last month of the Quarter for which the Royalty Payment is being calculated.

## 10. Most Favored Lessor. If RGC agrees, after signing this Lease, to pay a higher initial Payment per acre, higher aggregate Advance Royalty Payments per acre (excluding any such highest payments that result from either (i) an increase in a lease date payment which raises a lessor's total lease date payments to seven percent (7%) of RGC's then-current estimate of the lessor's total Advance Royalty Payments and Royalty Payments or (ii) variations in Advance Royalty Payments that are based upon or limited by Clause 12 hereof, or higher royalty rates as to any other leased property in the Area, RGC will within 30 days of the more favorable lease pay Lessor any amount necessary to adjust retroactively payments previously received by Lessor to the more favorable levels, and the more favorable levels that are prospective in nature will thereafter apply to this Lease. This Clause does not require that retroactive adjustments include the time value of money. This Clause applies only to leases and not to purchases, options to purchase, purchase-leaseback arrangements or other arrangements.

## 11. Completion of Mining.

(a)    RGC will send Lessor written notice when it has completed Mining on the Property.

(b)    The next Stock Report after such notice will contain a reconciliation comparing (i) the total of all Royalty Payments and Advance Royalty Payments paid to date, with (ii) the product obtained by multiplying the total number of acres of the Property from which RGC removed the topsoil in preparation for Mining times $3,500-per-acre average Minimum Royalty provision in Section 8 (Minimum Royalty) of the Lease.

(c)    If that Stock Report reflects that all tons of Minerals attributed to the Property have already been sold, that Stock Report will be Lessor's last Stock Report and final reconciliation, and Lessor will be paid (i) any Royalty Payments payable for that Quarter, and (ii) the final payment, if any, required by the $3,500-per-acre average Minimum Royalty provision (the "Final Payment"). The Final Payment will equal the amount, if any, by which the product described in Clause 11(b)(ii) exceeds the total described in Clause 11(b)(i).

(d)    If that Stock Report reflects that any tons of Minerals attributed to the Property have not yet been sold, Lessor will be paid any Royalty Payments payable for that Quarter, and Lessor may elect, by sending written notice to RGC within 30 days, to either: (i) forfeit all rights to future Royalty Payments with regard to all unsold tons and receive the Final Payment, if any, determined in accordance with Clause 11(c) above; or (ii) continue Lessor's Stock Account in existence, and defer the final reconciliation and Final Payment, if any, until all such unsold tons are sold and the final total of all Royalty Payments and Advance Royalty Payments can be used in determining any Final Payment due.

## 12. Advance Royalty Payment: "70% of Estimated Future Royalty Payments". At least one year before RGC commences Mining on the Property, RGC will estimate, using the then most current drilling data and survey information, the tons of Minerals located therein. Using the higher of this estimated tonnage or 4,977,663 tons and applying reasonably expected Recovery Rates and prices, RGC will in good faith estimate the total sales value of the saleable Minerals recoverable from the Mineralized Property. The Advance Royalty Payment equal to "70% of Estimated Future Royalty Payments" set forth in Section 6 (Initial Payment and Advance Royalty Payments) of the Lease will be determined by (a) multiplying that estimated total sales value times the _____ (b) multiplying the result by seventy percent (70%), and (c) deducting therefrom all Advance Royalty Payments previously made under the Lease.

## 13. No Reliance on Estimates or Representations. Because of the inherent uncertainties in making projections and estimates which may affect Lessor's Royalty Payments, Lessor, in deciding whether to enter into this Lease, should not rely upon any representation, written or oral, as to the likelihood or value of Royalty Payments, and Lessor should bear in mind that the $3,500-per-acre average Minimum Royalty provision contained in Section 8 (Minimum Royalty) of the Lease applies only if RGC engages in Mining on the Property, and even then applies only to the total number of acres from which RGC removes the topsoil in preparation for Mining. Lessor acknowledges that Lessor understands the foregoing sentence and Lessor agrees that Lessor has not relied upon any representation, written or oral, as to the likelihood or value of Royalty Payments.

961-1033



STD Lease
VA 8/89

# DEED OF MINING LEASE

THIS DEED OF MINING LEASE, including the attached Exhibits which are incorporated herein by this reference, ("Lease")
is made and entered into on October 13, 1989, by and
between G. L. Parson, Jr. AKA George Lee Parson, Jr. AKA G. L. Parson, and AKA
G. Lee Parson, Jr. and Mary Elizabeth Parson, AKA Mary Butterworth Parson, AKA
Mary B. Parson, AKA Mary E. Parson and AKA Mrs. G. L. Parson, Jr., husband and wife
Route 1, Box 60, Stony Creek, Virginia 23882

("Lessor") and RGC (USA) MINERALS INC., a Delaware corporation, whose address is Warner Road, P.O. Box 1307, Green Cove Springs, Florida, 32043 ("RGC"). In consideration of the mutual promises made in this Lease, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Lessor and RGC agree as follows:

**1. Defined Terms.** Any word or phrase that is capitalized and placed in quotations in this Lease is a defined term and when it is capitalized will have the same meaning throughout this Lease.

**2. Purpose.** The purpose of this Lease is to allow RGC to explore for and, at RGC's sole discretion, to mine, remove, commingle, and sell Minerals from the Property, to use the Property, to mine Minerals from the Property or other property, and to conduct related activities. "Minerals" means the following group of minerals and mineral products: Ilmenite, Leucoxene, Rutile, Zircon, Staurolite, Kyanite/Sillimanite/Monazite, Xenotime, and Garnet, and associated by-products. Title to any Minerals mined shall, if not already vested in RGC, pass to RGC as they are severed from the Property.

**3. Grant of Lease.** Lessor hereby leases to RGC the Property (as defined on Exhibit A), on the terms and conditions in this Lease.

**4. Grant of Rights.** Lessor grants to RGC the following exclusive rights with regard to the Property:
- (a) To enter the Property, to survey, explore, drill, test, and sample (the foregoing activities are defined as "Exploration").
- (b) To clear, fix, establish buildings (subject to Section 21 (Compensation for Buildings)), other structures or obstacles, and to, standing timber, plants, and foodstuffs on the Property and that RGC, in its absolute discretion, wishes to clear from the Property to exercise its rights as set out in this Section 4; to construct, relocate, use, or remove roads, power and communication lines, dredge ponds, tailing ponds, settling ponds, pipelines, buildings, storage facilities, canals, tailings, dykes, gates, drains, and other structures and facilities on the Property; to relocate, to prepare for mining, on the Property; and to develop, mine, cross mine, dredge, remove, concentrate, separate, commingle, stockpile, haul, process, and sell Minerals (the foregoing activities, whether conducted on the Property or on other property in Dinwiddie and Sussex Counties, Virginia ("Area"), are defined as "Operations").
- (c) To use the Property to store, transport, or dispose of Minerals, water, tailings, and material resulting from RGC's Operations.
- (d) To use water from or appurtenant to the Property and to drain through and from the Property and to draw into any course in the Property any water from RGC's Operations.
- (e) To take all steps to accomplish Reclamation (as defined in Section 14) of the Property.
- (f) To use all easements, means of access, and rights-of-way from and to the Property; and
- (g) To use the Property for the purpose described in this Section, in conjunction with RGC's Exploration, Operations and Reclamation on other property.

Notwithstanding the foregoing, RGC is not granted the right under this Lease to construct or operate on the Property a processing plant for the final concentration of the concentrate (rare saleable minerals).

**5. Term of Lease.** This Lease will begin on the date first written above and will end 20 years thereafter, unless (a) the Lease is ended earlier under Section 19 (Termination), (b) the Lease is automatically terminated by RGC's failure, for reasons other than a temporary inability to obtain, through diligent efforts, all necessary governmental permits and authorizations, to commence "Mining" (as defined in the Royalty Policy) in the Area by the eighth anniversary of this Lease, or (c) the Lease is automatically extended to allow RGC to complete ongoing operations on the Property. If so extended, the Lease shall terminate upon the earlier of written notice from RGC pursuant to Section 19 (Termination), or the passage of a period of 180 consecutive days, in which RGC conducts no Operations on the Property. "Term" means the period of time during which this Lease is in effect, and, in the absence of earlier termination, includes both the initial 20-year term and any extended term.

**6. Initial Payment and Advance Royalty Payments.** Subject to the terms and conditions of this Lease, RGC will pay to Lessor, during the Term of this Lease, on or before the dates indicated, the following lump sum payments and payments per acre of the Property retained under the Lease at the time of the payment:

| Payment Date | Payment Type | Payment |
|---|---|---|
| Lease Date | Initial Payment | $250 per acre |
| Lease Date | Advance Royalty | $750 per acre |
| On or before December 31 of each year following the year this Lease is signed | Rental Payment | $15 per acre |
| Earlier of (a) "Mining" (as defined in Royalty Policy) in Area or (b) Fifth Anniversary | Advance Royalty | $24,000.00 lump sum, equal to $1000 per acre of Mineralized Property (as defined in Royalty Policy) |
| Tenth Anniversary if no "Notice of Mining" (as defined in Section 9) given | Advance Royalty | $24,000.00 lump sum, equal to $1000 per acre of Mineralized Property, subject to 70% Limitation (as defined in Royalty Policy) |
| Fifteenth Anniversary if no Notice of Mining given | Advance Royalty | $24,000.00 lump sum, subject to 70% Limitation |
| Notice of Mining | Advance Royalty | 70% of Estimated Future Royalty Payments (as defined in Royalty Policy) |

The Initial Payment and all Rental and Advance Royalty Payments paid to Lessor are non-refundable. The Advance Royalty Payments paid to Lessor will be credited against any Royalty Payments otherwise payable pursuant to Section 7 (Royalty Payments) and may be prepaid by Payment to Lessor at the time of payment required upon Notice of Mining, will satisfy in full any obligation RGC may thereafter have to pay the Tenth and Fifteenth Anniversary Advance Royalty Payment.

**7. Royalty Payments.** RGC will pay to Lessor quarterly, Royalty Payments equal to �_▇▇▇▇▇▇_ of the Sales Value of Minerals attributed to the Property, which RGC mines and sells. The Royalty Payment will be paid in accordance with Exhibit B: RGC's Royalty Policy for Virginia Operations ("Royalty Policy").

**8. Minimum Royalty.** If the total of all Advance Royalty Payments and Royalty Payments paid to Lessor under this Lease does not average $3,500 per acre for all of the Property from which RGC removes the topsoil in preparation for Mining ("Minimum Royalty"), RGC will pay to Lessor the amount by which the Minimum Royalty exceeds such total. Any such payment will be determined and paid in accordance with Clause 1 of the Royalty Policy.

**9. Lessor's Use of the Property.** During Exploration, Lessor and RGC will work together to accommodate Lessor's normal activities on the Property. RGC will give Lessor at least twelve months notice ("Notice of Mining") if RGC's Mining will require Lessor to cease activities on that portion of the Property described in the Notice of Mining. Until the end of the notice period, Lessor will have the right, but not the obligation, to harvest any crops, timber, buildings, irrigation systems, fixtures, or personalty of Lessor from that portion of the Property. From the end of the notice period until RGC notifies Lessor otherwise, Lessor will cause all activities to cease on that portion of the Property. During Reclamation, RGC will

SS 0.      009

work with Lessor to allow Lessor to resume Lessor's normal activities on the Property (as soon as reasonably possible and as permitted by governmental reclamation requirements). Lessor will defend and indemnify RGC from and against any claims asserted against RGC arising out of the activities of Lessor or Lessor's invitees. Lessor will be solely responsible for, and will bear all risk of loss related to, any government allotment, subsidy, stabilization or conservation programs that may apply to the Property.

**11.   Safety.** Except as otherwise provided in this Lease, only RGC employees and visitors authorized in writing by RGC will be permitted on those parts of the Property on which Operations are being conducted. All RGC-authorized visitors and their vehicles will carry RGC identification at all times that they are on the Property.

**11.   RGC to Comply With Safety Laws and to Indemnify Lessor.** RGC will conduct its Exploration and Operations in compliance with all applicable safety laws and regulations. RGC will and does indemnify Lessor from and against any claims (environmental or otherwise) asserted against Lessor arising out of RGC's activities. RGC will also indemnify Lessor from, and pay Lessor for, actual damage caused by RGC to crops, pasture, timber, fences, gates, roads and other improvements not described in Section 21 (Compensation for Buildings), located on any portions of the Property that are not undeveloped but are otherwise used by RGC in its activities. RGC will in no event be liable for special or consequential damages, and any payments made pursuant to the preceding sentence will be deemed full and complete compensation for damages in question.

**12.   RGC's Right to Determine Whether, When and Where to Mine.** Nothing in this Lease or in the relationship between Lessor and RGC will constitute or create any express or implied duty on the part of RGC to perform Exploration or Operations, or to mine the Property at any rate, in any manner, or at all. RGC's Exploration and Operations, if any, will occur only to the extent and at the location and times, and in the methods and manner that RGC in its sole discretion may determine; provided, however, that RGC will not conduct Operations within 300 feet of Lessor's principal residence, or any principal residence on property adjoining the Property (in such a way as to deprive any such residence of access to a public road; utilities, and water supply (until RGC complies with Section 21(a) (Compensation for Buildings—Principal Residence) (in the case of Lessor's principal residence) or obtains the adjoining property owner's written consent (in the case of an adjoining residence); and provided further that, if RGC engages in Mining in the Area, then RGC will use its best efforts to mine all of the Mineralized Property that can be mined in a commercially reasonable manner.

**13.   Compliance With Laws.** RGC's activities on the Property will be conducted in compliance with all applicable Federal, State and local laws and regulations.

**14.   Reclamation.** RGC agrees to comply with all State and Federal laws, regulations and permits applicable to the Reclamation of the Property. RGC also agrees to post a bond to the extent required by Virginia law, to ensure that all the Property which RGC mines will be reclaimed in accordance with law. RGC will and does indemnify Lessor from and against any claims by State or Federal regulatory agencies arising from RGC's failure to reclaim in accordance with applicable laws, excluding claims caused in part or in whole by Lessor's failure to cooperate with RGC in accordance with the terms of this Lease. RGC's Reclamation of any Property mined may include, but not be limited to, refilling the mined pits, replacing and grading the topsoil, replanting and otherwise complying with all applicable governmental reclamation requirements ("Reclamation").

**15.   Audit.** Lessor will have the right at Lessor's expense to appoint an independent auditor reasonably approved by RGC (which approval is hereby given. If Lessor appoints a national firm in the United States of recognized reputation), to audit, not more than once in any year, RGC's records related to the determination of Royalty Payments for RGC's Fiscal Year (currently July 1 - June 30) immediately preceding such audit. Lessor will instruct Lessor's auditor to send a copy of his report to RGC at the same time that he sends his report to Lessor. Also, Lessor will notify RGC in writing of any objections Lessor may have regarding Royalty Payments, within 60 days of Lessor's receipt of Lessor's auditor's report.

**16.   Taxes.** Taxes will be apportioned and paid as follows:

(a)      RGC will pay the following: taxes or portions thereof, any, mineral severance taxes related to RGC's Operations; property taxes, prorated for the portion of the Property and the time period in which Lessor is prohibited under this Lease from conducting activities; and any increase in property taxes attributable to the Minerals or RGC's Operations.

(b)      Lessor will pay all other taxes related to the Property, including but not limited to: any, taxes on Released Land (as defined in Section 19 (Termination)); any license, capital levy, estate, gift, succession, inheritance, transfer or franchise taxes; and any taxes attributable to Lessor's activities on the Property.

(c)      Lessor will send RGC copies of all assessments, tax bills, or other tax notices related to the Property or to RGC's Operations thereon within 14 days of Lessor's receipt of the same (in such shorter time as may be necessary to preserve the rights of RGC, and Lessor to protest or appeal the same). Lessor will cooperate with RGC in any such protest or appeal. RGC may, in its discretion, pursue such protest or appeal independently of Lessor. RGC will (if any event not be obligated to pay (i) any increase in taxes which RGC is unable to protest or appeal due to Lessor's failure to comply with this Section 16(c) or (ii) any tax bill which RGC does not receive at least 14 days before the bill is due.

(d)      RGC may, but is not required to, pay any taxes on the Property, for which Lessor is responsible under Section 16(b), and deduct such taxes paid from any payments otherwise due to Lessor under this Lease.

**17.   Warranty of Title.**    Lessor warrants as follows:

(a)      Lessor is the sole, legal and equitable owner, in undivided fee simple, of the surface and mineral estate that comprise the Property without limitation whatsoever;

(b)      The Property is (free and clear of all leases, liens, encumbrances and outstanding adverse claims and interests, not of record;

(c)      Lessor has full power and authority to execute this Lease;

(d)      RGC shall have the quiet and peaceful possession and enjoyment of the Property, Minerals, and the proceeds therefrom, against all persons or entities who may claim any interest therein;

(e)      There has been no violation of any applicable Federal, State, or local law or regulation relating to zoning, land use, environmental protection or otherwise with respect to the Property or activities relating thereto; and

(f)       This Lease, and RGC's right, title and interest hereunder, shall at all times be superior to, and have priority over, any right, title or interest in the Property created during the Term of this Lease.

**18.   Lessor Interest.** In entering into this Lease, RGC is relying on Lessor's warranties of title contained in Section 17 (Warranty of Title). Without impairment of those warranties of title (if Lessor owns less than the entire and undivided estate in the Property, RGC may (a) proportionately) reduce all payments otherwise payable under this Lease; (b) offset any prior payments related to the unowned portion against any future payment payable under this Lease; and (c) exercise any other available rights or remedies.

**19.   Termination.** RGC will have the right to terminate this Lease with regard to all or any portion of the Property at any time by sending a written notice to Lessor at least 90 days prior to such termination. The termination will take effect upon the date specified in the notice. Upon termination (all of RGC's rights and obligations under this Lease with regard to the Property (or portion thereof specified in the notice (the "Released Land") will terminate except for any Reclamation rights and obligations and any Minimum Royalty or Royalty Payment obligations arising out of mining conducted on the Released Land prior to such termination. In the event of a partial termination, this Lease will continue in effect with respect to all Property except the Released Land, and the term "Property" will thereafter mean and include only the retained Property and not the Released Land. After termination, RGC will execute, deliver and record a release confirming the relinquishment of the Released Land. Nothing in this Section will negate any obligations RGC has under this Lease with respect to Reclamation of the Property. Notwithstanding the foregoing, RGC will not terminate this Lease in whole or in partial any time prior the sixth anniversary unless RGC also terminates all of its other mining leases in the Area.

**20.   Title Documents.** Lessor will promptly provide to RGC copies of all documents which Lessor now or in the future possesses, relating to or affecting title to the Property; including, but not limited for, title insurance policies, deeds, mortgages, trust or security deeds, boundary agreements, judgments, liens, orders, surveys, boundary descriptions, maps, wills conveying an interest in the Property, trust instruments, leases, licenses, easements and rights-of-way. Lessor will give RGC notice whenever Lessor learns of any matter which may affect the title to the Property. At RGC's request, Lessor will sign and deliver to RGC such additional formal assurances of other documents, in proper and recordable form, as may reasonably be necessary to carry out the terms and intent of this Lease. Lessor will inform RGC immediately if Lessor fails to pay or discharge in a timely manner any promissory note, mortgage, tax, or other lien upon the Property; and RGC may then pay or and be subrogated to the rights of the holder thereof. Except for any taxes for which RGC is liable under this Lease, RGC will have the right to offset from any payment otherwise payable to Lessor under this Lease, all amounts paid by RGC to discharge any such promissory note, mortgage, tax or other lien.

**21.   Compensation for Buildings.**

(a)      Principal Residence. If RGC proposes to remove Lessor's principal residence on the Property, RGC will give Lessor notice (than one year's notice of the intention to do so. At least 180 days prior to such removal, RGC will compensate Lessor by making a payment to Lessor equal to two times the then-present fair market value of such residence (excluding land) as determined by the average of two appraisals; one by an appraiser selected by Lessor and one by an appraiser selected by RGC, from a list of MAI or FHA-approved appraisers compiled by RGC. Lessor may thereafter occupy the residence until the one year notice period expires, at which time, Lessor will vacate the residence to allow its removal. No residence will be constructed on the Property during the Term of this Lease without the prior written consent of both Lessor and RGC.

41RTEMP2                                                                                                                                                   010

(b) of **Other Buildings**. If RGC proposes to remove other buildings on the Property, RGC will give Lessor not less than six months' notice of its intention to do so. At least 90 days prior to such removal, RGC will compensate Lessor by making a payment to Lessor equal to the approximate replacement cost of buildings of that nature, as determined by the average of two appraisals by appraisers selected in the manner described in Section 21(a). Lessor will cease using the relevant buildings 30 days prior to the proposed removal and will facilitate removal in all respects.

**22.    Third-Party Claims.** If RGC learns that a third party may have a claim of ownership in any portion or percentage of the Property or any payments under this Lease, RGC may deposit in a special escrow account (with a bank or title insurance company located in Virginia) any payments otherwise due to Lessor under this Lease and give Lessor written notice of the deposit. The sums deposited will remain in the special escrow account until the claim or controversy is resolved, or until there has been a final determination of the claim or controversy by a court or arbitrator, including any appeals therefrom.

**23.    Additional and After-Acquired Rights.** If, during the Term of this Lease, RGC acquires any right or interest in the Property or in any properly adjacent or easements appurtenant thereto, (a) Lessor will promptly notify RGC, (b) any such right or interest acquired in the Property, which Lessor had in this Lease already warranted to be part of the Property, will become part of the Property subject to this Lease without any additional payment to Lessor, (c) RGC may, at RGC's option, at any time, lease any other such right or interest on the same terms as the terms of this Lease, and (d) Lessor will sign, acknowledge, and deliver an Amendment to this Lease and to the Memorandum of this Lease to RGC, so as to include such right or interest.

**24.    Entireties.** If the Property is now or later owned, in severalty or in separate tracts, RGC will nevertheless be entitled to treat the Property as an undivided whole under this Lease, with all payments payable under the Lease to be paid (either directly or pursuant to Section 25 (Multiple Owners)), to the separate owners of the Property in the proportion that their ownership interest, measured in acres, comprehensive ownership of acres, bears to the whole Property, provided, however, that in no event will RGC's total payment obligations to the separate owners exceed the payment obligations that RGC would have incurred under the Lease if the Property were owned in undivided fee simple by a single owner.

**25.    Multiple Owners.** Whenever two or more parties are entitled to receive any payments under this Lease, RGC may pay such payments unless and until all of those parties designate in a recordable instrument an agent empowered to receive all such payments and to execute division and transfer orders on behalf of all those parties and their respective successors in title. Delivery of any payment due under this Lease to the designated agent fulfills RGC's obligation to make that payment to those parties.

**26.    Assignment.** Both parties have the right to assign their rights and obligations under this Lease, in whole or in part, provided, however, that:

(a)    The party making such an assignment must give the other party prior written notice thereof;

(b)    The provisions of this Lease will apply to and be binding upon the successors and assigns of the respective parties;

(c)    Any change or division in the ownership of the Property or of the right to receive any payments under this Lease, however accomplished, will not increase RGC's total payment obligations under this Lease or affect RGC's rights to conduct Exploration, Operations or Reclamation on the Property;

(d)    Notwithstanding Section 26(a), RGC may, without notice or consent, assign any of its rights or obligations to affiliates of RGC, or use the services of independent contractors or agents to perform any of its rights or obligations; and

(e)    No assignment will relieve the assigning party of any obligations or liability to the other party, unless the other party provides a written release to the assigning party.

**27.    Force Majeure.** Neither party will be deemed in default under this Lease during any period in which its exercise or performance of any of its rights or obligations under this Lease is prevented by any cause reasonably beyond its control. Such an event is referred to in this Lease as "Force Majeure." Force Majeure will include, but is not limited to, the following: fire, floods, storms, hurricanes, tornados, winds, other damage from the elements, declared or undeclared war, strikes, labor disputes, riots, civil unrest, action of governmental authorities, condemnation, eminent domain, crime, failure to receive required governmental approvals, inability to obtain water for Operations, a substantial fall in the market price of Mineral, lack of access, litigation, acts of God, and acts of the public enemy. The Term of this Lease will be extended for a period of time equal to the period of Force Majeure. All such periods will be deemed to begin at the earliest time a party is prevented from exercising or performing any of its rights or obligations by reason of Force Majeure.

**28.    No Broker.** Lessor and RGC represent and warrant to each other that no broker, agent, or finder has acted on its behalf in connection with this Lease, and that no commissions, fees, or other monies are due to any broker, agent, or finder. In addition, Lessor and RGC will and do indemnify each other from all claims with respect to any Brokerage, finder's or leasing commissions in connection with this Lease or any of the transactions contemplated under this Lease.

**29.    Condemnation.** Lessor will immediately notify RGC of any condemnation proceeding that may affect the Property. Lessor will cooperate with RGC in defending or settling the same. RGC may, in its discretion, defend its rights independently of Lessor. Any condemnation award will be shared between Lessor and RGC as provided by law. Any condemned Property will constitute Released Land as of the date of condemnation, and this Lease will continue in effect as to the remaining Property.

**30.    Dispute Resolution.** Subject to the provisions of this Section, any controversy, claim, or dispute arising out of or related to this Lease, or to the formation, negotiation, or breach thereof, will be settled by binding arbitration in Richmond, Virginia before a single arbitrator, in accordance with the Commercial Arbitration Rules of the American Arbitration Association. Any award of damages will be limited to actual, compensatory damages. Judgment upon the award rendered by the arbitrator may be confirmed by, and entered in, any court having jurisdiction thereof. Prior to initiating any arbitration, the initiating party will give the other party written notice of the claim, and will allow the other party 30 days from the date that the notice is received to amicably resolve the claim. If the claim is not resolved within the 30 day period, the initiating party's sole and exclusive remedy will be to submit the dispute to arbitration. The parties will comply with any arbitration award within 30 days of its issuance, or as soon as practicable thereafter, and the Lease will continue in full force and effect. In no event will the existence of any dispute, arbitration or award suspend or otherwise affect any party's rights or obligations under this Lease, or interfere in any way with RGC's Operations.

**31.    No Interference With RGC's Operations.** Lessor has not, and will not, during the Term of this Lease, take any action or grant any right which would in any way interfere with RGC's exercise of its rights as set out in Section 4 (Grant of Rights) of this Lease.

**32.    No Implied or Continuing Waiver.** If either party waives or does not enforce any provision of this Lease on any occasion, that action will not constitute waiver of: (a) that provision as to any other time, event or occurrence; or (b) any other provision.

**33.    Notices.** Any notice given to the other party under this Lease must be in writing, and sent by United States registered or certified mail (with receipt requested) or via Federal Express or similar overnight courier service, addressed to the address set forth on the first page of this Lease. All notices will be deemed to have been made when deposited in the mail or with the courier as provided above. All notices will be deemed to have been received upon actual receipt by any person at the address listed above. Either party may change its address for the mailing of notices by giving the other party notice of such change of address in the manner provided for in this Section.

**34.    Entire Agreement; No Oral Modification.** This Lease constitutes the entire agreement between the parties and supersedes all previous agreements (written or oral). Lessor hereby expressly acknowledges that, in entering into this Lease, Lessor has not relied on any oral or written statements made by RGC, its employees, agents or independent contractors. This Lease may only be modified by a written agreement in recordable form signed by Lessor and an authorized officer of RGC.

**35.    Choice of Law.** This Lease will be construed, interpreted and governed by the laws of Virginia.

**36.    Successors and Assigns.** This Lease constitutes a covenant running with the land and will be binding on, and inure to the benefit of, Lessor, RGC, and Lessor's and RGC's heirs, legal representatives, executors, administrators, successors and assigns, as the case may be.

**37.    Severability.** In the event that any court or duly appointed arbitrator determines that any provision of this Lease is unenforceable, illegal, or in conflict with any Federal, state, or local law, the parties will: petition (or will hereby be deemed to have petitioned) the court or arbitrator to reform that provision in such a way as to carry out the intent of the parties to the extent permissible under law. If the court or arbitrator declines to reform that provision, then that provision will be considered severable from the rest of the Lease, the remaining provisions of the Lease will not be affected, and this Lease will be construed and enforced as if the Lease did not contain the unenforceable or illegal provision.

**38.    Modification to Cure Any Violation of the Rule Against Perpetuities.** Lessor and RGC do not intend that any provision in this Lease will in any way violate the Rule Against Perpetuities or any related rule. If any such violation should occur, it is the intent of Lessor and RGC that the appropriate court or arbitrator will reform the provision in such a way as to approximate most closely the intent of the parties within the limits permissible under such rule or related rules, and will enforce the Lease as so reformed.

-5-

39.   *Memorandum.*  At the time this Lease is signed, the parties will sign a Memorandum of Lease which RGC will record. In the event of a conflict between the terms of the Memorandum of Lease and this Lease, the terms of this Lease will control.

40.   *Mortgagee Consent.*  Lessor agrees to use Lessor's best efforts to obtain promptly, and to provide to RGC a copy of any consent in this Lease required by the terms of any mortgage or other instrument creating rights superior to this Lease with respect to all or any part of the Property. Such consent, however, will neither affect nor be a condition precedent to the effectiveness and enforceability of the Lease as between Lessor and RGC.

41.   *Headlines.*  The headings contained in this Lease are for the convenience of the parties only, and will not be used in the interpretation.

42.   *Obligations That Survive This Lease.*  In addition to other obligations that survive this Lease as set forth in this Lease, the parties' obligations under the following Sections of this Lease will remain in full force and effect following, and will not be affected by, the termination of, or expiration of the Term of, this Lease: Sections 7.9, 11, 16-15, 17, 19, 22, 24-26, 30, 32-38, and 41-43.

43.   *Good Faith.*  During the Term of this Lease, each party will act in good faith to fulfill the intent of this Lease, and will meet with the other party to discuss and to try to resolve amicably any issues that may arise.

IN WITNESS WHEREOF, the parties have executed this Lease under seal as of the date first above written.

OWNER:

_G. L. Parson, Jr._ (SEAL)

G. L. Parson, Jr.
(Print Name)
AKA George Lee Parson, Jr.
AKA G. L. Parson
AKA G. Lee Parson, Jr.

_Mary Elizabeth Parson_ (SEAL)

Mary Elizabeth Parson
(Print Name)
AKA Mary Butterworth Parson
AKA Mary B. Parson
AKA Mary E. Parson
AKA Mrs. G. L. Parson, Jr.

STATE OF VIRGINIA

CITY/COUNTY OF _____

The foregoing instrument was acknowledged before me this 13th day of _____ 199_ by G. L. Parson, Jr. and Mary Elizabeth Parson, husband and wife.

My Commission Expires:

Oct. 25, 1991.

Notary Public

[NOTARIAL SEAL]

RGC (USA) MINERALS INC.

By: _Daniel P. Wolcott_

Its   Vice   President

[CORPORATE SEAL]

Attest: _____

Its   Secretary

STATE OF   FLORIDA

COUNTY OF   CLAY

The foregoing instrument was acknowledged before me this 13 day of February 1990 by Daniel P. Wolcott as Vice President of RGC (USA) MINERALS INC., a Delaware corporation, on behalf of the corporation.

_Ruth Robino_
Notary Public

My Commission Expires: Notary Public, State of Florida
My Commission Expires May 27, 1993

[NOTARIAL SEAL]

4187EMP2

EXHIBIT A
TO
MINING LEASE
BY AND BETWEEN

G. L. PARSON, JR., AKA GEORGE LEE PARSON, JR.,
AKA G. L. PARSON, and AKA G. LEE PARSON, JR., and
MARY ELIZABETH PARSON, AKA MARY BUTTERWORTH PARSON,
AKA MARY B. PARSON, AKA MARY E. PARSON, and
AKA MRS. G. L. PARSON, JR., husband and wife
(LESSOR)

AND

RGC (USA) MINERALS, INC.
(RGC)

EXHIBIT A

Under the terms of the above-referenced Mining Lease, to which this Exhibit is attached, Lessor has leased to RGC, and granted to RGC various rights regarding, certain real property (including all mineral rights and minerals) referred to as the "Property", which is situated in the Stony Creek Magisterial District, Sussex County, State of Virginia, which is hereby represented and warranted by Lessor to amount to 55.00 acres, and which is described as follows:

That same tract or parcel of land conveyed to G.L. Parson Jr., by Warranty Deed, dated April 11, 1960, and recorded in Deed Book 59 at page 559, in Clark's Office of Circuit Court of Sussex County, Virginia. To Wit: . . . . all of that certain tract or parcel of land sold in bulk and not by acres, said to contain fifty (50) acres, be it the same more or less, and being in Stony Creek Magisterial District, Sussex County, Virginia, with general warranty. Bounded and described as follows, on the North by Public Road leading from Concord Church to Stony Creek, On the East by the "Old Man Love Tract" formerly owned by Camp Manufacturing Company, on the South by a branch and on the West by said public road leading from Concord Church to Stony Creek, Va."; and being in all respects the identical real estate that was conveyed to G. Lee Parson, Sr., in the name of G. Lee Parson, by deed from J. Walter Harrison and wife, dated April 16, 1915 and duly recorded in the Clark's Office of the aforesaid county in Deed Book 24 at page 303.

Subject property is referred to, in the Sussex County tax records as Tax Parcel Number 101-17.

014

SPL Roy Pol
VA 5/89.

## EXHIBIT B
### TO
### MINING LEASE
### BY AND BETWEEN
G. L. Parson, Jr. and Mary Elizabeth Parson,
husband and wife
(Lessor)

### AND

### RGC (USA) MINERALS INC.
(RGC)

### RGC's Royalty Policy for Virginia Operations

COPYRIGHT © RGC (USA) MINERALS INC. 1989

This document sets forth RGC's Royalty Policy for Virginia Operations ("Royalty Policy") which is referred to in Section 7 (Royalty Payments) of the above-referenced Deed of Mining Lease ("Lease") and which is attached to and incorporated into the Lease by reference.

**1.   Definitions.**  The terms defined in the body of the Lease or anywhere in this Royalty Policy will have the same meanings throughout this Royalty Policy. The following terms will have the following meanings:

(a)      "Principal Minerals" means Ilmenite, Rutile and Zircon.

(b)      "Minor Minerals" means Minerals other than Principal Minerals.

(c)      "Mineralized Property" means that portion of the Property which RGC estimates, using the then most current drilling data and survey information, contains Mineral-bearing sands which have a minimum dredgeable depth of 15 feet and which have a cutoff grade of two percent (2%) by weight average Minerals content. All lump sum payments under Section 6 (Initial Payment and Advance Royalty Payments) of the Lease are based on the Mineralized Property as of the Lease Date, and subsequent changes in the acreage of the Mineralized Property will not affect the lump sum payments.

(d)      "Sales Value per ton of each Mineral" means the dollar value per short ton derived by dividing (i) the actual dollar sales of each Mineral, following processing, by the dry plant (net of returns, sales taxes, sales discounts and commissions but net out of all sales and discounts) for the calendar quarter ("Quarter") which is the subject of the Royalty Payment calculation, by (ii) the total sales tonnage for each Mineral in that Quarter, subject to the exclusion of sales to affiliates contained in Clause 9 (Sales to Affiliates) below.

(e)      "Lessor's Stock Account" means the account maintained by RGC in Lessor's name for the purpose of tracking and reporting production, inventory and sales allocations made with respect to saleable Minerals attributed to the Property and for the purpose of calculating and accounting to Lessor, through the Stock Report described in Clause 3 below, for any Royalty Payments.

(f)      "All Stock Accounts" means the Lessor's Stock Account and all other stock accounts maintained by RGC for other Properties on which RGC engages in Mining (as defined in Clause 6(b)(i) below).

(g)      "Recovery Rate" for any treatment of material is the weight of material that is present after that treatment divided by the weight of material before treatment, expressed as a percentage.

**2.   Calculating Royalties.**  This Royalty Policy sets forth the methodology to be used in determining and reporting the Royalty Payments payable to Lessor under the Lease. By signing the Lease Lessor agrees to that methodology, including, but not limited to (i) RGC's method of attributing Minerals to the Property, as set forth in Clause 6 below, and (ii) RGC's method of calculating Royalty Payments, as set forth in Clause 7 (Royalty Payment Calculations) below.

**3.   Stock Account and Stock Report.**  From the commencement of Mining (as defined in Clause 6(b)(i)), on the Property until such time as RGC's obligation to pay Lessor Royalty Payments has been fulfilled, RGC will establish and maintain Lessor's Stock Account and will send to Lessor within 30 days after the end of each Quarter a written report ("Stock Report") on the status of Lessor's Stock Account. The Stock Report will show:

(a)      The tons of saleable Minerals attributed to the Property for the Quarter (see Clause 6 below).

(b)      Sales from the accumulated tons of saleable Minerals referred to in Clause 3(a) above.

(c)      Any Advance Royalty Payments paid during the Quarter in accordance with Section 6 of the Lease.

(d)      Any Royalty Payment payable for the Quarter pursuant to Section 7 (Royalty Payments) of the Lease.

(e)      A reconciliation of Advance Royalty Payments and Royalty Payments to Lessor pursuant to Section 6 (Initial Payment and Advance Royalty Payments) and Section 7 (Royalty Payments) of the Lease.

The Stock Report will be certified as accurate by RGC's Operations manager or a senior financial employee. By signing this Lease, Lessor agrees to preserve the confidentiality of the sales and production information in all Stock Reports.

**4.   Royalty Rate.**  RGC will pay Lessor a Royalty Payment equal to ████████████ of the Sales Value per ton of each Mineral sold that is attributed to the Property, as reflected in the Stock Account and as reported to Lessor, quarterly in the Stock Report.

**5.   Royalty Payment.**  Any Royalty Payments due for Principal Minerals attributed to the Property will be paid within 30 days after the end of the Quarter in which such Principal Minerals were sold (i.e. invoiced to the purchaser), and, for Minor Minerals attributed to the Property, within 30 days of the end of the "Fiscal Year" (July 1 - June 30) in which they were sold.

**6.   Saleable Minerals Attributed to the Property.**  Saleable Minerals are attributed to the Property and to Lessor's Stock Account as set forth below:

(a)      RGC will survey, drill, and analyze drill samples from those portions of the Property which it plans to mine, in order to estimate the tons of Principal Minerals located therein.

(b)      Production of saleable Minerals is achieved by the following three steps in RGC's Operations:

(i)       "Mining" - extracting and delivery of mineral sand ore to the concentrator.

(ii)      "Concentrating" - removal of non-commercial material.

(iii)     "Processing" - removal of further non-commercial sand and separation into saleable Minerals.

Each of these steps results in recovery and loss of saleable Minerals, depending on the efficiency of each step and the nature of the material being treated. The Recovery Rate for each step varies to a small degree on a daily basis and is determined by regular sampling and analysis of the material as it passes through each step.

015

- 6 -

(c)     The Recovery Rates for a given Quarter and the estimates and survey information compiled pursuant to Clause 6(a) above are used to estimate the tons of saleable Principal Minerals recovered from the Property in that Quarter. These tons of Principal Minerals are then entered in Lessor's Stock Account.

(d)     Within 30 days of the end of each Fiscal Year, RGC will apportion its actual production of saleable Minor Minerals for the year among All Stock Accounts. The apportionment will be made in proportion to the attribution of Principal Minerals among All Stock Accounts for the year.

## 7.   Royalty Payment Calculations.

(a)     Principal Minerals Sold.

(i)     Within 30 days of the end of each Quarter, RGC will deduct the total tons of each Principal Mineral sold during that Quarter from All Stock Accounts.

(ii)     The tons of Principal Minerals sold will be deducted from All Stock Accounts on a "First-In/First-Out" (FIFO) basis. Where production of saleable Minerals is attributed to several stock accounts on the same date, sales attributable to such production will be deducted from the affected stock accounts in proportion to the tonnage allocated on that date to such stock accounts.

(iii)     The sales thus attributed to the Property will be entered in Lessor's Stock Account and reflected in the Stock Report.

(iv)     RGC will calculate the Sales Value per ton for each Principal Mineral for the Quarter.

(v)     The Royalty Payment payable to Lessor for the Quarter will equal ▮▮▮▮▮▮▮ of the Sales Value per ton for each Principal Mineral for the Quarter multiplied by the tons of each Principal Mineral sold which are attributed to the Property for the Quarter as reflected in the Stock Account.

(b)     Minor Minerals Sold.

Within 30 days after the end of each Fiscal Year, a calculation similar to that described in Clause 7(a)(v) above, will be made for Minor Minerals and the result will be reflected in the Stock Report for the last Quarter of the Fiscal Year.

(c)     Adjustments.

At the end of each Fiscal Year, RGC will compare its actual annual Mineral production to the total tons of Minerals attributed to All Stock Accounts in that year. If the actual production is less than the attributed production, then the shortfall will be deducted proportionately from All Stock Accounts. If the actual production exceeds the attributed production, then the excess will be allocated proportionately among All Stock Accounts.

## 8.   Commingling and Stockpiling.   RGC will commingle Minerals from the Property with Minerals from other properties; may engage in Mining on more than one property in a Quarter, and may in RGC's sole discretion from time to time stockpile Minerals depending on market conditions.

## 9.   Sales to Affiliates.   RGC may in its sole discretion sell part or all of its Minerals to affiliates of RGC. In such event, the Sales Value per ton of each Mineral used in calculating the Royalty Payment will be based on RGC's sales to non-affiliates. If such non-affiliate sales are less than 30% of RGC's total sales of the Mineral during the Quarter, then the Sales Value used in calculating the Royalty Payment will equal the greater of (a) the Sales Value based only on RGC's sales to non-affiliates or (b) the indexed price for the Mineral, determined by multiplying (i) the Sales Value per ton of the Mineral last used in calculating a Royalty Payment times (ii) the percentage change in the Producer Price Index – Titanium Pigments Index of the Bureau of Labor Statistics, U.S. Department of Labor (Code No. 0622020/0822400)" Such percentage change will be based on the change in the index from the last month of the Quarter in which the Sales Value referred to in Clause (i) was used to the last month of the Quarter for which the Royalty Payment is being calculated.

## 10.   Most Favored Lessor.   If RGC agrees, after signing this Lease, to pay a higher initial Payment per acre, higher aggregate Advance Royalty Payments per acre (excluding any such higher payments that result from either (i) an increase in a lease date payment which raises a lessor's total lease date payments to seven percent (7%) of RGC's then-current estimate of the lease's total Advance Royalty Payments and Royalty Payments or (ii) variations in Advance Royalty Payments that are based upon or limited by Clause 12 hereof), or higher royalty rates as to any other leased property in the Area, RGC will within 30 days of the more favorable lease pay Lessor any amount necessary to adjust retroactively payments previously received by Lessor to the more favorable levels, and the more favorable levels shall become prospective in nature, will thereafter apply, to this Lease. This Clause does not require that retroactive adjustments include the time value of money. This Clause applies only to leases and not to purchases, options to purchase, purchase-leaseback arrangements or other arrangements.

## 11.   Completion of Mining.

(a)     RGC will send Lessor written notice when it has completed Mining on the Property.

(b)     The next Stock Report after such notice will contain a reconciliation comparing (i) the total of all Royalty Payments and Advance Royalty Payments paid to date; with (ii) the product obtained by multiplying the total number of acres of the Property from which RGC removed the topsoil in preparation for Mining times $3,500-per-acre average Minimum Royalty provision in Section 5 (Minimum Royalty) of the Lease.

(c)     If that Stock Report reflects that all tons of Minerals attributed to the Property have already been sold, that Stock Report will be Lessor's final Stock Report and final reconciliation, and Lessor will be paid (i) any Royalty Payments payable for that Quarter, and (ii) the final payment, if any, required by the $3,500-per-acre average Minimum Royalty provision (the "Final Payment"). The Final Payment will equal the amount, if any, by which the product described in Clause 11(b)(ii) exceeds the total described in Clause 11(b)(i).

(d)     If that Stock Report reflects that any tons of Minerals attributed to the Property have not yet been sold, Lessor will be paid any Royalty Payments payable for that Quarter and Lessor may elect, by sending written notice to RGC within 30 days, to either: (i) to let all future Royalty Payments with regard to all unsold tons and receive the Final Payment, if any, determined in accordance with Clause 11(c) above; or (ii) continue Lessor's Stock Account in existence, and defer the final reconciliation and Final Payment, if any, until all such unsold tons are sold and the final total of all Royalty Payments and Advance Royalty Payments can be used in determining any Final Payment due.

## 12.   Advance Royalty Payment: 70% of Estimated Future Royalty Payments.   At least one year before RGC commences Mining on the Property, RGC will estimate, (using the then-most current drilling data and survey information, the tons of Minerals located therein. Using the higher of this estimated tonnage, or ▮▮▮▮▮▮ tons and applying reasonably expected Recovery Rate and prices, RGC will in good faith estimate the total dollar value of the saleable Minerals recoverable from the Mineralized Property. The Advance Royalty Payment equal to 70% of Estimated Future Royalty Payments set forth in Section 5 (Initial Payment and Advance Royalty Payment) of the Lease, will be determined by (a) multiplying the estimated total sales' value times (b) ▮▮▮▮▮; and (c) multiplying the result by seventy percent (70%); and (d) deducting therefrom all Advance Royalty Payments previously made under the Lease.

## 13.   No Reliance on Estimates or Representations.   Because of the inherent uncertainties in making projections and estimates which may affect Lessor's Royalty Payments, Lessor, in deciding whether to enter into this Lease, should not rely upon any representation, written or oral, as to the likelihood or value of Royalty Payments. Lessor should bear in mind that the $3,500-per-acre average Minimum Royalty provision contained in Section 5 (Minimum Royalty) of this Lease applies only if RGC engages in Mining on the Property, and even then applies only to the total number of acres from which RGC removes the topsoil in preparation for Mining. Lessor acknowledges that Lessor understands the foregoing sentence and Lessor agrees that Lessor has not relied upon any representation, written or oral, as to the likelihood or value of Royalty Payments.

(c) The Recovery Rates for a given Quarter and the estimates and survey information compiled pursuant to Clause 6(e) above are used to estimate the tons of saleable Principal Minerals recovered from the Property in that Quarter. Those tons of Principal Minerals are then entered in Lessor's Stock Account.

(d) Within 30 days of the end of each Fiscal Year, RGC will apportion its actual production of saleable Minor Minerals for the year among All Stock Accounts. The apportionment will be made in proportion to the attribution of Principal Minerals among All Stock Accounts for the year.

7. ***Royalty Payment Calculations.***

(a) Principal Minerals Sold

(i) Within 30 days of the end of each Quarter, RGC will deduct the total tons of each Principal Mineral sold during that Quarter from All Stock Accounts.

(ii) The tons of Principal Minerals sold will be deducted from All Stock Accounts on a "First-In/First-Out" (FIFO) basis. Where production of saleable Minerals is attributed to several stock accounts on the same date, sales attributable to such production will be deducted from the affected stock accounts in proportion to the tonnage allocated on that date to such stock accounts.

(iii) The sales thus attributed to the Property will be entered in Lessor's Stock Account and reflected in the Stock Report.

(iv) RGC will calculate the Sales Value per ton for each Principal Mineral for the Quarter.

(v) The Royalty Payment payable to Lessor for the Quarter will equal [redacted] of the Sales Value per ton for each Principal Mineral for the Quarter multiplied by the tons of each Principal Mineral sold which are attributed to the Property for the Quarter as reflected in the Stock Account.

(b) Minor Minerals Sold

Within 30 days after the end of each Fiscal Year, a calculation similar to that described in Clause 7(a)(v) above, will be made for Minor Minerals, and the result will be reflected in the Stock Report for the last Quarter of the Fiscal Year.

(c) Adjustments.

At the end of each Fiscal Year, RGC will compare its actual annual Mineral production to the total tons of Minerals attributed to All Stock Accounts in that year. If the actual production is less than the attributed production, then the shortfall will be deducted proportionately from All Stock Accounts. If the actual production exceeds the attributed production, then the excess will be allocated proportionately among All Stock Accounts.

8. ***Commingling and Stockpiling.*** RGC will commingle Minerals from the Property with Minerals from other properties, may engage in Mining on more than one property in a Quarter, and may in RGC's sole discretion from time to time stockpile Minerals depending on market conditions.

9. ***Sales to Affiliates.*** RGC may in its sole discretion sell part or all of its Minerals to affiliates of RGC. In such event, the Sales Value per ton of each Mineral used in calculating the Royalty Payment will be based only on RGC's sales to non-affiliates. If such non-affiliate sales are less than 30% of RGC's total sales of the Mineral during the Quarter, then the Sales Value used in calculating the Royalty Payment will equal the greater of (a) the Sales Value based only on RGC's sales to non-affiliates or (b) the indexed price for the Mineral, determined by multiplying (i) the Sales Value per ton of the Mineral last used in calculating a Royalty Payment times (ii) the percentage change in the Producer Price Index - Titanium Pigments Index of the Bureau of Labor Statistics, U.S. Department of Labor (Code No. 06220209, 1982=100). Such percentage change will be based on the change in the index from the last month of the Quarter in which the Sales Value referred to in Clause (i) was used to the last month of the Quarter for which the Royalty Payment is being calculated.

10. ***Most Favored Lessor.*** If RGC agrees, after signing this Lease, to pay a higher Initial Payment per acre, higher aggregate Advance Royalty Payments per acre, or higher royalty rates as to any other leased property in the Area, RGC will within 30 days of the more favorable lease pay Lessor any amount necessary to adjust retroactively payments previously received by Lessor to the more favorable levels, and the more favorable levels that are prospective in nature will thereafter apply to this Lease. This Clause does not require that retroactive adjustments include the time value of money. This Clause applies only to leases and not to purchases, options to purchase, purchase-leaseback arrangements or other arrangements.

11. ***Completion of Mining.***

(a) RGC will send Lessor written notice when it has completed Mining on the Property.

(b) The next Stock Report after such notice will contain a reconciliation comparing (i) the total of all Royalty Payments and Advance Royalty Payments paid to date, with (ii) the product obtained by multiplying the total number of acres of the Property from which RGC removed the topsoil in preparation for Mining times $3,500-per-acre average Minimum Royalty provision in Section 8 (Minimum Royalty) of the Lease.

(c) If that Stock Report reflects that all tons of Minerals attributed to the Property have already been sold, that Stock Report will be Lessor's last Stock Report and final reconciliation, and Lessor will be paid (i) any Royalty Payments payable for that Quarter, and (ii) the final payment, if any, required by the $3,500-per-acre average Minimum Royalty provision (the "Final Payment"). The Final Payment will equal the amount, if any, by which the product described in Clause 11(b)(ii) exceeds the total described in Clause 11(b)(i).

(d) If that Stock Report reflects that any tons of Minerals attributed to the Property have not yet been sold, Lessor will be paid any Royalty Payments payable for that Quarter, and Lessor may elect, by sending written notice to RGC within 30 days, to either: (i) forfeit all rights to future Royalty Payments with regard to all unsold tons and receive the Final Payment, if any, determined in accordance with Clause 11(c) above; or (ii) continue Lessor's Stock Account in existence, and defer the final reconciliation and Final Payment, if any, until all such unsold tons are sold and the final total of all Royalty Payments and Advance Royalty Payments can be used in determining any Final Payment due.

12. ***Advance Royalty Payment: "70% of Estimated Future Royalty Payments".*** At least one year before RGC commences Mining on the Property, RGC will estimate, using the then most current drilling data and survey information, the tons of Minerals located therein. Using this information and applying reasonably expected Recovery Rates and prices, RGC will in good faith estimate the total sales value of the saleable Minerals recoverable from the Mineralized Property. The Advance Royalty Payment equal to "70% of Estimated Future Royalty Payments" set forth in Section 6 (Initial Payment and Advance Royalty Payments) of the Lease will be determined by (a) multiplying the estimated total sales value times the [redacted], (b) multiplying the result by seventy percent (70%), and (c) deducting therefrom all Advance Royalty Payments previously made under the Lease.

13. ***No Reliance on Estimates or Representations.*** Because of the inherent uncertainties in making projections and estimates which may affect Lessor's Royalty Payments, Lessor, in deciding whether to enter into this Lease, should not rely upon any representation, written or oral, as to the likelihood or value of Royalty Payments, and Lessor should bear in mind that the $3,500-per-acre average Minimum Royalty provision contained in Section 8 (Minimum Royalty) of the Lease applies only if RGC engages in Mining on the Property, and even then applies only to the total number of acres from which RGC removes the topsoil in preparation for Mining. Lessor acknowledges that Lessor understands the foregoing sentence and Lessor agrees that Lessor has not relied upon any representation, written or oral, as to the likelihood or value of Royalty Payments.

work with Lessor, to allow Lessor to resume Lessor's normal activities on the Property, as soon as reasonably possible and as permitted by governmental reclamation requirements. Lessor will and does indemnify RGC from and against any claims asserted against RGC arising out of the activities of Lessor or Lessor's invitees. Lessor will not be solely responsible for, and will bear all risk of loss related to, any prospect allotment, subsidy, stabilization or conservation programs that may apply to the Property.

**10. Safety.** Except as otherwise provided in this Lease, only RGC employees and visitors authorized in writing by RGC will be permitted on those parts of the Property on which Operations are being conducted. All RGC authorized visitors and their vehicles will carry RGC identification at all times that they are on the Property.

**11. RGC to Comply With Safety Laws and to Indemnify Lessor.** RGC will conduct its Exploration and Operations in compliance with all applicable safety laws and regulations. RGC will and does indemnify Lessor from and against any claims (environmental or otherwise) asserted against Lessor arising out of RGC's activities. RGC will also indemnify Lessor from, and pay Lessor for, actual damages caused by RGC to crops, pasture, timber, fences, gates, roads and other improvements not described in Section 21 (Compensation for Buildings), located on any portions of the Property that are not mined but are otherwise used by RGC in its activities. RGC will in no event be liable for special or consequential damages, and any payments made pursuant to the preceding sentence will be deemed full and complete compensation for the damages in question.

**12. RGC's Right to Determine Whether, When and Where to Mine.** Nothing in this Lease or in the relationship between Lessor and RGC will constitute or create any express or implied obligation on the part of RGC to perform Exploration or Operations, or to mine the Property at any rate, in any manner, or at all. RGC's Exploration and Operations, if any, will occur only to the extent and at the locations and times, and in the methods and manner that RGC, in its sole discretion, may determine, provided, however, that RGC will not conduct Operations within 200 feet of Lessor's principal residence or any principal residence on property adjoining the Property, (or in such a way as to deprive any such residence of access to a public road), utilities, and water supply until RGC complies with Section 21(a) (Compensation for Buildings — Principal Residence (in the case of Lessor's principal residence) or obtains the adjoining property owner's written consent (in the case of an adjoining residence); and provided further that, if RGC engages in Mining in the Area, then RGC will use its best efforts to mine all of the Mineralized Property that can be mined in a commercially reasonable manner.

**13. Compliance With Laws.** RGC's activities on the Property will be conducted in compliance with all applicable Federal, State and local laws and regulations.

**14. Reclamation.** RGC agrees to comply with all State and Federal laws, regulations and permits applicable to the Reclamation of the Property. RGC also agrees to post a bond, to the extent required by Virginia law, to ensure that all the Property which RGC has reclaimed in accordance with law. RGC will and does indemnify Lessor from and against any claim asserted by State or Federal regulatory agencies arising from RGC's failure to reclaim in accordance with applicable laws, excluding a claim caused in part or in whole by Lessor's failure to cooperate with RGC in accordance with the terms of this Lease. Reclamation of any Property mined may include, but not be limited to, refilling the mined path with tailings discharged from the wet-mill dyking and eliminating settling ponds, replacing and seeding the topsoil/replanting, and otherwise complying with all applicable governmental reclamation requirements ("Reclamation").

**15. Audit.** Lessor will have the right at Lessor's expense to appoint an independent auditor reasonably approved by RGC (which approval is hereby given if Lessor appoints a national firm in the United States of recognized reputation), to audit, not more than once in any year, RGC's records relating to the determination of Royalty Payments for RGC's Fiscal Year (currently July 1 - June 30) immediately preceding such audit. Lessor will instruct Lessor's auditor to send a copy of his report to RGC at the same time that he sends his report to Lessor. Also, Lessor will notify RGC in writing of any objections Lessor may have regarding Royalty Payments, within 60 days of Lessor's receipt of Lessor's auditor's report.

**16. Taxes.**

(a)   RGC will pay the following taxes, or portions thereof, any mineral severance taxes related to RGC's Operations, property taxes, pro-rated for, the portion of the Property and the time period in which Lessor is prohibited under this Lease from conducting activities, and any increase in property taxes attributable to the Minerals or RGC's Operations.

(b)   Lessor will pay all other taxes related to the Property, including but not limited to, any taxes on Released Land (as defined in Section 19 (Termination)), any income, capital levy, estate, gift, succession, inheritance, transfer or franchise taxes, and any tax or attributable to Lessor's activities on the Property.

(c)   Lessor will send RGC copies of all assessments, tax bills or other tax notices related to the Property or to RGC's Operations thereon within 14 days of Lessor's receipt of the same or in such shorter time as may be necessary to preserve the rights of RGC and Lessor to protest or appeal the same. Lessor will cooperate with RGC in any such protest or appeal. RGC may, in its discretion, pursue such protest or appeal independently of Lessor. RGC will in any event not be obligated to pay (i) any increase in taxes which RGC is unable to protest or appeal due to Lessor's failure to comply with this Section 16(c) or (ii) any tax bill which RGC does not receive at least 14 days before the bill is due.

(d)   RGC may, but is not required to, pay any taxes on the Property for which Lessor is responsible under Section 16(b), and deduct such taxes paid from any payments otherwise due to Lessor under this Lease.

**17. Warranty of Title.** Lessor warrants as follows:

(a)   Lessor is the sole legal and equitable owner, in undivided fee simple, of the surface and mineral estates that comprise the Property without limitation whatsoever;

(b)   The Property is free and clear of all leases, liens, encumbrances and outstanding adverse claims and interests, not of record;

(c)   Lessor has full power and authority to execute this Lease;

(d)   RGC shall have the quiet and peaceful possession and enjoyment of the Property, Minerals, and that proceeds therefrom, against all persons or entities who may claim any interest therein;

(e)   There has been no violation of any applicable Federal, State, or local law or regulation relating to zoning, land use, environmental protection or otherwise with respect to the Property or activities relating thereto; and

(f)   This Lease, and RGC's right, title and interest hereunder, shall at all times be superior to, and have priority over, any right, title or interest in the Property created during the Term of this Lease.

**18. Lessor Interest.** In entering into this Lease, RGC is relying on Lessor's warranties of title contained in Section 17 (Warranty of Title). Without impairment of those warranties of title, if Lessor owns less than the entire and undivided estate in the Property, RGC may (a) proportionately reduce all payments otherwise payable under this Lease, (b) offset any prior payments related to the unowned portion against any future payments payable under this Lease; and (c) exercise any other available rights or remedies.

**19. Termination.** RGC will have the right to terminate this Lease with regard to all or any portion of the Property at any time by sending a written notice to Lessor at least 90 days prior to such termination. The termination will take effect upon the date specified in the notice. Upon termination, all of RGC's rights and obligations under this Lease with regard to the Property or portion thereof specified in the notice (the "Released Land"), will terminate except for any Reclamation rights and obligations and any Minimum Royalty or Royalty Payment obligations arising out of mining conducted on the Released Land prior to such termination. In the event of a partial termination, this Lease will continue in effect with respect to all Property except the Released Land, and the term "Property" will thereafter mean and include only the retained Property and not the Released Land. After termination, RGC will rectify, deliver and record a release containing the relinquishment of the Released Land. Nothing in this section will negate any obligations RGC has under this Lease with respect to Reclamation of the Property. Notwithstanding the foregoing, RGC will not terminate this Lease in whole or in part at any time prior to the sixth anniversary unless RGC also terminates all of its other mining leases in the Area.

**20. Title Documents.** Lessor will promptly provide to RGC copies of all documents which Lessor now or in the future possesses, relating to or affecting title to the Property, including but not limited to, title insurance policies, deeds, mortgages, trust or security deeds, boundary agreements, judgments, liens, orders, surveys, boundary descriptions, maps, wills conveying an interest in the Property, trust instruments, leases, licenses, easements and rights-of-way. Lessor will give RGC notice whenever Lessor learns of any matter which may affect the title to the Property. At RGC's request, Lessor will sign and deliver to RGC such additional (or new) assurances or other documents, in proper, and recordable form, as may reasonably be necessary to carry out the terms and intent of this Lease. Lessor will inform RGC immediately if Lessor fails to pay or discharge in a timely manner any promissory note, mortgage, tax, or other lien upon the Property, and RGC may then elect to be subrogated to the rights of the holder thereof. Except for any taxes for which RGC is liable under this Lease, RGC will have the right to offset from any payment otherwise payable to Lessor under this Lease, all amounts paid by RGC to discharge any such promissory note, mortgage, tax or other lien.

**21. Compensation for Buildings.**

(a)   Principal Residence. If RGC proposes to remove Lessor's principal residence on the Property, RGC will give Lessor not less than one year's notice of its intention to do so. At least 180 days prior to such removal, RGC will compensate Lessor by making a payment to Lessor equal to two times the then-present fair market value of such residence (including land), as determined by the average of two appraisals, one by an appraiser selected by Lessor, and one by an appraiser selected by RGC. If an appraisal of the FMV/approved appraiser compiled by RGC. Lessor may thereafter occupy the residence until the one-year notice period expires, at which time Lessor will vacate the residence to allow its removal. No residence will be constructed on the Property during the Term of this Lease without the prior written consent of both Lessor and RGC.

(b)    Other Buildings.  If RGC proposes to remove other buildings on the Property, RGC will give Lessor not less than six months' notice of its intention to do so.  At least 90 days prior to such removal, RGC will compensate Lessor by making a payment to Lessor equal to the approximate replacement cost of buildings of that nature, as determined by the appraisal of two appraisals selected in the manner described in Section 21(a).  Lessor will cease using the relevant buildings 30 days prior to the proposed removal and will facilitate removal in all respects.

22.    Third-Party Claims.  If RGC learns that a third party may have a claim of ownership in any portion or percentage of the Property or any payments under this Lease, RGC may deposit in a special escrow account (with a bank or title insurance company located in Virginia) any payments otherwise due to Lessor under this Lease and give Lessor written notice of the deposit.  The sums deposited will remain in the special escrow account until the claim or controversy is resolved, or until there has been a final determination of the claim or controversy by a court or arbitrator, including any appeals therefrom.

23.    Additional and After-Acquired Rights.  If during the Term of this Lease, Lessor acquires any right or interest in the Property, or in any property adjacent or appurtenant thereto, (a) Lessor will promptly notify RGC, (b) any such right or interest acquired in the Property, which Lessor had in this Lease already, warranted to be part of the Property, will become part of the Property subject to this Lease without any additional payment to Lessor, (c) RGC may, at RGC's option, at any time, lease any other such right or interest on the same terms as the terms of this Lease, and (d) Lessor will sign, acknowledge, and deliver an Amendment to this Lease and to the Memorandum of this Lease to RGC, so as to include such right or interest.

24.    Entireties.  If the Property is now or later owned in severalty or in separate tracts, RGC will nevertheless be entitled to treat the Property as an undivided whole under this Lease, with all payments payable under the Lease to be paid (either directly or pursuant to Section 25 (Multiple Owners)) to the separate owners of the Property in the proportion that their ownership interest measured in acres, or percentage ownership of acres bears to the whole Property; provided, however, that in no event will RGC's total payment obligations to the separate owners exceed the payment obligations that RGC would have incurred under the Lease if the Property were owned in undivided fee simple by a single owner.

25.    Multiple Owners.  Whenever two or more parties are entitled to receive any payments under this Lease, RGC may withhold any such payments unless and until all of those parties designate in a recordable instrument are agents empowered to receive all such payments and, to execute division and transfer orders on behalf of all those parties and their respective successors in title.  Delivery of any payment due under this Lease to the designated agent fulfills RGC's obligation to make that payment to those parties.

26.    Assignment.  Both parties have the right to assign their rights and obligations under the Lease, in whole or in part; provided, however, that:
(a)    The party making such an assignment must give the other party prior written notice thereof.
(b)    The provisions of this Lease will apply to and be binding upon the successors and assigns of the respective parties.
(c)    Any change or division in the ownership of the Property, or of the right to receive any payments under this Lease, however accomplished, will not increase RGC's total payment obligations under the Lease, or affect RGC's rights to conduct Exploration, Operations or Reclamation on the Property.
(d)    Notwithstanding Section 26(c), RGC may, without notice to, consent, assign any of its rights or obligations to affiliates of RGC, or use the services of independent contractors or agents to perform any of its rights or obligations; and
(e)    No assignment will relieve the assigning party of any obligations or liability to the other party, unless the other party provides a written release to the assigning party.

27.    Force Majeure.  Neither party will be deemed in default under this Lease during any period in which the exercise or performance of any of its rights or obligations under this Lease is prevented by any cause reasonably beyond its control.  Such an event is referred to in this Lease as "Force Majeure."  Force Majeure will include, but is not limited to, the following: fire, floods, storms, hurricanes, tornados, winds, other damage from the elements, declared or undeclared war, strikes, labor disputes, riots, civil unrest, other governmental authorities, condemnation, eminent domain, seizure, failure to receive required governmental approvals, inability to obtain water for Operations, a substantial fall in the market prices of Minerals, lack of access, litigation, acts of God, and acts of the public enemy.  The Term of this Lease will be extended for a period of time equal to the period of Force Majeure.  All such periods will be deemed to begin at the earliest time a party is prevented from exercising or performing any of its rights or obligations by reason of Force Majeure.

28.    No Broker.  Lessor and RGC represent and warrant, to each other that no broker, agent, or finder has acted on its behalf in connection with this Lease, and that no commissions, fees, or other monies are due to any broker, agent, or finder.  In addition, Lessor and RGC will each, to indemnify each other from all claims with respect to any brokerage, finder's or leasing commissions in connection with this Lease or to any of the transactions contemplated under this Lease.

29.    Condemnation.  Lessor will immediately notify RGC of any condemnation proceeding that may affect the Property.  Lessor will cooperate with RGC in defending or settling the same.  RGC may, in its discretion, defend its rights independently of Lessor.  Any condemnation award will be shared between Lessor and RGC as provided by law.  Any condemned Property will constitute Released Land as of the date of condemnation, and this Lease will continue in effect as to the remaining Property.

30.    Dispute Resolution.  Subject to the provisions of this Section, any controversy, claim, or dispute arising out of or related to this Lease (or to the formation, negotiation, or breach thereof), will be settled by binding arbitration in Richmond, Virginia before a single arbitrator, in accordance with the Commercial Arbitration Rules of the American Arbitration Association.  Any award of damages will be limited to actual, compensatory damages.  Judgment upon the award rendered by the arbitrator may be confirmed by, and entered in, any court having jurisdiction thereof.  Prior to initiating any arbitration, the initiating party will give the other party, written notice of the claim, and will allow the other party 30 days from the date that the notice is received, to amicably resolve the claim.  If the claim is not resolved within the 30 day period, the initiating party's sole and exclusive remedy will be to submit the dispute to arbitration.  The parties will comply with any arbitration award within 30 days of its issuance, or as soon as practicable thereafter, and the Lease will continue in full force and effect.  In no event will the existence of any dispute, arbitration, or award suspend or otherwise affect any party's rights or obligations under the Lease, or interfere in any way with RGC's Operations.

31.    No Interference With RGC's Operations.  Lessor has not, and will not, during the Term of this Lease, take any action or grant any right which would in any way interfere with RGC's exercise of its rights as set out in Section 4 (Grant of Rights) of this Lease.

32.    No Implied or Continuing Waiver.  If either party waives or does not enforce any provision of this Lease on any occasion, that action will not constitute waiver of (a) that provision as to any other time, event or occurrence, or (b) any other provision.

33.    Notices.  Any notice given to the other party under this Lease must be in writing, and sent by United States registered or certified mail, return receipt requested, or via Federal Express or similar overnight courier service addressed to the address set forth on the first page of this Lease.  All notices will be deemed to have been made when deposited in the mail or with the courier, as provided above.  All notices will be deemed to have been received upon actual receipt by any person at the address listed above.  Either party may change its address for the mailing of notices by giving the other party notice of such change of address in the manner provided for in this Section.

34.    Entire Agreement; No Oral Modification.  This Lease constitutes the entire agreement between the parties and supersedes all previous agreements, written or oral.  Lessor hereby expressly acknowledges that, in entering into this Lease, Lessor has not relied on any oral or written statements made by RGC, its employees, agents, or independent contractors.  This Lease may only be modified by a written agreement in recordable form signed by Lessor and an authorized officer of RGC.

35.    Choice of Law.  This Lease will be construed, interpreted and governed by the laws of Virginia.

36.    Successors and Assigns.  This Lease constitutes a covenant running with the land, and will be binding on, and inure to the benefit of, Lessor, RGC, and Lessor's and RGC's heirs, legal representatives, executors, administrators, successors and assigns, as the case may be.

37.    Severability.  In the event that any court or duly appointed arbitrator determines that any provision of this Lease is unenforceable, illegal, or in conflict with any Federal, state, or local law, the parties will petition the court (whereby it deemed to have petitioned) the court or arbitrator to reform that provision in such a way as to carry out the intent of the parties to the extent permissible under law.  If the court or arbitrator declines to reform that provision, then that provision will be considered severable from the rest of the Lease, the remaining provisions of the Lease will not be affected, and this Lease will be construed and enforced as if the Lease did not contain the unenforceable or illegal provision.

38.    Modification to Cure Any Violation of the Rule Against Perpetuities.  Lessor and RGC do not intend that any provision in this Lease will in any way violate the Rule Against Perpetuities or any related rule.  If any such violation should occur, it is the intent of Lessor and RGC that the appropriate court or arbitrator will reform the provision in such a way as to approximate most closely the intent of the parties within the limits permissible under such rule, or related rule, and will enforce the Lease as so reformed.

39. **Memorandum.** At the time the Lease is signed, the parties will sign a Memorandum of Lease which RGC will record. In the event of a conflict between the terms of the Memorandum of Lease and this Lease, the terms of this Lease will control.

40. **Mortgage Consent.** Lessor agrees to use Lessor's best efforts to obtain promptly, and to provide to RGC a copy of, any consent to this Lease required by the terms of any mortgage or other instrument creating rights superior to this Lease with respect to all or any part of the Property. Such consent, however, will neither affect nor be a condition precedent to the effectiveness and enforceability of the Lease as between Lessor and RGC.

41. **Headings.** The headings contained in this Lease are for the convenience of the parties only, and will not be used in its interpretation.

42. **Obligations That Survive The Lease.** In addition to other obligations that survive this Lease as set forth in this Lease, the parties' obligations under the following Sections of this Lease will remain in full force and effect following, and will not be affected by, the termination of, or expiration of the Term of, this Lease: Sections 7, 9, 11, 14, 15, 17, 19, 22, 24, 26, 30, 32-38, and 41-43.

43. **Good Faith.** During the Term of this Lease, each party will act in good faith to fulfill the intent of this Lease, and will treat with the other party to discuss and in try to resolve amicably any issues that may arise.

IN WITNESS WHEREOF, the parties have executed this Lease under and as of the date first above written.

OWNER:                                           RGC (USA) MINERALS INC.

_____ (SEAL)          By: _____
G. L. Parson, Jr.                                Its: Vice President
(Print Name)
AKA George Lee Parson, Jr.                  [CORPORATE SEAL]
AKA G. L. Parson                                 Attest: _____
AKA G. Lee Parson, Jr.
                                                         Its: Secretary

_____ (SEAL)          STATE OF FLORIDA
Mary Elizabeth Parson                       COUNTY OF CLAY
(Print Name)
AKA Mary Butterworth Parson              The foregoing instrument was acknowledged before me
AKA Mary B. Parson                            this 13 day of February, 1990,
AKA Mary E. Parson                            by Daniel P. Wolcott,
AKA Mrs. G. L. Parson, Jr.                    as Vice President of RGC (USA) MINERALS
                                                         INC., a Delaware corporation, on behalf of the
                                                         corporation.

                                                         _____
                                                         Notary Public
STATE OF VIRGINIA                            My Commission Expires:
CITY/COUNTY OF Sussex                     My Commission Expires May 31, 1993

The foregoing instrument was acknowledged before me
this 18th day of October, 1989,           [NOTARIAL SEAL]
by G. L. Parson, Jr. and Mary
Elizabeth Parson, husband and
wife.

My Commission Expires:
October 28, 1991
_____
Notary Public

[NOTARIAL SEAL]

41STEMP2

020

EXHIBIT A
TO
MINING LEASE
BY AND BETWEEN


G. L. PARSON, JR., AKA GEORGE LEE PARSON, JR.,
AKA G. L. PARSON, and AKA G. LEE PARSON, JR., and

MARY ELIZABETH PARSON, AKA MARY BUTTERWORTH PARSON,
AKA MARY B. PARSON, AKA MARY E. PARSON, and
AKA MRS. G. L. PARSON, JR., husband and wife
(LESSOR)


AND

RGC (USA) MINERALS INC.
(RGC)

**EXHIBIT A**

Under the terms of the above-referenced Mining Lease, to which this Exhibit is attached, Lessor has leased to ROC, and granted to ROC various rights regarding certain real property (including all mineral rights and minerals) referred to as the "Property", which is situated in the _____ Stony Creek _____ Magisterial District, Sussex _____ County, State of Virginia, which is hereby represented and warranted by Lessor to amount to ___3.50___ acres, and which is described as follows:

That same tract or parcel of land conveyed to G. Lee Parson (also known as G. Lee Parson, Sr.), by Warranty Deed, dated December 24, 1947, and recorded in Deed Book 44 at page 126, in Clerk's Office of Circuit Court of Sussex County, Virginia. To wit: All of that certain track or parcel of land, with the appurtenances thereto belonging, containing Three and one-half (3-1/2) acres, more or less, lying, being and situate on both sides of the Milwaukee Road Little Mill Magisterial District, Sussex County, Va. and bounded as follows: On the North, East and West by lands of Lee Parson and on the South by the land of Willis Robinson, the said tract of land hereby conveyed being situate about 300 yards West of the present residence of said G. Lee Parson.

The above stated land bequeathed and devised to George Lee Parson, Jr. (also known as G. L. Parson and G. L. Parson, Jr.) from the Will of G. Lee Parson, Sr., deceased, in Will Book 23 at page 430, dated May 3, 1966, recorded March 8, 1973 in the Clerk's Office of Sussex Circuit Court.

Subject property is referred to in the Sussex County tax records as Tax Parcel Number 101-14.

022

STD Roy Pol
VA 8/89

EXHIBIT B
TO
MINING LEASE
BY AND BETWEEN
G. L. Parson, Jr. and Mary Elizabeth Parson,
husband and wife
(Lessor)
AND

RGC (USA) MINERALS INC.
(RGC)

RGC's Royalty Policy for Virginia Operations
COPYRIGHT © RGC (USA) MINERALS INC. 1989

This document sets forth RGC's Royalty Policy for Virginia Operations ("Royalty Policy"), which is referred to in Section 7 (Royalty Payments) of the above-referenced Deed of Mining Lease ("Lease") and which is attached to and incorporated into the Lease by reference.

1. **Definitions.** The terms defined in the body of the Lease or anywhere in this Royalty Policy will have the same meanings throughout the Royalty Policy. The following terms will have the following meanings:

   (a) "Principal Minerals" means Ilmenite, Rutile and Zircon.

   (b) "Minor Minerals" means Minerals other than Principal Minerals.

   (c) "Mineralized Property" means that portion of the Property which RGC estimates, using the then most current drilling data and survey information, contains Minerals-bearing sands which have a minimum dredgeable depth of 15 feet and which have a cutoff grade of two percent (2%) by weight average Mineral content. All lump-sum Payments, under Section 6 (Initial Payment and Advance Royalty Payment), of the Lease are based on the Mineralized Property as of the Lease Date, and subsequent changes in the acreage of the Mineralized Property will not affect the lump sum payment.

   (d) "Sales Value per ton of each Mineral" means the dollar value per short ton derived by dividing (i) the actual dollar sales (of each Mineral) following processing, by the dry plant (net of returns, sales taxes, sales discounts and commissions, but not the (i) settlement discounts), for the calendar quarter ("Quarter") which is the subject of the Royalty Payment calculation, by (ii) the total sales tonnage for each Mineral in that Quarter, subject to the exclusion of sale to affiliates contained in Clause 9 (Sales to Affiliates) below.

   (e) "Lessor's Stock Account" means the account maintained by RGC. Lessor's name for the purpose of tracking and reporting production, inventory and sales allocations made with respect to saleable Minerals attributed to the Property and for the purpose of calculating and accounting to Lessor, through the Stock Report described in Clause 3 below, for any Royalty Payments.

   (f) "All Stock Accounts" means the Lessor's Stock Account and all other stock accounts maintained by RGC for other properties on which RGC engages in Mining (as defined in Clause 6(b)(i) below).

   (g) "Recovery Rate" for any treatment of material is the weight of material that is present after that treatment divided by the weight of material before treatment, expressed as a percentage.

2. **Calculating Royalties.** This Royalty Policy sets forth the methodology to be used in determining and reporting the Royalty Payments payable to Lessor under the Lease. By signing the Lease Lessor agrees to that methodology, including but not limited to (i) RGC's method of attributing Minerals to the Property, as set forth in Clause 6 below, and (ii) RGC's method of calculating Royalty Payments as set forth in Clause 7 (Royalty Payment Calculations) below.

3. **Stock Account and Stock Report.** From the commencement of Mining (as defined in Clause 6(b)(i)) on the Property until such time as RGC's obligation to pay Lessor Royalty Payments has been fulfilled, RGC will establish and maintain Lessor's Stock Account and will send to Lessor within 30 days after the end of each Quarter a written report ("Stock Report") on the status of Lessor's Stock Account. The Stock Report will show:

   (a) The tons of saleable Minerals attributed to the Property for the Quarter (see Clause 6 below);

   (b) Sales from the accumulated tons of saleable Minerals referred to in Clause 3(a) above;

   (c) Any Advance Royalty Payments paid during the Quarter in accordance with Section 6 of the Lease;

   (d) Any Royalty Payment payable for the Quarter pursuant to Section 7 (Royalty Payments) of the Lease;

   (e) A reconciliation of Advance Royalty Payments and Royalty Payments to Lessor, pursuant to Section 6 (Initial Payment and Advance Royalty Payment) and Section 7 (Royalty Payments) of the Lease.

   The Stock Report will be certified as accurate by RGC's Operations Manager or a senior financial employee. By signing this Lease, Lessor agrees to preserve the confidentiality of the sales and production information in all Stock Reports.

4. **Royalty Rate.** RGC will pay Lessor a Royalty Payment equal to ███████ of the Sales Value per ton of each Mineral sold that is attributed to the Property as reflected in the Stock Account ███████ reported to Lessor quarterly in the Stock Report.

5. **Royalty Payment.** Any Royalty Payments due for Principal Minerals attributed to the Property will be paid within 30 days after the end of the Quarter (in which) such Principal Minerals were sold (i.e. invoiced to the purchaser); and, for Minor Minerals attributed to the Property within 30 days of the end of the "Fiscal Year" (July 1 - June 30) in which they were sold.

6. **Saleable Minerals Attributed to the Property.** Saleable Minerals are attributed to the Property and to Lessor's Stock Account as set forth below:

   (a) RGC will survey, drill, and analyze drill samples from those portions of the Property which it plans to mine, in order to estimate the tons of Principal Minerals located therein.

   (b) Production of saleable Minerals is achieved by the following three steps in RGC's Operations:

       (i) "Mining": extracting and delivery of mineral sand ore to the concentrator;

       (ii) "Concentrating": removal of non-commercial material;

       (iii) "Processing": removal of further non-commercial sand and separation into saleable Minerals.

   Each of these steps results in recovery and loss of saleable Minerals depending on the efficiency of each step and the nature of the material being treated. The Recovery Rate for each step varies to a small degree on a daily basis and is determined by regular sampling and analysis of the material as it passes through each step.

617EM#2

023

   (c)   The Recovery Rates for a given Quarter and the estimates and survey information compiled pursuant to Clause 6(e) above are used to estimate the tons of saleable Principal Minerals recovered from the Property in that Quarter. Those tons of Principal Minerals are then entered in Lessor's Stock Account.

   (d)   Within 30 days of the end of each Fiscal Year, RGC will apportion its actual production of saleable Minor Minerals for the year among All Stock Accounts. The apportionment will be made in proportion to the attribution of Principal Minerals among All Stock Accounts for the year.

**7.  Royalty Payment Calculations.**

   (a)  **Principal Minerals Sold**

     (i)   Within 30 days of the end of each Quarter, RGC will deduct the total tons of each Principal Mineral sold during that Quarter from All Stock Accounts.

     (ii)   The tons of Principal Minerals sold will be deducted from All Stock Accounts on a "First-In/First-Out" (FIFO) basis. Where production of saleable Minerals is attributed to several stock accounts on the same date, sales attributable to such production will be deducted from the affected stock accounts in proportion to the tonnage allocated on that date to such stock accounts.

     (iii)   The sales thus attributed to the Property will be entered in Lessor's Stock Account and reflected in the Stock Report.

     (iv)   RGC will calculate the Sales Value per ton for each Principal Mineral for the Quarter.

     (v)   The Royalty Payment payable to Lessor for the Quarter will equal ▇▇▇▇▇▇ of the Sales Value per ton for each Principal Mineral for the Quarter multiplied by the tons of each Principal Mineral sold which are attributed to the Property for the Quarter as reflected in the Stock Account.

   (b)  **Minor Minerals Sold**

     Within 30 days after the end of each Fiscal Year, a calculation similar to that described in Clause 7(a)(iv) above, will be made for Minor Minerals, and the result will be reflected in the Stock Report for the last Quarter of the Fiscal Year.

   (c)  **Adjustments**

     At the end of each Fiscal Year, RGC will compare its actual annual Mineral production to the total tons of Minerals attributed to All Stock Accounts in that year. If the actual production is less than the attributed production, then the shortfall will be deducted proportionally from All Stock Accounts. If the actual production exceeds the attributed production, then the excess will be allocated proportionately among All Stock Accounts.

**8.  Commingling and Stockpiling.** RGC will commingle Minerals from the Property with Minerals from other properties, may engage in Mining on more than one property in a Quarter, and may in RGC's sole discretion from time to time stockpile Minerals depending on market conditions.

**9.  Sales to Affiliates.** RGC may in its sole discretion sell part or all of its Minerals to affiliates of RGC. In each event, the Sales Value per ton of each Mineral used in calculating the Royalty Payment will be based only on RGC's sales to non-affiliates. If such non-affiliate sales are less than 30% of RGC's total sales of the Mineral during the Quarter, then the Sales Value used in calculating the Royalty Payment will equal the greater of (a) the Sales Value based only on RGC's sales to non-affiliates or (b) the indexed price for the Mineral, determined by multiplying (i) the Sales Value per ton of the Mineral last used in calculating a Royalty Payment times (ii) the percentage change in the Producer Price Index - Titanium Pigments Index of the Bureau of Labor Statistics, U.S. Department of Labor (Code No. 06220209, 1982=100). Such percentage change will be based on the change in the index from the last month of the Quarter in which the Sales Value referred to in Clause (i) was used to the last month of the Quarter for which the Royalty Payment is being calculated.

**10.  Most Favored Lessor.** If RGC agrees, after signing this Lease, to pay a higher Initial Payment per acre, higher aggregate Advance Royalty Payments per acre, or higher royalty rates to any other leased property in the Area, RGC will within 30 days of the more favorable lease pay Lessor any amount necessary to adjust retroactively payments previously received by Lessor to the more favorable levels, and the more favorable levels that are prospective in nature will thereafter apply to this Lease. This Clause does not require that retroactive adjustments include the time value of money. This Clause applies only to leases and not to purchases, options to purchase, purchase-leaseback arrangements or other arrangements.

**11.  Completion of Mining.**

   (a)   RGC will send Lessor written notice when it has completed Mining on the Property.

   (b)   The next Stock Report after such notice will contain a reconciliation comparing (i) the total of all Royalty Payments and Advance Royalty Payments paid to date, with (ii) the product obtained by multiplying the total number of acres of the Property from which RGC removed the topsoil in preparation for Mining times $3,500-per-acre average Minimum Royalty provision in Section 8 (Minimum Royalty) of the Lease.

   (c)   If that Stock Report reflects that all tons of Minerals attributed to the Property have already been sold, that Stock Report will be Lessor's last Stock Report and final reconciliation, and Lessor will be paid (i) any Royalty Payments payable for that Quarter, and (ii) the final payment, if any, required by the $3,500-per-acre average Minimum Royalty provision (the "Final Payment"). The Final Payment will equal the amount, if any, by which the product described in Clause 11(b)(ii) exceeds the total described in Clause 11(b)(i).

   (d)   If that Stock Report reflects that any tons of Minerals attributed to the Property have not yet been sold, Lessor will be paid any Royalty Payments payable for that Quarter, and Lessor may elect, by sending written notice to RGC within 30 days, to either (i) forfeit all rights to future Royalty Payments with regard to all unsold tons and receive the Final Payment, if any, determined in accordance with Clause 11(c) above; or (ii) continue Lessor's Stock Account in existence, and defer the final reconciliation and Final Payment, if any, until all such unsold tons are sold and the final total of all Royalty Payments and Advance Royalty Payments can be used in determining any Final Payment due.

**12.  Advance Royalty Payment: "70% of Estimated Future Royalty Payments".** At least one year before RGC commences Mining on the Property, RGC will estimate, using the then most current drilling data and survey information, the tons of Minerals located therein. Using this information and applying reasonably expected Recovery Rates and prices, RGC will in good faith estimate the total sales value of the saleable Minerals recoverable from the Mineralized Property. The Advance Royalty Payment equal to "70% of Estimated Future Royalty Payments" set forth in Section 6 (Initial Payment and Advance Royalty Payments) of the Lease will be determined by (a) multiplying the estimated total sales value times the ▇▇▇▇▇▇, (b) multiplying the result by seventy percent (70%), and (c) deducting therefrom all Advance Royalty Payments previously made under the Lease.

**13.  No Reliance on Estimates or Representations.** Because of the inherent uncertainties in making projections and estimates which may affect Lessor's Royalty Payments, Lessor, in deciding whether to enter into this Lease, should not rely upon any representation, written or oral, as to the likelihood or value of Royalty Payments, and Lessor should bear in mind that the $3,500-per-acre average Minimum Royalty provision contained in Section 8 (Minimum Royalty) of the Lease applies only if RGC engages in Mining on the Property, and even then applies only to the total number of acres from which RGC removes the topsoil in preparation for Mining. Lessor acknowledges that Lessor understands the foregoing sentence and Lessor agrees that Lessor has not relied upon any representation, written or oral, as to the likelihood or value of Royalty Payments.

419TSMP2

STD Lease
VA 3/89-1

961-1035

# DEED OF MINING LEASE



COPY

THIS DEED OF MINING LEASE (including the attached Exhibits which are incorporated herein by this reference, ("Lease") is made and entered into on __ October 13, __ 1989 __ by and between G. L. Parson, Jr., AKA George Lee Parson, Jr., AKA G. L. Parson, and AKA G. Lee Parson, Jr. and Mary Elizabeth Parson, AKA Mary Butterworth Parson, AKA Mary B. Parson, AKA Mary E. Parson, and AKA Mrs. G. L. Parson, Jr. — husband and wife Route 1, Box 60, Stony Creek, Virginia 23882

("Lessor") and RGC (USA) MINERALS INC., a Delaware corporation whose address is Warner Road, P.O. Box 1307, Green Cove Springs, Florida, 32043 ("RGC"). In consideration of the mutual promises made in this Lease, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Lessor and RGC agree as follows:

1. **Defined Terms.** Any word or phrase that is capitalized and placed in quotations in this Lease is a defined term and when it is capitalized will have the same meaning throughout this Lease.

2. **Purpose.** The purpose of this Lease is to allow RGC to explore for and, at RGC's sole discretion, to mine, remove, commingle, and sell Minerals from the Property, to use the Property to mine Minerals from the Property or other property, and to conduct related activities. "Minerals" means the following group of minerals and mineral products: Ilmenite, Leucoxene, Rutile, Zircon, Staurolite, Kyanite/Sillimanite, Monazite, Xenotime, and Garnet, and associated by-products. Title to any Minerals mined shall, if not already vested in RGC, pass to RGC as they are severed from the Property.

3. **Grant of Lease.** Lessor hereby leases to RGC the Property (as defined in Exhibit A), on the terms and conditions in this Lease.

4. **Grant of Rights.** Lessor grants to RGC the following exclusive rights with regard to the Property:

(a) To enter the Property to survey, explore, drill, test, and sample (the foregoing activities are defined as "Exploration");

(b) To clear the Property of such buildings (subject to Section 21 (Compensation for Buildings)), other structures or obstacles, earth, standing timber, plants, and such other things or material that RGC, in its absolute discretion, wishes to clear from the Property; to exercise the rights granted in this Section 4; to construct, relocate, use, or remove roads, power and communication lines, dredge ponds, tailing ponds, settling ponds, pipelines, buildings, storage facilities, canals, tailings, railings, gates, fences, and other structures and facilities on the Property; to take steps to prepare for mining on the Property; and, to develop, mine, cross-mine, dredge, remove, concentrate, separate, commingle, stockpile, haul, process, ship, and sell Minerals (the foregoing activities, whether conducted on the Property or on other property in Dinwiddie and Sussex Counties, Virginia ("Area") are defined as "Operations");

(c) To use the Property to store, transport, or dispose of Minerals, water, tailings, and material resulting from RGC's Operations;

(d) To use water from or appurtenant to the Property and to drain through and from the Property and to draw into any course in the Property any water from RGC's Operations;

(e) To take all steps to accomplish Reclamation (as defined in Section 14) of the Property;

(f) To use all easements, means of access, and rights of way from and to the Property; and,

(g) To use the Property for the purposes described in this Section, in conjunction with RGC's Exploration Operations and Reclamation on other property.

Notwithstanding the foregoing, RGC is not granted the right under this Lease to construct or operate on the Property a processing plant for the final separation of the concentrate into saleable Minerals.

5. **Term of Lease.** This Lease will begin on the date first written above and will end 20 years thereafter, unless (a) the Lease is ended earlier under Section 19 (Termination), (b) the Lease is automatically terminated by RGC's failure, for reasons other than a temporary inability to obtain through diligent efforts all necessary governmental permits and authorizations, to commence "Mining" (as defined in the Royalty Policy) in the Area by the eighth anniversary of the Lease, or (c) the Lease is automatically extended to allow RGC to complete mining operations on the Property, if so intended, the Lease shall terminate upon the earlier of written notice from RGC pursuant to Section 19 (Termination), or the passage of a period of 180 consecutive days in which RGC conducts no Operations on the Property. "Term" means the period of time during which this Lease is in effect, and the exercise of earlier termination indicates both the initial 20-year term and any extended term.

6. **Initial Payment and Advance Royalty Payments.** Subject to the terms and conditions of this Lease, RGC will pay to Lessor, during the Term of this Lease, on or before the dates indicated, the following lump sum payments and payments per acre of the Property retained under the Lease at the time of that payment.

| Payment Date | Payment Type | Payment |
|---|---|---|
| Lease Date | Initial Payment | $250 per acre |
| Lease Date | Advance Royalty | $750 per acre |
| On or before December 31 of each year following the year this Lease is signed | Rental Payment | $15 per acre |
| Earlier of (a) Mining (as defined in Royalty Policy) in Area or (b) Fifth Anniversary | Advance Royalty | $4,170.00 lump sum, equal to $1000 per acre of "Mineralized Property" (as defined in Royalty Policy) |
| Tenth Anniversary if no "Notice of Mining" (as defined in Section 9) given | Advance Royalty | $4,170.00 lump sum, equal to $1000 per acre of Mineralized Property subject to 70% Limitation (as defined in Royalty Policy) |
| Fifteenth Anniversary if no Notice of Mining given | Advance Royalty | $4,170.00 lump sum subject to 70% Limitation |
| Notice of Mining | Advance Royalty | 70% of Estimated Future Royalty Payments (as defined in Royalty Policy) |

The Initial Payment and all Rental and Advance Royalty Payments paid to Lessor are non-refundable. The Advance Royalty Payments paid to Lessor will be credited against any Royalty Payments otherwise payable pursuant to Section 7 (Royalty Payments) and may be prepaid by RGC. Payment to Lessor of the payment required upon Notice of Mining will satisfy in full any obligation RGC may thereafter have to pay the Tenth and Fifteenth Anniversary Advance Royalty Payments.

7. **Royalty Payments.** RGC will pay Lessor a quarterly Royalty. Royalty is equal to _____ % of the Sales Value of Minerals attributable to the Property which RGC mines and sells. The Royalty Payments will be determined and paid in accordance with Exhibit B, RGC's Royalty Policy for Virginia Operations ("Royalty Policy").

8. **Minimum Royalty.** If the total of all Advance Royalty Payments and Royalty Payments paid to Lessor under this Lease does not average $3,500 per acre for all of the Property from which RGC removes the topsoil in preparation for Mining ("Minimum Royalty"), RGC will pay to Lessor the amount by which the Minimum Royalty exceeds such total. Any such payment will be determined and paid in accordance with Clause 11 of the Royalty Policy.

9. **Limited Lessor's Use of the Property.** During Exploration, Lessor, and RGC, will work together to accommodate Lessor's normal activities on the Property. RGC will give Lessor at least twelve months notice ("Notice of Mining") if RGC's Mining will require Lessor to cease activities on the portion of the Property described in the Notice of Mining. Until the end of the notice period, Lessor will have the right, but not the obligation, to remove, for Lessor's account any crops, timber, buildings, irrigation systems, fixtures or personalty of Lessor's that are not part of the Property, from the end of the notice period until RGC notifies Lessor otherwise, Lessor will cause all activities to cease on that portion of the Property. During Reclamation, RGC will

419    025

work with Lessor to allow Lessor to resume Lessor's normal activities on the Property, as soon as reasonably possible and as permitted by governmental reclamation requirements. Lessor will and does indemnify RGC from and against any claims asserted against RGC arising out of the activities of Lessor on Lessor's invitees. Lessor will be solely responsible for, and will bear all loss or loss related to any governmental allotment, subsidy, stabilization or conservation programs that may apply to the Property.

**10.   Safety.** Except as otherwise provided in this Lease, only RGC employees and visitors authorized in writing by RGC will be permitted on those parts of the Property on which Operations are being conducted. All RGC-authorized visitors and their vehicles will carry RGC identification at all times that they are on the Property.

**11.   RGC to Comply With Safety Laws and to Indemnify Lessor.** RGC will conduct the Exploration and Operations in compliance with all applicable safety laws and regulations. RGC will and does indemnify Lessor from and against any claims (environmental or otherwise) asserted against Lessor arising out of RGC's activities. RGC will also indemnify Lessor from and against any actual damages caused by RGC to crops, pasture, timber, fences, lanes, roads and other improvements not described in Section 41 (Compensation for Buildings), located on any portions of the Property that are not mined but are otherwise used by RGC in its activities. RGC will in no event be liable for special or consequential damages, and any payments made pursuant to the preceding sentence will be deemed full satisfaction of the damages in question.

**12.   RGC's Right to Determine Whether, When and Where to Mine.** Nothing in this Lease (or in the relationship between Lessor and RGC) will constitute (or create any express or implied) duty on the part of RGC to perform Exploration or Operations, or to mine the Property at any rate, in any manner, or at all. RGC's Exploration and Operations, if any, will occur only to the extent and at the locations and times, and in the methods and manner that RGC, in its sole discretion, may determine; provided, however, that RGC will not conduct Operations within 200 feet of Lessor's principal residence or any principal residence on property adjoining the Property (or in such a way as to deprive any such residence of access to a public road, utilities, and water supply until RGC complies with Section 21 (Compensation for Buildings—Principal Residence)(in the case of Lessor's principal residence) or in the case of adjoining property owner's written consent (in the case of an adjoining residence); and provided further that if RGC engages in Mining in the Area, then RGC will use its best efforts to mine all of the Mineralized Property that can be mined in a commercially reasonable manner.

**13.   Compliance With Laws.** RGC's activities on the Property will be conducted in compliance with all applicable Federal, State and local laws and regulations.

**14.   Reclamation.** RGC agrees to comply with all State and Federal laws, regulations and permits applicable to the Reclamation of the Property. RGC also agrees to post a bond, to the extent required by Virginia law, to ensure that all the Property which RGC mines will be reclaimed in accordance with law. RGC will and does indemnify Lessor from and against any claims by State or Federal regulatory agencies arising from RGC's failure to reclaim in accordance with applicable laws, excluding claims caused in part (or in whole) by Lessor's failure to cooperate with RGC in accordance with the terms of this Lease. RGC's Reclamation of any Property mined may include, but not be limited to, refilling the mined path with tailings discharged from its wet mill, drying and alternatively settling ponds, replacing and grading the topsoil/regrading and otherwise complying with all applicable governmental reclamation requirements ("Reclamation.")

**15.   Audit.** Lessor will have the right at Lessor's expense to appoint an independent auditor reasonably approved by RGC (which approval is hereby given.) Lessor appoints a national firm in the United States of recognized reputation, to audit, not more than once, in any year, RGC's records relating to the determination of Royalty Payments for RGC's "fiscal year" (currently July 1–June 30) immediately preceding such audit. Lessor will instruct Lessor's auditor to send a copy of his report to RGC, at the same time that he sends his report to Lessor. Also, Lessor will notify RGC in writing of any objections Lessor may have regarding Royalty Payments within 60 days of Lessor's receipt of Lessor's auditor's report.

**16.   Taxes.** Taxes will be apportioned and paid as follows:

(a)   RGC will pay the following taxes, or portions thereof: any mineral severance taxes related to RGC's Operations; property taxes, pro-rated for the portion of the Property and the time period in which Lessor is prohibited under that lease from conducting activities; and any increase in property taxes attributable to the Minerals or RGC's Operations.

(b)   Lessor will pay all other taxes related to the Property, including but not limited to: any taxes on Released Land (as defined in Section 19 (Termination)); any income/withholding, estate, gift, succession, inheritance, transfer, or franchise taxes; and any taxes attributable to Lessor's activities on the Property.

(c)   Lessor will send RGC copies of all assessments/tax bills (or other tax notices related to the Property (or to RGC's Operations thereon within 14 days of Lessor's receipt of the same (or in such shorter time as may be necessary to preserve the rights of RGC, and Lessor, to protest or appeal the same. Lessor will cooperate with RGC in any such protest or appeal. RGC may, in its discretion, pursue such protest or appeal independently of Lessor. RGC will in any event not be obligated to pay (i) any increase in taxes which RGC is unable to protest or appeal due to Lessor's failure to comply with this Section 16(c) or, (ii) any tax bill which RGC does not receive at least 14 days before the bill is due.

(d)   RGC may, but is not required to, pay any taxes on the Property for which Lessor is responsible under Section 16(b) and deduct such bona fide payments otherwise due to Lessor under this Lease.

**17.   Warranty of Title.** Lessor warrants as follows:

(a)   Lessor is the sole legal and equitable owner, in undivided fee simple, of the surface and mineral estates that comprise the Property without limitation whatsoever;

(b)   The Property is free and clear of all leases, liens, encumbrances and outstanding adverse claims and interests not of record;

(c)   Lessor has full power and authority to execute this Lease;

(d)   RGC shall have the quiet and peaceful possession and enjoyment of the Property, Minerals, and the proceeds therefrom, against all persons or entities who may claim any interest therein;

(e)   There has been no violation of any applicable Federal, State, or local law or regulation relating to zoning, land use, environmental protection or otherwise with respect to the Property, or activities relating thereto; and

(f)   This Lease, and RGC's right, title and interest hereunder, shall at all times be superior to, and have priority over, any right, title or interest in the Property created during the Term of this Lease.

**18.   Lesser Interests.** In essence, in event less than the entire and undivided estate in Section 17 (Warranty of Title). Without impairment of those warranties of title; if Lessor owns less than the entire and undivided estate in the Property, RGC may (a) proportionately reduce all payments otherwise payable under this Lease, (b) offset any prior payments related to the unowned portion against any future payments payable under this Lease, and (c) exercise any other available rights or remedies.

**19.   Termination.** RGC will have the right to terminate this Lease with regard to all or any portion of the Property at any time by sending a written notice to Lessor at least 90 days prior to such termination. The termination will take effect upon the date specified in the notice. Upon termination; all of RGC's rights and obligations under this Lease with regard to the Property or portion thereof specified in the notice (the "Released Land") will terminate except for any Reclamation rights and obligations and any Minimum Royalty or Royalty Payment obligations arising out of mining conducted on the Released Land prior to such termination. In the event of a partial termination, this Lease will continue in effect with respect to all Property except the Released Land (and, for the term Property) will thereafter mean (and include only the remained Property and not the Released Land. After termination, RGC will execute, deliver and record a release confirming the relinquishment of the Released Land. Nothing in this Section will negate any obligations RGC has under this Lease with respect to Reclamation of the Released Land. Notwithstanding the foregoing, RGC will not terminate this Lease (in whole or in part) at any time prior to the fifth anniversary unless RGC also terminates all of its other mining leases in the Area.

**20.   Title Documents.** Lessor will promptly provide to RGC copies of all documents which Lessor now or in the future possesses, relating to or affecting title to the Property, including but not limited to: title, insurance policies, deeds, mortgages, trust instruments, boundary agreements, judgments, liens, or any surveys, boundary descriptions, maps, wills, conveying an interest in the Property, trust instruments, leases, licenses, easements, and rights-of-way. Lessor will give RGC notice whenever Lessor learns of any matter which may affect the title to the Property. At RGC's request, Lessor will sign and deliver to RGC such additional formal instruments or other documents, to proper and recordable form, as may reasonably be necessary to carry out the terms and intent of this Lease. Lessor will inform RGC immediately if Lessor fails to pay or discharge in a timely manner, any promissory note, mortgage, tax, or other lien upon the Property, and RGC may then pay it and be subrogated to the rights of the holder thereof. Except for any taxes for which RGC is liable under this Lease, RGC will have the right to collect (or pay) any amount otherwise payable to Lessor under this Lease, all amounts paid by RGC to discharge any such promissory note, mortgage, tax or other lien.

**21.   Compensation for Buildings.**

(a)   **Principal Residence.** If RGC proposes to remove Lessor's principal residence on the Property, RGC will compensate Lessor not less than one year's notice of its intention to do so. At least 180 days prior to such removal, RGC will compensate Lessor by making a payment to Lessor equal to two times the then present (fair market value of such residence (excluding land, as determined by the average of two appraisals, one by an appraiser selected by Lessor, and one by an appraiser selected by RGC, from a list of six MAI (or FHA)-approved appraisers compiled by RGC. Lessor may thereafter occupy the residence until the one year notice period, expires, at which time Lessor will vacate the residence to allow its removal. No residence will be constructed on the Property during the Term of this Lease without the prior written consent of both Lessor and RGC.

0026

(c) **Other Buildings.** If RGC proposes to remove other buildings on the Property, RGC will give Lessor not less than six months' notice of its intention to do so. At least 90 days prior to such removal, RGC will compensate Lessor by making a payment to Lessor equal to the approximate replacement cost of buildings of that nature, as determined by the average of two appraisals by appraisers selected in the manner described in Section 21(a). Lessor will cease using the relevant buildings 30 days prior to the proposed removal and will facilitate removal in all respects.

**22.   Third-Party Claims.** If RGC learns that a third party may have a claim of ownership in any portion or percentage of the Property or any payments under this Lease, RGC may deposit in a special escrow account (with a bank or title insurance company located in Virginia) any payments otherwise due to Lessor under this Lease and give Lessor written notice of the deposit. The sums deposited will remain in the special escrow account until the claim or controversy is resolved, or until there has been a final determination of the claim or controversy by a court or arbitrator, including any appeals therefrom.

**23.   Additional (and After-Acquired) Rights.** If, during the Term of this Lease, Lessor acquires any right or interest in the Property or in any property adjacent or appurtenant thereto, (a) Lessor will promptly notify RGC, (b) any such right or interest acquired in the Property, which Lessor had in this Lease already, warranted to be part of the Property, will become part of the Property subject to this Lease without any additional payment to Lessor, (c) RGC may (at RGC's option, at any time) lease any other such right or interest on the same terms as the terms of this Lease, and (d) Lessor will sign, acknowledge, and deliver an Amendment to this Lease and to the Memorandum of this Lease to RGC, so as to include such right or interest.

**24.   Subdivision.** If the Property is now or later owned (in severalty or in separate tracts, RGC will nevertheless be entitled to treat the Property as an individual whole under this Lease, with all payments payable under this Lease to be paid (either directly or pursuant to Section 25 (Multiple Owners)) to the separate owners of the Property in the proportion that their ownership interest (measured in acres, or percentage ownership of acres) bears to the whole Property provided, however, that in no event will RGC's total payment obligations or the separate owners exceed the payment obligations that RGC would have incurred under the Lease if the Property were owned in individual fee simple by a single owner.

**25.   Multiple Owners.** Whenever two or more parties are entitled to receive any payments under this Lease, RGC may withhold any such payments unless and until all of those parties designate in a recordable instrument an agent empowered to receive all such payments and to execute division and transfer orders on behalf of all those parties and their respective successors in title. Delivery of any payment due under this Lease to the designated agent fulfills RGC's obligation to make that payment to those parties.

**26.   Assignment.** Both parties have the right to assign their rights and obligations under this Lease, in whole or in part provided, however, that:

(a)  The party making such an assignment must give the other party prior written notice thereof;

(b)  The provisions of this Lease will apply to and be binding upon the successors and assigns of the respective parties;

(c)  Any change or division in the ownership of the Property or of the right to receive any payments under the Lease; however accomplished, will not increase RGC's total payment obligations under the Lease or affect RGC's rights to conduct Exploration, Operations or Reclamation on the Property;

(d)  Notwithstanding Section 26(a) RGC may, without notice or consent, assign any of its rights or obligations to affiliates of RGC, or use the services of independent contractors or agents to perform any of its rights or obligations; and

(e)  No assignment will relieve the assigning party of any obligations or liability to the other party unless the other party provides a written release to the assigning party.

**27.   Force Majeure.** Neither party will be deemed in default under this Lease during any period in which its exercise or performance of any of its rights or obligations under this Lease is, prevented or (in any case) reasonably beyond its control. Such an event is referred to in this Lease as "Force Majeure." Force Majeure will include, but is not limited to, the following: fire, floods, storms, hurricanes, tornados, winds, other damage from the elements, declared or undeclared war; strikes; labor disputes; riots; civil unrest; actions of government; authorities; condemnation; eminent domain; crime; failure to receive required governmental approvals; inability to obtain water for Operations; a substantial fall in the market price of Minerals, lack of access; litigation; acts of God; and acts of the public enemy. The Term of this Lease will be extended for a period of time equal to the period of Force Majeure. All such periods will be deemed to begin at the earliest time a party is prevented from exercising or performing any of its rights or obligations by reason of Force Majeure.

**28.   No Broker.** Lessor and RGC represent and warrant to each other that no broker, agent, or finder has acted on its behalf in connection with this Lease, and that no commissions, fees, or other monies are due to any broker, agent, or finder. In addition, Lessor and RGC will and do indemnify each other from all claims with respect to any brokerage, finder's or leasing commissions in connection with this Lease or any of its transactions contemplated under this Lease.

**29.   Condemnation.** Lessor will, immediately notify RGC of any condemnation proceeding that may affect the Property. Lessor will cooperate with RGC in defending or settling the same. RGC may, in its discretion, defend its rights independently of Lessor. Any condemnation award will be shared between Lessor and RGC as provided by law. Any condemned Property will constitute Released Land as of the date of condemnation, and this Lease will continue in effect as to the remaining Property.

**30.   Dispute Resolution.** Subject to the provisions of this Section, any controversy, claim, or dispute arising out of or related to this Lease, or to the formation, negotiation, or breach thereof, will be settled by binding arbitration in Richmond, Virginia before a single arbitrator, in accordance with the Commercial Arbitration Rules of the American Arbitration Association. Any award of damages, will be limited to actual, compensatory damages. Judgment upon the award rendered by the arbitrator may be confirmed by, and entered in, any court having jurisdiction thereof. Prior to initiating any arbitration, the initiating party will give the other party written notice of the claim, and will allow the other party 30 days from the date that the notice is received to amicably resolve the claim. If the claim is not resolved within the 30 day period, the initiating party's sole and exclusive remedy will be to submit the dispute to arbitration. The parties will comply with any arbitration award within 30 days of its issuance, on as soon as practicable thereafter, and the Lease will continue in full force and effect. In no event will the existence of any dispute, arbitration or award excused or otherwise affect any party's rights or obligations under this Lease, or interfere in any way with RGC's Operations.

**31.   No Interference With RGC's Operations.** Lessor has not, and will not, during the Term of this Lease, take any action or grant any right which would in any way interfere with RGC's exercise of its rights as set out in Section 5 (Grant of Rights) of this Lease.

**32.   No Implied or Continuing Waiver.** If either party waives or does not enforce any provision of this Lease on any occasion, that action will not constitute waiver of; (a) that provision as to any other time, event or occurrence; or (b) any other provision.

**33.   Notices.** Any notice given to the other party under this Lease must be in writing, and sent by United States registered or certified mail (return receipt requested), or via Federal Express or similar overnight courier service, addressed to the addresses set forth as the first page of this Lease. All notices will be deemed to have been made when deposited in the mail or with the courier, as provided above. All notices will be deemed to have been received upon actual receipt by any person at the address listed above. Either party may change its address for the mailing of notices by giving the other party notice of such change of address in the manner provided for in this Section.

**34.   Entire Agreement; No Oral Modification.** This Lease constitutes the entire agreement between the parties and supersedes all previous agreements, written or oral. Lessor hereby expressly acknowledges that in entering into this Lease, Lessor has not relied on any oral or other written statements made by RGC, its employees, agents or independent contractors. This Lease may only be modified by a written agreement in recordable form signed by Lessor and an authorized officer of RGC.

**35.   Choice of Law.** This Lease will be construed, interpreted and governed by the laws of Virginia.

**36.   Successors and Assigns.** This Lease constitutes a covenant running with the land and will be binding on, and inure to the benefit of, Lessor, RGC and Lessor's and RGC's heirs, legal representatives, executors, administrators, successors and assigns, as the case may be.

**37.   Severability.** In the event that any court or duly appointed arbitrator determines that any provision of this Lease is unenforceable, illegal, or in conflict with any federal, state, or local law, the parties will petition (or will hereby be deemed to have petitioned) the court or arbitrator to inform that provision in such a way as to carry out the intent of the parties to the extent permissible under law. If the court or arbitrator declines to reform that provision, then that provision will be considered severable from the rest of the Lease, the remaining provisions of the Lease will not be affected, and this Lease will be construed and enforced as if the Lease did not contain the unenforceable or illegal provision.

**38.   Modification to Cure Any Violation of the Rule Against Perpetuities.** Lessor and RGC do not intend that any provision in this Lease will in any way violate the Rule Against Perpetuities or any related rule. If any such violation should occur; it is the intent of Lessor and RGC that the appropriate court or arbitrator will reform the provision in such a way as to approximate most closely the intent of the parties within the limits permissible under such rule or applicable rule, and will enforce the Lease as so reformed.

**39.  _Memorandum_.** At the time this Lease is signed, the parties will sign a Memorandum of Lease which RGC will record. In the event of a conflict between the terms of the Memorandum of Lease and this Lease, the terms of this Lease will control.

**40.  _Mortgagee Consent_.** Lessor agrees to use Lessor's best efforts to obtain promptly, and to provide to RGC a copy of, any consent to this Lease required by the terms of any mortgage or other instrument creating rights superior to this Lease with respect to all or any part of the Property. Such consent, however, will neither affect nor be a condition precedent to the effectiveness and enforceability of the Lease as between Lessor and RGC.

**41.  _Headings_.** The headings contained in this Lease are for the convenience of the parties only, and will not be used in its interpretation.

**42.  _Obligations That Survive This Lease_.** In addition to other obligations that survive this Lease as set forth in this Lease, the parties' obligations under the following Sections of this Lease will remain in full force and effect following, and will not be affected by, the termination of, or expiration of the Term of, this Lease: Sections 2, 9, 11, 16-18, 21, 29, 22, 24-26, 30, 32-35, and 41-43.

**43.  _Good Faith_.** During the Term of this Lease, each party will act in good faith to fulfill the intent of this Lease and will meet with the other party to discuss and to try to resolve amicably any issues that may arise.

**IN WITNESS WHEREOF,** the parties have executed this Lease under seal as of the date first above written.

OWNER:                                              RGC (USA) MINERALS INC.

_(signature)_ (SEAL)          By: _(signature)_

G. L. Parson, Jr.                                  Vice    President
(Print Name)

AKA George Lee Parson, Jr.          (CORPORATE SEAL)
AKA G. L. Parson                                 Attest: _(signature)_
AKA G. Lee Parson, Jr.
                                                              Secretary

_(signature)_ (SEAL)          STATE OF FLORIDA

Mary Elizabeth Parson                       COUNTY OF CLAY
(Print Name)

AKA Mary Butterworth Parson               The foregoing instrument was acknowledged before me
AKA Mary B. Parson                                 this 15 day of February, 1989 1990
AKA Mary E. Parson                                 by Daniel P. Wolcott,
AKA Mrs. G. L. Parson, Jr.                       as Vice    President of RGC (USA) MINERALS
                                                                INC., a Delaware corporation, on behalf of the
                                                                corporation.

                                                                _(signature)_
STATE OF VIRGINIA                               Notary Public

CITY/COUNTY OF _____                     My Commission Expires: Notary Public, State of Florida
The foregoing instrument was acknowledged before me                My Commission Expires May 21, 1993
this 19th day of October, 1989,
by G. L. Parson, Jr., and Mary
Elizabeth Parson, husband and
wife

                                                                [NOTARIAL SEAL]

My Commission Expires:

October 23, 1991

_(signature)_
Notary Public

[NOTARIAL SEAL]

EXHIBIT A
TO
MINING LEASE
BY AND BETWEEN


G. L. PARSON, JR., AKA GEORGE LEE PARSON, JR.,
AKA G. L. PARSON, and AKA G. LEE PARSON, JR., and

MARY ELIZABETH PARSON, AKA MARY BUTTERWORTH PARSON,
AKA MARY B. PARSON, AKA MARY E. PARSON, and
AKA MRS. G. L. PARSON, JR., husband and wife
(LESSOR)


AND


RGC (USA) MINERALS INC.
(RGC)

029

## EXHIBIT A

Under the terms of the above-referenced Mining Lease, to which this Exhibit is attached, Lessor has leased to REC, and granted to REC various rights regarding, certain real property (including all mineral rights and Minerals) referred to as the "Property" which is situated in the ____ Stony Creek ____ Magisterial District, Sussex ____ County, State of Virginia, which is hereby represented and warranted by Lessor to amount to ____ 4.17 ____ acres, and which is described as follows:

That same tract or parcel of land conveyed to G.L. Parson (also known as G. Lee Parson, Sr.) by Warranty Deed dated November 14, 1959, and recorded in Deed Book 59 at page 279 in Clerk's Office of Circuit Court of Sussex County, Virginia, to wit: All of that certain track piece or parcel of land lying and being situate in Stony Creek Magisterial District, Sussex County, Virginia, containing four and seventeen hundredths (4.17) acres by actual survey, and being shown and designated on a certain plat of survey, dated March 1, 1952, made by H.C. Frye, C.E., which said plat of survey is recorded in the aforesaid Clerk's Office in Plat Book 7 at page 26, and reference thereto is hereby invited for a more perfect description of the real estate herein conveyed; and being more particularly described on said plat as follows: Commencing on the West side of State Highway Route No. 619 at the Southeastern corner of a certain lot of land owned by B.J. Rideout, Jr.; thence S. 79° 30' W. 443 ft. to a point; thence South 24° 46' E. 494 ft. to a point; thence N. 62° 30' E. 465 ft. to a point; thence along Route 619 N. 30° 00' W. 370 ft. to the point of beginning; and being in all respects the same real estate that was conveyed to the parties of the first part, as husband and wife, by the entireties, with the right of survivorship as at common law, by deed from B.J. Rideout, Sr. and wife, and dated March 17, 1952, and recorded in the aforesaid Clerk's Office in Deed Book 48 at page 477.

The above stated land bequeathed and devised to Virgie Fraher Parson (also known as Virgie F. Parson) from the Will of G. Lee Parson, Sr., deceased, in Will Book 23 at page 430 dated May 3, 1966, recorded March 8, 1973 in the Clerk's Office of Sussex Circuit Court.

AND ALSO the above stated land bequeathed and devised to George Lee Parson, Jr. (also known as G. L. Parson, G. Lee Parson, Jr. and G. L. Parson, Jr.) from the Will of Virgie F. Parson (also known as Virgie Fraher Parson), deceased, in Will Book 31 at page 314 dated September 25, 1973, recorded October 15, 1982 in the Clerk's Office of Sussex Circuit Court.

Subject property is referred to in the Sussex County tax records as Tax Parcel Number 8-101-3.

SPLRoy Pol/
VA 8/89

# EXHIBIT B
## TO
## MINING LEASE
## BY AND BETWEEN
G. L. Parson, Jr. and Mary Elizabeth Parson,
husband and wife
(Lessor)

## AND

## RGC (USA) MINERALS INC.
## (RGC)

### RGC's Royalty Policy for Virginia Operations

### COPYRIGHT © RGC (USA) MINERALS INC. 1989

This document sets forth RGC's Royalty Policy for Virginia Operations (Royalty Policy), which is referred to in Section 7 (Royalty Payments) of the above referenced Deed of Mining Lease (Lease) and which is attached to and incorporated into the Lease by reference.

**1.   Definitions.**  The terms defined in the body of the Lease or anywhere in this Royalty Policy will have the same meanings throughout this Royalty Policy. The following terms will have the following meanings:

(a)     "Principal Minerals" means Ilmenite, Rutile and Zircon.

(b)     "Minor Minerals" means Minerals other than Principal Minerals.

(c)     "Mineralized Property" means that portion of the Property which RGC estimates, using the then most current drilling data and survey information, contains Minerals-bearing sands which have a minimum developable depth of 15 feet and which have a cut-off grade of two percent (2%) by weight average Minerals content. All lump sum payments under Section 4 (Initial Payment and Advance Royalty Payments) of the Lease are based on the Mineralized Property as of the Lease Date, and subsequent changes in the acreage of the Mineralized Property will not affect the lump sum payments.

(d)     "Sales Value per ton of each Mineral" means the dollar value per short ton derived by dividing (i) the actual dollar sales of each Mineral following processing by the day plant (net of returns, sales taxes, sales discounts and commissions but not net of settlement discounts), for the calendar quarter (Quarter), which is the subject of the Royalty Payment calculation, by (ii) the total [sales] tonnage for each Mineral in that Quarter, subject to the exclusion of sales to affiliates contained in Clause 9 (Sales to Affiliates) below.

(e)     "Lessor's Stock Account" means the account maintained by RGC to Lessor insure for the purpose of tracking and reporting production, inventory, and sales allocations made with respect to saleable Minerals attributed to the Property (and, for the purpose of calculating and accounting to Lessor, through the Stock Report described in Clause 3 below) for any Royalty Payments.

(f)     "All Stock Accounts" means the Lessor's Stock Account and all other stock accounts maintained by RGC for other properties on which RGC engages in Mining (as defined in Clause 6(b)(i) below).

(g)     "Recovery Rate" for any treatment of material is the weight of material that is present after that treatment divided by the weight of material before treatment, expressed as a percentage.

**2.   Calculating Royalties.**  This Royalty Policy sets forth the methodology to be used in determining and reporting the Royalty Payments payable to Lessor under the Lease. By signing the Lease Lessor agrees to that methodology, including but not limited to (i) RGC's method of attributing Minerals to the Property, as set forth in Clause 6 below, and (ii) RGC's method of calculating Royalty Payments as set forth in Clause 7 (Royalty Payment Calculation) below.

**3.   Stock Account and Stock Report.**  From the commencement of Mining (as defined in Clause 6(b)(i)) on the Property until such time as RGC's obligation to pay Lessor Royalty Payments has been fulfilled, RGC will establish and maintain Lessor's Stock Account and will send to Lessor within 30 days after the end of each Quarter a written report (Stock Report) on the status of Lessor's Stock Account. The Stock Report will show:

(a)     The tons of saleable Minerals attributed to the Property for the Quarter (see Clause 6 below);

(b)     Sales from the accumulated tons of saleable Minerals referred to in Clause 3(a) above;

(c)     Any Advance Royalty Payments paid during the Quarter in accordance with Section 6 of the Lease;

(d)     Any Royalty Payment payable for the Quarter pursuant to Section 7 (Royalty Payments) of the Lease;

(e)     A reconciliation of Advance Royalty Payments and Royalty Payments to Lessor pursuant to Section 6 (Initial Payment and Advance Royalty Payments) and Section 7 (Royalty Payments) of the Lease.

The Stock Report will be certified as accurate by RGC's Operations manager or a senior financial employee. By signing this Lease, Lessor agrees to preserve the confidentiality of the sales and production information in all Stock Reports.

**4.   Royalty Rate.**  RGC will pay Lessor a Royalty Payment equal to ▇▇▇▇▇▇ of the Sales Value per ton of each Mineral sold that is attributed to the Property, as reflected in the Stock Account and as reported to Lessor quarterly in the Stock Report.

**5.   Royalty Payments.**  Any Royalty Payments due for Principal Minerals attributed to the Property will be paid within 30 days after the end of the Quarter in which such Principal Minerals were sold (i.e. invoiced to the purchaser), and, for Minor Minerals attributed to the Property within 30 days of the end of the Fiscal Year (July 1 - June 30) in which they were sold.

**6.   Saleable Minerals Attributed to the Property.**  Saleable Minerals are attributed to the Property and to Lessor's Stock Account as set forth below:

(a)     RGC will survey, drill, and analyze drill samples from those portions of the Property which it plans to mine, in order to estimate the tons of Principal Minerals located therein.

(b)     Production of saleable Minerals is achieved by the following three steps in RGC's Operations:

(i)     "Mining" - extracting and delivery of minerals and ore to the concentrator;

(ii)     "Concentrating" - removal of non-commercial material;

(iii)     "Processing" - removal of further non-commercial sand and separation into saleable Minerals.

Each of these steps results in recovery and loss of saleable Minerals, depending on the efficiency of each step and the nature of the material being treated. The Recovery Rate for each step varies to a small degree on a daily basis and is determined by regular sampling and analysis of the material as it passes through each step.

031

(c) The Recovery Rates for a given Quarter and the estimates and survey information compiled pursuant to Clause 6(a) above are used to estimate the tons of saleable Principal Minerals recovered from the Property in that Quarter. Those tons of Principal Minerals are then entered in Lessor's Stock Account.

(d) Within 30 days of the end of each Fiscal Year, RGC will apportion its actual production of saleable Minor Minerals for the year among All Stock Accounts. The apportionment will be made in proportion to the attribution of Principal Minerals among All Stock Accounts for the year.

## 7. Royalty Payment Calculations.

(a) Principal Minerals Sold

(i) Within 30 days of the end of each Quarter, RGC will deduct the total tons of each Principal Mineral sold during that Quarter from All Stock Accounts.

(ii) The tons of Principal Minerals sold will be deducted from All Stock Accounts on a "First-In/First-Out" (FIFO) basis. Where production of saleable Minerals is attributed to several stock accounts on the same date, sales attributable to such production will be deducted from the affected stock accounts in proportion to the tonnage allocated on that date to such stock accounts.

(iii) The sales thus attributed to the Property will be entered in Lessor's Stock Account and reflected in the Stock Report.

(iv) RGC will calculate the Sales Value per ton for each Principal Mineral for the Quarter.

(v) The Royalty Payment payable to Lessor for the Quarter will equal ▓▓▓▓▓▓ of the Sales Value per ton for each Principal Mineral for the Quarter multiplied by the tons of each ▓▓▓ Principal Mineral sold which are attributed to the Property for the Quarter as reflected in the Stock Account.

(b) Minor Minerals Sold

Within 30 days after the end of each Fiscal Year, a calculation similar to that described in Clause 7(a)(v) above, will be made for Minor Minerals, and the result will be reflected in the Stock Report for the last Quarter of the Fiscal Year.

(c) Adjustments

At the end of each Fiscal Year, RGC will compare the actual annual Mineral production to the total tons of Minerals attributed to All Stock Accounts in that year. If the actual production is less than the attributed production, then the shortfall will be deducted proportionately from All Stock Accounts. If the actual production exceeds the attributed production, then the excess will be allocated proportionately among All Stock Accounts.

## 8. Commingling and Stockpiling. RGC will commingle Minerals from the Property with Minerals from other properties, may engage in Mining on more than one property in a Quarter, and may in RGC's sole discretion from time to time stockpile Minerals depending on market conditions.

## 9. Sales to Affiliates. RGC may in its sole discretion sell part or all of its Minerals to Affiliates of RGC. In such event, the Sales Value per ton of each Mineral used in calculating the Royalty Payment will be based only on RGC's sales to non-affiliates. If such non-affiliate sales are less than 30% of RGC's total sales of the Mineral during the Quarter, then the Sales Value used in calculating the Royalty Payment will equal the greater of (a) the Sales Value based only on RGC's sales to non-affiliates or (b) the indexed price for the Mineral, determined by multiplying (i) the Sales Value per ton of the Mineral last used in calculating a Royalty Payment times (ii) the percentage change in the Producer Price Index - Titanium Pigments Index of the Bureau of Labor Statistics, U.S. Department of Labor (Code No. 06220109.1982=100.) Such percentage change will be based on the change in the Index from the last month of the Quarter in which the Sales Value referred to in Clause (i) was used to the last month of the Quarter for which the Royalty Payment is being calculated.

## 10. Most Favored Lessor. If RGC agrees, after signing this Lease, to pay a higher initial Payment per acre, higher aggregate Advance Royalty Payments per acre (excluding any such higher payments that result from either (i) an increase in a lease date payment which raises a lessor's total lease date payments to seven percent (7%) of RGC's then-current estimate of the lessor's total Advance Royalty Payments and Royalty Payments or; (ii) variations in Advance Royalty Payments that are based upon or limited by Clause 12 hereof), or higher royalty rates as to any other leased property in the Area, RGC will within 30 days of the more favorable lease pay Lessor any amount necessary to adjust retroactively payments previously received by Lessor to the more favorable levels, and the more favorable levels thereafter apply to this Lease. This Clause does not require final retroactive adjustments include the time value of money. This Clause applies only to leases and not to purchases, options to purchase, purchase-leasebacks or arrangements or other arrangements.

## 11. Completion of Mining.

(a) RGC will send Lessor written notice when it has completed Mining on the Property.

(b) The next Stock Report after such notice will contain a reconciliation comparing (i) the total of all Royalty Payments and Advance Royalty Payments paid to date, with (ii) the product obtained by multiplying the total number of acres of the Property from which RGC removed the topsoil in preparation for Mining, times $3,500 per acre average Minimum Royalty provision in Section 8 (Minimum Royalty) of the Lease.

(c) If that Stock Report reflects that all tons of Minerals attributed to the Property have already been sold, that Stock Report will be the Lessor's last Stock Report and final reconciliation, and Lessor will be paid (i) any Royalty Payments payable for that Quarter, and (ii) the final payment, if any, required by this $3,500-per-acre average Minimum Royalty provision (the "Final Payment"). The Final Payment will equal the amount (if any) by which the product described in Clause 11(b)(ii) exceeds the total described in Clause 11(b)(i).

(d) If that Stock Report reflects that any tons of Minerals attributed to the Property have not yet been sold, Lessor will be paid any Royalty Payments payable for that Quarter, and Lessor may elect, by sending written notice to RGC within 30 days, to either: (i) forfeit all rights to future Royalty Payments with regard to all unsold tons and receive the Final Payment, if any, determined in accordance with Clause 11(c) above, or (ii) continue Lessor's Stock Account in existence, and defer the final reconciliation and Final Payment, if any, until all such unsold tons are sold and the final total of all Royalty Payments and Advance Royalty Payments can be used in determining any Final Payment due.

## 12. Advance Royalty Payment: 70% of Estimated Future Royalty Payments. At least one year before RGC commences Mining on the Property, RGC will estimate, using the then-level current drilling data and survey information, the tons of Minerals located therein. Using the higher of this estimated density or approximately 3,300 ▓▓ tons and applying reasonably expected Recovery Rates and prices, RGC will in good faith estimate the total sales value of the saleable Minerals recoverable from the Mineralized Property. The Advance Royalty Payment equal to 70% of Estimated Future Royalty Payments set forth in Section 6 (Initial Payment ▓▓▓▓▓▓▓ Advance Royalty Payments) of the Lease will be determined by (a) multiplying the estimated total sales value times the ▓▓▓▓▓▓▓▓ (b) multiplying the result by seventy percent (70%), and (c) deducting therefrom all Advance Royalty Payments previously made under the Lease.

## 13. No Reliance on Estimates or Representations. Because of the inherent uncertainties in making projections and estimates which underlie Lessor's Royalty Payments, Lessor, in deciding whether to enter into this Lease, should not rely upon any representation, written or oral, as to the likelihood or value of Royalty Payments, and Lessor should bear in mind that the $3,500-per-acre average Minimum Royalty provision contained in Section 8 (Minimum Royalty) of the Lease applies only if RGC engages in Mining on the Property, and even then applies only to the total number of acres from which RGC removes the topsoil in preparation for Mining. Lessor acknowledges that Lessor understands the foregoing uncertainties and Lessor agrees that Lessor has not relied upon any representation, written or oral, as to the likelihood or value of Royalty Payments.

STD Lease
VA 8/89



96-1-0036
COPY

# DEED OF MINING LEASE

THIS DEED OF MINING LEASE including the attached Exhibits which are incorporated herein by this reference, ("Lease") is made and entered into on __October 13,__ 1989 by and between __G. L. Parson, Jr. AKA George Lee Parson, Jr., AKA G. L. Parson, and AKA G. Lee Parson, Jr., and Mary Elizabeth Parson, AKA Mary Butterworth Parson; AKA Mary E. Parson, AKA Mary E. Parson and AKA Mrs. G. L. Parson, Jr., husband and wife Route 1, Box 60, Stony Creek, Virginia 23882__

("Lessor") and RGC (USA) MINERALS INC., a Delaware corporation whose address is Werner Road, P.O. Box 1307, Green Cove Springs, Florida 32043 ("RGC"). In consideration of the mutual promises made in this Lease, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Lessor and RGC agree as follows:

1.  **Defined Terms.** Any word or phrase that is capitalized and placed in quotations in this Lease is a defined term and when it is capitalized will have the same meaning throughout this Lease.

2.  **Purpose.** The purpose of this Lease is to allow RGC to explore for and, at RGC's sole discretion, to mine, remove, commingle, haul and stockpile Minerals from the Property, to use the Property to mine Minerals from the Property or other property, and to conduct related activities. "Minerals" means the following group of minerals and mineral products: Ilmenite, Leucoxene, Rutile, Zircon, Staurolite, Kyanite, Sillimanite, Monazite, Xenotime, and Garnet, and associated By-Products. Title to any Minerals mined shall, if and when conveyed to RGC, pass to RGC as they are removed from the Property.

3.  **Grant of Lease.** Lessor hereby leases to RGC the Property, (as defined on Exhibit A), on the terms and conditions in this Lease.

4.  **Grant of Rights.** Lessor grants to RGC the following exclusive rights with regard to the Property.
    (a)  To enter the Property to survey, explore, drill, test, and sample, (the foregoing activities are defined as "Exploration").
    (b)  To clear the Property of such buildings, (subject to Section 21 (Compensation for Buildings)), other structures, to obstacles, earth, standing timber, plants, and such other things or material that, in its absolute discretion, relates to clear from the Property, to exercise that rights as set out in this Section 4; to construct, relocate, use, or remove roads, power and communication lines, dredge ponds, tailings ponds, settling ponds, pipelines, buildings, storage facilities, canals, tailings, signs, gates, fences, and other structures and facilities on the Property, to take steps to prepare for mining on the Property; and to develop, mine, dress-mine, dredge, remove, concentrate, separate, commingle, stockpile, haul, process, ship, and sell Minerals (the foregoing activities, whether conducted on the Property or on other property in Dinwiddie and Sussex Counties, Virginia ("Area") are defined as "Operations").
    (c)  To use the Property to store, transport or dispose of Minerals, water, tailings, and material resulting from RGC's Operations.
    (d)  To use water from or appurtenant to the Property and to drain through and from the Property and to draw into any course in the Property any water from RGC's Operations.
    (e)  To take all steps to accomplish Reclamation (as defined in Section 14) of the Property.
    (f)  To use all easements, means of access, and rights-of-way from and to the Property; and
    (g)  To use the Property for the purposes described in this Section, in conjunction with RGC's Exploration, Operations and Reclamation on other property.

    Notwithstanding the foregoing, RGC is not granted the right under this Lease to construct or operate on the Property a processing plant for the final separation of the concentrate into salable Minerals.

5.  **Term of Lease.** This Lease will begin on the date first written above and will end 20 years thereafter, unless (a) the Lease is ended earlier under Section 19 (Termination), (b) this Lease is automatically terminated by RGC's failure, for reasons other than a temporary inability to obtain through diligent efforts all necessary governmental permits and authorizations, to commence Mining (as defined in the Royalty Policy) in the Area by the eighth anniversary of the Lease, for (c) the Lease is automatically extended to allow RGC in complete ongoing operations on the Property, if so extended, the Lease shall terminate upon the earlier of written notice from RGC pursuant to Section 19 (Termination), or the passage of a period of 180 consecutive days in which RGC conducts no Operations on the Property. "Term" means the period of time during which this Lease is in effect, and in the absence of earlier termination, includes both the initial 20-year term and any extended term.

6.  **Initial Payment and Advance Royalty Payments.** Subject to the terms and conditions of this Lease, RGC will pay to Lessor, during the Term of this Lease, on or before the dates indicated the following lump sum payments and payments per acre of the Property retained under the Lease at the time of the payment:

| Payment Due | Royalty Type | Payment |
|---|---|---|
| Lease Date | Initial Payment | $250 per acre |
| Lease Date | Advance Royalty | $750 per acre |
| On or before December 31 of each year following the year this Lease is signed | Rental Payment | $15 per acre |
| Earlier of (a) "Mining" (as defined in Royalty Policy) in Area or (b) Fifth Anniversary | Advance Royalty | $223,000.00 lump sum, equal to $1000 per acre of "Mineralized Property" (as defined in Royalty Policy) |
| Tenth Anniversary (if no "Notice of Mining" (as defined in Section 5) gives | Advance Royalty | $223,000.00 lump sum, equal to $1000 per acre of Mineralized Property, subject to 70% Limitation (as defined in Royalty Policy) |
| Fifteenth Anniversary (if no Notice of Mining given...) | Advance Royalty | $223,000.00 lump sum, subject to 70% Limitation |
| Notice of Mining | Advance Royalty | 70% of Estimated Future Royalty Payments (as defined in Royalty Policy) |

The Initial Payment and all Rental and Advance Royalty Payments paid to Lessor are non-refundable. The Advance Royalty Payments paid to Lessor will be credited against any Royalty Payments otherwise payable pursuant to Section 7 (Royalty Payments) and may be prepaid by RGC. Payment to Lessor of the payment required upon Notice of Mining will satisfy in full any obligation RGC may thereafter have to pay the Tenth and Fifteenth Anniversary Advance Royalty Payments.

7.  **Royalty Payments.** RGC will pay to Lessor quarterly Royalty Payments equal to ▮▮▮▮▮▮▮ of the Sales Value of Minerals attributed to the Property, which RGC mines and sells. The Royalty Payments will be determined and paid in accordance with Exhibit B, RGC's Royalty Policy for Virginia Operations ("Royalty Policy").

8.  **Minimum Royalty.** If the total of all Advance Royalty Payments and Royalty Payments paid to Lessor under this Lease does not average $3,000 per acre for all of the Property from which RGC removes the topsoil in preparation for Mining ("Minimum Royalty"), RGC will pay to Lessor the amount by which the Minimum Royalty exceeds such total. Any such payment will be determined and paid in accordance with Clause 11 of the Royalty Policy.

9.  **Lessor's Use of the Property.** During Exploration, Lessor and RGC will work together to accommodate Lessor's normal activities on the Property. RGC will give Lessor at least twelve months' notice ("Notice of Mining") if RGC's Mining will require Lessor to cease activities on the portion of the Property described in the Notice of Mining. Until the end of the notice period, Lessor will have the right, but not the obligation, to remove for Lessor's account any crops, timber, buildings, irrigation systems, fixtures or personal property on the Lease from that portion of the Property. From the end of the notice period until RGC notifies Lessor otherwise, Lessor will cause all activities to cease on that portion of the Property. During Reclamation, RGC will

RG 0033

work with Lessor to allow Lessor to resume Lessor's normal activities on the Property, as soon as reasonably possible and as permitted by governmental reclamation requirements. Lessor will and does indemnify RGC from and against any claims asserted against RGC arising out of that activity of Lessor's invitees; Lessor will be solely responsible for, and will bear all risk of loss related to, any government allotment, subsidy, stabilization or conservation programs that may apply to the Property.

**10.   _Safety._**  Except as otherwise provided in this Lease, only RGC employees and visitors authorized in writing by RGC will be permitted on those parts of the Property on which Operations are being conducted.  All RGC-authorized visitors and their vehicles will carry RGC identification at all times that they are on the Property.

**11.   _RGC to Comply With Safety Laws and to Indemnify Lessor._**  RGC will conduct its Exploration and Operations in compliance with all applicable safety laws and regulations. RGC will and does indemnify Lessor from and against any claims (environmental or otherwise) asserted against Lessor, arising out of RGC's activities. RGC will also indemnify Lessor from and pay Lessor for, actual damages caused by RGC to crops, pasture, timber, fences, gates, roads and other improvements not described in Section 21 (Compensation for Buildings), located on any portions of the Property that are not mined but are otherwise used by RGC in its activities. RGC will in no event be liable for special or consequential damages, and any payments made pursuant to the preceding sentence will be deemed full and complete compensation for the damages in question.

**12.   _RGC's Right to Determine Whether, When and Where to Mine._**  Nothing in this Lease or in the relationship between Lessor and RGC will constitute or create any express or implied duty on the part of RGC to perform Exploration or Operations, or to mine the Property at any rate, in any manner, or at all.  RGC's Exploration and Operations, if any, will occur only to the extent and at the locations and times, and in the methods and manner that RGC, in its sole discretion, may determine provided, however, that RGC will not conduct Operations within 200 feet of Lessor's principal residence or any principal residence on property adjoining the Property, or in such a way as to deprive any such residence of access to a public road, utilities, and water supply until RGC complies with Section 21(a) (Compensation for Buildings—Principal Residence) [in the case of Lessor's principal residence) or obtains the adjoining property owner's written consent [in the case of an adjoining residence]; and provided, further, that, if RGC engages in Mining in the Area, then RGC will use its best efforts to mine all of the Mineralized Property that can be mined in a commercially reasonable manner.

**13.   _Compliance With Laws._**  RGC's activities on the Property will be conducted in compliance with all applicable Federal, State and local laws and regulations.

**14.   _Reclamation._**  RGC agrees to comply, with all State and Federal laws, regulations and permits applicable to the Reclamation of the Property. RGC also agrees to post a bond, to the extent required by Virginia law, to ensure that all the Property which RGC mines will be reclaimed in accordance with law; RGC will and does indemnify Lessor from and against any claims by State or Federal regulatory agencies arising from RGC's failure to reclaim in accordance with applicable laws, excluding claims caused in part or in whole by Lessor's failure to cooperate with RGC in accordance with the terms of this Lease. [RGC's Reclamation of any Property mined may include, but not be limited to, refilling the mined pit with fill, tailings discharged from the wet mill, dykes and eliminating settling ponds, replacing and grading the topsoil, replanting and otherwise complying with all applicable governmental reclamation requirements (Reclamation).]

**15.   _Audit._**  Lessor will have the right at Lessor's expense to appoint an independent auditor reasonably approved by RGC (which approval is hereby given if Lessor appoints a national firm like United States [or] recognized reputation), to audit, not more than once [in any] year, RGC's records relating to the determination of Royalty Payments for RGC's Fiscal Year (currently July 1-June 30) immediately preceding such audit. Lessor will instruct Lessor's auditor to send a copy of its report to RGC at the same time that it sends its report to Lessor. Also, Lessor will notify RGC in writing of any objections Lessor may have regarding Royalty Payments, within 60 days of Lessor's receipt of Lessor's auditor's report.

**16.   _Taxes._**  Taxes will be apportioned and paid as follows:

  (a)  RGC will pay the following taxes, or portions thereof:  any mineral severance, taxes related to RGC' Operations; property taxes, pro-rated for the portion of the Property and the time period in which Lessor is prohibited under this Lease from conducting activities; and any increase in property taxes attributable to the Minerals at RGC's Operations.

  (b)  Lessor will pay all other taxes related to the Property, including but not limited to: any taxes on Released Land (as defined in Section 19 (Termination)) any income, capital levy, estate, gift, succession, inheritance, transfer or franchise taxes; and any taxes attributable to Lessor's activities on the Property.

  (c)  Lessor, will send RGC copies of all assessments, tax bills, or other tax notices related to the Property, or to RGC's Operations thereon within 14 days of Lessor's receipt of the same or in such shorter time as may be necessary to preserve the rights of RGC and Lessor to protest or appeal the same. Lessor will cooperate with RGC in any such protest or appeals. RGC may, in its discretion, pursue such protest or appeal independently of Lessor. [RGC will, in any event not be obligated to pay RGC's share in taxes which RGC is unable to protest or appeal due to Lessor's failure to comply with this Section 16(c) or (ii) any tax bill which RGC does not received at least 14 days before the bill is due.

  (d)  RGC may, but is not required to, pay any taxes or the Property for which Lessor is responsible under Section 16(b), and deduct such taxes paid from any payments otherwise due to Lessor under this Lease.

**17.   _Warranty of Title._**  Lessor warrants as follows:

  (a)  Lessor is the sole legal and equitable owner, in undivided fee simple, of the surface and mineral estates that comprise the Property without limitation whatsoever.

  (b)  The Property is free and clear of all leases, liens, encumbrances and outstanding adverse claims and interests, and of record.

  (c)  Lessor has full power and authority to execute this Lease.

  (d)  RGC shall have the quiet and peaceful possession and enjoyment of the Property, Minerals, and the proceeds thereof, against all persons or entities who may claim any interest therein.

  (e)  There has been no violation of any applicable Federal, State, or local law, or regulation relating to zoning, land use, environmental protection or otherwise with respect to the Property or activities relating thereto.

  (f)  This Lease, and RGC's right, title and interest hereunder, shall at all times be superior to, and have priority over, any right, title or interest in the Property created during the Term of this Lease.

**18.   _Lessor Interest._**  In entering into this Lease, RGC is relying on Lessor's warranties of title contained in Section 17 (Warranty of Title). Without impairment of those warranties of title, if Lessor owns less than the entire and undivided estate in the Property, RGC may (a) proportionately reduce all payments otherwise payable under this Lease; (b) offset any prior payments related to the uncovered portion against any future payments payable under this Lease; and (c) exercise any other available rights or remedies.

**19.   _Termination._**  RGC will have the right to terminate this Lease with regard to all or any portion of the Property at any time by sending a written notice to Lessor at least 90 days prior to such termination. The termination will take effect upon the date specified in the notice. Upon termination, all of RGC's rights and obligations under this Lease [with regard to the Property, or portion thereof specified in the notice (the Released Land) will terminate, except for any Reclamation rights and obligations and any Minimum Royalty, or Royalty Payment obligations arising out of mining conducted on the Released Land prior to such termination. In the event of a partial termination, this Lease will continue in effect, with respect to all Property except the Released Land, and the term Property will thereafter mean and include only the retained Property without the Released Land. After termination, RGC will execute, deliver, and record a release confirming the relinquishment of the Released Land.] Nothing in this Section will negate any obligation RGC has under this Lease with respect to Reclamation of the Released Land. Notwithstanding the foregoing, RGC will not terminate this Lease in whole or in part at any time prior to the sixth anniversary unless RGC also terminates all of its other mining lease in the Area.

**20.   _Title Documents._**  Lessor will promptly provide to RGC copies of all documents which Lessor now or in the future possesses, relating to, or affecting, title to the Property, including, but not limited to, title insurance policies; deeds, mortgages; trust or security deeds; boundary agreements; judgments; liens; orders; surveys; boundary descriptions; maps, while conveying an interest in the Property; trust instruments; leases; licenses; easements and rights-of-way. Lessor will give RGC notice whenever Lessor learns of any matter which may affect the title to the Property. At RGC's request, Lessor will sign and deliver to RGC such additional formal assurances of title or documents, for properties recordable form, as may reasonably be necessary to carry out the terms and intent of this Lease. Lessor will inform RGC immediately, if Lessor fails to pay or discharge in a timely manner, any promissory note, mortgage, tax, or other lien upon the Property, and RGC may then pay (and be subrogated to the rights of the holder thereof, except for any taxes for which RGC is liable under this Lease, RGC will have the right to offset from any payment otherwise payable to Lessor under this Lease; all amounts paid by RGC to discharge any such promissory note, mortgage, tax or other lien.

**21.   _Compensation for Buildings._**

  (a)  _Lessor's Principal Residence._  If RGC proposes to remove Lessor's principal residence on the Property, RGC will, no sooner give Lessor notice [than one year's notice of its intention to do so].  At least 180 days prior to such removal, RGC will compensate Lessor by making a payment to Lessor equal to two times the then-present fair-market value of such residence (excluding land), as determined by the average of two appraisals, one by an appraiser selected by Lessor, and one by an appraiser selected by RGC, from a list of six MAI or FHA-approved appraisers compiled by RGC. Lessor may thereafter occupy the residence until the one year notice period expires, at which time Lessor will vacate the residence to allow its removal.  No residence will be permitted on the Property during the Term of this Lease without the prior written consent of both Lessor and RGC.

(b) **Other Buildings.** If RGC proposes to remove other buildings on the Property, RGC will give Lessor not less than six months' notice of its intention to do so. At least 90 days prior to such removal, RGC will compensate Lessor by making a payment to Lessor equal to the approximate replacement cost of buildings of that nature, as determined by the average of two appraisals by appraisers selected in the manner described in Section 21(a). Lessor will cease using the relevant buildings 30 days prior to the proposed removal and will facilitate removal in all respects.

22. **Third-Party Claims.** If RGC learns that a third party may have a claim of, ownership in any portion or percentage of the Property or any payments under this Lease, RGC may deposit in a special escrow account (with a bank or title insurance company located in Virginia) any payments otherwise due to Lessor under this Lease and give Lessor written notice of the deposit. The sums deposited will remain in the special escrow account until the claim or controversy is resolved, or until there has been a final determination of the claim or controversy by a court or arbitrator, including any appeals therefrom.

23. **Additional and After-Acquired Rights.** If during the Term of this Lease, Lessor acquires any right or interest in the Property or in any property adjacent or appurtenant thereto, (a) Lessor will promptly notify RGC, (b) any such right or interest acquired in the Property (which Lessor had in this Lease already warranted to be part of the Property) will become part of the Property subject to this Lease without any additional payment to Lessor; (c) RGC may, at RGC's option, at any time, lease any other such right or interest on the same terms as the terms of this Lease, and (d) Lessor will sign, acknowledge, and deliver an Amendment to the Lease and to the Memorandum of this Lease to RGC, so as to include such right or interest.

24. **Entireties.** If the Property is sold or later owned in severalty or in separate tracts, RGC will nevertheless be entitled to treat the Property as an undivided whole under this Lease, with all payments payable under the Lease to be paid (either directly or pursuant to Section 25 (Multiple Owners)) to the separate owners of the Property as the proportion that their ownership interest, measured in acres, or percentage ownership of acres, bears to the whole Property Provided, however, that in no event will RGC's total payment obligations to the separate owners exceed the payment obligations that RGC would have incurred under the Lease if the Property were owned in individual fee simple by a single owner.

25. **Multiple Owners.** Whenever two or more parties are entitled to receive any payments under this Lease, RGC may withhold any such payments unless and until all of those parties designate in a notarized instrument an agent empowered to receive all such payments and to execute division and transfer orders on behalf of all those parties and their respective successors in title. Delivery of any payment due under this Lease to the designated agent fulfills RGC's obligation to make that payment to those parties.

26. **Assignment.** Both parties have the right to assign their rights and obligations under this Lease, in whole or in part, provided, however, that:

(a) The party making such an assignment must give the other party prior written notice thereof.

(b) The provisions of this Lease will apply to and be binding upon the successors and assigns of the respective parties.

(c) Any change or division in the ownership of the Property or of the right to receive any payments under this Lease, however accomplished, will not increase RGC's total payment obligations under the Lease or affect RGC's rights to conduct Exploration, Operations or Reclamation on the Property.

(d) Notwithstanding Section 26(a), RGC may, without notice or consent, assign any of its rights or obligations to affiliates of RGC, or use the services of independent contractors or agents to perform any of its rights or obligations; and

(e) No assignment will relieve the assigning party of any obligations or liability to the other party, unless the other party provides a written release to the assigning party.

27. **Force Majeure.** Neither party will be deemed in default under this Lease during any period in which the exercise of performance of any of its rights or obligations under this Lease is prevented by any occurrence reasonably beyond its control. Such an event is referred to in this Lease as "Force Majeure." Force Majeure will include, but is not limited to, the following: fire, floods, storms, hurricanes, tornados, winds, other damage from the elements, declared or undeclared war, strikes, labor disputes, riots, civil unrest, action of governmental authorities, condemnation, eminent domain, cause, failure to receive required governmental approvals, inability to obtain water for Operations; a substantial fall in the market price of Minerals, lack of access, litigation, acts of God, and acts of the public enemy. The Term of this Lease will be extended for a period of time equal to the period of Force Majeure. All such periods will be deemed to begin at the earliest time a party is prevented from exercising or performing any of the rights or obligations by reason of Force Majeure.

28. **No Broker.** Lessor and RGC represent and warrant to each other that no broker, agent, or finder has acted on its behalf in connection with this Lease, and that no commissions, fees, or other monies are due to any broker, agent or finder. In addition, Lessor and RGC will and do indemnify each other from all claims with respect to any brokerage, finder's or leasing commissions in connection with this Lease or any of the transactions contemplated under this Lease.

29. **Condemnation.** If Lessor will immediately notify RGC of any condemnation proceeding that may affect the Property. Lessor will cooperate with RGC in defending or settling the same. RGC may, in its discretion, defend its rights independently of Lessor. Any condemnation award will be shared between Lessor and RGC as provided by law. Any condemned Property will constitute Released Land as of the date of condemnation, and this Lease will continue in effect as to the remaining Property.

30. **Dispute Resolution.** Subject to the provisions of this Section, any controversy, claim, or dispute arising out of or related to this Lease, or to the formation, negotiation, or breach thereof, will be settled by binding arbitration in Richmond, Virginia, before a single arbitrator, in accordance with the Commercial Arbitration Rules of the American Arbitration Association. Any award of damages will be limited to actual, compensatory damages. Judgment upon the award rendered by the arbitrator may be confirmed by, and entered in, any court having jurisdiction thereof. Prior to initiating any arbitration, the initiating party will give the other party, written notice of the claim, and will allow the other party 30 days from the date that the notice is received to amicably resolve the claim. If the claim is not resolved within the 30 day period, the initiating party's sole and exclusive remedy will be to submit the dispute to arbitration. The parties will comply with any arbitration award within 30 days of its issuance, or as soon as practicable thereafter, and the Lease will continue in full force and effect. In no event will the existence of any dispute, arbitration award or otherwise affect any party's rights or obligations under this Lease, or interfere in any way with RGC's Operations.

31. **No Interference With RGC's Operations.** Lessor has not, and will not, during the Term of this Lease, take any action or grant any right which would in any way interfere with RGC's exercise of its rights as set out in Section 4 (Grant of Rights) of this Lease.

32. **No Implied or Continuing Waiver.** If either party waives or does not enforce any provision of this Lease on any occasion, that action will not constitute waiver of: (a) that provision as to any other time, event or occurrence or (b) any other provision.

33. **Notices.** Any notice given under this Lease must be in writing, and sent by United States registered or certified mail, return receipt requested, or via Federal Express or similar overnight courier service, addressed to the address set forth on the first page of this Lease. All notices will be deemed to have been made when deposited in the mail or with the courier as provided above. All notices will be deemed to have been received upon actual receipt by any person at the address listed above. Either party may change its address for the mailing of notices by giving the other party notice of such change of address in the manner provided for in this Section.

34. **Entire Agreement; No Oral Modification.** This Lease constitutes the entire agreement between the parties and supersedes all previous agreements, written or oral. Lessor hereby expressly acknowledges that, in entering into this Lease, Lessor has not relied on any oral or written statements made by RGC, its employees, agents, or independent contractors. This Lease may only be modified by a written agreement in recordable form signed by Lessor and an authorized officer of RGC.

35. **Choice of Law.** This Lease will be construed, interpreted and governed by the laws of Virginia.

36. **Successors and Assigns.** This Lease constitutes a covenant running with the land and will be binding on, and inure to the benefit of, Lessor, RGC, and Lessor's and RGC's heirs, legal representatives, executors, administrators, successors and assigns, as the case may be.

37. **Severability.** In the event that any court or duly appointed arbitrator determines that any provision of this Lease is unenforceable, illegal, or in conflict with any Federal, state, or local law, the parties will petition (or will hereby be deemed to have petitioned) the court or arbitrator to reform that provision to such extent as to carry out the intent of the parties to the extent permissible under law. If the court or arbitrator declines to reform that provision, then that provision will be considered severable from the rest of this Lease, the remaining provisions of the Lease will not be affected and this Lease will be construed and enforced as if the Lease did not contain the unenforceable or illegal provision.

38. **Modification to Cure Any Violation of the Rule Against Perpetuities.** Lessor and RGC do not intend that any provision in this Lease will in any way violate the Rule Against Perpetuities or any related rule. If any such violation should occur, it is the intent of Lessor and RGC that the appropriate court or arbitrator will reform that provision in such a way as to approximate most closely the intent of the parties within the limits permissible under such rule or related rule, and will enforce the Lease as so reformed.

**39.**   **Memorandum:**  At the time this Lease is signed, the parties will sign a Memorandum of Lease which RGC will record. In the event of a conflict between the terms of the Memorandum of Lease and this Lease, the terms of this Lease will control.

**40.**   **Mortgage Consent.**  Lessor agrees to use Lessor's best efforts to obtain promptly, and to provide to RGC a copy of any consent to this Lease required by the terms of any mortgage or other instrument creating rights superior to this Lease with respect to all or any part of the Property. Such consent, however, will neither affect nor be a condition precedent to the effectiveness and enforceability of the Lease as between Lessor and RGC.

**41.**   **Headings.**  The headings contained in this Lease are for the convenience of the parties only, and will not be used in its interpretation.

**42.**   **Obligations That Survive This Lease.**  In addition to other obligations that survive this Lease as set forth in this Lease, the parties' obligations under the following Sections of this Lease will remain in full force and effect following, and will not be affected by, the termination of, or expiration of the Term of, this Lease: Sections 7-9, 11, 14-15, 17, 19, 22, 24-26, 30, 32-38, and 41-43.

**43.**   **Good Faith.**  During the Term of this Lease, each party will act in good faith to fulfill the intent of this Lease, and will meet with the other party collectively and to try to resolve amicably any issues that may arise.

IN WITNESS WHEREOF, the parties have executed this Lease under seal as of the date first above written.

OWNER:

_G. L. Parson Jr._ (SEAL)

G. L. Parson, Jr.
(Print Name)
AKA: George Lee Parson, Jr.
AKA: G. L. Parson
AKA: G. Lee Parson, Jr.

_Mary Elizabeth Parson_ (SEAL)

Mary Elizabeth Parson
(Print Name)
AKA: Mary Butterworth Parson
AKA: Mary B. Parson
AKA: Mary E. Parson
AKA: Mrs. G. L. Parson, Jr.

STATE OF VIRGINIA
CITY/COUNTY OF _Surry_

The foregoing instrument was acknowledged before me this _15th_ day of _October_, 1989, by G. L. Parson, Jr. and Mary Elizabeth Parson, husband and wife.

My Commission Expires:

_Octob. 28, 1991_

_Thomas H. Rine, Jr._
Notary Public

[NOTARIAL SEAL]

RGC (USA) MINERALS INC.:

By: _Daniel P. Wolcott_
Its: __Vice__   President
[CORPORATE SEAL]

Attest: _____
Secretary

STATE OF   FLORIDA
COUNTY OF   CLAY

The foregoing instrument was acknowledged before me this _13_ day of _February_, 1989, 1990, by Daniel P. Wolcott, __Vice__ President of RGC (USA) MINERALS INC., a Delaware corporation, on behalf of the corporation.

_Bill Rollins_
Notary Public

My Commission Expires: _____
Notary Public, State of Florida
My Commission Expires May 21, 1993
Bonded Thru Troy Fain - Insurance Inc.

[NOTARIAL SEAL]

4

ATTEMPT:

1036

EXHIBIT A
TO
MINING LEASE
BY AND BETWEEN


G. L. PARSON, JR., AKA GEORGE LEE PARSON, JR.,
AKA G. L. PARSON, and AKA G. LEE PARSON, JR., and

MARY ELIZABETH PARSON, AKA MARY BUTTERWORTH PARSON,
AKA MARY E. PARSON, AKA MARY E. PARSON, and
AKA MRS. G. L. PARSON, JR., husband and wife
(LESSOR)


AND


RGC (USA) MINERALS INC.
(RGC)

**EXHIBIT A**

Under the terms of the above-referenced Mining Lease, to which this Exhibit is attached, Lessor has leased to Bee, and granted to Bee various rights regarding certain real property (including all mineral rights and minerals) referred to as the Property, which is situated in the ___Stony Creek___ Magisterial District, ___Sussex___ County, State of Virginia, which is hereby represented and warranted by Lessor to amount to ___446.00___ acres, and which is described as follows:

That same tract or parcel of land conveyed to G. Lee Parson, Jr., by Warranty Deed, dated March 22, 1960, and recorded in Deed Book 59 at page 524, in Clerk's Office of Circuit Court of Sussex County, Virginia. To Wit: All that certain tract of land, with all the improvements thereon and the appurtenances thereto belonging, lying, being and situate on the East side of the Nottoway River in Stony Creek Magisterial District, Sussex County, Virginia, containing eight hundred (800) acres, more or less, and bounded as follows: On the north by the lands now or formerly belonging to Slate, C.R. Chappell, Robinson and Camp Manufacturing Company; on the east by the lands now or formerly belonging to Otho Chappell, Henry Poole, G. Lee Parson, Sr. and the Wyatt Mill Road; on the South by the lands now or formerly belonging to J. H. Poole and the Nottoway River; and on the West by said Nottoway River and the land now or formerly belonging to the Camp Manufacturing Company, the land hereby conveyed is the same that was conveyed to G. Lee Parson, Sr. from J. Thompson Wyatt, Special Commissioner, by deed dated June 11th, 1946 recorded in the Circuit Court Clerk's Office of said County in Deed Book 42, at page 100; by deed from Francis E. Wyatt and others, dated May 3, 1945, and recorded in said Clerk's Office in Deed Book 41 at page 137; by deed from William E. Anderson, unmarried, dated November 7th, 1945, and recorded in said Clerk's Office, in Deed Book 41, at page 365; and by deed from Benjamin G. Anderson, unmarried, dated May 10th, 1945, and recorded in said Clerk's Office, in Deed Book 41, at page 136.

The above-described property was resurveyed by J. C. Shearin, dated March 20, 1972, recorded May 30, 1989 in Plat Book 18 at Page 6 in the Sussex County, Virginia records. The above stated deed recites 800.0 acres which is now corrected to recite 933.30 acres which is an increase of 133.30 acres, stated as follows: Tract No. 1 contains 50.0 acres, Tract No. 2 contains 343.0 acres, Tract No. 3 contains 379.0 acres and an open tract of land not presently surveyed containing approximately 161.30 acres, more or less.

LESS and EXCEPT from this tract of land the westerly portion thereof, containing 487.30 acres.

Subject property is referred to in the Sussex County tax records as Tax Parcel Number 101-36.

038

SPL Roy Pol
VA 8/89

**EXHIBIT B**
**TO**
**MINING LEASE**
**BY AND BETWEEN**
G. L. Parson, Jr. and Mary Elizabeth Parson,
husband and wife
(Lessor)

**AND**

**RGC (USA) MINERALS INC.**
**(RGC)**

**RGC's Royalty Policy for Virginia Operations**

**COPYRIGHT © RGC (USA) MINERALS INC. 1989**

This document sets forth RGC's Royalty Policy for Virginia Operations ("Royalty Policy") which is referred to in Section 7 (Royalty Payments) of the above-referenced Deed of Mining Lease ("Lease") and which is attached to and incorporated into the Lease by reference.

1. **Definitions.** The terms defined in the body of the Lease or anywhere in this Royalty Policy will have the same meanings throughout this Royalty Policy. The following terms will have the following meanings:

   (a)   "Principal Minerals" means Ilmenite, Rutile and Zircon.

   (b)   "Minor Minerals" means Minerals other than Principal Minerals.

   (c)   "Mineralized Property" means that portion of the Property which RGC estimates, using the then most current drilling data and survey information, contains Mineral-bearing sands which have a minimum (dredgeable depth of 15 feet and which have a cut-off grade of two percent (2%) by weight average Minerals content. All lump sum payments under Section 6 (Initial Payment and Advance Royalty Payments) of the Lease are based on the Mineralized Property as of the Lease Date, and subsequent changes in the acreage of the Mineralized Property will not affect the lump sum payments.

   (d)   "Sales Value per ton of each Mineral" means the dollar value per short ton derived by dividing (i) the actual dollar sales of each Mineral following processing, by the dry plant (net of returns, sales taxes, sales discounts and commissions but not net of settlement discounts) for the calendar quarter ("Quarter") which is the subject of the Royalty Payment calculation, by (ii) the total sales tonnage for each Mineral in that Quarter, subject to the exclusion of sales to affiliates contained in Clause 9 (Sales to Affiliates) below.

   (e)   "Lessor's Stock Account" means the account maintained by RGC in Lessor's name for the purpose of tracking and reporting production, inventory and sales allocations and, with respect to saleable Minerals attributed to the Property and for the purpose of calculating and accounting to Lessor through the Stock Report described in Clause 3 below, for any Royalty Payments.

   (f)   "All Stock Accounts" means the Lessor's Stock Account and all other stock accounts maintained by RGC for other properties on which RGC engage in Mining (as defined in Clause 6(b)(i) below).

   (g)   "Recovery Rate" for any treatment of material is the weight of material that is present after that treatment divided by the weight of material before treatment, expressed as a percentage.

2. **Calculating Royalties.** This Royalty Policy sets forth the methodology to be used in determining and reporting the Royalty Payments payable to Lessor under the Lease. By signing the Lease Lessor agrees to that methodology, including but not limited to, (i) RGC's method of attributing Minerals to the Property as set forth in Clause 6 below, and (ii) RGC's method of calculating Royalty Payments as set forth in Clause 7 (Royalty Payment Calculations) below.

3. **Stock Account and Stock Report.** From the commencement of Mining (as defined in Clause 6(b)(i)) on the Property until such time as RGC's obligation to pay Lessor Royalty Payments has been fulfilled, RGC will establish and maintain Lessor's Stock Account and will send to Lessor within 30 days after the end of each Quarter a written report ("Stock Report") on the status of Lessor's Stock Account. The Stock Report will show:

   (a)   The tons of saleable Minerals attributed to the Property for the Quarter (see Clause 6 below);

   (b)   Sales from the accumulated tons of saleable Minerals referred to in Clause 3(a) above;

   (c)   Any Advance Royalty Payments paid during the Quarter in accordance with Section 6 of the Lease;

   (d)   Any Royalty Payment payable for the Quarter pursuant to Section 7 (Royalty Payments) of the Lease;

   (e)   A reconciliation of Advance Royalty Payments and Royalty Payments to Lessor pursuant to Section 6 (Initial Payment and Advance Royalty Payments) and Section 7 (Royalty Payments) of the Lease.

The Stock Report will be certified as accurate by RGC's Operations manager or a senior financial employee. By signing this Lease, Lessor agrees to preserve the confidentiality of the sales and production information in all Stock Reports.

4. **Royalty Rate.** RGC will pay Lessor a Royalty Payment equal to ███████ of the Sales Value per ton of each Mineral sold that is attributed to the Property, as reflected in the Stock Account and as reported to Lessor quarterly in the Stock Report.

5. **Royalty Payment.** Any Royalty Payments due for Principal Minerals attributed to the Property will be paid within 30 days after the end of the Quarter in which such Principal Minerals were sold (i.e. invoiced to the purchaser), and, for Minor Minerals attributed to the Property within 30 days of the end of the Fiscal Year (July 1 – June 30) in which they were sold.

6. **Saleable Minerals Attributed to the Property.** Saleable Minerals are attributed to the Property and to Lessor's Stock Account as set forth below:

   (a)   RGC will survey, drill and analyze drill samples from those portions of the Property which it plans to mine, in order to estimate the tons of Principal Minerals located therein.

   (b)   Production of saleable Minerals is achieved by the following three steps in RGC's Operations:

      (i)    "Mining" – extracting and delivery of mineral sand ore to the concentrator;

      (ii)   "Concentrating" – removal of non-commercial material;

      (iii)  "Processing" – removal of further non-commercial sand and separation into saleable Minerals.

   Each of these steps results in recovery and loss of saleable Minerals depending on the efficiency of each step and the nature of the material being treated. The Recovery Rate for each step varies to a small degree on a daily basis and is determined by regular sampling and analysis of the material as it passes through each step.

039

(c)     The Recovery Rate for a given Quarter and the estimates and survey information compiled pursuant to Clause (a) above are used to estimate the tons of saleable Principal Minerals recovered from the Property in that Quarter. Those tons of Principal Minerals are then entered in Lessor's Stock Account.

(d)     Within 30 days of the end of each Fiscal Year, RGC will apportion its actual production of saleable Minor Minerals in the year among All Stock Accounts. The apportionment will be made in proportion to the attribution of Principal Minerals among All Stock Accounts for the year.

## 7.    Royalty Payment Calculations.

(a)     Principal Minerals Sold.

(i)     Within 30 days of the end of each Quarter, RGC will deduct the total tons of each Principal Mineral sold during that Quarter from All Stock Accounts.

(ii)    The tons of Principal Minerals sold will be deducted from All Stock Accounts on a "First In/First Out" (FIFO) basis. Where production of saleable Minerals is attributed to a week's stock accumulation, the tons sold are attributable to such production will be deducted from the affected stock accounts in proportion to the tonnage allocated on that date to each stock account.

(iii)   The sales thus attributed to the Property will be entered in Lessor's Stock Account and reflected in the Stock Report.

(iv)    RGC will calculate the Sales Value per ton for each Principal Mineral for the Quarter.

(v)     The Royalty Payment payable to Lessor for the Quarter will equal _____ of the Sales Value per ton for each Principal Mineral for the Quarter multiplied by the tons of each Mineral sold which are attributed to the Property for the Quarter as reflected in the Stock Account.

(b)     Minor Minerals Sold.

Within 30 days after the end of each Fiscal Year, a calculation similar to that described in Clause 7(a) above, will be made for Minor Minerals, and the result will be reflected in the Stock Report for the last Quarter of the Fiscal Year.

(c)     Adjustments.

At the end of each Fiscal Year, RGC will compare its actual annual Mineral production to the total tons of Minerals attributed to All Stock Accounts in that year. If the actual production is less than the attributed production, then the shortfall will be deducted proportionately from All Stock Accounts. If the actual production exceeds the attributed production, then the excess will be allocated proportionately among All Stock Accounts.

## 8.    Commingling and Stockpiling.   RGC will commingle Minerals from the Property with Minerals from other properties, may engage in Mining on more than one property in a Quarter, and may in RGC's sole discretion from time to time stockpile Minerals depending on market conditions.

## 9.    Sales to Affiliates.   RGC may in its sole discretion sell part or all of its Minerals to affiliates of RGC. In such event, the Sales Value per ton of each Mineral used in calculating the Royalty Payment will be based only on RGC's sales to non-affiliates. If such non-affiliate sales are less than 20% of RGC's total sales of the Mineral during the Quarter, then the Sales Value used in calculating the Royalty Payment will equal the greater of (a) the Sales Value based only on RGC's sales to non-affiliates or (b) the indexed price for the Mineral determined by multiplying (i) the Sales Value per ton of the Mineral last used in calculating a Royalty Payment times (ii) the percentage change in the Producer Price Index – Titanium Pigments Index of the Bureau of Labor Statistics, U.S. Department of Labor (Code No. 061320206/1982=100) [such percentage change will be based on the change in the Index from the last month of the Quarter in which the Sales Value referred to in Clause (b) was used to the last month of the Quarter for which the Royalty Payment is being calculated.]

## 10.   Most Favored Lessor.   If RGC agrees, after signing this Lease, to pay a higher initial Payment per acre, higher aggregate Advance Royalty Payments per acre (excluding any such higher payments that result from either (i) an increase in a lease that represents which raises a lessee's total lease date payments to seven percent (7%) of RGC's then-current estimate of the lessor's actual Advance Royalty Payments and Royalty Payments or (ii) variations in Advance Royalty Payments that are based upon or limited by Clause 12 hereof), or higher royalty rates to any other leased property in the Area, RGC, will within 30 days of the more favorable lease payment, pay Lessor any amount necessary to adjust retroactively payments previously received by Lessor to the more favorable levels, and the more favorable levels that are prospective in nature will thereafter apply to this Lease. This Clause does not require that retroactive adjustments include the time value of money. This Clause applies only to leases and options to purchase, purchase-leaseback arrangements or other arrangements.

## 11.   Completion of Mining.

(a)     RGC will end Lessor written notice when it has completed Mining on the Property.

(b)     The next Stock Report after such notice will contain a reconciliation comparing (i) the total of all Royalty Payments and Advance Royalty Payments paid to date, with (ii) the product obtained by multiplying the total number of acres of the Property from which RGC removed the topsoil in preparation for Mining, times a $3,500 per-acre average Minimum Royalty provision in Section 8 (Minimum Royalty) of the Lease.

(c)     If that Stock Report reflects that all tons of Minerals attributed to the Property have already been sold, that Stock Report will be Lessor's last Stock Report and a final reconciliation, and Lessor will (regard of) any Royalty Payment payable for that Quarter; and (ii) the final payment, if any, required by the $3,500-per-acre average Minimum Royalty provision (the "Final Payment"). The Final Payment will equal the amount, if any, by which the product described in Clause 11(b)(ii) exceeds the total described in Clause 11(b)(i).

(d)     If that Stock Report reflects that any tons of Minerals attributed to the Property have not yet been sold, Lessor will be paid any Royalty Payments payable for that Quarter, and Lessor may elect, by sending written notice to RGC within 30 days, to either: (i) forfeit all right to future Royalty Payments will regard to all unsold tons and receive the Final Payment, if any, determined in accordance with Clause 11(c) above; or (ii) continue Lessor's Stock Account in existence, and defer the final reconciliation and Final Payment, if any, until all such unsold tons are sold and the final total of all Royalty Payments and Advance Royalty Payments can be used in determining any Final Payment due.

## 12.   Advance Royalty Payment: 70% of Estimated Future Royalty Payments.   At least one year before RGC continues Mining on the Property, RGC will estimate, using the then most current drilling data and survey information, the tons of Minerals located therein. Using the higher of this estimated tonnage or _____ tons and applying reasonably expected Recovery Rates, and prices, RGC will in good faith estimate the total sales value of the saleable Minerals recoverable from the Mineralized Property. The Advance Royalty Payment equal (70% of Estimated Future Royalty Payments) set forth in Section 5 (Initial Payment) and 7 (Advance Royalty Payments) of the Lease will be determined by (a) multiplying the estimated total sales value times (b), multiplying the result by seventy percent (70%), and (c) deducting therefrom all Advance Royalty Payments previously made under the Lease.

## 13.   No Reliance on Estimates or Representations.   Because of the inherent uncertainties in making projections and estimates which may affect Lessor's Royalty Payments, Lessor in deciding whether to enter into this Lease, should not rely upon any representation, written or oral, as to the likelihood of or the Royalty Payments, and Lessor should bear in mind that the $3,500-per-acre average Minimum Royalty provision contained in Section 8 (Minimum Royalty) of the Lease applies only if RGC engages in Mining on the Property, and even then applies only to the total number of acres from which RGC removes the topsoil in preparation for Mining. Lessor acknowledges that Lessor understands the foregoing sentence and has and Lessor agrees that Lessor has not relied upon any representation, written or oral as to the likelihood of or value of Royalty Payments.

531TEMP2                                                                                      040

STD Lease
VA 8/89



# DEED OF MINING LEASE

**THIS DEED OF MINING LEASE** including the attached Exhibits which are incorporated herein by this reference, ("Lease") is made and entered into on _____October 13,_____ _____1989_____ by and between G. L. Parson, Jr., AKA George "Leo" Parson, Jr., AKA G. L. Parson, and AKA G. Lee Parson, Jr., and Mary Elizabeth Parson, AKA Mary Butterworth Parson, AKA Mary B. Parson, AKA Mary B. Parson, and AKA Mrs. G. L. Parson, Jr., husband and wife, Route 1, Box 60, Stony Creek, Virginia 23882.

("Lessor") and RGC (USA) MINERALS INC., a Delaware corporation whose address is Warner Road, P.O. Box 1307, Green Cove Springs, Florida 32043 ("RGC"). In consideration of the mutual promises made in this Lease, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Lessor and RGC agree as follows:

**1.** _**Defined Terms.**_ Any word or phrase that is capitalized and placed in quotations in this Lease is a defined term and when it is capitalized will have the same meaning throughout this Lease.

**2.** _**Purpose.**_ The purpose of this Lease is to allow RGC to explore for and cut RGC's sole discretion, to mine, remove, commingle, and sell Minerals from the Property, to use the Property, to mine Minerals from the Property, or other property, and to conduct related activities. Minerals means the following group of Minerals and mineral products: Ilmenite, Leucoxene, Rutile, Zircon, Staurolite, Kyanite/Sillimanite, Monazite/Xenotime, and Garnet, and associated by-products. Title to any Minerals mined shall, if not already vested in RGC, pass to RGC as they are severed from the Property.

**3.** _**Grant of Lease.**_ Lessor hereby leases to RGC the Property (as defined, on Exhibit A), on the terms and conditions in this Lease.

**4.** _**Grant of Rights.**_ Lessor grants to RGC the following exclusive rights with regard to the Property:

(a)  To enter the Property on either a complex, drill, test, and mine. [the foregoing activities are defined as "Exploration"]

(b)  To clear the Property, of such, buildings [subject to Section 21 (Compensation for Buildings)], other structures, or obstacles, earth, standing timber, plants, and any other things, or material that RGC, in its absolute discretion, wishes to clear, from the Property; to exercise the rights as set out in this Section 4; to construct, relocate, use, or remove roads, power and communication lines, dredge, ponds, tailing deposit settling pond, and pipelines; buildings, storage facilities, canals, wharves, piers, levees, yards, other structures and facilities on the Property; to take, store, prepare for, mining on the Property, and to develop, mine, cross-mine, dredge, remove, concentrate, separate, commingle, stockpile, haul, process, ship, and sell Minerals [the foregoing activities, or those conducted on the Property, or on other property in Dinwiddie and Sussex Counties, Virginia ("Area"), are defined as "Operations"].

(c)  To use the Property to store, transport, or dispose of Minerals, water, tailings, and material resulting from RGC's Operations.

(d)  To use water as appurtenant to the Property and to drain through and from the Property and to draw into any course in the Property any water from RGC's Operations.

(e)  To take all steps to accomplish Reclamation (as defined in Section 14) of the Property.

(f)  To use all easements, means of access, and rights-of-way from and to the Property, and

(g)  To use the Property for the purpose, described in this Section, in conjunction with RGC's Exploration, Operations and Reclamation on other property.

Notwithstanding the foregoing, RGC is not granted the right under the Lease to construct a concentrate on the Property, provided, for the final separation of the concentrate into salable Minerals.

**5.** _**Term of Lease.**_ This Lease will begin on the date first written above and will end 20 years thereafter, unless (a) the Lease is ended earlier under Section 19 (Termination), (b) the Lease is automatically terminated by RGC's failure, for reasons other than its temporary inability to obtain through diligent efforts, all necessary governmental permits and authorizations, to commence Mining [as defined in the Royalty Policy] or the Area, by the eighth anniversary of the Lease, or (c) the Lease is automatically extended to allow RGC to complete ongoing operations on the Property. If so extended, the Lease shall terminate upon the earlier of written notice from RGC, pursuant to Section 29 (Termination), or the passage of a period of 180 consecutive days, in which RGC conducted no Operations on the Property. "Term" means the period of time during which this Lease is in effect, and in the absence of earlier termination, includes both the initial 20-year term and any extended term.

**6.** _**Initial Payment and Advance Royalty Payments.**_ Subject to the terms and conditions of this Lease, RGC will pay to Lessor, during the Term of this Lease, on or before the dates indicated, the following lump sum payments and payments per acre of the Property retained under the Lease at the time of the payment:

| Payment Date | Payment Type | Payment |
|---|---|---|
| Lease Date | Initial Payment | $250 per acre |
| Lease Date | Advance Royalty | $1,431.93 per acre |
| On or before December 31 of each year following the year this Lease is signed | Rental Payment | $15 per acre |
| Earlier of (a) Mining (as defined in Royalty Policy) in Area or (b) Fifth Anniversary | Advance Royalty | $107,000.00 lump sum equal to $1000 per acre of Mineralized Property (as defined in Royalty Policy) |
| Tenth Anniversary if no Notice of Mining (as defined in Section 9) given | Advance Royalty | $107,000.00 lump sum equal to $1000 per acre of Mineralized Property, subject to 70% Limitation (as defined in Royalty Policy) |
| Fifteenth Anniversary if no Notice of Mining given | Advance Royalty | $107,000.00 lump sum, subject to 70% Limitation |
| Notice of Mining | Advance Royalty | 70% of Estimated Future Royalty Payments (as defined in Royalty Policy) |

The Initial Payment and all Rental and Advance Royalty Payments paid to Lessor are non-refundable. The Advance Royalty Payments paid by Lessor shall be credited against any Royalty Payments otherwise payable pursuant to Section 7 (Royalty Payments) and they be prepaid by RGC as Payment to Lessor of the payment required upon Notice of Mining will satisfy in full any obligation RGC may otherwise have to pay the Tenth and Fifteenth Anniversary Advance Royalty Payments.

**7.** _**Royalty Payments.**_ RGC will pay to Lessor quarterly Royalty Payments equal ████████ % of the Sales Values of Minerals attributed to the Property which RGC mines and sells. The Royalty Payments are determined and paid in accordance with Exhibit B, RGC's Royalty Policy, for Virginia Operations (Royalty Policy.)

**8.** _**Minimum Royalty.**_ If the total of all Advance Royalty Payments and Royalty Payments paid to Lessor under this Lease does not average $3500 per acre for all of the Property from which RGC receives the topsoil in preparation for Mining ("Minimum Royalty"), RGC will pay to Lessor the amount by which the Minimum Royalty exceeds such total. Any such payment will be determined and paid in accordance with Claims 10 of the Royalty Policy.

**9.** _**Notice and Effect of the Property.**_ Mining Operations. Lessor and RGC will work together to accommodate Lessor's normal activities on the Property. RGC will give Lessor at least twelve months' notice ("Notice of Mining") if RGC's Mining will require Lessor to cease activities on the portion of the Property described in the Notice of Mining. Until the end of the notice period, Lessor will have the right, but not the obligation, to remove for Lessor's account any crops, fences, buildings, irrigation systems, fixtures or personalty of Lessor from that portion of the Property. From the end of the notice period until RGC notifies Lessor otherwise, Lessor will cause all activities to cease on that portion of the Property. During Reclamation, RGC will

15.00                                                                    04.1

work with Lessor to allow Lessor to resume Lessor's normal activities on the Property, as soon as reasonably possible and, as permitted by governmental reclamation requirements. Lessor will and does indemnify RGC from and against any claims asserted against RGC arising out of the activities of Lessor or Lessor's invitees. Lessor will be solely responsible for, and will bear all risk of loss related to, any government allotment, subsidy, stabilization or conservation programs that may apply to the Property.

**10.   Safety.** Except as otherwise provided in this Lease, only RGC employees and visitors authorized in writing by RGC will be permitted on those parts of the Property on which Operations are being conducted. All RGC authorized visitors and their vehicles will carry RGC identification at all times that they are on the Property.

**11.   RGC to Comply With Safety Laws and to Indemnify Lessor.** RGC will conduct its Exploration and Operations in compliance with all applicable safety laws and regulations. RGC will and does indemnify Lessor from and against any claims (environmental or otherwise) asserted against Lessor arising out of RGC's activities. RGC will also indemnify Lessor from and pay Lessor for, actual damages caused by RGC to crop pasture, timber, fences, gates, roads and other improvements not described in Section 21(Compensation for Buildings) located on any portions of the Property that are to indemnified that are otherwise used by RGC in its activities. RGC will in no event be liable for special or consequential damages, and any payments made pursuant to the preceding sentence will be deemed full and complete compensation for the damages in question.

**12.   RGC's Right to Determine Whether, When and Where to Mine.** Nothing in this Lease or in the relationship between Lessor and RGC will constitute or create any express or implied duty on the part of RGC to perform Exploration or Operations, or to mine the Property at any rate, in any manner, or at all. RGC's Exploration and Operations, if any, will occur only to the extent and at the locations and times, and in the method and manner that RGC, in its sole discretion, may determine; provided, however, that RGC will not conduct Operations within 200 feet of Lessor's principal residence or any principal residence on property adjoining the Property, or in such a way as to deprive any such residence of access to a public road, utilities, and water supply until RGC complies with Section 21(a) (Compensation for Buildings – Principal Residence) (in the case of Lessor's principal residence) or obtains the adjoining property owner's written consent (in the case of any adjoining residence); and provided further that, if RGC engages in Mining in the Area, then RGC will use its best efforts to mine all of the Mineralized Property that can be mined in a commercially reasonable manner.

**13.   "Compliance With Laws.** RGC's activities on the Property will be conducted in compliance with all applicable Federal, State and local laws and regulations.

**14.   Reclamation.** RGC agrees to comply with all State and Federal laws, regulations and permits applicable to the Reclamation of the Property. RGC also agrees to post a bond, to the extent required by Virginia law, to ensure that all the Property which RGC mines will be reclaimed in accordance with law. RGC will and does indemnify Lessor from and against any claims by State or Federal regulatory agencies arising from RGC's failure to reclaim in accordance with applicable laws, excluding claims caused in part or in whole by Lessor's failure to cooperate with RGC in accordance with the terms of this Lease. RGC's Reclamation of any Property mined may include, but not be limited to, refilling the mined path with tailings discharged from the wet mill, dyking and eliminating settling ponds, regrading and grading the topsoil, replanting and otherwise complying with all applicable governmental reclamation requirements ("Reclamation").

**15.   Audit.** Lessor will have the right at Lessor's expense to appoint an independent auditor reasonably approved by RGC (which approval is hereby given if Lessor appoints a national firm in the United States of recognized reputation), to audit, not more than once in any year, RGC's records relating to the determination of Royalty Payments for RGC's Fiscal Year (currently July 1-June 30) immediately preceding such audit. Lessor will instruct Lessor's auditor to send a copy of its report to RGC at the same time that he sends his report to Lessor. Also, Lessor will notify RGC in writing of any objections Lessor may have regarding Royalty Payments, within 60 days of Lessor's receipt of Lessor's auditor's report.

**16.   Taxes.** Taxes will be apportioned and paid as follows:

(a)   RGC will pay the following taxes (or portions thereof): any mineral severance taxes related to RGC's Operations; property taxes, pro-rated, for the portion of the Property and the time period in which Lessor is prohibited under this Lease from conducting activities; and any increase in property taxes attributable to the Minerals or RGC's Operations.

(b)   Lessor will pay all other taxes related to the Property, including but not limited to: any taxes on Related Land (as defined in Section 19 (Termination)); any income, capital levy, estate, gift, succession, inheritance, transfer or franchise taxes; and any taxes attributable to Lessor's activities on the Property.

(c)   Lessor will send RGC copies of all assessments, tax bills or other tax notices related to the Property or to RGC's Operations thereon within 14 days of Lessor's receipt of the same or in such shorter time as may be necessary to preserve the rights of RGC and Lessor to protest or appeal the same. Lessor will cooperate with RGC, in any such protest or appeal. RGC may, in its discretion, pursue such protest or appeal independently of Lessor. RGC will in no event not be obligated to pay (i) any increase in taxes which RGC is unable to protest or appeal due to Lessor's failure to comply with this Section 16(c) or (ii) any tax bill which RGC does not receive at least 14 days before the bill is due. RGC may, but is not required to, pay any taxes on the Property for which Lessor is responsible under Section 16(b) and deduct such taxes paid from any payments otherwise due to Lessor under this Lease.

**17.   Warranty of Title.** Lessor warrants as follows:

(a)   Lessor is the sole legal and equitable owner, in undivided fee simple, of the surface and mineral estates that comprise the Property without limitation whatsoever;

(b)   The Property is free and clear of all leases, liens, encumbrances and outstanding adverse claims and interests not of record;

(c)   Lessor has full power and authority to execute this Lease;

(d)   RGC shall have the quiet and peaceful possession and enjoyment of the Property, Minerals, and the proceeds therefrom, against all persons or entities who may claim any interest therein;

(e)   There has been no violation of any applicable Federal, state, or local law or regulation relating to zoning, land use, environmental protection or otherwise with respect to the Property or activities relating thereto; and

(f)   This Lease and RGC's right, title and interest hereunder, shall at all times be superior to and have priority over any right, title or interest in the Property created during the Term of this Lease.

**18.   Lesser Interest.** In entering into this Lease, RGC is relying on Lessor's warranties of title contained in Section 17 (Warranty of Title). Without impairment of those warranties of title, if Lessor owns less than the entire and undivided estate in the Property, RGC may (a) proportionately reduce its payments otherwise payable under this Lease; (b) offset any prior payments related to the uncovered portion against any future payments payable under this Lease; and (c) exercise any other available rights or remedies.

**19.   Termination.** RGC will have the right to terminate this Lease with regard to all or any portion of the Property at any time by sending a written notice to Lessor at least 30 days prior to such termination. The termination will take effect upon the date specified in the notice. Upon termination, all of RGC's rights and obligations under this Lease, with regard to the Property or portion thereof specified in the notice (the "Released Land") will terminate except for any Reclamation rights and obligations and any Minimum Royalty or Royalty Payment obligations arising out of mining conducted on the Released Land prior to such termination. In the event of a partial termination, this Lease will continue in effect with respect to all Property except the Released Land; and the term "Property" will thereafter mean and include only the retained Property and not the Released Land. After termination RGC will execute, deliver and record a release constituting relinquishment of the Released Land. Nothing in this Section will negate any obligations RGC has under this Lease with respect to Reclamation of the Property. Notwithstanding the foregoing, RGC will not terminate this Lease in whole or in part at any time prior to the sixth anniversary unless RGC also terminates all of its other mining leases in the Area.

**20.   Title Documents.** Lessor will promptly provide to RGC copies of all documents which Lessor now or in the future possesses, relating to or affecting title to the Property, including but not limited to: title insurance policies, deeds, mortgages, trust or security deeds, boundary agreements, judgments, liens, orders, surveys, boundary description, maps, wills conveying an interest in the Property, trust instruments, deeds of lease, assessments and plats of any. Lessor will give RGC notice whenever Lessor learns of any matter which may affect the title to the Property. At RGC's request, Lessor will sign and deliver to RGC such additional formal assurances or other documents, in proper and recordable form, as may reasonably be necessary to carry out the terms and intent of this Lease. Lessor will inform RGC immediately if Lessor fails to pay or discharge in a timely manner any promissory note, mortgage, tax, or other lien upon the Property, and RGC may then pay it and be subrogated to the rights of the holder thereof. Except for any taxes for which RGC is liable under this Lease, RGC will have the right to offset, from any payment otherwise payable to Lessor under this Lease, all amounts paid by RGC to discharge any such promissory note, mortgage, tax or other lien.

**21.   Compensation for Buildings.**

(a)   **Principal Residence.** If RGC proposes to remove Lessor's principal residence on the Property, RGC, will give Lessor not less than one year's notice of its intention to do so. At least 180 days prior to such removal, RGC will compensate Lessor by making a payment to Lessor equal to two times the then-present fair market value of such residence (excluding land), as determined by the average of two appraisals, one by an appraiser selected by Lessor, and one by an appraiser selected by RGC, from a list of one MAI or two AAA-approved appraisers mutually acceptable to RGC. Lessor may thereafter occupy the residence until the one-year notice period expires, at which time Lessor will vacate the residence to allow its removal. No residence will be constructed on the Property during the Term of this Lease without the prior written consent of both Lessor and RGC.

(b) **Other Buildings.** If RGC proposes to remove other buildings on the Property, RGC will give Lessor not less than six months' notice of its intention to do so. At least 90 days prior to such removal, RGC will compensate Lessor by making a payment to Lessor equal to the approximate replacement cost of buildings of that nature, as determined by the average of two appraisals by appraisers selected in the manner described in Section 21(a). Lessor will consent to the relevant buildings, 30 days prior to the proposed removal and will facilitate removal in all respects.

22. **Third-Party Claims.** If RGC learns that a third party may have a claim of ownership in any portion or percentage of the Property or any payments under this Lease, RGC may deposit in a special escrow account (with a bank or title insurance company located in Virginia) any payments otherwise due to Lessor under this Lease and give Lessor written notice of the deposit. The interest so applied, will remain in the special escrow account until the claim is controversy is resolved, or until there has been a final determination of the claim or the controversy by a court arbitrator, including any appeals therefrom.

23. **Additional and After-Acquired Rights.** If, during the Term of this Lease, Lessor acquires any right or interest in the Property or in any property adjacent or easements appurtenant thereto, (a) Lessor will promptly notify RGC, (b) any such right or interest acquired in the Property, (which Lessor deems is) the Lease already warranted to be part of the Property, will become part of the Property subject to this Lease, without any additional payment to Lessor; (c) RGC may, at RGC's option, at any time, lease any other such right, or interest (on the same terms as the terms of this Lease); and (d) Lessor will sign, acknowledge, and deliver an Amendment to this Lease and to the Memorandum of this Lease to RGC, so as to include such right or interest.

24. **Entireties.** If the Property is now or later owned as severalty or in separate tracts, RGC will nevertheless be entitled to treat the Property as undivided whole under this Lease, with all payments payable under the Lease to be paid (either directly or pursuant to Section 25 (Multiple Owners)) to the separate owners of the Property in the proportion that their ownership interest amounts to pieces, or percentage ownership of acres, bears to the whole Property, provided, however, that in no event will RGC's total payment obligations to the separate owners exceed the payment obligations that RGC would have incurred under the Lease if the Property were owned in undivided fee simple by a single owner.

25. **Multiple Owners.** Whenever two or more parties are entitled to receive any payments under this Lease, RGC will make any such payments unless and until all of those parties designate in a recordable instrument an agent empowered to receive all such payments and to execute division and transfer orders on behalf of all those parties and their respective successors in title. Delivery of any payment due under this Lease to the designated agent fulfills RGC's obligation to make that payment to those parties.

26. **Assignment.** Both parties have the right to assign their rights and obligations under this Lease, in whole or in part, provided, however, that:

    (a) The party making such an assignment must give the other party prior written notice thereof;

    (b) The provisions of this Lease will apply to and be binding upon the successors and assigns of the respective parties;

    (c) Any change or division in the ownership of the Property or of the right to receive any payments under this Lease, however accomplished, will not increase RGC's total payment obligations under this Lease or affect RGC's rights to conduct Exploration, Operations or Reclamation on the Property;

    (d) Notwithstanding Section 26(a), RGC may, without notice or consent, assign any of its rights or obligations to affiliates of RGC, or use the services of independent contractors or agents to perform any of its rights or obligations; and

    (e) No assignment will relieve the assigning party of any obligations or liability to the other party, unless the other party provides a written release to the assigning party.

27. **Force Majeure.** Neither party will be deemed in default under this Lease, during any period in which its exercise or performance of any of its rights or obligations under this Lease is prevented by any cause reasonably beyond its control. Such an event is referred to in this Lease as "Force Majeure." Force Majeure will include, but is not limited to, the following: fire, floods, storms, hurricanes, tornados, winds, other damage from the elements, declared or undeclared war, strikes, labor disputes, riots, civil unrest, action of governmental authorities, condemnation, violence, crime, failure to receive required governmental approvals, inability to obtain water for Operations, a substantial fall in the market prices of Minerals, lack of access, litigation, acts of God, and acts of the public enemy. The Term of this Lease will be extended for a period of time equal to the period of Force Majeure. All such periods will be deemed to begin at the earliest time a party is prevented from exercising or performing any of its rights or obligations by reason of Force Majeure.

28. **No Broker.** Lessor and RGC represent and warrant to each other that no broker, agent, or finder has acted on its behalf in connection with this Lease, and that no commissions, fees or other monies are due to any broker, agent, or finder. In addition, Lessor and RGC will not do, indemnify each other, from all claims, with respect to any brokerage, finder's or leasing commissions in connection with the Lease or any of the transactions contemplated under this Lease.

29. **Condemnation.** Lessor will immediately notify RGC of any condemnation proceeding that may affect the Property. Lessor will cooperate with RGC in defending or settling the same. RGC may, in its discretion, defend its rights independently of Lessor. Any condemnation award will be shared between Lessor and RGC, as provided by law. Any condemned Property will constitute Released Land as of the date of condemnation, and this Lease will continue in effect as to the remaining Property.

30. **Dispute Resolution.** Subject to the provisions of this Section, any controversy, claim, or dispute arising out of or related to this Lease (or to the formation, negotiation, or breach thereof) will be settled by binding arbitration in Richmond, Virginia before a single arbitrator (in accordance with the Commercial Arbitration Rules of the American Arbitration Association). Any award of damages will be limited to actual, compensatory damages. Judgment upon the award rendered by the arbitrator may be confirmed by, and entered in, any court having jurisdiction thereof. Prior to initiating any arbitration, the initiating party will give the other party written notice of the claim, and (will allow the other party 30 days from the date that the notice is received to) amicably resolve the claim. If the claim is not resolved within the 30 day period, the initiating party's sole and exclusive remedy will be to submit the dispute to arbitration. The parties will comply with any arbitration award within 30 days of its issuance. As a condition precedent thereto, and the Lease will continue in full force and effect. In no event will the existence of any dispute, arbitration or award suspend or otherwise affect any party's rights or obligations under this Lease, or interfere in any way with RGC's Operations.

31. **No Interference With RGC's Operations.** Lessor has not, and will not, during the Term of this Lease, take any action or grant any right which would in any way interfere with RGC's exercise of its rights as set out in Section 4 (Grant of Rights) of this Lease.

32. **No Implied or Continuing Waiver.** If either party waives or does not enforce any provision of this Lease on any occasion, that action will not constitute waiver of (a) that provision as to any other time, event or occurrence; or (b) any other provision.

33. **Notices.** Any notice given to the other party under this Lease must be in writing, and sent by United States registered or certified mail, return receipt requested, or via Federal Express or similar overnight courier service, addressed to the Address set forth on the first page of this Lease. All notices will be deemed to have been made when deposited in the mail or with the courier as provided above. All notices will be deemed to have been received upon actual receipt by any person at the address listed above. Either party may change its address for the mailing of notices by giving the other party notice of such change of address in the manner provided for in this Section.

34. **Entire Agreement; No Oral Modification.** This Lease constitutes the entire agreement between the parties and supersedes all previous agreements, written or oral, Lessor hereby expressly acknowledges that, in entering into this Lease, Lessor has not relied on any oral or written statements made by RGC, its employees, agents or independent contractors. This Lease may only be modified by a written agreement in recordable form signed by Lessor and an authorized officer of RGC.

35. **Choice of Law.** This Lease will be construed, interpreted and governed by the laws of Virginia.

36. **Successors and Assigns.** This Lease constitutes a covenant running with the land, and will be binding on, and inure to the benefit of, Lessor's and RGC's heirs, legal representatives, successors, administrators, assignees, and assigns, as the case may be.

37. **Severability.** In the event that any court (or duly appointed arbitrator or arbitrator) (to the extent of this Lease is unenforceable, illegal, or in conflict with any) Federal, state, or local law, the parties will (within the extent permissible under law). If the court (or arbitrator) declines to reform that provision, then that provision will be considered severable from the rest of the Lease, the remaining provisions of the Lease will not be affected, and the Lease will be construed and enforced as if the Lease did not contain the unenforceable or illegal provision.

38. **Modification to Cure Any Violation of the Rule Against Perpetuities.** Lessor and RGC do not intend that any provision in this Lease will in any way violate the Rule Against Perpetuities or any related rule. If any such violation should occur, it is the intent of Lessor and RGC that the appropriate court or arbitrator will reform the provision in such a way as to approximate most closely the intent of the parties, within the limits permissible under such rule or related rule, and will enforce the Lease as so reformed.

**39.** **_Memorandum_.** (At the time this Lease is signed, the parties will sign a Memorandum of Lease which RGC will record. In the event of a conflict between the terms of the Memorandum of Lease and this Lease, the terms of this Lease will control.

**40.** **_Mortgage Consent_.** Lessor agrees to use Lessor's best efforts to obtain promptly, and to provide to RGC a copy, of any consent to this Lease required by the terms of any mortgage or other instrument creating rights superior to this Lease with respect to all or any part of the Property. Such consent, however, will neither affect nor be a condition precedent to the effectiveness and enforceability of the Lease as between Lessor and RGC.

**41.** **_Headings_.** The headings contained in this Lease are for the convenience of the parties only, and will not be used in its interpretation.

**42.** **_Obligations That Survive This Lease_.** In addition to other obligations that survive this Lease as set forth in this Lease, the parties' obligations under the following Sections of this Lease will remain in full force and effect following, and will not be affected by, the termination of, or expiration of the Term of, this Lease: Sections 7, 9, 11, 14, 15, 17, 19, 22, 24, 26, 30, 32-38, and 41-43.

**43.** **_Good Faith_.** During the Term of this Lease, each party will act in good faith to fulfill the intent of this Lease, and will meet with the other party to discuss and to try to resolve amicably any issues that may arise.

IN WITNESS WHEREOF, the parties have executed this Lease under seal as of the date first above written.

OWNER:

_____ [SEAL]
G. L. Parson, Jr.
(Print Name)
AKA George Lee Parson, Jr.
AKA G. L. Parson
AKA G. Lee Parson, Jr.

_____ [SEAL]
Mary Elizabeth Parson
(Print Name)
AKA Mary Butterworth Parson
AKA Mary B. Parson
AKA Mary E. Parson
AKA Mrs. G. L. Parson, Jr.

STATE OF VIRGINIA
CITY/COUNTY OF _____

The foregoing instrument was acknowledged before me this ____ day of _____ 1989, by G. L. Parson, Jr. and Mary Elizabeth Parson, husband and wife.

My Commission Expires:

October 23, 1991
_____
Notary Public

[NOTARIAL SEAL]

RGC (USA) MINERALS INC.

_____
By:   Vice   President
(CORPORATE SEAL)

Attest: _____
Its:   Secretary

STATE OF   FLORIDA
COUNTY OF   CLAY

The foregoing instrument was acknowledged before me this 13 day of   February   1989, 1990, by   Daniel P. Wolcott   as   Vice   President of RGC (USA) MINERALS INC., a Delaware corporation, on behalf of the corporation.

_____
Notary Public

My Commission Expires: Notary Public, State of Florida
My Commission Expires May 21, 1991

[NOTARIAL SEAL]

EXHIBIT A

TO

MINING LEASE

BY AND BETWEEN

G. L. PARSON, JR., AKA GEORGE LEE PARSON, JR.,
AKA G. L. PARSON, and AKA G. LEE PARSON, JR., and

MARY ELIZABETH PARSON, AKA MARY BUTTERWORTH PARSON,
AKA MARY B. PARSON, AKA MARY E. PARSON, and
AKA MRS. G. L. PARSON, JR., husband and wife
(LESSOR);

AND

RGC (USA) MINERALS, INC.
(RGC)

0045

## EXHIBIT A

Under the terms of the above-referenced Mining Lease, to which this Exhibit is attached, Lessor has leases to BGC, and granted to BGC various rights regarding certain real property (including all mineral rights and Minerals) referred to as the Property, which is situated in the _____ Stone Creek _____ Magisterial District, _____ Sussex _____ County, State of Virginia, which is hereby represented and warranted by Lessor to amount to 125.00 acres, and which is described as follows:

That same tract or parcel of land bequeathed to G. L. Parson, Jr. by Last Will and Testament of G. Lee Parson, Sr. (also known as G. L. Parson and also known as G. L. Parson, Sr.), dated May 3, 1966, recorded March 8, 1973, in Volume 23, page 430 through 436 of the Clerk's Office of Sussex Circuit Court, Sussex County, Virginia. To Wit: The farm that I own, situate near Concord Church in Sussex County, Virginia, and known as "The Walter Harrison Farm", across State Road No. 619 from Berry Ridout Farm, the side where the home part is situated and containing approximately 125 acres.

ALSO, being that same tract or parcel of land conveyed to G. L. Parson, by Warranty Deed, dated February 8, 1924, and recorded in Deed Book 28 at page 519, in Clerk's Office of Circuit Court of Sussex County, Virginia. To Wit: all that certain tract or parcel of land situated in the Stony Creek Magisterial District, County of Sussex, State of Virginia; containing one hundred and twenty-five acres, more or less and bounded as follows: on the North and West by the Walker's Mill Road, on the East by the lands of C. W. Parsons and Willie Roberson (Willis Robinson) and on the South by the land of B. Wesley Barns and the public road leading to Stony Creek, Virginia.

EXEMPTING from this tract of land all mining operations for a cemetery, situated upon 0.50 acres, more or less and six (6) bulk barns, situated upon 2.00 acres more or less.

Subject property is referred to in the Sussex County tax records as Tax Parcel Number 101-7.

046

SPL Roy Pol
VA 8/89

EXHIBIT B
TO
MINING LEASE
BY AND BETWEEN
G. L. Parson, Jr. and Mary Elizabeth Parson,
husband and wife
(Lessor)

AND

RGC (USA) MINERALS INC.
(RGC)

RGC's Royalty Policy for Virginia Operations

COPYRIGHT © RGC (USA) MINERALS INC. 1989

This document sets forth RGC's Royalty Policy for Virginia Operations ("Royalty Policy"), which is referred to in Section 7 (Royalty Payments) of the above-referenced Deed of Mining Lease ("Lease") and which is attached to and incorporated into the Lease by reference.

1. **Definitions.** The terms defined in the body of the Lease or anywhere in this Royalty Policy will have the same meanings throughout this Royalty Policy. The following terms will have the following meanings:

    (a) "Principal Minerals" means Ilmenite, Rutile and Zircon.

    (b) "Minor Minerals" means Minerals other than Principal Minerals.

    (c) "Mineralized Property" means that portion of the Property which RGC estimates, using the then most current drilling data and survey information, contains Minerals-bearing sands which have a minimum dredgeable depth of 15 feet and which have a cut-off grade of two percent (2%) by weight average Minerals content. All lump sum payments under Section 6 (Initial Payment and Advance Royalty Payments) of the Lease are based on the Mineralized Property as of the Lease Date, and subsequent changes in the acreage of the Mineralized Property will not affect the lump sum payments.

    (d) "Sales Value per ton of each Mineral" means the dollar value per short ton derived by dividing (i) the actual dollar sales of each Mineral following processing by the dry plant (net of returns, sales taxes, sales discounts and commissions but not net of settlement discounts) for the calendar quarter ("Quarter") which is the subject of the Royalty Payment calculation, by (ii) the total sales tonnage for each Mineral in that Quarter, subject to the exclusion of sales to affiliates contained in Clause 9 (Sales to Affiliates) below.

    (e) "Lessor's Stock Account" means the account maintained by RGC in Lessor's name for the purpose of tracking and reporting production, inventory and sales allocations made with respect to saleable Minerals attributed to the Property, and for the purpose of calculating and accounting to Lessor, through the Stock Report described in Clause 3 below, for any Royalty Payments.

    (f) "All Stock Accounts" means the Lessor's Stock Account and all other stock accounts maintained by RGC for other properties on which RGC engages in Mining (as defined in Clause 6(b)(i) below).

    (g) "Recovery Rate" for any treatment of material is the weight of material that is present after that treatment divided by the weight of material before treatment, expressed as a percentage.

2. **Calculating Royalties.** This Royalty Policy sets forth the methodology to be used in determining and reporting the Royalty Payments payable to Lessor under the Lease. By signing the Lease Lessor agrees to that methodology, including but not limited to (i) RGC's method of attributing Minerals to the Property as set forth in Clause 6 below, and (ii) RGC's method of calculating Royalty Payments as set forth in Clause 7 (Royalty Payment Calculations) below.

3. **Stock Account and Stock Report.** From the commencement of Mining (as defined in Clause 6(b)(i)) on the Property until such time as RGC's obligation to pay Lessor Royalty Payments has been fulfilled, RGC will establish and maintain Lessor's Stock Account and will send to Lessor within 30 days after the end of each Quarter a written report ("Stock Report") on the status of Lessor's Stock Account. The Stock Report will show:

    (a) The tons of saleable Minerals attributed to the Property for the Quarter (see Clause 6 below);

    (b) Sales from the accumulated tons of saleable Minerals referred to in Clause 3(a) above;

    (c) Any Advance Royalty Payments paid during the Quarter in accordance with Section 6 of the Lease;

    (d) Any Royalty Payment payable for the Quarter pursuant to Section 7 (Royalty Payments) of the Lease;

    (e) A reconciliation of Advance Royalty Payments and Royalty Payments to Lessor pursuant to Section 6 (Initial Payment and Advance Royalty Payments) and Section 7 (Royalty Payments) of the Lease.

The Stock Report will be certified as accurate by RGC's Operations manager or a senior financial employee. By signing this Lease, Lessor agrees to preserve the confidentiality of the sales and production information in all Stock Reports.

4. **Royalty Rate.** RGC will pay Lessor a Royalty Payment equal to ▆▆▆▆▆▆▆▆ of the Sales Value per ton of each Mineral sold that is attributed to the Property, as reflected in the Stock Account and as reported to Lessor quarterly in the Stock Report.

5. **Royalty Payment.** Any Royalty Payments due for Principal Minerals attributed to the Property will be paid within 30 days after the end of the Quarter in which such Principal Minerals were sold (i.e. invoiced to the purchaser), and; for Minor Minerals attributed to the Property within 30 days of the end of the "Fiscal Year" (July 1 - June 30) in which they were sold.

6. **Saleable Minerals Attributed to the Property.** Saleable Minerals are attributed to the Property and to Lessor's Stock Account as set forth below:

    (a) RGC will survey, drill, and analyze drill samples from those portions of the Property which it plans to mine, in order to estimate the tons of Principal Minerals located therein.

    (b) Production of saleable Minerals is achieved by the following three steps in RGC's Operations:

        (i) "Mining" - extracting and delivery of mineral sand ore to the concentrator;

        (ii) "Concentrating" - removal of non-commercial material;

        (iii) "Processing" - removal of further non-commercial sand and separation into saleable Minerals.

        Each of these steps results in recovery and loss of saleable Minerals depending on the efficiency of each step and the nature of the material being treated. The Recovery Rate for each step varies to a small degree on a daily basis and is determined by regular sampling and analysis of the material as it passes through each step.

-6-

511TEMP2

(c) The Recovery Rates for a given Quarter and the estimates and survey information compiled pursuant to Clause 6(a) above are used to estimate the tons of saleable Principal Minerals recovered from the Property in that Quarter. Those tons of Principal Minerals are then entered in Lessor's Stock Account.

(d) Within 30 days of the end of each Fiscal Year, RGC will apportion its actual production of saleable Minor Minerals for the year among All Stock Accounts. The apportionment will be made in proportion to the attribution of Principal Minerals among All Stock Accounts for the year.

7. ***Royalty Payment Calculations***

(a) Principal Minerals Sold

(i) Within 30 days of the end of each Quarter, RGC will deduct the total tons of each Principal Mineral sold during that Quarter from All Stock Accounts.

(ii) The tons of Principal Minerals sold will be deducted from All Stock Accounts on a "First-In/First-Out" (FIFO) basis. Where production of saleable Minerals is attributed to several stock accounts on the same date, sales attributable to such production will be deducted from the affected stock accounts in proportion to the tonnage allocated on that date to such stock accounts.

(iii) The sales thus attributed to the Property will be entered in Lessor's Stock Account and reflected in the Stock Report.

(iv) RGC will calculate the Sales Value per ton for each Principal Mineral for the Quarter.

(v) The Royalty Payment payable to Lessor for the Quarter will equal [redacted] of the Sales Value per ton for each Principal Mineral for the Quarter multiplied by the tons of each Principal Mineral sold which are attributed to the Property for the Quarter as reflected in the Stock Account.

(b) Minor Minerals Sold

Within 30 days after the end of each Fiscal Year, a calculation similar to that described in Clause 7(a)(v) above, will be made for Minor Minerals, and the result will be reflected in the Stock Report for the last Quarter of the Fiscal Year.

(c) Adjustments.

At the end of each Fiscal Year, RGC will compare its actual annual Mineral production to the total tons of Minerals attributed to All Stock Accounts in that year. If the actual production is less than the attributed production, then the shortfall will be deducted proportionately from All Stock Accounts. If the actual production exceeds the attributed production, then the excess will be allocated proportionately among All Stock Accounts.

8. ***Commingling and Stockpiling.*** RGC will commingle Minerals from the Property with Minerals from other properties, may engage in Mining on more than one property in a Quarter, and may in RGC's sole discretion from time to time stockpile Minerals depending on market conditions.

9. ***Sales to Affiliates.*** RGC may in its sole discretion sell part or all of its Minerals to affiliates of RGC. In such event, the Sales Value per ton of each Mineral used in calculating the Royalty Payment will be based only on RGC's sales to non-affiliates. If such non-affiliate sales are less than 30% of RGC's total sales of the Mineral during the Quarter, then the Sales Value used in calculating the Royalty Payment will equal the greater of (a) the Sales Value based only on RGC's sales to non-affiliates or (b) the indexed price for the Mineral, determined by multiplying (i) the Sales Value per ton of the Mineral last used in calculating a Royalty Payment times (ii) the percentage change in the Producer Price Index - Titanium Pigments Index of the Bureau of Labor Statistics, U.S. Department of Labor (Code No. 06220209, 1982=100). Such percentage change will be based on the change in the index from the last month of the Quarter in which the Sales Value referred to in Clause (i) was used to the last month of the Quarter for which the Royalty Payment is being calculated.

10. ***Most Favored Lessor.*** If RGC agrees, after signing this Lease, to pay a higher Initial Payment per acre, higher aggregate Advance Royalty Payments per acre (excluding any such higher payments that result from either (i) an increase in a lease date payment which raises a lessor's total lease date payments to seven percent (7%) of RGC's then-current estimate of the lessor's total Advance Royalty Payments and Royalty Payments or (ii) variations in Advance Royalty Payments that are based upon or limited by Clause 12 hereof), or higher royalty rates as to any other leased property in the Area, RGC will within 30 days of the more favorable lease pay Lessor any amount necessary to adjust retroactively payments previously received by Lessor to the more favorable levels, and the more favorable levels that are prospective in nature will thereafter apply to this Lease. This Clause does not require that retroactive adjustments include the time value of money. This Clause applies only to leases and not to purchases, options to purchase, purchase-leaseback arrangements or other arrangements.

11. ***Completion of Mining.***

(a) RGC will send Lessor written notice when it has completed Mining on the Property.

(b) The next Stock Report after such notice will contain a reconciliation comparing (i) the total of all Royalty Payments and Advance Royalty Payments paid to date, with (ii) the product obtained by multiplying the total number of acres of the Property from which RGC removed the topsoil in preparation for Mining times $3,500-per-acre average Minimum Royalty provision in Section 8 (Minimum Royalty) of the Lease.

(c) If that Stock Report reflects that all tons of Minerals attributed to the Property have already been sold, that Stock Report will be Lessor's last Stock Report and final reconciliation, and Lessor will be paid (i) any Royalty Payments payable for that Quarter, and (ii) the final payment, if any, required by the $3,500-per-acre average Minimum Royalty provision (the "Final Payment"). The Final Payment will equal the amount, if any, by which the product described in Clause 11(b)(ii) exceeds the total described in Clause 11(b)(i).

(d) If that Stock Report reflects that any tons of Minerals attributed to the Property have not yet been sold, Lessor will be paid any Royalty Payments payable for that Quarter, and Lessor may elect, by sending written notice to RGC within 30 days, to either: (i) forfeit all rights to future Royalty Payments with regard to all unsold tons and receive the Final Payment, if any, determined in accordance with Clause 11(c) above; or (ii) continue Lessor's Stock Account in existence, and defer the final reconciliation and Final Payment, if any, until all such unsold tons are sold and the final total of all Royalty Payments and Advance Royalty Payments can be used in determining any Final Payment due.

12. ***Advance Royalty Payment: "70% of Estimated Future Royalty Payments".*** At least one year before RGC commences Mining on the Property, RGC will estimate, using the then most current drilling data and survey information, the tons of Minerals located therein. Using the higher of this estimated tonnage or 495,937 tons and applying reasonably expected Recovery Rates and prices, RGC will in good faith estimate the total sales value of the saleable Minerals recoverable from the Mineralized Property. The Advance Royalty Payment equal to "70% of Estimated Future Royalty Payments" set forth in Section 6 (Initial Payment and Advance Royalty Payments) of the Lease will be determined by (a) multiplying the estimated total sales value times the [redacted], (b) multiplying the result by seventy percent (70%), and (c) deducting therefrom all Advance Royalty Payments previously made under the Lease.

13. ***No Reliance on Estimates or Representations.*** Because of the inherent uncertainties in making projections and estimates which may affect Lessor's Royalty Payments, Lessor, in deciding whether to enter into this Lease, should not rely upon any representation, written or oral, as to the likelihood or value of Royalty Payments, and Lessor should bear in mind that the $3,500-per-acre average Minimum Royalty provision contained in Section 8 (Minimum Royalty) of the Lease applies only if RGC engages in Mining on the Property, and even then applies only to the total number of acres from which RGC removes the topsoil in preparation for Mining. Lessor acknowledges that Lessor understands the foregoing sentence and Lessor agrees that Lessor has not relied upon any representation, written or oral, as to the likelihood or value of Royalty Payments.

961-1038

COPY

STD Lease
VA 8/89

# DEED OF MINING LEASE

THIS DEED OF MINING LEASE, including the attached Exhibits which are incorporated herein by this reference, ("Lease") is made and entered into on October 13, 1989 by and between G. L. Parson, Jr., AKA George Lee Parson, Jr., AKA G. L. Parson, and AKA G. Lee Parson, Jr., and Mary Elizabeth Parson, AKA Mary Butterworth Parson, AKA Mary B. Parson, AKA Mary E. Parson, and AKA Mrs. G. L. Parson, Jr., husband and wife Route 1, Box 60, Stony Creek, Virginia 23882

("Lessor") and RGC (USA) MINERALS INC., a Delaware corporation whose address is Warner Road, P.O. Box 1307, Green Cove Springs, Florida, 32043 ("RGC"). In consideration of the mutual promises made in this Lease, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Lessor and RGC agree as follows:

1. *Defined Terms.* Any word or phrase that is capitalized and placed in quotations in this Lease is a defined term and when it is capitalized will have the same meaning throughout this Lease.

2. *Purpose.* The purpose of this Lease is to allow RGC to explore for and, at RGC's sole discretion, to mine, remove, commingle, and sell Minerals from the Property, to use the Property to mine Minerals from the Property or other property, and to conduct related activities. "Minerals" means the following group of minerals and mineral products: Ilmenite, Leucoxene, Rutile, Zircon, Staurolite, Kyanite/Sillimanite, Monazite, Xenotime, and Garnet, and associated by-products. Title to any Minerals mined shall, if not already vested in RGC, pass to RGC as they are severed from the Property.

3. *Grant of Lease.* Lessor hereby leases to RGC the Property (as defined on Exhibit A), on the terms and conditions in this Lease.

4. *Grant of Rights.* Lessor grants to RGC the following exclusive rights with regard to the Property:

(a) To enter the Property to survey, explore, drill, test, and sample (the foregoing activities are defined as "Exploration");

(b) To clear the Property of such buildings (subject to Section 21 (Compensation for Buildings)), other structures or obstacles, earth, standing timber, plants, and such other things or material that RGC, in its absolute discretion, wishes to clear from the Property to exercise its rights as set out in this Section 4; to construct, relocate, use, or remove roads, power and communication lines, dredge ponds, tailing ponds, settling ponds, pipelines, buildings, storage facilities, canals, tailings, signs, gates, fences, and other structures and facilities on the Property; to take steps to prepare for mining on the Property; and to develop, mine, cross-mine, dredge, remove, concentrate, separate, commingle, stockpile, haul, process, ship, and sell Minerals (the foregoing activities, whether conducted on the Property or on other property in Dinwiddie and Sussex Counties, Virginia ("Area"), are defined as "Operations");

(c) To use the Property to store, transport, or dispose of Minerals, water, tailings, and material resulting from RGC's Operations;

(d) To use water from or appurtenant to the Property and to drain through and from the Property and to draw into any course in the Property any water from RGC's Operations;

(e) To take all steps to accomplish Reclamation (as defined in Section 14) of the Property;

(f) To use all easements, means of access, and rights-of-way from and to the Property; and

(g) To use the Property for the purposes described in this Section, in conjunction with RGC's Exploration, Operations and Reclamation on other property.

Notwithstanding the foregoing, RGC is not granted the right under this Lease to construct or operate on the Property a processing plant for the final separation of the concentrate into saleable Minerals.

5. *Term of Lease.* This Lease will begin on the date first written above and will end 20 years thereafter, unless (a) the Lease is ended earlier under Section 19 (Termination), (b) the Lease is automatically terminated by RGC's failure, for reasons other than a temporary inability to obtain through diligent efforts all necessary governmental permits and authorizations, to commence "Mining" (as defined in the Royalty Policy) in the Area by the eighth anniversary of the Lease, or (c) the Lease is automatically extended to allow RGC to complete ongoing operations on the Property. If so extended, the Lease shall terminate upon the earlier of written notice from RGC pursuant to Section 19 (Termination), or the passage of a period of 180 consecutive days in which RGC conducts no Operations on the Property. "Term" means the period of time during which this Lease is in effect, and, in the absence of earlier termination, includes both the initial 20-year term and any extended term.

6. *Initial Payment and Advance Royalty Payments.* Subject to the terms and conditions of this Lease, RGC will pay to Lessor, during the Term of this Lease, on or before the dates indicated the following lump sum payments and payments per acre of the Property retained under the Lease at the time of the payment:

| Payment Date | Payment Type | Payment |
|---|---|---|
| Lease Date | Initial Payment | $250 per acre |
| Lease Date | Advance Royalty | $750 per acre |
| On or before December 31 of each year following the year this Lease is signed | Rental Payment | $15 per acre |
| Earlier of (a) "Mining" (as defined in Royalty Policy) in Area or (b) Fifth Anniversary | Advance Royalty | $10,000.00 lump sum, equal to $1000 per acre of "Mineralized Property" (as defined in Royalty Policy) |
| Tenth Anniversary if no "Notice of Mining" (as defined in Section 9) given | Advance Royalty | $10,000.00 lump sum, equal to $1000 per acre of Mineralized Property, subject to "70% Limitation" (as defined in Royalty Policy) |
| Fifteenth Anniversary if no Notice of Mining given | Advance Royalty | $10,000.00 lump sum, subject to 70% Limitation |
| Notice of Mining | Advance Royalty | 70% of Estimated Future Royalty Payments (as defined in Royalty Policy) |

The Initial Payment and all Rental and Advance Royalty Payments paid to Lessor are non-refundable. The Advance Royalty Payments paid to Lessor will be credited against any Royalty Payments otherwise payable pursuant to Section 7 (Royalty Payments) and may be prepaid by RGC. Payment to Lessor of the payment required upon Notice of Mining will satisfy in full any obligation RGC may thereafter have to pay the Tenth and Fifteenth Anniversary Advance Royalty Payments.

7. *Royalty Payments.* RGC will pay to Lessor quarterly Royalty Payments equal to [redacted] of the Sales Values of Minerals, attributed to the Property, which RGC mines and sells. The Royalty Payments will be determined and paid in accordance with Exhibit B, RGC's Royalty Policy for Virginia Operations ("Royalty Policy").

8. *Minimum Royalty.* If the total of all Advance Royalty Payments and Royalty Payments paid to Lessor under this Lease does not average $3,500 per acre for all of the Property from which RGC removes the topsoil in preparation for Mining ("Minimum Royalty"), RGC will pay to Lessor the amount by which the Minimum Royalty exceeds such total. Any such payment will be determined and paid in accordance with Clause 11 of the Royalty Policy.

9. *Lessor's Use of the Property.* During Exploration, Lessor and RGC will work together to accommodate Lessor's normal activities on the Property. RGC will give Lessor at least twelve months notice ("Notice of Mining") if RGC's Mining will require Lessor to cease activities on the portion of the Property described in the Notice of Mining. Until the end of the notice period, Lessor will have the right, but not the obligation, to remove for Lessor's account any crops, timber, buildings, irrigation systems, fixtures or personalty of Lessor from that portion of the Property. From the end of the notice period until RGC notifies Lessor otherwise, Lessor will cause all activities to cease on that portion of the Property. During Reclamation, RGC will

10.00

work with Lessor to allow Lessor to resume Lessor's normal activities on the Property, as soon as reasonably possible and as permitted by governmental reclamation requirements. Lessor will and does indemnify RGC from and against any claims asserted against RGC arising out of the activities of Lessor or Lessor's invitees. Lessor will be solely responsible for, and will bear all risk of loss related to, any government allotment, subsidy, stabilization or conservation programs that may apply to the Property.

*10.* ***Safety***. Except as otherwise provided in this Lease, only RGC employees and visitors authorized in writing by RGC will be permitted on those parts of the Property on which Operations are being conducted. All RGC-authorized visitors and their vehicles will carry RGC identification at all times that they are on the Property.

*11.* ***RGC to Comply With Safety Laws and to Indemnify Lessor***. RGC will conduct its Exploration and Operations in compliance with all applicable safety laws and regulations. RGC will and does indemnify Lessor from and against any claims (environmental or otherwise) asserted against Lessor arising out of RGC's activities. RGC will also indemnify Lessor from, and pay Lessor for, actual damages caused by RGC to crops, pasture, timber, fences, gates, roads and other improvements not described in Section 21 (Compensation for Buildings), located on any portions of the Property that are not mined but are otherwise used by RGC in its activities. RGC will in no event be liable for special or consequential damages, and any payments made pursuant to the preceding sentence will be deemed full and complete compensation for the damages in question.

*12.* ***RGC's Right to Determine Whether, When and Where to Mine***. Nothing in this Lease or in the relationship between Lessor and RGC will constitute or create any express or implied duty on the part of RGC to perform Exploration or Operations, or to mine the Property at any rate, in any manner, or at all. RGC's Exploration and Operations, if any, will occur only to the extent and at the locations and times, and in the methods and manner that RGC, in its sole discretion, may determine; provided, however, that RGC will not conduct Operations within 200 feet of Lessor's principal residence or any principal residence on property adjoining the Property, or in such a way as to deprive any such residence of access to a public road, utilities, and water supply until RGC complies with Section 21(a) (Compensation for Buildings — Principal Residence) (in the case of Lessor's principal residence) or obtains the adjoining property owner's written consent (in the case of an adjoining residence); and provided further that, if RGC engages in Mining in the Area, then RGC will use its best efforts to mine all of the Mineralized Property that can be mined in a commercially reasonable manner.

*13.* ***Compliance With Laws***. RGC's activities on the Property will be conducted in compliance with all applicable Federal, State and local laws and regulations.

*14.* ***Reclamation***. RGC agrees to comply with all State and Federal laws, regulations and permits applicable to the Reclamation of the Property. RGC also agrees to post a bond, to the extent required by Virginia law, to ensure that all the Property which RGC mines will be reclaimed in accordance with law. RGC will and does indemnify Lessor from and against any claims by State or Federal regulatory agencies arising from RGC's failure to reclaim in accordance with applicable laws, excluding claims caused in part or in whole by Lessor's failure to cooperate with RGC in accordance with the terms of this Lease. RGC's Reclamation of any Property mined may include, but not be limited to, refilling the mined path with tailings discharged from the wet mill, dyking and eliminating settling ponds, replacing and grading the topsoil, replanting and otherwise complying with all applicable governmental reclamation requirements ("Reclamation").

*15.* ***Audit***. Lessor will have the right at Lessor's expense to appoint an independent auditor reasonably approved by RGC (which approval is hereby given if Lessor appoints a national firm in the United States of recognized reputation), to audit, not more than once in any year, RGC's records relating to the determination of Royalty Payments for RGC's "Fiscal Year" (currently July 1 - June 30) immediately preceding such audit. Lessor will instruct Lessor's auditor to send a copy of his report to RGC at the same time that he sends his report to Lessor. Also, Lessor will notify RGC in writing of any objections Lessor may have regarding Royalty Payments, within 60 days of Lessor's receipt of Lessor's auditor's report.

*16.* ***Taxes***. Taxes will be apportioned and paid as follows:

(a) RGC will pay the following taxes or portions thereof: any mineral severance taxes related to RGC's Operations; property taxes, pro-rated for the portion of the Property and the time period in which Lessor is prohibited under this Lease from conducting activities; and any increase in property taxes attributable to the Minerals or RGC's Operations.

(b) Lessor will pay all other taxes related to the Property, including but not limited to: any taxes on Released Land (as defined in Section 19 (Termination)); any income, capital levy, estate, gift, succession, inheritance, transfer or franchise taxes; and any taxes attributable to Lessor's activities on the Property.

(c) Lessor will send RGC copies of all assessments, tax bills or other tax notices related to the Property or to RGC's Operations thereon within 14 days of Lessor's receipt of the same or in such shorter time as may be necessary to preserve the rights of RGC and Lessor to protest or appeal the same. Lessor will cooperate with RGC in any such protest or appeal. RGC may, in its discretion, pursue such protest or appeal independently of Lessor. RGC will in any event not be obligated to pay (i) any increase in taxes which RGC is unable to protest or appeal due to Lessor's failure to comply with this Section 16(c) or (ii) any tax bill which RGC does not receive at least 14 days before the bill is due.

(d) RGC may, but is not required to, pay any taxes on the Property for which Lessor is responsible under Section 16(b), and deduct such taxes paid from any payments otherwise due to Lessor under this Lease.

*17.* ***Warranty of Title***. Lessor warrants as follows:

(a) Lessor is the sole legal and equitable owner, in undivided fee simple, of the surface and mineral estates that comprise the Property without limitation whatsoever;

(b) The Property is free and clear of all leases, liens, encumbrances and outstanding adverse claims and interests, not of record;

(c) Lessor has full power and authority to execute this Lease;

(d) RGC shall have the quiet and peaceful possession and enjoyment of the Property, Minerals, and the proceeds therefrom, against all persons or entities who may claim any interest therein;

(e) There has been no violation of any applicable Federal, State, or local law or regulation relating to zoning, land use, environmental protection or otherwise with respect to the Property or activities relating thereto; and

(f) This Lease, and RGC's right, title and interest hereunder, shall at all times be superior to, and have priority over, any right, title or interest in the Property created during the Term of this Lease.

*18.* ***Lesser Interest***. In entering into this Lease, RGC is relying on Lessor's warranties of title contained in Section 17 (Warranty of Title). Without impairment of those warranties of title, if Lessor owns less than the entire and undivided estate in the Property, RGC may (a) proportionately reduce all payments otherwise payable under this Lease, (b) offset any prior payments related to the unowned portion against any future payments payable under this Lease, and (c) exercise any other available rights or remedies.

*19.* ***Termination***. RGC will have the right to terminate this Lease with regard to all or any portion of the Property at any time by sending a written notice to Lessor at least 90 days prior to such termination. The termination will take effect upon the date specified in the notice. Upon termination, all of RGC's rights and obligations under this Lease with regard to the Property or portion thereof specified in the notice (the "Released Land") will terminate except for any Reclamation rights and obligations and any Minimum Royalty or Royalty Payment obligations arising out of mining conducted on the Released Land prior to such termination. In the event of a partial termination, this Lease will continue in effect with respect to all Property except the Released Land, and the term "Property" will thereafter mean and include only the retained Property and not the Released Land. After termination, RGC will execute, deliver and record a release confirming the relinquishment of the Released Land. Nothing in this Section will negate any obligations RGC has under this Lease with respect to Reclamation of the Property. Notwithstanding the foregoing, RGC will not terminate this Lease in whole or in part at any time prior to the sixth anniversary unless RGC also terminates all of its other mining leases in the Area.

*20.* ***Title Documents***. Lessor will promptly provide to RGC copies of all documents which Lessor now or in the future possesses, relating to or affecting title to the Property, including but not limited to: title insurance policies, deeds, mortgages, trust or security deeds, boundary agreements, judgments, liens, orders, surveys, boundary descriptions, maps, wills conveying an interest in the Property, trust instruments, leases, licenses, easements and rights-of-way. Lessor will give RGC notice whenever Lessor learns of any matter which may affect the title to the Property. At RGC's request, Lessor will sign and deliver to RGC such additional formal assurances or other documents, in proper and recordable form, as may reasonably be necessary to carry out the terms and intent of this Lease. Lessor will inform RGC immediately if Lessor fails to pay or discharge in a timely manner any promissory note, mortgage, tax, or other lien upon the Property, and RGC may then pay it and be subrogated to the rights of the holder thereof. Except for any taxes for which RGC is liable under this Lease, RGC will have the right to offset, from any payment otherwise payable to Lessor under this Lease, all amounts paid by RGC to discharge any such promissory note, mortgage, tax or other lien.

*21.* ***Compensation for Buildings***.

(a) Principal Residence. If RGC proposes to remove Lessor's principal residence on the Property, RGC will give Lessor not less than one year's notice of its intention to do so. At least 180 days prior to such removal, RGC will compensate Lessor by making a payment to Lessor equal to two times the then-present fair market value of such residence (excluding land), as determined by the average of two appraisals, one by an appraiser selected by Lessor, and one by an appraiser selected by RGC from a list of six MAI or FHA-approved appraisers compiled by RGC. Lessor may thereafter occupy the residence until the one year notice period expires, at which time Lessor will vacate the residence to allow its removal. No residence will be constructed on the Property during the Term of this Lease without the prior written consent of both Lessor and RGC.

(b) **Other Buildings.** If RGC proposes to remove other buildings on the Property, RGC will give Lessor not less than six months' notice of its intention to do so. At least 90 days prior to such removal, RGC will compensate Lessor by making a payment to Lessor equal to the approximate replacement cost of buildings of that nature, as determined by the average of two appraisals by appraisers selected in the manner described in Section 21(a). Lessor will cease using the relevant buildings 30 days prior to the proposed removal and will facilitate removal in all respects.

**22.** **Third-Party Claims.** If RGC learns that a third party may have a claim of ownership in any portion or percentage of the Property or any payments under this Lease, RGC may deposit in a special escrow account (with a bank of title insurance company located in Virginia) any payments otherwise due to Lessor under this Lease and give Lessor written notice of the deposit. The sums deposited will remain in the special escrow account until the claim or controversy is resolved, or until there has been a final determination of the claim or controversy by a court or arbitrator, including any payment thereunder.

**23.** **Additional and After-Acquired Rights.** If, during the Term of this Lease, Lessor acquires any right or interest in the Property or in any property adjacent or easement appurtenant thereto: (a) Lessor will promptly notify RGC; (b) any such right or interest acquired in the Property which Lessor had in this Lease already warranted to be part of the Property, will become part of the Property subject to this Lease without any additional payment to Lessor; (c) RGC may (at RGC's option, at any time, lease any other such right or interest) on the same terms as the terms of this Lease; and (d) Lessor will acknowledge and deliver an Amendment to this Lease and to the Memorandum of this Lease to RGC, so as to include such right or interest.

**24.** **Entireties.** If the Property is now or later owned in severalty or in separate tracts, RGC will nevertheless be entitled to exercise the Property as an undivided whole under this Lease, with all payments payable under this Lease to be paid (either directly or pursuant to Section 25 (Multiple Owners)) to the separate owners of the Property in the proportion that their ownership interest, measured in acres, or percentage ownership of acres, bears to the whole Property; provided, however, that no event will RGC's total payment obligations by the payment, owners exceed the payment obligations that RGC would have incurred under the Lease if the Property were owned in undivided fee simple by a single owner.

**25.** **Multiple Owners.** Whenever two or more parties are entitled to receive any payments under this Lease, RGC may withhold any such payment unless and until all of those parties designate to a recordable instrument a single person appointed to receive all such payments (and to execute a division and transfer) orders on behalf of all those parties (and their respective successors in title). Delivery of any payment due under this Lease to the designated agent fulfills RGC's obligation to make that payment to those parties.

**26.** **Assignment.** Both parties have the right to assign their rights and obligations under this Lease, in whole or in part; provided, however, that:

(a) The party making such an assignment must give the other party prior written notice thereof.

(b) The provisions of this Lease will apply to and be binding upon the successors and assigns of the respective parties;

(c) Any change or division in the ownership of the Property or of the right to receive any payments under this Lease, however accomplished, will not increase RGC's total payment obligations under this Lease or affect RGC's rights to conduct Exploration, Operations or Reclamation on the Property.

(d) Notwithstanding Section 26(a), RGC may, without notice or consent, assign any of its rights or obligations to affiliates of RGC, or use the services of independent contractors or agents to perform any of its rights or obligations; and,

(e) An assignment will relieve the assigning party of any obligation or liability to the other party, unless the other party provides a written release to the assigning party.

**27.** **Force Majeure.** Neither party will be deemed in default under this Lease during any period in which the exercise or performance of any of its rights or obligations under this Lease is prevented by any cause reasonably beyond its control. Such an event (if referred to in this Lease as a "Force Majeure.") Force Majeure will include, but is not limited to, the following fire, flood, storm, hurricanes, tornado, winds, other damage from the elements; declared or undeclared war; strikes, labor disputes; riots; civil unrest; action of governmental authorities; condemnation; eminent domain; inability to receive (required) governmental approval; inability to obtain water for Operations; a substantial fall in the market price of Minerals; acts of access, litigation; acts of God; and acts of the public enemy. The term of this Lease will be extended for a period of time equal to the period of Force Majeure. All such period will be deemed to begin at the earliest time a party is prevented from exercising or performing any of its rights or obligations by reasons of Force Majeure.

**28.** **No Broker.** Lessor and RGC represent and warrant to each other that no broker, agent, or finder has acted on behalf in connection with this Lease, and that no commissions, fees, or other monies are due to any broker, agent, or finder. In addition, Lessor and RGC will and do indemnify each other from all claims with respect to any brokerage, finder's or leasing commissions in connection with this Lease or any of the transactions contemplated under this Lease.

**29.** **Condemnation.** Lessor will immediately notify RGC of any condemnation proceeding that may affect the Property; Lessor will cooperate with (RGC) in defending or settling the same. RGC may (in its discretion) defend the same independently (of Lessor.) Any condemnation award will be shared between Lessor and RGC (as provided by law. Any condemned Property will constitute Released Land as of the date of condemnation, and this Lease will continue in effect as to the remaining Property.

**30.** **Dispute Resolution.** Subject to the provisions of this Section, any controversy, claim, or dispute arising out of or related to this Lease, or to the formation, negotiation, or breach thereof, will be settled by binding arbitration in Richmond, Virginia before a single arbitrator, in accordance with the Commercial Arbitration Rules of the American Arbitration Association. Any award of damages will be limited to actual compensatory damages. Judgment upon the award rendered by the arbitrator may be confirmed by, and entered in, any court having jurisdiction thereof. Prior to initiating any arbitration, the initiating party will give the other party written notice of the claim, and will allow the other party 30 days from the date that the notice is received to amicably resolve the claim. If the claim is not resolved within the 30 day period, the initiating party's sole and exclusive remedy will be to submit the dispute to arbitration. The parties will comply with any arbitration award within 30 days of its issuance; or (as soon as practicable thereafter, and the Lease will continue in full force and effect. In no event will the existence of any dispute, arbitration or award, suspend or otherwise affect any party's rights or obligations under this Lease, or interfere in any way with RGC's Operations.

**31.** **No Interference With RGC's Operations.** Lessor has not, and will not, during the Term of this Lease, take any action or grant any right which would in any way interfere with RGC's exercise of its rights as set out in Section 4 (Grant of Rights) of this Lease.

**32.** **No Implied or Continuing Waiver.** If either party waives or does not enforce any provision of this Lease on any occasion, that action will not constitute a waiver of: (a) that provision as to any other time, event or occurrence; or (b) any other provision.

**33.** **Notices.** Any notice given to the other party under this Lease must be in writing, and sent by United States registered or certified mail, return receipt requested, or via Federal Express or similar overnight courier service, addressed to the addresses set forth on the first page of this Lease. All notices will be deemed to have been made when deposited in the mail or with the courier as provided above. All notices will be deemed to have been received upon actual receipt by any person at the address listed above. Either party may change its address for the mailing of notices by giving the other party notice of such change of address in a manner provided for in this Section.

**34.** **Entire Agreement; No Oral Modification.** This Lease constitutes the entire agreement between the parties and supersedes all previous agreements, written or oral. Lessor hereby expressly acknowledges that, in entering into this Lease, Lessor has not relied on any oral or written statements made by RGC, its employees, agents or independent contractors. This Lease may only be modified by a written agreement in recordable form signed by Lessor and an authorized officer of RGC.

**35.** **Choice of Law.** This Lease will be construed, interpreted and governed by the laws of Virginia.

**36.** **Successors and Assigns.** This Lease constitutes a covenant running with the land and will be binding on, and inure to the benefit of, Lessor, RGC, and Lessor's and RGC's heirs, legal representatives, executors, administrators, successors and assigns, as the case may be.

**37.** **Severability.** In the event that any court or duly appointed arbitrator determines that any provision of this Lease is unenforceable, illegal, or in conflict with any Federal, state, or local law, the parties (will petition (or, will hereby be deemed to have petitioned) the court or arbitrator to reform that provision in such a way as to carry out the intent of the parties to the extent permissible under law. If the court or arbitrator declines to reform that provision, then that provision will be considered severable from the rest of the Lease, the remaining provisions of the Lease will not be affected, and this Lease will be construed and enforced as if the Lease did not contain the unenforceable or illegal provision.

**38.** **Modification to Cure Any Violation of the Rule Against Perpetuities.** If Lessor and RGC do not intend that any provision in this Lease will in any way violate the Rule Against Perpetuities or any related rule. If any such violation should occur, it is the intent of Lessor and RGC that the appropriate court or arbitrator will reform the provision in such a way as to approximate most closely the intent of the parties within the limits permissible under such rule or related rule, and will enforce the Lease as so reformed.

- 3 -

39. **Memorandum**. At the time this Lease is signed, the parties will sign a Memorandum of Lease which RGC will record. In the event of a conflict between the terms of the Memorandum of Lease and this Lease, the terms of this Lease will control.

40. **Mortgagee Consent**. Lessor agrees to use Lessor's best efforts to obtain promptly, and to provide to RGC a copy of, any consent to this Lease required by the terms of any mortgage or other instrument creating rights or prior to this Lease with respect to all or any part of the Property. Such consent, however, will neither affect nor be a condition precedent to the effectiveness and enforceability of the Lease as between Lessor and RGC.

41. **Headings**. The headings contained in this Lease are for the convenience of the parties only, and will not be used in its interpretation.

42. **Obligations That Survive This Lease**. In addition to other obligations that survive this Lease as set forth in this Lease, the parties' obligations under the following Sections of this Lease will remain in full force and effect following, and will not be affected by, the termination of, or expiration of the Term of, this Lease: Sections 7, 9, 11, 14, 15, 17, 19, 22, 24-26, 30, 32-38, and 41-43.

43. **Good Faith**. During the Term of this Lease, each party will act in good faith to fulfill the intent of this Lease, and will meet with the other party to discuss and to try to resolve amicably any issues that may arise.

IN WITNESS WHEREOF, the parties have executed this Lease under seal as of the date first above written.

OWNER:                                           RGC (USA) MINERALS INC.

_____ (SEAL)                   By: _____

G. L. Parson, Jr.                                Its:     Vice     President
(Print Name)
AKA George Lee Parson, Jr.                       [CORPORATE SEAL]
AKA G. L. Parson                                 Attest: _____
AKA G. Lee Parson, Jr.                                                    Secretary

_____ (SEAL)                   STATE OF   FLORIDA
                                                 COUNTY OF     CLAY
Mary Elizabeth Parson
(Print Name)                                     The foregoing instrument was acknowledged before me
AKA Mary Butterworth Parson                      this   13   day of   February   , 19    , 1990,
AKA Mary B. Parson                               by   Daniel P. Wolcott ,
AKA Mary E. Parson                               Vice      President of RGC (USA) MINERALS
AKA Mrs. G. L. Parson, Jr.                       INC., a Delaware corporation, on behalf of the
                                                 corporation.

                                                 _____
STATE OF VIRGINIA                                Notary Public
                                                 My Commission Expires: Notary Public, State of Florida
CITY/COUNTY OF                                         My Commission Expires May 21, 1992

The foregoing instrument was acknowledged before me
this _____ day of _____, 1989,
by   G. L. Parson, Jr. and Mary                  [NOTARIAL SEAL]
Elizabeth Parson , husband and
wife

My Commission Expires:

_____
Notary Public:

[NOTARIAL SEAL]

EXHIBIT A

TO

MINING LEASE

BY AND BETWEEN

G. L. PARSON, JR., AKA GEORGE LEE PARSON, JR.,
AKA G. L. PARSON, and AKA G. LEE PARSON, JR., and

MARY ELIZABETH PARSON, AKA MARY BUTTERWORTH PARSON,
AKA MARY B. PARSON, AKA MARY E. PARSON, and
AKA MRS. G. L. PARSON, JR., husband and wife
(LESSOR)

AND

RGC (USA) MINERALS INC.
(RGC)

**EXHIBIT A**

Under the terms of the above-referenced Mining Lease, to which this Exhibit is attached, Lessor has leased to BOC, and granted to BOC various rights regarding certain real property (including all mineral rights and Minerals) referred to as the "Property", which is situated in the _____ Stony Creek _____ Magisterial District, _____ Sussex _____ County, State of Virginia, which is hereby represented and warranted by Lessor to amount to 10:00± acres, and which is described as follows:

That same tract or parcel of land conveyed to G. L. Parson (also known as G. Lee Parson, Sr.), from M. L. Finney, as grantor, by Trustees Deed dated January 25, 1941 and recorded in Book 38 at page 100 in the Clerk's Office of Sussex Circuit Court.

The property is a small part of "The Wesley Barnes Farm", between the parsonage and the two branches down beside the public road and around the grave yard to the road and back to the branch again, in fee-simple, as found in Deed Book 11, page 464, Deed Book 5, page 613, Deed Book 11, page 196 and Deed Book 22 page 409.

The above stated land bequeathed and devised to George Lee Parson, Jr. (also known as G. L. Parson, G. Lee Parson, Jr. and G. L. Parson, Jr.) from the will of G. Lee Parson, Sr. deceased, in Will Book 23 at page 430 dated May 3, 1966, recorded March 8, 1973 in the Clerk's Office of Sussex Circuit Court.

EXEMPTING from all mining operations a one acre parcel of land lying in a southerly direction from the present cemetery adjacent to this tract of land. This parcel of land is presently unsurveyed and is to be used as a cemetery.

Subject property is referred to in the Sussex County tax records as Tax Parcel Number 8-101-6.

SPL Roy Pol
VA 8/89

EXHIBIT B
TO
MINING LEASE
BY AND BETWEEN
G. L. Parson, Jr. and Mary Elizabeth Parson,
husband and wife
(Lessor)

AND

RGC (USA) MINERALS INC.
(RGC)

RGC's Royalty Policy for Virginia Operations

COPYRIGHT © RGC (USA) MINERALS INC. 1989

This document sets forth RGC's Royalty Policy for Virginia Operations ("Royalty Policy"), which is referred to in Section 7 (Royalty Payments) of the above-referenced Deed of Mining Lease ("Lease") and which is attached to and incorporated into the Lease by reference.

1. **Definitions.** The terms defined in the body of this Lease or anywhere in this Royalty Policy will have the same meanings throughout this Royalty Policy. The following terms will have the following meanings:

   (a)    "Principal Minerals" means Ilmenite, Rutile and Zircon.

   (b)    "Minor Minerals" means Minerals other than Principal Minerals.

   (c)    "Mineralized Property" means that portion of the Property which RGC estimates, using the then most current drilling data and survey information, contains Minerals bearing sands which have a minimum discoverable depth of 15 feet and which have a cut-off grade of two percent (2%) by weight average Minerals content. All lump sum payments under Section 6 (Initial Payment and Advance Royalty Payments) of the Lease are based on the Mineralized Property as of the Lease Date, and subsequent changes in the acreage of the Mineralized Property will not affect the lump sum payments.

   (d)    "Sales Value per ton of each Mineral" means the dollar value per short ton derived by dividing (I) the actual dollar sales of each Mineral following processing, by the dry-plant (net of returns, sales taxes, sales discounts and commissions but not net of settlement discounts) for the calendar quarter ("Quarter") which is the subject of the Royalty Payment calculation, by (II) the total sales tonnage for each Mineral in that Quarter, subject to the exclusion of sales to affiliates contained in Clause 9 (Sales to Affiliates) below.

   (e)    "Lessor's Stock Account" means the account maintained by RGC in Lessor's name for the purpose of tracking and reporting production, inventory and sales allocations made with respect to saleable Minerals attributed to the Property, and for the purpose of calculating and accounting to Lessor, through the Stock Report described in Clause 3 below, for any Royalty Payments.

   (f)    "All Stock Accounts" means the Lessor's Stock Account and all other stock accounts maintained by RGC for other properties on which RGC engages in Mining (as defined in Clause 6(b)(I) below).

   (g)    "Recovery Rate" for any treatment of material is the weight of material that is present after that treatment divided by the weight of material before treatment, expressed as a percentage.

2. **Calculating Royalties.** This Royalty Policy sets forth the methodology to be used in determining and reporting the Royalty Payments payable to Lessor under the Lease. By signing the Lease Lessor agrees to that methodology, including but not limited to (I) RGC's method of attributing Minerals to the Property as set forth in Clause 6 below, and (II) RGC's method of calculating Royalty Payments as set forth in Clause 7 (Royalty Payment Calculations) below.

3. **Stock Account and Stock Report.** From the commencement of Mining (as defined in Clause 6(b)(I)) on the Property until such time as RGC's obligation to pay Lessor Royalty Payments has been fulfilled, RGC will establish and maintain Lessor's Stock Account and will send to Lessor, within 30 days after the end of each Quarter, a written report ("Stock Report") on the status of Lessor's Stock Account. The Stock Report will show:

   (a)    The tons of saleable Minerals attributed to the Property for the Quarter (see Clause 6 below).

   (b)    Sales from the accumulated tons of saleable Minerals referred to in Clause 3(a) above.

   (c)    Any Advance Royalty Payments paid during the Quarter in accordance with Section 6 of the Lease.

   (d)    Any Royalty Payment payable for the Quarter pursuant to Section 7 (Royalty Payments) of the Lease.

   (e)    A reconciliation of Advance Royalty Payments and Royalty Payments to Lessor pursuant to Section 6 (Initial Payment and Advance Royalty Payments) and Section 7 (Royalty Payments) of the Lease.

   The Stock Report will be certified as accurate by RGC's Operations Manager or a senior financial employee. By signing this Lease, Lessor agrees to preserve the confidentiality of the sales and production information in all Stock Reports.

4. **Royalty Rate.** RGC will pay Lessor a Royalty Payment equal to ▒▒▒▒▒▒▒▒ of the Sales Value per ton of each Mineral sold that is attributed to the Property, as reflected in the Stock Account and as reported to Lessor quarterly in the Stock Report.

5. **Royalty Payment.** Any Royalty Payments due for Principal Minerals attributed to the Property will be paid within 30 days after the end of the Quarter in which such Principal Minerals were sold (i.e. invoiced to the purchaser), and, for Minor Minerals attributed to the Property within 30 days of the end of the (Fiscal Year (July 1 – June 30) in which they were sold.

6. **Saleable Minerals Attributed to the Property.** Saleable Minerals are attributed to the Property and to Lessor's Stock Account as set forth below:

   (a)    RGC will survey, drill, and analyze drill samples from those portions of the Property which it plans to mine, in order to estimate the tons of Principal Minerals located therein.

   (b)    Production of saleable Minerals is achieved by the following three steps in RGC's Operations:

   (I)    "Mining" – extracting and delivery of mineral sand ore to the concentrator.

   (II)   "Concentrating" – removal of non-commercial material.

   (III)  "Processing" – removal of further non-commercial sand and separation into saleable Minerals.

   Each of these steps results in recovery and loss of saleable Minerals depending on the efficiency of each step and the nature of the material being treated. The Recovery Rate for each step varies to a small degree on a daily basis and is determined by regular sampling and analysis of the material as it passes through each step.

055

(c)  The Recovery Rate, for a given Quarter and the estimates and survey information compiled pursuant to Clause 7(a) above are used to calculate the tons of saleable Principal Minerals recovered from the Property in that Quarter. Those tons of Principal Minerals are then entered in Lessor's Stock Account.

(d)  Within 30 days of the end of each Fiscal Year, RGC will apportion its actual production of saleable Minor Minerals for the year among All Stock Accounts. The apportionment will be made in proportion to the attribution of Principal Minerals among All Stock Accounts for the year.

### *Royalty Payment Calculations*

(a)  **Principal Minerals Sold**

(i)  Within 30 days of the end of each Quarter, RGC will deduct the total tons of each Principal Mineral sold during that Quarter from All Stock Accounts.

(ii)  The tons of Principal Minerals sold will be deducted from All Stock Accounts on a "First-In/First-Out" (FIFO) basis. Where production of saleable Minerals is attributed to several stock accounts, on the same date, sales attributable to such production will be deducted from the affected stock accounts in proportion to the tonnage allocated on that date to such stock accounts.

(iii)  The sales thus attributed to the Property will be entered in Lessor's Stock Account and reflected in the Stock Report.

(iv)  RGC will calculate the Sales Value per ton for each Principal Mineral for the Quarter.

(v)  The Royalty Payment payable to Lessor for the Quarter will equal ▮▮▮▮▮▮ of the Sales Value per ton for each Principal Mineral for the Quarter multiplied by the tons of each Principal Mineral sold which are attributed to the Property for the Quarter as reflected in the Stock Account.

(b)  **Minor Minerals Sold**

Within 30 days after the end of each Fiscal Year, a calculation similar to that described in Clause 7(a)(v) above, will be made for Minor Minerals, and the result will be reflected in the Stock Report for the last Quarter of the Fiscal Year.

(c)  **Adjustments**

At the end of each Fiscal Year, RGC will compare the actual annual Mineral production to the total tons of Minerals attributed to All Stock Accounts in that year. If the actual production is less than the attributed production, then the shortfall will be deducted proportionately from All Stock Accounts. If the actual production exceeds the attributed production, then the excess will be allocated proportionately among All Stock Accounts.

**8.  *Commingling and Stockpiling.***  RGC will commingle Minerals from the Property with Minerals from other properties, may engage in Mining on more than one property in a Quarter, and may in RGC's sole discretion from time to time stockpile Minerals depending on market conditions.

**9.  *Sales to Affiliates.***  RGC may in its sole discretion sell part or all of its Minerals to affiliates of RGC. In such event, the Sales Value per ton of each Mineral used in calculating the Royalty Payment will be based only on RGC's sales to non-affiliates. If such non-affiliate sales are less than 30% of RGC's total sales of the Mineral during the Quarter, then the Sales Value used in calculating the Royalty Payment will equal the greater of (a) the Sales Value based only on RGC's sales to non-affiliates or, (b) the Indexed price for the Mineral, determined by multiplying (i) the Sales Value per ton of the Mineral last used in calculating a Royalty Payment times (ii) the percentage change in the Producer Price Index - Titanium Pigments Index of the Bureau of Labor Statistics (U.S. Department of Labor) (Code No. 06120300; 1982=100). Such percentage change will be based on the change in the Index from the last month of the Quarter in which the Sales Value referred to in Clause (i) was used to the last month of the Quarter for which the Royalty Payment is being calculated.

**10.  *Most Favored Lessor.***  If RGC agrees, after signing this Lease, to pay a higher Initial Payment, per acre, higher aggregate Advance Royalty Payments per acre (excluding any such higher payments that result from either (i) an increase in lease date payment, which raises a Lessor's total lease date payments to a even percent (7%) of RGC's then-current estimate of the lessor's total Advance Royalty Payments and Royalty Payments; or (ii) variations in Advance Royalty Payments that are based upon or limited by Clause 12 hereof), or higher royalty rates as to any other lease property in the Area, RGC will within 30 days of the higher favorable lease pay Lessor an amount necessary to adjust retroactively payments previously received by Lessor to the more favorable levels, and the more favorable levels thereafter will be made applicable to this Lease. This Clause does not require that retroactive adjustments include the time value of money. This Clause applies only to leases and not to purchases, options to purchase, purchase-leaseback arrangements or other arrangements.

**11.  *Completion of Mining.***

(a)  RGC will send Lessor written notice when it has completed Mining on the Property.

(b)  The next Stock Report after such notice will contain a reconciliation comparing (i) the total of all Royalty Payments and Advance Royalty Payments paid to date, with (ii) the product obtained by multiplying the total number of acres of the Property from which RGC removed the deposit in preparation for Mining, times $3,500-per-acre average Minimum Royalty provision in Section 6 (Minimum Royalty) of this Lease.

(c)  If that Stock Report reflects that all tons of Minerals attributed to the Property have already been sold, that Stock Report will be Lessor's last Stock Report and final reconciliation, and Lessor will be paid (i) any Royalty Payments payable for that Quarter; and (ii) the final payment, if any, required by the $3,500-per-acre average Minimum Royalty provision (the "Final Payment"). The Final Payment will equal the amount, if any, by which the product described in Clause 11(b)(ii) exceeds the total described in Clause 11(b)(i).

(d)  If that Stock Report reflects that any tons of Minerals attributed to the Property have not yet been sold, Lessor will be paid any Royalty Payments payable for that Quarter; and Lessor may elect, by sending written notice to RGC within 30 days, to either: (i) forfeit all rights to future Royalty Payments with regard to all unsold tons and receive the Final Payment, if any, determined in accordance with Clause 11(c) above; or (ii) continue Lessor's Stock Account (in existence), and defer the final reconciliation and Final Payment, if any, until all such unsold tons are sold and the final total of all Royalty Payments and Advance Royalty Payments can be used in determining any Final Payment due.

**12.  *Advance Royalty Payment: 70% of Estimated Future Royalty Payments.***  At least one year before RGC commences Mining on the Property, RGC will estimate, using the then (most current) mining and survey information, the tons of Minerals located therein. Using the higher of this estimated tonnage or ▮▮ 22,218 ▮▮▮ then and applying reasonably expected Recovery Rates and prices, RGC will in good faith estimate the total sales value of the saleable Minerals recoverable from the Mineralized Property. The Advance Royalty Payment equal to "70% of Estimated Future Royalty Payments," set forth in Section 5 (Initial Payment and Advance Royalty Payments) of the Lease, will be determined by (a) multiplying the estimated total sales value times the ▮▮▮▮▮▮▮▮▮ value; (b) multiplying the result by seventy percent (70%); and (c) deducting therefrom all Advance Royalty Payments previously made under the Lease.

**13.  *No Reliance on Estimates or Representations.***  Because of the inherent uncertainties in making projections and the uncertainties which may affect Lessor's Royalty Payments, Lessor, in deciding whether to enter into this Lease, should not rely upon any representation, written or oral, as to the likelihood or value of Royalty Payments; and Lessor should bear in mind that the $3,500-per-acre average Minimum Royalty provision contained in Section 6 (Minimum Royalty) of the Lease applies only if RGC engages in Mining on the Property, and even then applies only to the total number of acres from which RGC removes the deposit in preparation for Mining. Lessor acknowledges that Lessor understands the foregoing sentence and, Lessor agrees that Lessor has not relied upon any representation, written or oral, as to the likelihood or value of Royalty Payments.



96/-1040

COPY

STD Lease
(VA 8/89)

# DEED OF MINING LEASE

THIS DEED OF MINING LEASE, including the attached Exhibits which are incorporated herein by this reference, ("Lease")

is made and entered into _____ October 13 _____, 19 89 ____ by and ____

between G. L. Parson, Jr. AKA George Lee Parson, Jr. AKA G. L. Parson and AKA

G. Lee Parson, Jr. and Mary Elizabeth Parson AKA Mary Ruth Parson AKA

Mary B. Parson AKA Mary P. Parson and AKA Mrs. G. L. Parson, Jr. husband and wife

Santa ..., Box 60, Stony Creek, Virginia 23882

("Lessor") and RGC (USA) MINERALS INC., a Delaware corporation whose address is Warner Road, P.O. Box 1307 (Green Cove Springs, Florida, 32043) ("RGC"). In consideration of the mutual promises made in this Lease, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Lessor and RGC agree as follows:

**1.** _Defined Terms._ Any word or phrase that is capitalized and placed in quotations in this Lease is a defined term and when it is capitalized will have the same meaning throughout this Lease.

**2.** _Purpose._ The purpose of this Lease is to allow RGC to explore for and, at RGC's sole discretion, to mine, remove, commingle, and sell Minerals from the Property, to use the Property, to mine Minerals from the Property, or other property and to conduct related activities. "Minerals" means the following group of mineral and mineral products: Ilmenite, Leucoxene, Rutile, Zircon, Staurolite, Kyanite/Sillimanite, Monazite, Xenotime, and Garnet," and associated by-products. (Title to any Minerals mined shall, if not already vested in RGC,) pass to RGC as they are severed from the Property.

**3.** _Grant of Lease._ Lessor hereby leases to RGC the Property (as defined on Exhibit A), on the terms and conditions in this Lease.

**4.** _Grant of Rights._ Lessor grants to RGC the following exclusive rights with regard to the Property:

(a) To enter the Property, to survey, explore, drill, test, and sample (the foregoing activities are defined as Exploration);

(b) To clear the Property of such buildings (subject to Section 21 (Condemnation, for "Buildings)), other structures or obstacles, earth, standing timber, plants, and such other things or material that RGC in its absolute discretion, wishes to clear from the Property to exercise its rights as set out in this Section; to construct, relocate, use, or remove roads, power and communication lines, dredge ponds, tailing ponds, settling, ponds, pipelines, buildings, storage facilities, canals, tailings, slime, gates, fences, and, other structures and facilities on the Property; to take steps to prepare for mining on the Property; and to develop, mine, store, mill, dredge, remove, concentrate, separate, commingle, stockpile, haul, process and sell Minerals (the foregoing activities, whether conducted on the Property or on other property in Dinwiddie and Sussex Counties, Virginia ("Area"), are defined as "Operations.")

(c) To use the Property to store, transport, or dispose of Minerals, water, tailings, and material resulting from RGC's Operations;

(d) To use (water) from (or appurtenant) to the Property and to drain, through and from the Property and to draw into any water course in the Property any water from RGC's Operations;

(e) To take all steps to accomplish Reclamation (as defined in Section 14) of the Property;

(f) To use all easements, means of access, and rights-of-way from and to the Property and;

(g) To use the Property for the purposes described in this Section, in conjunction with RGC's Exploration, Operations and Reclamation on other property;

Notwithstanding the foregoing, RGC is not granted the right under the Lease to construct or operate on the Property a processing plant for the final separation of the concentrate into saleable Minerals.

**5.** _Term of Lease._ This Lease will begin on the date first written above and will end 20 years thereafter, unless (a) the Lease is ended earlier under Section 19 (Termination), (b) the Lease is automatically terminated by RGC's failure, for reasons other than a temporary inability (to deal with truly) diligent efforts all necessary governmental permits and authorizations, to commence (Mining (as defined) in the Royalty Policy), in the Area, by the eighth anniversary of the Lease; or, (c) the Lease is automatically extended to allow RGC to complete ongoing operations on the Property, (if to extends, the Lease shall terminate upon the earlier of written notice from RGC pursuant to Section 19 (Termination), (d the passage of a period of 180 consecutive days in which RGC conducts no Operations on the Property. "Term" means the period of time during which this Lease is in effect, and, in the absence of earlier termination, includes both the initial 20-year term and any extended term.

**6.** _Initial Payment and Advance Royalty Payments._ Subject to the terms and conditions of this Lease, RGC will pay to Lessor, during the Term of this Lease, on or before the dates indicated, the following lump-sum payments and payments (in are of the Property retained under the Lease at the time of payment):

| Payment Date | Payment Type | Payment |
|---|---|---|
| Lease Date | Initial Payment | $250 per acre GLP [signature] |
| Lease Date | Advance Royalty | $880.20 $700 per acre |
| On or before December 31 of each year following the year this Lease is signed | Rental Payment | $15 per acre MEP [signature] |
| Earlier of (a) Mining (as defined in Royalty Policy) in Area or (b) Fifth Anniversary | Advance Royalty | $16,500.00 (lump sum, equal to $1000 per acre of "Mineralized Property" (as defined in Royalty Policy) |
| Tenth Anniversary if no Notice of Mining ("as defined in Section 9) given | Advance Royalty | $16,500.00 (lump sum, equal to $1000 per acre of Mineralized Property, subject to 70% Limitation (as defined in Royalty Policy) |
| Fifteenth Anniversary if no Notice of Mining given | Advance Royalty | $16,500.00 (lump sum, subject to 70% Limitation) |
| Notice of Mining | Advance Royalty | 70% of Estimated Future Royalty Payments (as defined in Royalty Policy) |

The Initial Payment and all Rental and Advance Royalty Payments paid to Lessor are non-refundable. The Advance Royalty Payments paid to Lessor will be credited against any Royalty Payments otherwise payable pursuant to Section 7 (Royalty Payments) and may be prepaid by RGC. (Payment to Lessor of the payment required upon Notice of Mining) will satisfy in full any obligation RGC may thereafter have to pay the Tenth and Fifteenth Anniversary Advance Royalty Payments.

**7.** _Royalty Payments._ RGC will pay to Lessor quarterly Royalty Payments equal to ▬▬▬ of the Sales Value of Minerals attributed to the Property, which RGC mines and sells. The Royalty Payment ▬▬▬ and paid in accordance with Exhibit B, RGC's Royalty Policy for Virginia Operations ("Royalty Policy").

**8.** _Minimum Royalty._ If the total of all Advance Royalty Payments and Royalty Payments paid to Lessor under (this Lease does not average $3,500 per acre (or all of the Property from which RGC removes the topsoil in preparation for Mining ("Minimum Royalty"), RGC will pay to Lessor the amount by which the Minimum Royalty exceeds such total. Any such payment will be determined and paid in accordance with Clause 11 of the Royalty Policy.

**9.** _Lessor's Use of the Property._ During Exploration, Lessor and RGC will work together to accommodate Lessor's normal activities on the Property; RGC will give Lessor at least (twelve months notice ("Notice of Mining") of RGC's Mining (will require Lessor to cease) activities on (that portion of the Property described in the Notice of Mining.) Until the end of that notice period, Lessor will have the right, but not the obligation, to remove (or Lessor's account) any crops, timber, buildings, irrigation systems, fixtures or personalty of Lessor from that portion of the Property. From the end of the notice period until RGC modifies (Lessor otherwise,) Lessor will cease all activities (to cease on that portion of the Property. During Reclamation, RGC will ...

[signature/initials] 6C

057

work with Lessor to allow Lessor to resume Lessor's normal activities on the Property, as soon as reasonably possible and as permitted by governmental reclamation requirements. Lessor will and does indemnify RGC from and against any claims asserted against RGC arising out of the activities of Lessor or Lessor's invitees. Lessor will be solely responsible for, and will bear all risk of loss related to, any government and/or subsidy stabilization conservation programs that may apply to the Property.

**10.** **Safety.** Except as otherwise provided in this Lease, only RGC employees and visitors authorized in writing by RGC will be permitted on those parts of the Property on which Operations are being conducted. All RGC-authorized visitors and their vehicles will carry RGC identification at all times that they are on the Property.

**11.** **RGC to Comply With Safety Laws and to Indemnify Lessor.** RGC will conduct its Exploration and Operations in compliance with applicable safety laws and regulations. RGC will and does indemnify Lessor from and against any claims (and the amount of), otherwise) asserted against Lessor arising out of RGC's activities. RGC will also indemnify Lessor from, and pay Lessor for, actual damages caused by RGC to crops, pasture, timber, fences, gates, roads and other improvements not described in Section 21 (Compensation for Buildings) located on any portion of the Property that are not mined but are otherwise used by RGC in its activities. RGC will in no event be liable for special or consequential damages, and any payments made pursuant to the preceding sentence, will be deemed full and complete compensation for the damage in question.

**12.** **RGC's Right to Determine Whether, When and Where to Mine.** Nothing in this Lease or in the relationship between Lessor and RGC will constitute or create any express or implied duty on the part of RGC to perform Exploration or Operations, or to mine the Property at any rate, in any manner, or at all. RGC's Exploration and Operations, if any, will occur only to the extent and at the locations and times and in the method and manner that RGC, in its sole discretion, may determine; provided, however, that RGC will not conduct Operations within 300 feet of Lessor's principal residence or any principal residence on property adjoining the Property, or in such a way as to deprive any such residence of access to a public road, utilities, and water supply, until RGC complies with Section 21(a) (Compensation for Buildings — Principal Residence) (in the case of Lessor's principal residence) or obtains the adjoining property owner's written consent (in the case of an adjoining residence), and provided further that, if RGC engages in Mining in this Area, then RGC will use its best efforts to mine all of the Mineralized Property that can be mined in a commercially reasonable manner.

**13.** **Compliance With Laws.** RGC's activities on the Property will be conducted in compliance with all applicable Federal, State and local laws and regulations.

**14.** **Reclamation.** RGC agrees to comply with all State and Federal laws, regulations and permits applicable to the Reclamation of the Property. RGC also agrees to post a bond, to the extent required by Virginia law, to ensure that all the Property which will be reclaimed in accordance with law. RGC will and does indemnify Lessor from and against any claims by State or Federal regulatory agencies arising from RGC's failure to reclaim in accordance with applicable laws, excluding claims caused in part or in whole by Lessor's failure to cooperate with RGC in accordance with the terms of this Lease. RGC's Reclamation of any Property mined may include, but not be limited to, refilling the mined path with tailings discharged from the wet mill; dyking and eliminating settling ponds; replacing and grading the topsoil, replanting and otherwise complying with all applicable governmental reclamation requirements ("Reclamation").

**15.** **Audit.** Lessor will have the right at Lessor's expense to appoint an independent auditor reasonably approved by RGC (which approval is hereby given if Lessor appoints a national firm in the United States of recognized reputation), to audit not more than once (in any year), RGC's records relating to the determination of Royalty Payments for RGC's Fiscal Year (currently July 1 – June 30) immediately preceding such audit. Lessor will instruct such auditor to send a copy of his report to RGC at the same time that he sends his report to Lessor. Also, Lessor will notify RGC in writing of any objections Lessor may have regarding Royalty Payments, within 60 days of Lessor's receipt of Lessor's auditor's report.

**16.** **Taxes.** Taxes will be apportioned and paid as follows:

(a)    RGC will pay the following taxes to the extent thereof: any mineral severance taxes related to RGC's Operations; property taxes, pro-rated, for the portion of the Property and the time period in which Lessor is prohibited from (conducting activities); and any increase in property taxes attributable to the Minerals or RGC's Operations.

(b)    Lessor will pay all other taxes related to the Property, including but not limited to: any taxes on Released Land (as defined in Section 19 (Termination)); any income, capital levy, estate, gift, succession, inheritance, transfer or franchise taxes; and any taxes attributable to Lessor's activities on the Property.

(c)    Lessor (will send RGC copies of all assessments, tax bills or other tax notices related to the Property or to RGC's Operations thereon within 10 days of Lessor's receipt of the same or in such shorter time as may be necessary to preserve the rights of RGC and Lessor to protest or appeal the same. Lessor will cooperate with RGC in any such protest or appeal. RGC may, in its discretion, pursue such protest or appeal independently of Lessor. RGC will in any event not be obligated to pay (i) any increase in taxes which RGC is unable to protest or appeal due to Lessor's failure to comply with this Section 16(c) or (ii) any tax bill which RGC does not receive at least 5 days before the bill is due.

(d)    RGC may, but is not required to, pay any taxes on the Property for which Lessor is responsible under Section 16(b), and deduct such taxes paid from any payments otherwise due to Lessor under this Lease.

**17.** **Warranty of Title.** Lessor warrants as follows:

(a)    Lessor is the sole legal and equitable owner, in undivided fee simple, of the surface and mineral estates that comprise the Property without limitation whatsoever;

(b)    The Property is free and clear of all leases, liens, encumbrances and outstanding adverse claims and interests, and of record;

(c)    Lessor has full power and authority to execute this Lease;

(d)    RGC shall have the quiet and peaceful possession and enjoyment of the Property, Minerals, and the proceeds thereof as, against all persons or entities who may claim any interest therein;

(e)    There has been no violation of any applicable Federal, State, or local law or regulation relating to zoning, land use, environmental protection or otherwise with respect to the Property, or activities relating thereto; and

(f)    This Lease, and RGC's right, title and interest hereunder, shall at all times be superior to, and have priority over, any right, title or interest in the Property created during the Term of this Lease.

**18.** **Lessor Interest.** In entering into this Lease, RGC is relying on Lessor's warranties of title contained in Section 17 (Warranty of Title). Without impairment of those warranties of title, if Lessor owns less than the entire and undivided estate in the Property RGC can (a) proportionally reduce all payments otherwise payable under this Lease; (b) offset any prior payments related to the unowned portion against any future payments payable under this Lease, and (c) exercise any other available rights or remedies.

**19.** **Termination.** RGC will have the right to terminate this Lease with regard to all or any portion of the Property at any time by sending a written notice to Lessor at least 90 days prior to such termination. The termination will take effect upon the date specified in the notice. Upon termination, all of RGC's rights and obligations under this Lease with regard to the Property or portion thereof specified in the notice (the "Released Land"), will terminate except for any Reclamation rights and obligations and any Minimum Royalty or Royalty Payment obligations arising out of mining conducted on the Released Land prior to such termination. In the event of a partial termination, this Lease will continue in effect with respect to all Property except the Released Land, and the term "Property" will thereafter mean, and include, only the retained Property and not the Released Land. After termination, RGC will execute, deliver and record a release continuing the relinquishment of the Released Land. Nothing in this Section will repair any obligations RGC has under this Lease with respect to Reclamation of the Property. Notwithstanding the foregoing, RGC will not terminate this Lease in whole or in part at any time prior to the sixth anniversary unless RGC also terminates all of its other mining leases in the Area.

**20.** **Title Documents.** Lessor will promptly provide to RGC copies of all documents which Lessor now or in the future possesses, relating to or affecting title to the Property, including but not limited to, title insurance policies, deeds, mortgages, trust or security deeds, boundary agreements, judgments, liens, orders, surveys, boundary descriptions, maps, wills conveying an interest in the Property, trust instruments, leases, licenses, easements and rights-of-way. Lessor will give RGC notice whenever Lessor learns of any matter which may affect its title to the Property. At RGC's request, Lessor will sign and deliver to RGC such additional formal assurances or other documents, in proper and recordable form, as may reasonably be necessary to carry out the terms and intent of this Lease. Lessor will inform RGC immediately if Lessor fails to pay or discharge in a timely manner any promissory note, mortgage, tax, or other lien upon the Property, and RGC may then pay it and be subrogated to the rights of the holder thereof. Except for any taxes for which RGC is liable under this Lease, RGC will have the right to offset from any payment otherwise payable to Lessor under this Lease, all amounts paid by RGC to discharge any such promissory note, mortgage, tax or other lien.

**21.** **Compensation for Buildings.**

(a)    Principal Residence. If RGC proposes to remove Lessor's principal residence on the Property, RGC will give Lessor notice thereof, and, upon receipt of such notice, if, in Lessor or its submission) to do so, within 180 days prior to such removal, RGC will compensate Lessor by making a payment to Lessor equal to two times the then present fair market value of such residence (excluding land), as determined by the average of two appraisals, one by an appraiser selected by Lessor, and one by an appraiser selected by RGC; from a MAI (or the MAI of the FMA-approved appraisers completed by RGC. Lessor may thereafter occupy the residence until the one-year notice period expires, at which time Lessor will vacate the residence to allow its removal. No residence will be constructed on the Property during the Term of this Lease without the prior written consent of both Lessor and RGC.

44STEMP2                                                                                                   058

(b)   **Other Buildings.**  If RGC proposes to remove other buildings on the Property, RGC will give Lessor not less than six months' notice of its intention to do so.  At least 90 days prior to such removal, RGC will compensate Lessor by paying a payment to Lessor equal to the appraised replacement cost of buildings of that nature, as determined by the average of two appraisals by appraisers selected in the manner described in Section 21(a).  Lessor will cease using the relevant buildings 30 days prior to the proposed removal and will facilitate removal in all respects.

22.   **Third Party Claims.**  If RGC learns that a third party may have a claim of ownership in any portion or percentage of the Property, or any payments under this Lease, RGC may deposit in a special escrow account, with a bank or title insurance company located in Virginia any payments otherwise due to Lessor under this Lease and give Lessor written notice of the deposit.  The sums deposited will remain in the escrow account until the claim or controversy is resolved, or until there has been a final determination of the claim or controversy by a court or arbitrator, including any appeals therefrom.

23.   **Additional and After-Acquired Rights.**  If, during the Term of this Lease, Lessor acquires any right or interest in the Property or in any property adjacent or easement appurtenant thereto, (a) Lessor will promptly notify RGC; (b) any such right or interest acquired in the Property, which Lessor had in this Property already warranted to be part of the Property will become part of the Property subject to this Lease without any additional payment to Lessor; (c) RGC may, at RGC's option, (i) any time, lease any other such right or interest on the same terms as the terms of this Lease, and (d) Lessor will sign, acknowledge, and deliver an Amendment to this Lease and to the Memorandum of this Lease to RGC, so as to include such right or interest.

24.   **Entireties.**  If the Property is now or later owned in severalty or in separate tracts, RGC will nevertheless be entitled to treat the Property as an undivided whole under this Lease, with all payments payable under this Lease to be paid (either directly or pursuant to Section 25 (Multiple Owners)) to the separate owners of the Property in the proportion that their ownership interest, measured in acres, or percentage ownership of acres, bears to the whole Property provided, however, that in no event will RGC's total payment obligations to the separate owners exceed the payment obligations that RGC would have incurred under this Lease if the Property were owned in undivided fee simple by a single owner.

25.   **Multiple Owners.**  Whenever two or more parties are entitled to receive any payments under this Lease, RGC may withhold any such payments unless and until all of those parties designate in a recordable instrument an agent empowered to receive all such payments and to execute division and transfer orders on behalf of all those parties and their respective successors in title.  Delivery of any payment due under this Lease to the designated agent fulfills RGC's obligation to make that payment to those parties.

26.   **Assignment.**  Both parties have the right to assign their rights and obligations under this Lease, in whole or in part; provided, however, that:

(a)   The party making such an assignment must give the other party prior written notice thereof;

(b)   The provisions of this Lease will apply to and be binding upon the successors and assigns of the respective parties;

(c)   Any change or division in the ownership of the Property, or of the right to receive any payments under this Lease, however accomplished, will not increase RGC's total payment obligations under this Lease or affect RGC's rights to conduct Exploration, Operations or Reclamation on the Property;

(d)   Notwithstanding Section 26(c), RGC may, without notice or consent, assign any of its rights or obligations to affiliates of RGC, or use the services of independent contractors or agents to perform any of its rights or obligations; and,

(e)   No assignment will relieve the assigning party of any obligations or liability to the other party, unless the other party provides a written release to the assigning party.

27.   **Force Majeure.**  Neither party will be, deemed in default under this Lease during any period in which its exercise or performance of any of its rights or obligations under this Lease is prevented by any cause reasonably beyond its control.  Such an event is referred to in this Lease as "Force Majeure."  Force Majeure will include, but is not limited to, the following: fire, floods, storms, hurricanes, tornados, winds, other damage from the elements, declared or undeclared war, strikes, labor disputes, riots, civil unrest, action of governmental authorities, condemnation, eminent domain, failure or inability to receive required governmental approvals, inability to obtain water for Operations, a substantial fall in the market prices of Minerals, acts of excess, litigation, acts of God, and acts of the public enemy.  The Term of this Lease will be extended for a period of time equal to the period of Force Majeure.  All such periods will be deemed to begin at the earliest time a party is prevented from exercising or performing any of its rights or obligations by reasons of Force Majeure.

28.   **No Broker.**  Lessor and RGC represent and warrant to each other that no broker, agent, or finder has acted on its behalf in connection with this Lease, and that no commission, fees, or other monies are due to any broker, agent, or finder.  In addition, Lessor and RGC will, and do indemnify each other from all claims with respect to any brokerage, finder's or leasing commission in connection with Lessor of any of the transactions contemplated under this Lease.

29.   **Condemnation.**  Lessor will immediately notify RGC of any condemnation proceeding that may affect the Property.  Lessor will cooperate with RGC in defending or settling the same.  RGC may, in its discretion, defend its rights independently of Lessor.  Any condemnation award will be shared between Lessor and RGC as provided by law.  Any condemned Property will be until the Released Land as of the date of condemnation, and this Lease will continue in effect as to the remaining Property.

30.   **Dispute Resolution.**  Subject to the provisions of this Section, any controversy, claim, or dispute arising out of or related to this Lease, or to the formation, negotiation, or breach thereof, will be settled by binding arbitration in Richmond, Virginia before a single arbitrator, in accordance with the Commercial Arbitration Rules of the American Arbitration Association.  Any award of damages will be limited to actual, compensatory damages.  Judgment upon the award rendered by the arbitrator may be confirmed by, and entered by, any court having jurisdiction thereof.  Prior to initiating any arbitration, the initiating party will give the other party written notice of the claim and will allow the other party 30 days from the date that the notice is received to amicably resolve the claim.  If the claim is not resolved within the 30 day period, the initiating party's sole and exclusive remedy will be to submit the dispute to arbitration.  The parties will comply with any arbitration award within 30 days of its issuance, or as soon as practicable thereafter, and the Lease will continue in full force and effect.  In no event will the existence of any dispute, arbitration or award suspend or otherwise affect any party's rights or obligations under this Lease, or interfere in any way with RGC's Operations.

31.   **No Interference With RGC's Operations.**  Lessor has not, and will not, during the Term of this Lease, take any action or grant any right which would in any way interfere with RGC's exercise of its rights as set out in Section 4 (Grant of Rights) of this Lease.

32.   **No Implied or Continuing Waiver.**  If either party waives or does not enforce any provision of this Lease on any occasion, that action will not constitute a waiver of: (a) that provision as, to any other time, event or occurrence or (b) any other provision.

33.   **Notices.**  Any notice given to the other party under this Lease must be in writing, and sent by United States registered or certified mail, return receipt requested, or via Federal Express or similar overnight courier service, addressed to the address set forth on the first page of this Lease.  All notices will be deemed to have been received upon actual receipt by any person at the address set forth on the first page of this Lease.  All notices will be deemed to have been received upon actual receipt by any person at the address provided above.  If notices will be deemed to have been received upon actual receipt by any person at the address provided above.  Either party may change its address for the mailing of notices by giving the other party notice of such change of address in the manner provided for in this Section.

34.   **Entire Agreement; No Oral Modification.**  This Lease constitutes the entire agreement between the parties and supersedes all previous agreements, written or oral.  Lessor hereby expressly acknowledges that, in entering into this Lease, Lessor has not relied on any oral or written statements made by RGC, its employees, agents or independent contractors.  This Lease may only be modified by a written agreement in recordable form signed by Lessor and an authorized officer of RGC.

35.   **Choice of Law.**  This Lease will be construed, interpreted and governed by the laws of Virginia.

36.   **Successors and Assigns.**  This Lease constitutes a covenant running with the land, and will be binding on, and inure to the benefit of, Lessor, RGC, and Lessor's and RGC's heirs, legal representatives, executors, administrators, successors and assigns, as the case may be.

37.   **Severability.**  In the event that any court or duly appointed arbitrator determines that any provision of this Lease is unenforceable, illegal or in conflict with any Federal, state, or local law, the parties will petition for, will hereby be deemed to have petitioned the court or arbitrator to reform that provision in such a way as to carry out the intent of the parties to the extent permissible under law.  If the court or arbitrator declines to reform that provision, then that provision will be considered severable from the rest of the Lease, the remaining provisions of the Lease will not be affected, and this Lease will be construed and enforced as if the Lease did not contain the unenforceable or illegal provision.

38.   **Modification in Our Any Violation of the Rule Against Perpetuities.**  Lessor and RGC do not intend that any provision of this Lease will in any way violate the Rule Against Perpetuities or any related rule.  If any such violation should occur, it is the intent of Lessor and RGC that the appropriate court or arbitrator will reform the provision in such a way as to approximate most closely the intent of the parties within the limits permissible under such rule or related rule, and will enforce the Lease as so reformed.

059

**39.** *Memorandum.* At the time this Lease is signed, the parties will sign a Memorandum of Lease which RGC will record. In the event of a conflict between the terms of the Memorandum of Lease and this Lease, the terms of this Lease will control.

**40.** *Mortgagee Consent.* Lessor agrees to use Lessor's best efforts to obtain promptly, and to provide to RGC a copy of any consent to this Lease required by the terms of any mortgage or other instrument creating any right superior to this Lease with respect to all or any part of the Property. Such consent, however, will neither affect nor be a condition precedent to the effectiveness and enforceability of the Lease as between Lessor and RGC.

**41.** *Headings.* The headings contained in this Lease are for the convenience of the parties only, and will not be used in its construction.

**42.** *Obligations That Survive This Lease.* In addition to other obligations that survive this Lease as set forth in this Lease, the parties' obligations under the following Sections of this Lease will remain in full force and effect following, and will not be affected by, the termination of, or expiration of the Term of, this Lease: Sections 7.9, 11, 14, 15, 17, 19, 22, 24, 26, 30, 32(d) and 41(c).

**43.** *Good Faith.* During the Term of this Lease, each party will act in good faith to fulfill the intent of this Lease, and will meet with the other party to discuss and to try to resolve amicably any issues that may arise.

IN WITNESS WHEREOF, the parties have executed this Lease under seal as of the date first above written.

OWNER:                                     RGC (USA) MINERALS INC.:

_____ [SEAL]          By _____

G. L. Parson, Jr.                         Its   Vice   President
(Print Name)
AKA George Lee Parson, Jr.          [CORPORATE SEAL]
AKA G. L. Parson                         Attest _____
AKA G. Lee Parson, Jr.                  Its _____ Secretary


_____ [SEAL]          STATE OF   FLORIDA
Mary Elizabeth Parson                  COUNTY OF   CLAY
(Print Name)
AKA Mary Butterworth Parson          The foregoing instrument was acknowledged before me
AKA Mary B. Parson                       this   13   day of   February   1990
AKA Mary B. Parson                       by   Daniel P. Wolcott
AKA Mrs. G. L. Parson, Jr.              as   Vice   President of RGC (USA) MINERALS
                                                  INC., a Delaware corporation, on behalf of the
                                                  corporation.

                                                  _____
STATE OF VIRGINIA                        Notary Public
COUNTY OF _____
The foregoing instrument was acknowledged before me   My Commission Expires _____
this   13   day of   October   1989
by   G. L. Parson Jr. and Mary          Notary Public, State of Florida
Elizabeth Parson, husband and           My Commission Expires May 21, 1993
wife.                                             [seal]

_____
_____
My Commission Expires:                   [NOTARIAL SEAL]
October 28, 1991

_____
Notary Public

[NOTARIAL SEAL]

418TB2402                                                                          060

EXHIBIT A
TO
MINING LEASE
BY AND BETWEEN

G. L. PARSON, JR., AKA GEORGE LEE PARSON, JR.,
AKA G. L. PARSON, and AKA G. LEE PARSON, JR., and

MARY ELIZABETH PARSON, AKA MARY BUTTERWORTH PARSON,
AKA MARY B. PARSON, AKA MARY E. PARSON, and
AKA MRS. G. L. PARSON, JR., husband and wife
(LESSOR)

AND

RGC (USA) MINERALS INC.
(RGC)

**EXHIBIT A**

Under the terms of the above-referenced Mining Lease, to which this exhibit is attached, Lessor has leased to BGC, and granted to BGC various rights regarding, certain real property (including all mineral rights and Minerals) referred to as the "Property", which is situated in the ____ Stony Creek ____ Magisterial District, Sussex ____ County, State of Virginia, which is hereby represented and warranted by Lessor to amount to 16.50 acres, and which is described as follows:

That same tract or parcel of land conveyed to G. L. Parson, Jr. by Warranty Deed, dated April 15, 1960, and recorded in Deed Book 59 at page 579, in Clerk's Office of Circuit Court of Sussex County, Virginia. To Wit: All that certain tract or parcel of land lying and being situate in the County of Sussex and State of Virginia containing sixteen and five tenths acres (16.5) more or less and herein after described as follows: Beginning at an iron stob on the Cabin Point Road, running thence along the said Road South 79° 15' East 983 feet, thence North 12° 00' East 343 feet along the said Road, thence North 7°00' West 1013 feet to a pine tree, thence South 41°45' West 1537 feet to the point of beginning.

Subject property is referred to in the Sussex County tax records as Tax Parcel Number 101-13.

SPL Key Pol
VA 8/89

**EXHIBIT B**
**TO**
**MINING LEASE**
**BY AND BETWEEN**
G. L. Parson, Jr. and Mary Elizabeth Parson,
husband and wife
("Lessor")

**AND**

**RGC (USA) MINERALS INC.**
**(RGC)**

**RGC's Royalty Policy for Virginia Operations**
**COPYRIGHT © RGC (USA) MINERALS INC. 1989**

This document sets forth RGC's Royalty Policy for Virginia Operations ("Royalty Policy"), which is referred to in Section 7 (Royalty Payments) of the above-referenced Deed of Mining Lease ("Lease") and which is attached to and incorporated into the Lease by reference.

**1.  _Definitions._**  The terms defined in the body of the Lease or anywhere in this Royalty Policy will have the same meanings throughout this Royalty Policy. The following terms will have the following meanings:

(a)    "Principal Minerals" means Ilmenite, Rutile and Zircon.

(b)    "Minor Minerals" means Minerals other than Principal Minerals.

(c)    "Mineralized Property" means that portion of the Property which RGC estimates, using the then most current drilling data and survey information, contains Mineral-bearing sand which have a minimum dredgeable depth of 50 feet and which have a cut-off grade of two percent (2%) by weight average Minerals content. Although such payments under Section 6 (Initial and Advance Royalty Payments) of the Lease are based on the Mineralized Property as of the Lease Date, and subsequent changes in the acreage of the Mineralized Property will not affect the lump sum payments.

(d)    "Sales Value per ton of each Mineral" means the dollar value per short ton derived by dividing (i) the actual dollar sales of each Mineral following processing by the 'dry plant' (net of returns, sales taxes, sales discounts and commissions but not set up and paid discounts) for the calendar quarter ("Quarter") which is the subject of the Royalty Payment calculation, by (ii) the total sales tonnage for each Mineral in that Quarter, subject to the exclusion of sales to affiliates contained in Clause 9 (Sales to Affiliates) below.

(e)    "Lessor's Stock Account" means the account maintained by RGC in Lessor's name for the purpose of tracking and reporting production, inventory and sales allocations made with respect to saleable Minerals attributed to the Property and for the purpose of calculating and accounting to Lessor, through the Stock Report described in Clause 3 below, for any Royalty Payments.

(f)    "All Stock Accounts" means the Lessor's Stock Account and all other stock accounts maintained by RGC for other properties on which RGC engages in Mining (as defined in Clause 6(b)) below.

(g)    "Recovery Rate" for any treatment of material is the weight of material that is present after that treatment divided by the weight of material before treatment, expressed as a percentage.

**2.  _Calculating Royalties._**  This Royalty Policy sets forth the methodology to be used in determining and reporting the Royalty Payments payable to Lessor under the Lease. By signing the Lease Lessor agrees to that methodology including, but not limited to (i) RGC's method of attributing Minerals to the Property, as set forth in Clause 6 below, and (ii) RGC's method of calculating Royalty Payments as set forth in Clause 7 (Royalty Payment Calculations) below.

**3.  _Stock Account and Stock Report._**  From the commencement of Mining (as defined in Clause 6(b)(i)) on the Property until such time as RGC's obligation to pay Lessor Royalty Payments has been fulfilled, RGC will establish and maintain Lessor's Stock Account and will send to Lessor, within 30 days after the end of each Quarter, a written report (Stock Report) on the status of Lessor's Stock Account. The Stock Report will show:

(a)    The tons of saleable minerals attributed to the Property for the Quarter (see Clause 6 below);

(b)    Sales from the accumulated tons of saleable Minerals referred to in Clause 3(a) above;

(c)    Any Advance Royalty Payments paid during the Quarter in accordance with Section 6 of the Lease;

(d)    Any Royalty Payment payable for the Quarter pursuant to Section 7 (Royalty Payments) of the Lease;

(e)    A reconciliation of Advance Royalty Payments and Royalty Payments to Lessor pursuant to Section 6 (Initial Payment and Advance Royalty Payments) and Section 7 (Royalty Payments) of the Lease.

The Stock Report will be certified as accurate by RGC's Operations manager or a senior financial employee. By signing the Lease, Lessor agrees to preserve the confidentiality of the sales and production information in all Stock Reports.

**4.  _Royalty Rate._**  RGC will pay Lessor a Royalty Payment equal to ▅▅▅▅▅▅ of the Sales Value per ton of each Mineral sold that is attributed to the Property, as reported in the Stock Report, ▅▅▅▅▅ to Lessor quarterly in the Stock Report.

**5.  _Royalty Payment._**  Any Royalty Payments due for Principal Minerals attributed to the Property will be paid within 30 days after the end of the Quarter in which such Principal Minerals were sold (e.g. invoiced to the purchaser); and, for Minor Minerals attributed to the Property within 30 days of the end of the Fiscal Year (July 1 - June 30) in which they were sold.

**6.  _Saleable Minerals Attributed to the Property._**  Saleable Minerals are attributed to the Property and to Lessor's Stock Account as set forth below:

(a)    RGC will survey, drill, and analyze drill samples from those portions of the Property which it plans to mine, in order to estimate the tons of Principal Minerals located therein.

(b)    Production of saleable Minerals is achieved by the following three steps in RGC's Operations:

(i)    "Mining" - extracting and delivery of minerals and ore to the concentrator;

(ii)   "Concentrating" - removal of non-commercial material;

(iii)  "Processing" - removal of further non-commercial sand and separation into saleable Minerals.

Each of these steps results in recovery and loss of saleable Minerals depending on the efficiency of each step and the nature of the material being treated. The Recovery Rate for each step varies to a small degree on a daily basis and is determined by regular sampling and analysis of the material as it passes through each step;

063

(c)    The Recovery Rates for a given Quarter and the estimate and survey information compiled pursuant to Clause 6(a) above are used to estimate the tons of saleable Principal Minerals recovered from the Property in that Quarter. Those tons of Principal Minerals are then entered in Lessor's Stock Account.

(d)    Within 30 days of the end of each Fiscal Year, RGC will apportion its actual production of saleable Minor Minerals for the remaining "All Stock" Accounts. (The apportionment will be made in proportion to the attribution of Principal Minerals among All Stock Accounts for the year.)

## 7.    Royalty Payment Calculations.

(a)    Principal Minerals Sold.

(i)    Within 30 days of the end of each Quarter, RGC will deduct the total tons of each Principal Mineral sold during that Quarter from All Stock Accounts.

(ii)    The tons of Principal Mineral sold will be deducted from All Stock Accounts on a "First-In/First-Out" (FIFO) basis. Where production of saleable Minerals is attributed to several Stock accounts on the same date, sales attributable to such production will be deducted from the affected stock accounts in proportion to the tonnage allocated on that date to such stock accounts.

(iii)    The sales thus attributed to the Property will be entered in Lessor's Stock Account and reflected in the Stock Report.

(iv)    RGC will calculate the Sales Value per ton for each Principal Mineral for the Quarter.

(v)    The Royalty Payment payable to Lessor for the Quarter will equal ███████████ of the Sales Value per ton for each Principal Mineral for the Quarter multiplied by the ███████████ Mineral sold which are attributed to the Property for the Quarter as reflected in the Stock Account.

(b)    Minor Minerals Sold.

Within 30 days after the end of each Fiscal Year, a calculation similar to that described in Clause 7(a)(v) above, will be made for Minor Minerals, and the result will be reflected in the Stock Report for the last Quarter of the Fiscal Year.

(c)    Adjustments.

At the end of each Fiscal Year, RGC will compare its actual annual Mineral production to the total tons of Minerals attributed to All Stock Accounts in that year. If the actual production is less than the attributed production, then the shortfall will be deducted proportionally from "All Stock" Accounts. If the actual production exceeds the attributed production, then this excess will be allocated proportionately among All Stock Accounts.

## 8.    Commingling and Stockpiling.    RGC will commingle Minerals from the Property with Minerals from other properties, may engage in Mining on more than one property in a Quarter, and may in RGC's sole discretion from time to time stockpile Minerals depending on market conditions.

## 9.    Sales to Affiliates.    RGC may in its sole discretion sell part or all of its Minerals to affiliates of RGC. In such event, the Sales Value per ton of each Mineral used in calculating the Royalty Payment will be based only on RGC's sales to non-affiliates. If such non-affiliate sales are less than 30% of RGC's total sales of the Mineral during the Quarter, then the Sales Value used in calculating the Royalty Payment will equal the greater of (i) the Sales Value based only on RGC's sales to non-affiliates or (b) the indexed price. For Mineral, determined by multiplying (i) the Sales Value per ton of that Mineral last used in calculating a Royalty Payment times (ii) the percentage change in the Producer Price Index – Titanium Pigments Index of the Bureau of Labor Statistics, U.S. Department of Labor (Code No. 0320209, 1982=100). Such percentage change will be based on the change in the Index from the last month of the Quarter in which the Sales Value referred to in Clause (i) was used to the last month of the Quarter for which the Royalty Payment is being calculated.

## 10.    Most-Favored Lessor.    If RGC agrees, after signing this Lease, to pay, a higher Initial Payment per acre, higher aggregate Advance Royalty Payments per acre (excluding any most higher payments that result from either (i) an increase in a the then-current saleable mineral's total base rate payments to seven percent (7%) of RGC's then-current estimate of the lessor's total Advance Royalty Payments and Royalty Payments or (ii) variations in Advance Royalty Payments that are based upon or limited by Clause 12 hereof), or higher royalty rates as to any other Leased property in the Area, RGC will within 30 days of the more-favorable lease pay Lessor, any amount necessary to adjust retroactively any payments previously received by Lessor to the more favorable levels, and the more favorable levels that are prospective in nature will thereafter apply to this Lease. This Clause does not require that retroactive adjustments include the time value of money. This Clause applies only to leases and not to purchases, options to purchase, purchase-leaseback arrangements or other arrangements.

## 11.    Completion of Mining.

(a)    RGC will send Lessor written notice when it has completed Mining on the Property.

(b)    The next Stock Report after such notice will contain a reconciliation comparing (i) the total of all Royalty Payments and Advance Royalty Payments, paid to date, with (ii) the product obtained by multiplying the total number of acres of the Property from which RGC removed that topsoil in preparation for Mining times $3,500 per acre (average Minimum Royalty provision in Section 6 (Minimum Royalty)) of the Lease.

(c)    If that Stock Report reflects that all tons of Minerals attributed to the Property have already been sold, that Stock Report will be Lessor's final Stock Report and that reconciliation and Lessor will be paid (i) any Royalty Payments payable for that Quarter and (ii) the final payment, if any required by the $3,500 per acre average Minimum Royalty provision (the "Final Payment"). The Final Payment will equal the amount, if any, by which that product described in Clause 11(b)(ii) exceeds the total described in Clause 11(b)(i).

(d)    If that Stock Report reflects that any tons of Minerals attributed to the Property have not yet been sold, Lessor will be paid any Royalty Payments payable for that Quarter, and Lessor may elect, by sending written notice to RGC within 30 days to either, (i) forfeit all rights to future Royalty Payments with regard to all unsold tons, and receive the Final Payment (if any determined in accordance with Clause 11(c) above) or (ii) continue Lessor's Stock Account in existence, and defer the reconciliation and Final Payment. If any, until all such unsold tons are sold and the final total of all Royalty Payments and Advance Royalty Payments can be used in determining any Final Payment due.

## 12.    Advance Royalty Payment: 70% of Estimated Future Royalty Payments.    At least one year before RGC commences Mining on the Property, RGC will estimate, using the then-most-current drilling data and survey information, the tons of Minerals located therein. Using the higher of that estimated tonnage or ___ ███████ tons, and applying reasonably expected Recovery Rates and prices, RGC will in good faith estimate the total sales value of the saleable Minerals recoverable from the Mineralized Property. The Advance Royalty Payment equal to 70% of Estimated Future Royalty Payments, set forth in Section 6 (Initial Payment) ___ ███████ Royalty Payments) of the Lease will be determined by (a) multiplying the estimated total sales value times the ███████ Royalty rate, (b) multiplying the result by seventy percent (70%), and (c) deducting therefrom all Advance ___ previously paid under the Lease.

## 13.    No Reliance on Estimates or Representations.    Because of the inherent uncertainties in making projections and estimates which may affect Lessor's Royalty Payments, Lessor, in deciding whether to enter into this Lease, should not rely upon any representation, written or oral, as to the likelihood or value of Royalty Payments, and Lessor should bear in mind that the $3,500-per-acre average Minimum Royalty provision contained in Section 6 (Minimum Royalty) of the Lease applies only if RGC engages in Mining on the Property, and even that applies only to the total number of acres from which RGC removes the topsoil in preparation for Mining. Lessor acknowledges that Lessor understands the foregoing sentence and Lessor agrees that Lessor has not relied upon any representation, written or oral, as to the likelihood or value of Royalty Payments.

SNTTEMP2                                                                 ...064

# DEED OF MINING LEASE

THIS DEED OF MINING LEASE, including the attached Exhibits which are incorporated herein by this reference ("Lease"), is made and entered into on October 13, 19__ , by and between C. L. Parson, Jr. AKA George Lee Parson, Jr. AKA G. L. Parson and AKA C. L. Parson, Jr., and Mary Elizabeth Parson AKA Mary Butterworth Parson, AKA

work with Lessor to allow Lessor to resume Lessor's normal activities on the Property as soon as reasonably possible and as permitted by governmental reclamation requirements. Lessor will and does indemnify RGC from and against any claims asserted against RGC arising out of the activities of Lessor or Lessor's invitees. Lessor will be solely responsible for, and will bear all risk of loss related to, any government allotment, subsidy, stabilization or conservation programs that may apply to the Property.

**10.** ***Safety***. Except as otherwise provided in this Lease, only RGC employees and visitors authorized in writing by RGC will be permitted on those parts of the Property on which Operations are being conducted. All RGC-authorized visitors and their vehicles will carry RGC identification at all times that they are on the Property.

**11.** ***RGC to Comply With Safety Laws and to Indemnify Lessor***. RGC will conduct its Exploration and Operations in compliance with all applicable safety laws and regulations. RGC will and does indemnify Lessor from and against any claims (environmental or otherwise) asserted against Lessor arising out of RGC's activities. RGC will also indemnify Lessor from, and pay Lessor for, actual damages caused by RGC to crops, pasture, timber, fences, gates, roads and other improvements not described in Section 21 (Compensation for Buildings), located on any portions of the Property that are not mined but are otherwise used by RGC in its activities. RGC will in no event be liable for special or consequential damages, and any payments made pursuant to the preceding sentence will be deemed full and complete compensation for the damages in question.

**12.** ***RGC's Right to Determine Whether, When and Where to Mine***. Nothing in this Lease or in the relationship between Lessor and RGC will constitute or create any express or implied duty on the part of RGC to perform Exploration or Operations, or to mine the Property at any rate, in any manner, or at all. RGC's Exploration and Operations, if any, will occur only to the extent and at the locations and times, and in the methods and manner that RGC, in its sole discretion, may determine; provided, however, that RGC will not conduct Operations within 200 feet of Lessor's principal residence or any principal residence on property adjoining the Property, or in such a way as to deprive any such residence of access to a public road, utilities, and water supply until RGC complies with Section 21(a) (Compensation for Buildings — Principal Residence) (in the case of Lessor's principal residence) or obtains the adjoining property owner's written consent (in the case of an adjoining residence); and provided further that, if RGC engages in Mining in the Area, then RGC will use its best efforts to mine all of the Mineralized Property that can be mined in a commercially reasonable manner.

**13.** ***Compliance With Laws***. RGC's activities on the Property will be conducted in compliance with all applicable Federal, State and local laws and regulations.

**14.** ***Reclamation***. RGC agrees to comply with all State and Federal laws, regulations and permits applicable to the Reclamation of the Property. RGC also agrees to post a bond, to the extent required by Virginia law, to ensure that all the Property which RGC mines will be reclaimed in accordance with law. RGC will and does indemnify Lessor from and against any claims by State or Federal regulatory agencies arising from RGC's failure to reclaim in accordance with applicable laws, excluding claims caused in part or in whole by Lessor's failure to cooperate with RGC in accordance with the terms of this Lease. RGC's Reclamation of any Property mined may include, but not be limited to, refilling the mined path with tailings discharged from the wet mill, dyking and eliminating settling ponds, replacing and grading the topsoil, replanting and otherwise complying with all applicable governmental reclamation requirements ("Reclamation").

**15.** ***Audit***. Lessor will have the right at Lessor's expense to appoint an independent auditor reasonably approved by RGC (which approval is hereby given if Lessor appoints a national firm in the United States of recognized reputation), to audit, not more than once in any year, RGC's records relating to the determination of Royalty Payments for RGC's "Fiscal Year" (currently July 1 - June 30) immediately preceding such audit. Lessor will instruct Lessor's auditor to send a copy of his report to RGC at the same time that he sends his report to Lessor. Also, Lessor will notify RGC in writing of any objections Lessor may have regarding Royalty Payments, within 60 days of Lessor's receipt of Lessor's auditor's report.

**16.** ***Taxes***. Taxes will be apportioned and paid as follows:

(a) RGC will pay the following taxes or portions thereof: any mineral severence taxes related to RGC's Operations; property taxes, pro-rated for the portion of the Property and the time period in which Lessor is prohibited under this Lease from conducting activities; and any increase in property taxes attributable to the Minerals or RGC's Operations.

(b) Lessor will pay all other taxes related to the Property, including but not limited to: any taxes on Released Land (as defined in Section 19 (Termination)); any income, capital levy, estate, gift, succession, inheritance, transfer or franchise taxes; and any taxes attributable to Lessor's activities on the Property.

(c) Lessor will send RGC copies of all assessments, tax bills or other tax notices related to the Property or to RGC's Operations thereon within 14 days of Lessor's receipt of the same or in such shorter time as may be necessary to preserve the rights of RGC and Lessor to protest or appeal the same. Lessor will cooperate with RGC in any such protest or appeal. RGC may, in its discretion, pursue such protest or appeal independently of Lessor. RGC will in any event not be obligated to pay (i) any increase in taxes which RGC is unable to protest or appeal due to Lessor's failure to comply with this Section 16(c) or (ii) any tax bill which RGC does not receive at least 14 days before the bill is due.

(d) RGC may, but is not required to, pay any taxes on the Property for which Lessor is responsible under Section 16(b), and deduct such taxes paid from any payments otherwise due to Lessor under this Lease.

**17.** ***Warranty of Title***. Lessor warrants as follows:

(a) Lessor is the sole legal and equitable owner, in undivided fee simple, of the surface and mineral estates that comprise the Property without limitation whatsoever;

(b) The Property is free and clear of all leases, liens, encumbrances and outstanding adverse claims and interests, not of record;

(c) Lessor has full power and authority to execute this Lease;

(d) RGC shall have the quiet and peaceful possession and enjoyment of the Property, Minerals, and the proceeds therefrom, against all persons or entities who may claim any interest therein;

(e) There has been no violation of any applicable Federal, State, or local law or regulation relating to zoning, land use, environmental protection or otherwise with respect to the Property or activities relating thereto; and

(f) This Lease, and RGC's right, title and interest hereunder, shall at all times be superior to, and have priority over, any right, title or interest in the Property created during the Term of this Lease.

**18.** ***Lesser Interest***. In entering into this Lease, RGC is relying on Lessor's warranties of title contained in Section 17 (Warranty of Title). Without impairment of those warranties of title, if Lessor owns less than the entire and undivided estate in the Property, RGC may (a) proportionately reduce all payments otherwise payable under this Lease, (b) offset any prior payments related to the unowned portion against any future payments payable under this Lease, and (c) exercise any other available rights or remedies.

**19.** ***Termination***. RGC will have the right to terminate this Lease with regard to all or any portion of the Property at any time by sending a written notice to Lessor at least 90 days prior to such termination. The termination will take effect upon the date specified in the notice. Upon termination, all of RGC's rights and obligations under this Lease with regard to the Property or portion thereof specified in the notice (the "Released Land") will terminate except for any Reclamation rights and obligations and any Minimum Royalty or Royalty Payment obligations arising out of mining conducted on the Released Land prior to such termination. In the event of a partial termination, this Lease will continue in effect with respect to all Property except the Released Land, and the term "Property" will thereafter mean and include only the retained Property and not the Released Land. After termination, RGC will execute, deliver and record a release confirming the relinquishment of the Released Land. Nothing in this Section will negate any obligations RGC has under this Lease with respect to Reclamation of the Property. Notwithstanding the foregoing, RGC will not terminate this Lease in whole or in part at any time prior to the sixth anniversary unless RGC also terminates all of its other mining leases in the Area.

**20.** ***Title Documents***. Lessor will promptly provide to RGC copies of all documents which Lessor now or in the future possesses, relating to or affecting title to the Property, including but not limited to: title insurance policies, deeds, mortgages, trust or security deeds, boundary agreements, judgments, liens, orders, surveys, boundary descriptions, maps, wills conveying an interest in the Property, trust instruments, leases, licenses, easements and rights-of-way. Lessor will give RGC notice whenever Lessor learns of any matter which may affect the title to the Property. At RGC's request, Lessor will sign and deliver to RGC such additional formal assurances or other documents, in proper and recordable form, as may reasonably be necessary to carry out the terms and intent of this Lease. Lessor will inform RGC immediately if Lessor fails to pay or discharge in a timely manner any promissory note, mortgage, tax, or other lien upon the Property, and RGC may then pay it and be subrogated to the rights of the holder thereof. Except for any taxes for which RGC is liable under this Lease, RGC will have the right to offset, from any payment otherwise payable to Lessor under this Lease, all amounts paid by RGC to discharge any such promissory note, mortgage, tax or other lien.

**21.** ***Compensation for Buildings***.

(a) Principal Residence. If RGC proposes to remove Lessor's principal residence on the Property, RGC will give Lessor not less than one year's notice of its intention to do so. At least 180 days prior to such removal, RGC will compensate Lessor by making a payment to Lessor equal to two times the then-present fair market value of such residence (excluding land), as determined by the average of two appraisals, one by an appraiser selected by Lessor, and one by an appraiser selected by RGC, from a list of six MAI or FHA-approved appraisers compiled by RGC. Lessor may thereafter occupy the residence until the one year notice period expires, at which time Lessor will vacate the residence to allow its removal. No residence will be constructed on the Property during the Term of this Lease without the prior written consent of both Lessor and RGC.

(b)    **Other Buildings.**  If RGC proposes to remove other buildings on the Property, RGC will give Lessor not less than the months' notice of its intention to do so.  At least 90 days prior to such removal, RGC will compensate Lessor by making a payment to Lessor equal to the approximate replacement cost of buildings of that nature, as determined by the average of two appraisals by appraisers selected in the manner described in Section 21(a).  Lessor will cease using the relevant buildings 30 days prior to the proposed removal and will facilitate removal in all respects.

22.    **Third-Party Claims.**  If RGC learns that a third party may have a claim of ownership in any portion or percentage of the Property or any payments under this Lease, RGC may deposit in a special escrow account (with a bank or title insurance company located in Virginia) any payments otherwise due to Lessor under this Lease and give Lessor written notice of the deposit.  The sums deposited will remain in the special escrow account until the claim or controversy is resolved, or until there has been a final determination of the claim or controversy by a court or arbitrator, including any appeals thereupon.

23.    **Additional and After-Acquired Rights.**  If, during the Term of this Lease, Lessor acquires any right or interest in the Property, or in any property adjacent or easement appurtenant thereto, (a) Lessor will promptly notify RGC, (b) any such right or interest acquired in the Property, which Lessor had in this Lease, already warranted to be part of the Property, will become part of the Property subject to this Lease without any additional payment to Lessor, (c) RGC may, at RGC's option, at any time, lease any other such right or interest (on the same terms as the terms of this Lease, and (d) Lessor will, sign, acknowledge, and deliver an Amendment to this Lease and to the Memorandum of this Lease to RGC, so as to include such right or interest.

24.    **Entireties.**  If the Property is now or later owned in severalty, or in separate tracts, RGC will nevertheless be entitled to treat the Property as an undivided whole under this Lease, with all payments payable under the Lease to be paid (either directly or, pursuant to Section 25 (Multiple Owners)) to the separate owners of the Property in the proportion that their ownership interest, measured in acres, or percentage ownership of acres, bears to the whole Property; provided, however, that in no event will RGC's total payment obligations for the separate owners exceed the payment obligations that RGC would have incurred under the Lease if the Property were owned in undivided fee simple by a single owner.

25.    **Multiple Owners.**  Whenever two or more parties are entitled to receive any payments under this Lease, RGC may withhold any such payments unless and until all of those parties designate in a recordable instrument an agent empowered (a) to receive all such payments and to (execute division, and transfer, checks) on behalf of all those parties (and their respective successors in title.  Delivery of any payment due under this Lease to the designated agent fulfills RGC's obligation to make that payment to those parties.

26.    **Assignment.**  Both parties have the right to assign their rights and obligations under this Lease, in whole or in part; provided, however, that:

(a)    The party making such an assignment must give the other party prior written notice thereof.
(b)    The provisions of this Lease will apply to and be binding upon the successors and assigns of the respective parties.
(c)    Any change or division in the ownership of the Property or of the right to receive any payments under this Lease, however accomplished, will not increase RGC's total payment obligations under this Lease or affect RGC's rights to conduct Exploration, Operations or Reclamation on the Property.
(d)    Notwithstanding Section 26(a), RGC may, without notice or consent, assign any of its rights or obligations to affiliates of RGC, or use the services of independent contractors or agents to perform any of its rights or obligations; and
(e)    No assignment will relieve the assigning party of any of its obligations or liability to the other party, unless the other party provides a written release to the assigning party.

27.    **Force Majeure.**  Neither party will be deemed in default under this Lease during any period in which its exercise or performance of any of its rights or obligations under this Lease is prevented by any cause reasonably beyond its control.  Such an event is referred to in this Lease as "Force Majeure."  Force Majeure will include, but is not limited to, the following: fire, floods, storms, hurricanes, tornados, winds, other damage from the elements, declared or undeclared war, strikes, labor disputes, riots, civil unrest, action of government authorities, condemnation, eminent domain, crime, failure to receive required governmental approvals, inability to obtain water for Operations, a substantial fall in the market prices of Minerals, lack of steam, litigation, acts of God, and acts of the public enemy.  The Term of this Lease will be extended for a period of time equal to the period of Force Majeure.  All such periods will be deemed to begin at the earliest time a party is prevented from exercising or performing any of its rights or obligations by reason of Force Majeure.

28.    **No Broker.**  Lessor and RGC represent and warrant to each other that no broker, agent, or finder has acted on its behalf in connection with this Lease, and that no commissions, fees, or other moneys are due to any broker, agent or finder.  In addition, Lessor and RGC will and do indemnify each other from all claims with respect to any brokerage, finder's or leasing commissions in connection with this Lease or any of the transactions contemplated under this Lease.

29.    **Condemnation.**  Lessor will cooperate with RGC in defending or settling the same, and RGC may, in its discretion, defend its rights independently of Lessor.  Any condemnation award will be shared between Lessor and RGC as provided by law.  Any condemned Property will constitute Released Land as of the date of condemnation, and this Lease will continue in effect as to the remaining Property.

30.    **Dispute Resolution.**  Subject to the provisions of this Section, any controversy, claim, or dispute arising out of or related to this Lease, or to the formation, negotiation, or breach thereof, will be settled by binding arbitration in Richmond, Virginia before a single arbitrator, in accordance with the Commercial Arbitration Rules of the American Arbitration Association.  Any award of damages will be limited to actual, compensatory damages.  Judgment upon the award rendered by the arbitrator may be confirmed by and entered in any court having jurisdiction thereof.  Prior to initiating any arbitration, the initiating party will give the other party written notice of the claim, and will allow the other party 30 days from the date that the notice is received to amicably resolve the claim.  If the claim is not resolved within the 30 day period, the initiating party's sole and exclusive remedy will be to submit the dispute to arbitration.  The parties will comply with any arbitration award within 30 days of its issuance, or as soon as practicable thereafter, and the Lease will continue in full force and effect.  In no event will the existence of any dispute, arbitration, or award impaired or otherwise affect any party's rights or obligations under this Lease, or interfere in any way with RGC's Operations.

31.    **No Interference With RGC's Operations.**  Lessor has not, and will not, during the Term of this Lease, take any action or grant any right which would in any way interfere with RGC's exercise of its rights as set out in Section 4 (Grant of Rights of this Lease).

32.    **No Implied or Continuing Waiver.**  If either party waives or does not enforce any provision of this Lease on any occasion, that action will not constitute a waiver of: (a) that provision as to any other time, event or occurrence or (b) any other provision.

33.    **Notices.**  Any notice given, to the other party under this Lease must be in writing, and sent to that party by registered or certified mail (return receipt requested), or via Federal Express or similar overnight courier service, addressed to the address set forth in the first page of this Lease.  All notices will be deemed to have been made when deposited in the mail or with the courier as provided above.  All notices will be deemed to have been received upon actual receipt by any person at the address listed above (either party may change its address for the mailing of notices by giving the other party notice of such change of address in the manner provided for in this Section.

34.    **Entire Agreement; No Oral Modification.**  This Lease constitutes the entire agreement between the parties and supersedes all previous agreements (written or oral).  Lessor hereby expressly acknowledges that, in entering into this Lease, Lessor has not relied on any (oral or written) statements made by RGC, its employees, agents or independent contractors.  This Lease may only be modified by a written agreement in recordable form signed by Lessor and an authorized officer of RGC.

35.    **Choice of Law.**  This Lease will be construed, interpreted and governed by the laws of Virginia.

36.    **Successors and Assigns.**  This Lease constitutes a covenant running with the land and will be binding on, and inure to the benefit of, Lessor, RGC, and Lessor's and RGC's heirs, legal representatives, executors, administrators, successors and assigns, as the case may be.

37.    **Severability.**  In the event that any court or duly appointed arbitrator determines that any provision of this Lease is unenforceable, illegal, or in conflict with any Federal, state, or local law, the parties will petition the court to have this Lease performed by the court or arbitrator to reform, that provision in such a way as to carry out the intent of the parties to the extent permissible under law.  If the court or arbitrator declines to reform that provision, then that provision will be considered severable from the rest of the Lease, the remaining provisions of the Lease will not be affected, and the Lease will be construed and enforced as if the Lease did not contain the unenforceable or illegal provision.

38.    **Modification in Case Any Violation of the Rule Against Perpetuities.**  Lessor and RGC do not intend that any provision in this Lease will in any way violate the Rule Against Perpetuities or any related rule.  If any such violation should occur, it is the intent of Lessor and RGC that the appropriate court or arbitrator will reform the provision in such a way as to approximate most closely the intent of the parties within the limits permissible under such rule or related rule, and will reform the Lease as so reformed.

**39.** **Memorandum.** At the time this Lease is signed, the parties will sign a Memorandum of Lease which RGC will record. In the event of a conflict between the terms of the Memorandum of Lease and this Lease, the terms of this Lease will control.

**40.** **Mortgagee Consent.** Lessor agrees to use Lessor's best efforts to obtain promptly, and to provide to RGC a copy of any consent to this Lease required by the terms of any mortgage or other instrument creating rights superior to this Lease with respect to all or any part of the Property. Such consent, however, will neither affect nor be a condition precedent to the effectiveness and enforceability of the Lease as between Lessor and RGC.

**41.** **Headings.** The headings contained in this Lease are for the convenience of the parties only, and will not be used in its interpretation.

**42.** **Obligations That Survive This Lease.** In addition to other obligations that survive this Lease as set forth in this Lease, the parties' obligations under the following Sections of this Lease will remain in full force and effect following, and will not be affected by, the termination of, or expiration of the Term of this Lease; Sections 7-9, 11, 14-15, 17, 19, 22, 23, 26, 30, 32-38, and 40-43.

**43.** **Good Faith.** During the Term of this Lease, each party will act in good faith to fulfill the intent of this Lease, and will meet with the other party to discuss and to try to resolve amicably any issues that may arise.

IN WITNESS WHEREOF, the parties have executed this Lease under seal as of the date first above written.

OWNER:

_(signature)_ (SEAL)

G. L. Parson, Jr.
(Print Name)
AKA George Lee Parson, Jr.
AKA G. L. Parson
AKA G. Lee Parson, Jr.

_(signature)_ (SEAL)

Mary Elizabeth Parson
(Print Name)
AKA Mary Butterworth Parson
AKA Mary B. Parson
AKA Mary E. Parson
AKA Mrs. G. L. Parson, Jr.

STATE OF VIRGINIA

CITY/COUNTY OF _Sussex_

The foregoing instrument was acknowledged before me
this _13th_ day of _October_, 1999,
by G. L. Parson, Jr., and Mary
Elizabeth Parson, husband and
wife.

My Commission Expires: _Oct. 19, 1991._

_(signature)_
Notary Public

[NOTARIAL SEAL]

RGC (USA) MINERALS INC.:

By: _Daniel P. Wolcott_

Its: _Vice_ President

[CORPORATE SEAL]

Attest: _(signature)_

Its: _____ Secretary

STATE OF _FLORIDA_
COUNTY OF _CLAY_

The foregoing instrument was acknowledged before me
this _13_ day of _February_, 1999, 1990
by _Daniel P. Wolcott_,
as _Vice_ President of RGC (USA) MINERALS
INC., a Delaware corporation, on behalf of the
corporation.

_(signature)_
Notary Public

My Commission _____

Notary Public, State of Florida
My Commission Expires May 21, 1993
Bonded Thru Troy Fain Insurance Inc.

[NOTARIAL SEAL]

41BT&MF2

068

EXHIBIT A
TO
MINING LEASE
BY AND BETWEEN


G. L. PARSON, JR., AKA GEORGE LEE PARSON, JR.,
AKA G. L. PARSON, and AKA G. LEE PARSON, JR., and

MARY ELIZABETH PARSON, AKA MARY BUTTERWORTH PARSON,
AKA MARY B. PARSON, AKA MARY E. PARSON, and
AKA MRS. G. L. PARSON, JR., husband and wife
(LESSOR)


AND


RGC (USA) MINERALS INC.
(RGC)

## EXHIBIT A

Under the terms of the above-referenced Mining Lease, to which this Exhibit is attached, Lessor has leased to MQC, and granted to MQC various rights regarding, certain real property (including all mineral rights and minerals) referred to as the "Property", which is situated in the _____ Stony Creek _____ Magisterial District, _____ Sussex _____ County, State of Virginia, which is hereby represented and warranted by Lessor to amount to 200.00 acres, and which is described as follows:

That same tract or parcel of land conveyed to G.L. Parson, Jr. by Warranty Deed, dated April 11, 1960, and recorded in Deed Book 59 at page 559 in Clerk's Office of Circuit Court of Sussex County, Virginia. To Wit: all that certain tract, piece or parcel of land lying and being situate in Stony Creek Magisterial District, Sussex County, Virginia, containing, by estimation, two hundred (200) acres, and bounded as follows: On the North by G. Lee Parson; on the East by W. S. Barnes; on the South by the public road leading from Stewart's to Concord Church; on the West by R. C. Chappell and said public road leading from Stewart's to Concord Church and Wesley Barnes, reserving a certain road or passage-way which leads from the house now owned by W. S. Barnes through said tract of land to the public road at the forks of the road, on of which leads to Purdy, as and for an outlet of the occupants of the said house, now occupied by W. S. Barnes, with the right or privilege of the purchaser of straightening said road, if he shall so desire," and being in all respects the identical real estate that was conveyed to G. Lee Parson, Sr., in the name of G. Lee Parson, by deed from John B. Cole, Special Commissioner, dated June 1, 1927, and duly recorded in the Clerk's Office of the aforesaid county in Deed Book 31 at page 244.

Subject property is referred to in the Sussex County tax records as Tax Parcel Number 101-31.

SPL Roy Pol
VA 8/89

**EXHIBIT B**
**TO**
**MINING LEASE**
**BY AND BETWEEN**
G. L. Parson, Jr. and Mary Elizabeth Parson,
husband and wife
(Lessor)
**AND**
**RGC (USA) MINERALS INC.**
(RGC)

**RGC's Royalty Policy for Virginia Operations**

**COPYRIGHT © RGC (USA) MINERALS INC. 1989**

This document sets forth "RGC's Royalty Policy for Virginia Operations ("Royalty Policy"), which is referred to in Section 7 (Royalty Payments) of the above-referenced Deed of Mining Lease ("Lease") and which is attached to and incorporated into the Lease by reference.

**1.    Definitions.**   The terms defined in the body of the Lease or elsewhere in this Royalty Policy will have the same meanings throughout this Royalty Policy. The following terms will have the following meanings:

(a)    "Principal Minerals" means Ilmenite, Rutile and Zircon.

(b)    "Minor Minerals" means Minerals other than Principal Minerals.

(c)    "Mineralized Property" means that portion of the Property which RGC estimates, using the then-most current drilling data and survey information, contains Minerals bearing sands which have a minimum dredgeable depth of 15 feet and which have a cut-off grade of two percent (2%) by weight average Minerals' content. [All lump sum payments under Section 6 (Initial Payment and Advance Royalty Payment) of the Lease are based on the Mineralized Property as of the Lease Date, and subsequent changes in the acreage of the Mineralized Property will not affect the lump sum payment.]

(d)    "Sales Value portion of each Mineral" means the dollar value per short ton derived by dividing (I) the actual dollar sales of such Mineral following processing by the dry plant (net of returns, sales taxes, sales discounts and commissions but not net of settlement discounts) for the calendar quarter ("Quarter") which is the subject of the Royalty Payment calculation, by (II) the total sales tonnage for such Mineral in that Quarter, subject to the deduction of sales to Affiliates contained in Clause 9 (Sales to Affiliates) below.

(e)    "Lessor's Stock Account" means the account maintained by RGC in Lessor's name for the purpose of tracking and reporting production, inventory, and sales allocations made with respect to saleable Minerals attributed to the Property and for the purpose of calculating and accounting to Lessor, through the Stock Report described in Clause 3 below, for any Royalty Payments.

(f)    "All Stock Accounts" means the Lessor's Stock Account and all other stock accounts maintained by RGC for other properties on which RGC engages in Mining (as defined in Clause 6(b)(i) below).

(g)    "Recovery Rate" for any treatment of material is the weight of material that is present after that treatment divided by the weight of material before treatment, expressed as a percentage.

**2.    Calculating Royalties.**   This Royalty Policy sets forth the methodology to be used in determining and reporting the Royalty Payments payable to Lessor under the Lease. By signing the Lease Lessor agrees to that methodology, including but not limited to (I) RGC's method of attributing Minerals to the Property as set forth in Clause 6 below, and (II) RGC's method of calculating Royalty Payments as set forth in Clause 7 (Royalty Payment Calculations) below.

**3.    Stock Account and Stock Report.**   From the commencement of Mining (as defined in Clause 6(b)(i)) on the Property until such time as RGC's obligation to pay Lessor Royalty Payments has been (i)filled, RGC will establish and maintain Lessor's Stock Account and will send to Lessor within 30 days after the end of each Quarter a written report ("Stock Report") on the status of Lessor's Stock Account. The Stock Report will show:

(a)    The tons of saleable Minerals attributed to the Property for the Quarter (see Clause 6 below)

(b)    Sales from the accumulated tons of saleable Minerals referred to in Clause 3(a) above;

(c)    Any Advance Royalty Payments paid during the Quarter in accordance with Section 6 of the Lease;

(d)    Any Royalty Payment payable for the Quarter pursuant to Section 7 (Royalty Payments) of the Lease;

(e)    A reconciliation of Advance Royalty Payments and Royalty Payments to Lessor pursuant to Section 6 (Initial Payment and Advance Royalty Payment) and Section 7 (Royalty Payments) of the Lease.

The Stock Report will be certified as accurate by RGC's Operations manager or a senior financial employee. By signing this Lease, Lessor agrees to preserve the confidentiality of the sales and production information in all Stock Reports.

**4.    Royalty Rate.**   RGC will pay Lessor a Royalty Payment equal to ▮▮▮▮▮▮▮▮ of the Sales Value per ton of each Mineral sold that is attributed to the Property, as reflected in the Stock Account and as reported to Lessor quarterly in the Stock Report.

**5.    Royalty Payment.**   Any Royalty Payments due for Principal Minerals attributed to the Property will be paid within 30 days after the end of the Quarter in which Principal Minerals were sold (i.e. invoiced to the purchaser). And, for Minor Minerals attributed to the Property within 30 days of the end of the "Fiscal Year" (July 1–June 30) in which they were sold.

**6.    Saleable Minerals Attributed to the Property.**   Saleable Minerals are attributed to the Property and to Lessor's Stock Account as set forth below:

(a)    RGC will survey, drill, and analyze drill samples from those portions of the Property which it plans to mine, in order to estimate the tons of Principal Minerals located therein.

(b)    Production of saleable Minerals is achieved by the following three steps in RGC's Operations:

(i)    "Mining" - extracting and delivery of mineral sand ore to the concentrator

(ii)    "Concentrating" - removal of non-commercial material;

(iii)    "Processing" - removal of further non-commercial sand and separation into saleable Minerals.

Each of these steps results in recovery and loss of saleable Minerals depending on the efficiency of each step and the nature of the material being treated. The Recovery Rate for each step varies to a small degree on a daily basis and is determined by regular sampling and analysis of the material as it passes through each step.

-071-

(c)  The Recovery Rates for a given Quarter and the estimates and survey information compiled pursuant to Clause 6(a) above are used to estimate the tons of saleable Principal Minerals recovered from the Property in that Quarter. Those tons of Principal Minerals are then entered in Lessor's Stock Account.

(d)  Within 30 days of the end of each Fiscal Year, RGC will apportion its actual production of saleable Minor Minerals for the year among All Stock Accounts. The apportionment will be made in proportion to the attribution of Principal Minerals among All Stock Accounts for the year.

## 7.  Royalty Payment Calculations.

(a)  Principal Minerals Sold:

(i)  Within 30 days of the end of each Quarter, RGC will deduct the total tons of each Principal Mineral sold during that Quarter from All Stock Accounts.

(ii)  The tons of Principal Minerals sold will be deducted from All Stock Accounts on a "First-In/First-Out" (FIFO) basis. Where production of saleable Minerals is attributed to several stock accounts on the same date, sales attributable to such production will be deducted from the affected stock accounts in proportion to the tonnage allocated on that date to such stock accounts.

(iii)  The sales thus attributed to the Property will be entered in Lessor's Stock Account and reflected in the Stock Report.

(iv)  RGC will calculate the Sales Value per ton for each Principal Mineral for the Quarter.

(v)  The Royalty Payment payable to Lessor for the Quarter will equal _____ of the Sales Value per ton for each Principal Mineral for the Quarter multiplied by the tons of each Principal Mineral sold which are attributed to the Property for the Quarter as reflected in the Stock Account.

(b)  Minor Minerals Sold:

Within 30 days after the end of each Fiscal Year, a calculation similar to that described in Clause 7(a)(v) above, will be made for Minor Minerals, and the result will be reflected in the Stock Report for the last Quarter of the Fiscal Year.

(c)  Adjustments:

At the end of each Fiscal Year, RGC will compare its actual annual Mineral production to the total tons of Minerals attributed to All Stock Accounts in that year. If the actual production is less than the attributed production, then the shortfall will be deducted proportionately from All Stock Accounts. If the actual production exceeds the attributed production, then the excess will be allocated proportionately among All Stock Accounts.

## 8.  Commingling and Stockpiling.  RGC will commingle Minerals from the Property with Minerals from other properties; may engage in Mining on more than one property in a Quarter; and may in RGC's sole discretion from time to time stockpile Minerals depending on market conditions.

## 9.  Sales to Affiliates.  RGC may in its sole discretion sell part or all of its Minerals to affiliates of RGC. In such event, the Sales Value per ton of each Mineral used in calculating the Royalty Payment will be based only on RGC's sales to non-affiliates. If such non-affiliate sales are less than 30% of RGC's total sales of the Mineral during the Quarter, then the Sales Value used in calculating the Royalty Payment will equal the greater of (a) the Sales Value based only on RGC's sales to non-affiliates or (b) the indexed price for the Mineral, determined by multiplying (i) the Sales Value per ton of the Mineral last used in calculating a Royalty Payment times (ii) the percentage change in the Producer Price Index—Titanium Pigments Index of the Bureau of Labor Statistics, U.S. Department of Labor (Code No. 06220200, 19820100). Such percentage change will be based on the change in the index from the last month of the Quarter in which the Sales Value referred to in Clause (i) was used to the last month of the Quarter for which the Royalty Payment is being calculated.

## 10.  Most Favored Lessor.  If RGC agrees, after signing this Lease, to pay a higher Initial Payment per acre, higher aggregate Advance Royalty Payments per acre (excluding any such higher payments that result from either (i) an increase in a lease date payment which takes a lessor's total lease date payments to seven percent (7%) of RGC's then current estimate of the lessor's total Advance Royalty Payments and Royalty Payments or (ii) variations in Advance Royalty Payments that are based upon or limited by Clause 12 hereof), or higher royalty rates as to any other leased property in the Area, RGC will within 30 days of the more favorable lease, pay Lessor any amount necessary to adjust retroactively payments previously received by Lessor to the more favorable levels, and/or more favorable levels thereafter (prospective in nature) will thereafter apply to this Lease. This Clause does not require that retroactive adjustments include the time value of money. This Clause applies only to leases and not to purchases, options to purchase, purchase-leaseback arrangements or other arrangements.

## 11.  Completion of Mining.

(a)  RGC will send Lessor written notice when it has completed Mining on the Property.

(b)  The same Stock Report after such notice will contain a reconciliation comparing (i) the total of all Royalty Payments and Advance Royalty Payments paid to date, with (ii) the product obtained by multiplying the total number of acres of the Property from which RGC removed the topsoil in preparation for Mining, times $3,500 per acre average Minimum Royalty provision in Section 8 (Minimum Royalty) of the Lease.

(c)  If that Stock Report reflects that all tons of Minerals attributed to the Property have already been sold, that Stock Report will be Lessor's last Stock Report and final reconciliation, and Lessor will be paid (i) any Royalty Payment payable for that Quarter, and (ii) the final payment, if any, required by the $3,500-per-acre average Minimum Royalty provision (the "Final Payment"). The Final Payment will equal the amount (if any) by which the product described in Clause 11(b)(ii) exceeds the total described in Clause 11(b)(i).

(d)  If that Stock Report reflects that any tons of Minerals attributed to the Property have not yet been sold, Lessor will be paid any Royalty Payments payable for that Quarter, and Lessor may elect, by sending written notice to RGC within 30 days, to either: (i) forfeit all rights to future Royalty Payments with regard to all unsold tons and receive the Final Payment, if any, determined in accordance with Clause 11(c) above; or, (ii) continue Lessor's Stock Account in existence, and defer the final reconciliation and Final Payment, if any, until all such unsold tons are sold and the final total of all Royalty Payments and Advance Royalty Payments can be used in determining any Final Payment due.

## 12.  Advance Royalty Payments: 70% of Estimated Future Royalty Payments.  At least one year before RGC commences Mining on the Property, RGC will estimate, using the then most current drilling data and survey information, the tons of Minerals located therein. Using that higher of this estimated tonnage or $50,193.___ tons and applying reasonably expected Recovery Rates and prices, RGC will in good faith estimate the total sales value of the saleable Minerals recoverable from the Mineralized Property. The Advance Royalty Payment equal to 70% of Estimated Future Royalty Payments set forth in Section 6 (Initial Payment and Advance Royalty Payments) of the Lease will be determined by (a) multiplying the estimated total sales value times (i) _____ (b) multiplying the result by seventy percent (70%), and (c) deducting therefrom all Advance Royalty Payments previously made under the Lease.

## 13.  No Reliance on Estimates or Representations.  Because of the inherent uncertainties in making projections and estimates which may affect Lessor's Royalty Payments, Lessor in deciding whether to enter into this Lease, should not rely upon any representation, written or oral, as to the likelihood or value of Royalty Payments; and Lessor should bear in mind that the $3,500-per-acre average Minimum Royalty provision contained in Section 8 (Minimum Royalty) of the Lease applies only if RGC engages in Mining on the Property, and even then applies only to the total number of acres from which RGC removes the topsoil in preparation for Mining. Lessor acknowledges that Lessor understands this foregoing sentence and Lessor agrees that Lessor has not relied upon any representation, written or oral, as to the likelihood or value of Royalty Payments.


COPY

STD Lease
VA 8/89.

# DEED OF MINING LEASE

THIS DEED OF MINING LEASE, including the attached Exhibits which are incorporated herein by this reference, ("Lease") is made and entered into on _____ October 13, _____ 1989, by and between G. L. Parson, Jr., AKA George Lee Parson, Jr., AKA G. L. Parson, and AKA G. Lee Parson, Jr., and Mary Elizabeth Parson, AKA Mary Butterworth Parson, AKA Mary B. Parson, AKA Mary E. Parson, and AKA Mrs. G. L. Parson, Jr., husband and wife, Route 1, Box 60, Stony Creek, Virginia 23882

("Lessor") and RGC (USA) MINERALS, INC., a Delaware corporation whose address is Warner Road, P.O. Box 1307, Green Cove Springs, Florida, 32043 ("RGC"). In consideration of the mutual promises made in this Lease, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Lessor and RGC agree as follows:

1. **Defined Terms:** Any word or phrase that is capitalized and placed in quotations in this Lease is a defined term and when it is capitalized will have the same meaning throughout this Lease.

2. **Purpose:** The purposes of this Lease is to allow RGC to explore for, and, at RGC's sole discretion, to mine, remove, commingle, and sell Minerals from the Property; to use the Property to mine Minerals from the Property or other property; and to conduct related activities. "Minerals" means the following group of minerals and mineral products: Ilmenite, Leucoxene, Rutile, Zircon, Staurolite, Kyanite/Sillimanite, Monazite, Xenotime, and Garnet, and associated by-products. Title to any Minerals mined shall, if not already vested in RGC, pass to RGC as they are severed from the Property.

3. **Grant of Lease.** Lessor hereby leases to RGC the Property (as defined on Exhibit A) on the terms and conditions in this Lease.

4. **Grant of Rights.** Lessor grants to RGC the following exclusive rights with regard to the Property:
   (a) To enter the Property to survey, explore, drill, test, and sample (the foregoing activities are defined as "Exploration").
   (b) To clear the Property of such buildings (subject to Section 21 (Compensation for Buildings)), other structures, obstacles, earth, standing timber, plants, and such other trees or material that RGC, in its absolute discretion, wishes to clear from the Property; to exercise its rights as set out in this Section 4; to construct, relocate, use, or remove roads, power and communication lines, dredge ponds, tailing ponds, settling ponds, pipelines, buildings, storage facilities, canals, tailings, signs, gates, fences, and other structures; and facilities on the Property; to take steps to prepare for mining on the Property; and to develop, mine, cross-mine, dredge, remove, concentrate, separate, commingle, stockpile, haul, process, ship, and sell Minerals (the foregoing activities, whether conducted on the Property or on other property in Dinwiddie and Sussex Counties, Virginia ("Area"), are defined as "Operations").
   (c) To use the Property to store, transport, or dispose of Minerals, waste, tailings, and material resulting from RGC's Operations.
   (d) To use water from or appurtenant to the Property and to drain through and from the Property and to draw water any course in the Property any water from RGC's Operations.
   (e) To take all steps to accomplish Reclamation (as defined in Section 14) of the Property.
   (f) To use all easements, means of access, and rights-of-way from and to the Property, and
   (g) To use the Property for the purposes described in this Section, in conjunction with RGC's Exploration, Operations and Reclamation on other property.

Notwithstanding the foregoing, RGC is not granted the right, under this Lease to construct or operate on the Property a processing plant for the final separation of the concentrate into saleable Minerals.

5. **Term of Lease.** This Lease will begin on the date first written above and will end 20 years thereafter, unless (a) the Lease is earlier terminated under Section 19 (Termination), (b) the Lease is automatically terminated by RGC's failure, for reasons other than a temporary inability, to obtain through diligent efforts all necessary governmental permits and authorizations, (to commence "Mining" (as defined in the Royalty Policy) in the Area) by the eighth anniversary of the Lease, or (c) the Lease is automatically extended to allow RGC to complete ongoing operations on the Property. If so extended, the Lease shall terminate upon the earlier of written notice from RGC pursuant to Section 19 (Termination), or the passage of a period of 180 consecutive days, in which RGC conducts no Operations on the Property. ("Area" means the period of time during which this Lease is in effect and, in the absence of earlier termination, includes both the initial 20-year term and any extended term.)

6. **Initial Payment and Advance Royalty Payments.** Subject to the terms and conditions of this Lease, RGC will pay to Lessor, during the Term of this Lease, on or before the dates indicated the following lump sum payments and payments per acre of the Property retained under the Lease at the time of the payment:

| Payment Date | Payment Type | Payment |
|---|---|---|
| Lease Date | Initial Payment | $250 per acre |
| Lease Date | Advance Royalty | $750 per acre |
| On or before December 31 of each year following the year this Lease is signed | Rental Payment | $15 per acre |
| Earlier of (a) Mining (as defined in Royalty Policy) in Area or (b) Fifth Anniversary | Advance Royalty | $65,000.00 lump sum, equal to $1000 per acre of "Mineralized Property" (as defined in Royalty Policy) |
| Tenth Anniversary if no Notice of Mining (as defined in Section 9) given | Advance Royalty | $65,000.00 lump sum, equal to $1000 per acre of "Mineralized Property" subject to 70% Limitation) (as defined in Royalty Policy) |
| Fifteenth Anniversary if no Notice of Mining given | Advance Royalty | $65,000.00 lump sum, subject to 70% Limitation |
| Notice of Mining | Advance Royalty | 70% of Estimated Future Royalty Payments (as defined in Royalty Policy) |

The Initial Payment and all Rental and Advance Royalty Payments paid to Lessor are non-refundable. The Advance Royalty Payments (paid to Lessor) will be credited against any Royalty Payments otherwise payable pursuant to Section 7 (Royalty Payments) and may be prepaid by RGC. Payment to Lessor of the payment required upon Notice of Mining will satisfy in full any obligation RGC may thereafter have to pay the Tenth and Fifteenth Anniversary Advance Royalty Payments.

7. **Royalty Payments.** RGC will pay to Lessor, quarterly, Royalty Payments equal to _____ of the Sales Value of Minerals attributed to the Property, which RGC mines and sells. The Royalty Payments will be paid in accordance with Exhibit B, RGC's Royalty Policy for Virginia Operations ("Royalty Policy").

8. **Minimum Royalty.** If the total, of all Advance Royalty Payments and Royalty Payments paid to Lessor, under this Lease does not average $3,500 per acre for all of the Property from which RGC removes the topsoil in preparation for Mining ("Minimum Royalty"), RGC will pay to Lessor the amount by which the Minimum Royalty exceeds such total. Any such payment will be determined and paid in accordance with Clause 11 of the Royalty Policy.

9. **Notice of Use of the Property.** During Exploration, Lessor and RGC will work together to accommodate Lessor's current activities on the Property. RGC will give Lessor at least twelve months' notice ("Notice of Mining") if RGC's Mining will require Lessor to cease activities on the portion of the Property described in the Notice of Mining. Until the end of the notice period, Lessor will have the right, but not the obligation, to remove for Lessor's account any crops, timber, buildings, irrigation systems, fixtures, or personalty of Lessor from that portion of the Property. From the end of the notice period until RGC notifies Lessor otherwise, Lessor will cause all activities to cease on that portion of the Property. During Reclamation, RGC will

197.0    073

work with Lessor to allow Lessor to resume Lessor's normal activities on the Property as soon as reasonably possible and as permitted by governmental reclamation requirements. Lessor will and does indemnify RGC from and against any claims asserted against RGC arising out of the activities of Lessor or Lessor's invitees; Lessor will be solely responsible for, and will bear all risk of loss related to, any government allotment, subsidy, stabilization or conservation programs that may apply to the Property.

**10.   Safety.**   Except as otherwise provided in this Lease, only RGC employees and visitors authorized in writing by RGC will be permitted on those parts of the Property on which Operations are being conducted. All RGC-authorized visitors and their vehicles will carry RGC identification at all times that they are on the Property.

**11.   RGC to Comply With Safety Laws and to Indemnify Lessor.**   RGC will conduct its Exploration and Operations in compliance with all applicable safety laws and regulations. RGC will and does indemnify Lessor from and against any claims (environmental or otherwise) asserted against Lessor, arising out of RGC's activities. RGC will also indemnify Lessor from, and pay Lessor for, actual damages caused by RGC to crops, roads, timber, fences, gates, ponds and other improvements not described in Section 21 (Compensation for Buildings) located on any portions of the Property that are not mined but are otherwise used by RGC, in its activities. RGC will in no event be liable for special or consequential damages, and any payments made pursuant to this preceding sentence will be deemed full and complete compensation for the damages in question.

**12.   RGC's Right to Determine Whether, When and Where to Mine.**   Nothing in this Lease or in the relationship between Lessor and RGC will constitute or create any express or implied duty on the part of RGC to perform Exploration or Operations, or to mine the Property at any rate, in any manner, or at all. RGC's Exploration and Operations, if any, will occur only to the extent and in the location and times, and in the methods and manner that RGC, in its sole discretion, may determine; provided, however, that RGC will not conduct Operations within 200 feet of Lessor's principal residence, or any principal residence on property adjoining the Property, or in such a way as to deprive any such residence of access to a public road, utilities, and water supply until RGC complies with Section 21(a) (Compensation for Buildings -- Principal Residence) (in the case of Lessor's principal residence) or obtains the adjoining property owner's written consent (in the case of an adjoining residence) and provided further that, if RGC engages in Mining in the Area, then RGC will use its best efforts to mine all of the Minerals of Property that are contained in a commercially reasonable manner.

**13.   Compliance With Laws.**   RGC's activities on the Property will be conducted in compliance with all applicable Federal, State and local laws and regulations.

**14.   Reclamation.**   RGC agrees to comply with all State and Federal laws, regulations and permits applicable to the Reclamation of the Property. RGC also agrees to post a bond, to the extent required, by Virginia law, to ensure that all the Property for which RGC mines will be reclaimed in accordance with law. RGC will and does indemnify Lessor from and against any claims by State or Federal regulatory agencies arising from RGC's failure to reclaim in accordance with applicable laws, excluding claims caused in part or in whole by Lessor's failure to cooperate with RGC in accordance with the terms of this Lease. RGC's Reclamation of any Property mined may include, but not be limited to, refilling the mined path, refilling discharged from the wet mill, drying and eliminating settling ponds, replacing and grading the topsoil, replanting and otherwise complying with all applicable governmental reclamation requirements ("Reclamation").

**15.   Audits.**   Lessor will have the right at Lessor's expense to appoint an independent auditor reasonably approved by RGC, (which approval will be hereby given) if Lessor appoints a national firm, in the United States of recognized reputation), to audit, not more than once in any year, RGC's records relating to the determination of Royalty Payments for RGC's Fiscal Year (currently July 1 -- June 30) immediately preceding such audit. Lessor will instruct Lessor's auditor to send a copy of his report to RGC at the same time that he sends his report to Lessor. Also, Lessor will notify RGC in writing of any objections Lessor may have regarding Royalty Payments within 60 days of Lessor's receipt of Lessor's auditor's report.

**16.   Taxes.**   Taxes will be apportioned and paid as follows:

(a)     RGC will pay the following taxes or portions thereof: any mineral severance taxes related to RGC's Operations; property taxes, provided, for the portion of the Property and the time period in which Lessor is prohibited under this Lease from conducting activities; and any increase in property taxes attributable to the Minerals of RGC's Operations.

(b)     Lessor will pay all other taxes related to the Property, including but not limited to, any tax on Released Land (as defined in Section 19 (Termination)); any income, capital levy, estate, gift, succession, inheritance, transfer or franchise taxes; and any taxes attributable to Lessor's activities on the Property.

(c)     Lessor will send RGC copies of all assessments, tax bills, or other tax notices related to the Property, or to RGC's Operations thereon within 15 days of Lessor's receipt of the same or in such shorter time as may be necessary to preserve the rights of RGC and Lessor to protest or appeal the same. Lessor will cooperate with RGC in any such protest or appeal. RGC may (in its discretion) pursue such protest or appeal independently of Lessor. RGC will in any event not be obligated to pay (i) any increase in taxes which RGC is unable to protest or appeal due to Lessor's failure to comply with this Section 16(c), or (ii) any tax bill which RGC does not receive at least 14 days before the bill is due.

(d)     RGC may, but is not required to, pay any taxes on the Property for which Lessor is responsible under Section 16(b) and deduct, and have paid from any payments otherwise due to Lessor under the Lease.

**17.   Warranty of Title.**   Lessor warrants as follows:

(a)     Lessor is the sole legal and equitable owner, in undivided fee simple, of the surface and mineral estates that comprise the Property without limitation whatsoever.

(b)     The Property is free and clear of all leases, liens, encumbrances and outstanding adverse claims and interests, not of record.

(c)     Lessor has full power and authority to execute this Lease.

(d)     RGC shall have the quiet and peaceful possession and enjoyment of, the Property, Minerals, and the proceeds therefrom, against all persons or entities who may claim any interest therein.

(e)     There has been no violation of any applicable Federal, State, or local law or regulation relating to zoning, land use, environmental protection or otherwise with respect to the Property, or activities relating thereto; and

(f)     This Lease, and RGC's right, title and interest hereunder, shall at all times be superior to, and have priority over, any right, title or interest in the Property created during the Term of this Lease.

**18.   Lessor Indemnity.**   On existing date this Lease, RGC is relying on Lessor's warranties of title contained in Section 17 (Warranty of Title). Without impairment of those warranties of title, if Lessor owns less than the entire and undivided estate in the Property, RGC may (a) proportionately reduce all payments otherwise payable under this Lease, (b) offset any prior payments related to the unowned portion against any future payments payable under this Lease, and (c) exercise any other available rights or remedies.

**19.   Termination.**   RGC will have the right to terminate this Lease with regard to all or any portion of the Property at any time by sending a written notice to Lessor at least 90 days prior to such termination. The termination will take effect upon the date specified in the notice. Upon termination, all of RGC's rights and obligations under this Lease with regard to the Property (or portion thereof specified in the notice (the "Released Land") will terminate except for any Reclamation rights and obligations and any Minimum Royalty or Royalty Payment obligations arising out of mining conducted on the Released Land prior to such termination. In the event of a partial termination, this Lease will continue in effect with respect to all Property except the Released Land and the then "Property" will thereafter mean and include only the retained Property and not the Released Land. After termination, RGC will execute, deliver and record a release confirming the relinquishment of the Released Land. Nothing in this Section will negate any obligations RGC has under this Lease with respect to Reclamation of the Released Land. Notwithstanding the foregoing, RGC will not terminate this Lease in whole or in part at any time prior to the sixth anniversary unless RGC also terminates all of its other mining leases in the Area.

**20.   Title Documents.**   Lessor will promptly provide to RGC copies of all documents which Lessor now or, in the future possesses, relating to, or affecting title to, the Property, including, but not limited to, title insurance policies, deeds, mortgages, trust or security deeds, boundary agreements, judgments, liens, orders, surveys, boundary descriptions, maps, while conveying an interest in the Property, trust instruments, leases, licenses, easements and riparian ways. Lessor will give RGC notice, whenever Lessor learns of any matter which may affect the title to the Property. At RGC's request, Lessor will sign and deliver to RGC such additional formal assurances or other documents, in proper and recordable form, as may reasonably be necessary to carry out the terms and intent of this Lease. Lessor will inform RGC (immediately) if Lessor fails to pay or discharge in a timely manner any mortgage, lien, or judgment that attaches upon the Property, and RGC may then pay it, and be subrogated to the rights of the holder thereof. Except for any taxes for which RGC is liable under this Lease, RGC will have the right to offset, from any payment otherwise payable to Lessor, under this Lease, all amounts paid by RGC to discharge any such promissory note, mortgage, tax or other lien.

**21.   Compensation for Buildings.**

(a)     Principal residence.   If RGC proposes to remove Lessor's principal residence on the Property, RGC will give Lessor not less than one year's notice of its intention to do so.   At least 180 days prior to such removal, RGC will compensate Lessor by making a payment to Lessor equal to two times the then present fair market value of such residence (excluding land), as determined by the average of two appraisals: one by an, appraiser selected by Lessor, and one by an appraiser selected by RGC, from a list (of an MAI or FHA approved appraisers, compiled by RGC). Lessor may thereafter occupy the residence until the time the one entire period expires, at which time Lessor will vacate the residence to allow its removal. No residence will be constructed on the Property during the Term of this Lease without the prior written consent of both Lessor and RGC.

-2-

6BTEM02

0074

**(b)    Other Buildings.**  If RGC proposes to remove other buildings on the Property, RGC will give Lessor not less than six months' notice of its intention to do so. At least 90 days prior to such removal, RGC will compensate Lessor by making a payment to Lessor equal to the approximate replacement cost of buildings of that nature, as determined by the average of two appraisals by appraisers selected in the manner described in Section 23(a). Lessor will cease using the relevant buildings 30 days prior to the proposed removal and will facilitate removal in all respects.

**22.    Third-Party Claims.**  If RGC learns that a third party may have a claim of ownership in any portion or percentage of the Property or is under this Lease, RGC may deposit in a special escrow account (with a bank or title insurance company located in Virginia) any payments otherwise due to Lessor under this Lease and give Lessor written notice of the deposit. The sums deposited will remain in the special escrow account until the claim of controversy is resolved, or until there has been a final determination of the claim or controversy by a court or arbitrator, including any appeals therefrom.

**23.    Additional and After-Acquired Rights.**  If, during the Term of this Lease, Lessor acquires any right or interest in the Property or in any portion adjacent or accessible thereto, then: (a) Lessor will promptly notify RGC, (b) any such right or interest acquired in the Property, which Lessor had in this Lease already warranted to be part of the Property, will become part of the Property subject to this Lease without any additional payment to Lessor, (c) RGC may, at RGC's option, at any time, lease any other such right or interest on the same terms as the terms of this Lease, and (d) Lessor will sign, acknowledge, and deliver, an Amendment to this Lease and to the Memorandum of this Lease to RGC, so as to include such right or interest.

**24.    Entireties.**  If the Property is now or later owned in severalty or in separate tracts, RGC will nevertheless be entitled to treat the Property as an undivided whole under this Lease, with all payments payable under the Lease to be paid (either directly or pursuant to Section 25 (Multiple Owners)) to the separate owners of the Property in the proportions that their ownership interest remains of its an percentage ownership of acres bears to the whole Property; provided, however that in no event will RGC's total payment obligations to the separate owners exceed the payment obligations that RGC would have incurred under the Lease if the Property were owned in undivided fee simple by a single owner.

**25.    Multiple Owners.**  Whenever two or more parties are entitled to receive any payment under this Lease, RGC may withhold any such payments unless and until all of those parties designate in a recordable instrument an agent empowered to receive all such payments and, to execute, identify, division and transfer orders on behalf of all those parties and their respective successors in title. Delivery of any payment due under this Lease to the designated agent fulfills RGC's obligation to make that payment to those parties.

**26.    Assignment.**  Both parties have the right to assign their rights and obligations under this Lease, in whole or in part provided, however that:

(a)    The party making such an assignment must give the other party prior written notice thereof;

(b)    The provisions of this Lease will apply to and be binding upon the successors and assigns of the respective parties;

(c)    Any change or division in the ownership of the Property or of the right to receive any payments under the Lease, however accomplished, will not increase RGC's total payment obligations under this Lease or affect RGC's rights to conduct Exploration Operations or Reclamation on the Property;

(d)    Notwithstanding Section 26(a), RGC may, without notice or consent, assign any of its rights or obligations to affiliate of RGC, or use the services of independent contractors or agents to perform any of its rights or obligations; and

(e)    No assignment will relieve the assigning party of any obligations or liability to the other party, unless the other party provides a written release to the assigning party.

**27.    Force Majeure.**  Neither party will be deemed in default under this Lease during any period in which its exercise or performance of any of its rights or obligations under this Lease is prevented by any cause reasonably beyond its control. Such an event is referred to in this Lease as "Force Majeure." Force Majeure will include, but is not limited to, the following: fire, flood, storm, hurricane, tornado, winds, other damage from the elements, declared or undeclared war, strikes, labor disputes, riots, civil unrest, action of governmental authorities, condemnation, eminent domain, crime, failure to secure required governmental approvals, inability to obtain water for Operations, a substantial fall in the market prices of Minerals, lack of access, litigation, acts of God, and acts of the public enemy. The Term of this Lease will be extended for a period of time equal to the period of Force Majeure. All such periods will be deemed to begin at the earliest time a party is prevented from exercising or performing any of its rights or obligations by reasons of Force Majeure.

**28.    No Broker.**  Lessor and RGC represent and warrant to each other, that no broker, agent, or finder has acted on its behalf in connection with this Lease, and that no commissions, fees, or other monies are due to any broker, agent, finder. In addition, Lessor and RGC will and do indemnify each other from all claims with respect to any brokerage, finder's or leasing commissions in connection with this Lease or any of the transactions contemplated under this Lease.

**29.    Condemnation.**  Lessor will immediately notify RGC of any condemnation proceeding that may affect the Property. Lessor will cooperate with RGC in defending or settling the same. RGC may, in its discretion, defend its rights independently of Lessor. Any condemnation award will be shared between Lessor and RGC as provided below. Any condemned Property will constitute Released Land as of the date of condemnation, and this Lease will continue in effect as to the remaining Property.

**30.    Dispute Resolution.**  Subject to the provisions of this Section, any controversy, claim, or dispute arising out of or related to this Lease, or to the formation, negotiation, or breach thereof, will be settled by binding arbitration in Richmond, Virginia before a single arbitrator, in accordance with the Commercial Arbitration Rules of the American Arbitration Association. Any award of damages will be limited to actual, compensatory damages. Judgment upon the award rendered by the arbitrator may be confirmed by, and entered in, any court having jurisdiction thereof. Prior to initiating any arbitration, the initiating party will give the other party written notice of the claim, and will allow the other party 30 days from the date that the notice is received to amicably resolve the claim. If the claim is not resolved within the 30-day period, the initiating party's sole and exclusive remedy will be to submit the dispute to arbitration. The parties will comply with any arbitration award within 30 days of its issuance, or as soon as practicable, thereafter, and the Lease will continue in full force and effect. In no event will the existence of any dispute, arbitration or award suspend or otherwise affect any party's rights or obligations under this Lease, or interfere in any way with RGC's Operations.

**31.    No Interference With RGC's Operations.**  Lessor has not, and will not, during the Term of this Lease, take any action or grant any right which would in any way interfere with RGC's exercise of its rights as set out in Section 4 (Grant of Rights) of this Lease.

**32.    No Implied or Continuing Waiver.**  If either party waives or does not enforce any provision of this Lease on any occasion that action will not constitute waiver of: (a) that provision as to any other time, event or occurrence or, (b) any other provision.

**33.    Notices.**  Any notice given to the other party under this Lease must be in writing, and sent by United States registered or certified mail, return receipt requested, or via Federal Express or similar overnight courier service, addressed to the address set forth on the first page of this Lease. All notices will be deemed to have been made when deposited in the mail or with the courier as provided above. All notices will be deemed to have been received upon actual receipt by any person at the address listed above. Either party may change its address for the mailing of notices by giving the other party notice of such changed address in the manner provided for in this Section.

**34.    Entire Agreement; No Oral Modification.**  This Lease constitutes the entire agreement between the parties and supersedes all previous agreements written or oral. Lessor hereby expressly acknowledges that, in entering into this Lease, Lessor has not relied on any oral or written statements made by RGC, its employees, agents or independent contractors. This Lease may only be modified by a written agreement in recordable form signed by Lessor and an authorized officer of RGC.

**35.    Choice of Law.**  This Lease will be construed, interpreted and governed by the laws of Virginia.

**36.    Successors and Assigns.**  This Lease constitutes a covenant running with the land and will be binding on, and inure to the benefit of, Lessor, RGC, and Lessor's and RGC's heirs, legal representatives, executors, administrators, successors and assigns, as the case may be.

**37.    Severability.**  In the event that any court or duly appointed arbitrator determines that any provision of this Lease is unenforceable, illegal, or in conflict with any Federal, state, or local law, the parties will petition (or will hereby, be deemed to have petitioned) the court or arbitrator to reform that provision in such a way as to carry out the intent of the parties to the extent permissible under law. If the court or arbitrator declines to reform that provision, then that provision will be considered severable from the rest of the Lease, the remaining provisions of the Lease will not be affected, and the Lease will be construed and enforced as if the Lease did not contain the unenforceable or illegal provision.

**38.    Modification to Cure Any Violation of the Rule Against Perpetuities.**  Lessor and RGC do not intend that any provision in this Lease will in any way violate the Rule Against Perpetuities or any related rule. If any such violation should occur, it is the intent of Lessor and RGC that the appropriate court or arbitrator will reform the provision in such a way as to approximate most closely the intent of the parties within the limits permissible under such rule or related rule, and will enforce the Lease as so reformed.

**39.** *Memorandum.* At the time this Lease is signed, the parties will sign a Memorandum of Lease which RGC will record. In the event of a conflict between the terms of the Memorandum of Lease and this Lease, the terms of this Lease will control.

**40.** *Mortgage Consent.* Lessor agrees to use Lessor's best efforts to obtain, promptly, and to provide to RGC a copy of any consent to this Lease required by the terms of any mortgage or other instrument creating rights superior to this Lease with respect to all or any part of the Property. Such consent, however, will neither affect nor be a condition precedent to the effectiveness and enforceability of the Lease as between Lessor and RGC.

**41.** *Headings.* The headings contained in this Lease are for the convenience of the parties only, and will not be used in its interpretation.

**42.** *Obligations That Survive This Lease.* In addition to other obligations that survive this Lease as set forth in this Lease, the parties' obligations under the following Sections of this Lease will remain in full force and effect following, and will not be affected by, the termination of, or expiration of the Term of, this Lease: Sections 7-9, 11, 14-15, 17-19, 22, 24-26, 30, 32-38, and 41-43.

**43.** *Good Faith.* During the Term of this Lease, each party will act in good faith to fulfill the intent of this Lease, and will meet with the other party to discuss and to try to resolve amicably any issues that may arise.

IN WITNESS WHEREOF, the parties have executed this Lease under seal as of the date first above written.

OWNER:                                                  RGC (USA) MINERALS INC.

_____ (SEAL)    By: _____
G.L. Parson, Jr.                                            Vice          President

(Print Name)                                            [CORPORATE SEAL]
AKA George Lee Parson, Jr.                        Attest: _____
AKA Gl. L. Parson                                                              Secretary
AKA G. Lee Parson, Jr.

_____ (SEAL)    STATE OF    FLORIDA
Mary Elizabeth Parson                               COUNTY OF    CLAY

(Print Name)
AKA Mary Butterworth Parson                     The foregoing instrument was acknowledged before me
AKA Mary B. Parson                                   this  13   day of   February   19__ , 1990,
AKA Mary E. Parson                                   by  Daniel P. Wolcott
AKA Mrs. G. L. Parson, Jr.                          as  Vice   President of RGC (USA) MINERALS
                                                                INC., a Delaware corporation, on behalf of the
                                                                corporation.

                                                                _____
                                                                Notary Public

STATE OF VIRGINIA                                   My Commission Expires: Notary Pub. State of Florida
CITY/COUNTY OF _____                                My Commission Expires May 2, 1993
The foregoing instrument was acknowledged before me
this __ day of _____, 19__,                       [NOTARIAL SEAL]
by  G.L. Parson, Jr. and Mary
Elizabeth Parson, husband and
wife

My Commission Expires:
_____

_____
Notary Public

[NOTARIAL SEAL]

41STEMP2

EXHIBIT A
TO
MINING LEASE
BY AND BETWEEN

G. L. PARSON, JR., AKA GEORGE LEE PARSON, JR.,
AKA G. L. PARSON and AKA G. LEE PARSON, JR., and

MARY ELIZABETH PARSON, AKA MARY BUTTERWORTH PARSON,
AKA MARY B. PARSON, AKA MARY E. PARSON, and
AKA MRS. G. L. PARSON, JR., husband and wife
(LESSOR)

AND

RGC (USA) MINERALS INC.
(RGC)

**EXHIBIT A**

Under the terms of the above-referenced Mining Lease to which this Exhibit is attached, Lessor has leased to RGC, and granted to RGC various rights regarding certain real property (including all mineral rights and minerals) referred to as the "Property", which is situated in the ____ Stony Creek ____ Magisterial District, ____ Sussex ____ County, State of Virginia, which is hereby represented and warranted by Lessor to amount to ____ 187/100 ____ acres, and which is described as follows:

That same tract or parcel of land conveyed to G. Lee Parson, Jr. by Warranty Deed, dated February 16, 1970, and recorded in Deed Book 73 at page 600, in Clerk's Office of Circuit Court of Sussex County, Virginia. To Wit: All that certain tract, piece or parcel of land, lying and being situate in Stony Creek Magisterial District, Sussex County, Virginia, containing one hundred and eighty-seven (187) acres, more or less, adjoining the lands of Markham B. Chappell Old Eppes Tract; Green Church Road; and Wyatt Mill Road, being in all respects the same land which was devised unto Nannie B. Chappell by John E. Stewart, as will be seen by reference to the first clause of his last will and testament, of record in the clerk's Office of the Circuit Court of Sussex County, Virginia, except a portion thereof, containing about twenty-five (25) acres, which was conveyed to Nannie B. Chappell to Markham B. Chappell by deed recorded in the aforesaid Clerk's Office in Deed Book 27, at page 323; and being in all respects the same real estate conveyed to G. Lee Parson, Sr., in the name of G. Lee Parson, from John R. Cole, Special Commissioner, by deed dated the 29th day of December, 1934, and recorded in the aforesaid Clerk's Office in Deed Book 34, at page 283.

EXEMPTING from this tract of land three (3) bulk barns situated upon two (2) acres, more or less.

Subject property is referred to in the Sussex County Tax Records as Tax Parcel Number 8-101-38.

078

SPL Roy Pol
VA 3/89

**EXHIBIT B**
**TO**
**MINING LEASE**
**BY AND BETWEEN**
G. L. Parson, Jr. and Mary Elizabeth Parson,
husband and wife
(Lessor)

**AND**

**RGC (USA) MINERALS INC.**
**(RGC)**

**RGC's Royalty Policy for Virginia Operations**
**COPYRIGHT © RGC (USA) MINERALS INC. 1989**

This document sets forth RGC's Royalty Policy for Virginia Operations ("Royalty Policy"), which is referred to in Section 7 (Royalty Payment) of the above-referenced Deed of Mining Lease ("Lease") and which is attached to and incorporated into the Lease by reference.

1. **Definitions.** The terms defined in the body of the Lease or anywhere in this Royalty Policy will have the same meanings throughout this Royalty Policy. The following terms will have the following meanings:

   (a)   "Principal Minerals" means Ilmenite, Rutile and Zircon.

   (b)   "Minor Minerals" means Minerals other than Principal Minerals.

   (c)   "Mineralized Property" means that portion of the Property which RGC estimates, using the then most current drilling data and survey information, contains Minerals bearing sands which have a minimum dredgeable depth of 15 feet and which have a cut-off grade of two percent (2%) by weight average Mineral content. All lump sum payments under Section 5(c) (Initial Payment) and Advance Royalty Payments of the Lease are based on the Mineralized Property as of the Lease Date, and subsequent changes in the acreage of the Mineralized Property will not affect the lump sum payments.

   (d)   "Sales Value per ton of each Mineral" means the dollar value per short ton derived by dividing (i) the actual dollar sales of each Mineral (following processing, by the dry plant (net of returns, sales, taxes, sales discounts and commissions but not net of settlement discounts) for the calendar quarter ("Quarter") which is the subject of the Royalty Payment calculation by (ii) the total sales tonnage for each Mineral in that Quarter, subject to the exclusion of sales to affiliates contained in Clause 9 (Sales to Affiliated below).

   (e)   "Lessor's Stock Account" means the account maintained by RGC in Lessor's name for the purpose of tracking and reporting production, inventory and sales allocations made with respect to saleable Minerals attributed to the Property, and for the purpose of calculating and accounting to Lessor, through the Stock Report described in Clause 3 below, for any Royalty Payments.

   (f)   "All Stock Accounts" means the Lessor's Stock Account and all other stock accounts maintained by RGC for other properties on which RGC engages in Mining (as defined in Clause 6(b)(i) below).

   (g)   "Recovery Rate" for any treatment of material is the weight of material that is present after that treatment divided by the weight of material before treatment, expressed as a percentage.

2. **Calculating Royalties.** This Royalty Policy sets forth the methodology to be used in determining and reporting the Royalty Payments payable to Lessor under the Lease, by signing the Lease Lessor agrees to that methodology including, but not limited to: (i) RGC's method of attributing Minerals to the Property set forth in Clause 6 below; and (ii) RGC's method of calculating Royalty Payments as set forth in Clause 7 (Royalty Payment Calculations) below.

3. **Stock Account and Stock Report.** From the commencement of Mining (as defined in Clause 6(b)(i)) on the Property until such time as RGC's obligation to pay Lessor Royalty Payments has been fulfilled, RGC will establish and maintain Lessor's Stock Account and will send to Lessor within 30 days after the end of each Quarter, a written report ("Stock Report") on the status of Lessor's Stock Account. The Stock Report will show:

   (a)   The tons of saleable Minerals attributed to the Property for the Quarter (see Clause 6 below);

   (b)   Sales from the accumulated tons of saleable Minerals referred to in Clause 3(a) above;

   (c)   Any Advance Royalty Payments paid during the Quarter in accordance with Section 6 of the Lease;

   (d)   Any Royalty Payment payable for the Quarter pursuant to Section 7 (Royalty Payment) of the Lease;

   (e)   A reconciliation of Advance Royalty Payments and Royalty Payments to Lessor pursuant to Section 5 (Initial Payment and Advance Royalty Payments) and Section 7 (Royalty Payments) of the Lease.

   The Stock Report will be certified as accurate by RGC's Operations manager or a senior financial employee. By signing this Lease, Lessor agrees to preserve the confidentiality of the sales and production information in all Stock Reports.

4. **Royalty Rate.** RGC will pay Lessor a Royalty Payment equal to [ ] of the Sales Value per ton of each Mineral sold that is attributed to the Property, as reflected in the Stock Account [ ] ted to Lessor quarterly in the Stock Report.

5. **Royalty Payment.** Any Royalty Payments due for Principal Minerals attributed to the Property will be paid within 30 days after the end of the Quarter in which such Principal Minerals were sold (i.e. invoiced to the purchaser), and, for Minor Minerals attributed to the Property, within 30 days of the end of the Fiscal Year (July 1; June 30) in which they were sold.

6. **Saleable Minerals Attributed to the Property.** Saleable Minerals are attributed to the Property and to Lessor's Stock Account as set forth below:

   (a)   RGC will survey, drill, and analyze drill samples from those portions of the Property which it plans to mine, in order to estimate the tons of Principal Minerals located therein.

   (b)   Production of saleable Minerals is achieved by the following three steps in RGC's Operations:

       (i)    "Mining" - extracting and delivery of mineral sand ore to the concentrator;

       (ii)   "Concentrating" - removal of non-commercial materials;

       (iii)  "Processing" - removal of further non-commercial sand and separation into saleable Minerals.

   Each of these steps results in recovery and loss of saleable Minerals depending on the efficiency of each step and the nature of the material being treated. The Recovery Rate for each step varies on a small degree on a daily basis and is determined by regular sampling and analysis of the material as it passes through each step.

(c) The Recovery Rates for a given Quarter and the estimates and survey information compiled pursuant to Clause 6(a) above are used to estimate the tons of saleable Principal Minerals recovered from the Property in that Quarter. Those tons of Principal Minerals are then entered in Lessor's Stock Account.

(d) Within 30 days of the end of each Fiscal Year, RGC will apportion its actual production of saleable Minor Minerals for the year among All Stock Accounts. The apportionment will be made in proportion to the attribution of Principal Minerals among All Stock Accounts for the year.

7. ***Royalty Payment Calculations.***

(a) Principal Minerals Sold

(i) Within 30 days of the end of each Quarter, RGC will deduct the total tons of each Principal Mineral sold during that Quarter from All Stock Accounts.

(ii) The tons of Principal Minerals sold will be deducted from All Stock Accounts on a "First-In/First-Out" (FIFO) basis. Where production of saleable Minerals is attributed to several stock accounts on the same date, sales attributable to such production will be deducted from the affected stock accounts in proportion to the tonnage allocated on that date to such stock accounts.

(iii) The sales thus attributed to the Property will be entered in Lessor's Stock Account and reflected in the Stock Report.

(iv) RGC will calculate the Sales Value per ton for each Principal Mineral for the Quarter.

(v) The Royalty Payment payable to Lessor for the Quarter will equal [redacted] of the Sales Value per ton for each Principal Mineral for the Quarter multiplied by the tons of each Principal Mineral sold which are attributed to the Property for the Quarter as reflected in the Stock Account.

(b) Minor Minerals Sold

Within 30 days after the end of each Fiscal Year, a calculation similar to that described in Clause 7(a)(v) above, will be made for Minor Minerals, and the result will be reflected in the Stock Report for the last Quarter of the Fiscal Year.

(c) Adjustments.

At the end of each Fiscal Year, RGC will compare its actual annual Mineral production to the total tons of Minerals attributed to All Stock Accounts in that year. If the actual production is less than the attributed production, then the shortfall will be deducted proportionately from All Stock Accounts. If the actual production exceeds the attributed production, then the excess will be allocated proportionately among All Stock Accounts.

8. ***Commingling and Stockpiling.*** RGC will commingle Minerals from the Property with Minerals from other properties, may engage in Mining on more than one property in a Quarter, and may in RGC's sole discretion from time to time stockpile Minerals depending on market conditions.

9. ***Sales to Affiliates.*** RGC may in its sole discretion sell part or all of its Minerals to affiliates of RGC. In such event, the Sales Value per ton of each Mineral used in calculating the Royalty Payment will be based only on RGC's sales to non-affiliates. If such non-affiliate sales are less than 30% of RGC's total sales of the Mineral during the Quarter, then the Sales Value used in calculating the Royalty Payment will equal the greater of (a) the Sales Value based only on RGC's sales to non-affiliates or (b) the indexed price for the Mineral, determined by multiplying (i) the Sales Value per ton of the Mineral last used in calculating a Royalty Payment times (ii) the percentage change in the Producer Price Index - Titanium Pigments Index of the Bureau of Labor Statistics, U.S. Department of Labor (Code No. 06220209, 1982=100). Such percentage change will be based on the change in the Index from the last month of the Quarter in which the Sales Value referred to in Clause (i) was used to the last month of the Quarter for which the Royalty Payment is being calculated.

10. ***Most Favored Lessor.*** If RGC agrees, after signing this Lease, to pay a higher Initial Payment per acre, higher aggregate Advance Royalty Payments per acre (excluding any such higher payments that result from either (i) an increase in a lease date payment which raises a lessor's total lease date payments to seven percent (7%) of RGC's then-current estimate of the lessor's total Advance Royalty Payments and Royalty Payments or (ii) variations in Advance Royalty Payments that are based upon or limited by Clause 12 hereof), or higher royalty rates as to any other leased property in the Area, RGC will within 30 days of the more favorable lease pay Lessor any amount necessary to adjust retroactively payments previously received by Lessor to the more favorable levels, and the more favorable levels that are prospective in nature will thereafter apply to this Lease. This Clause does not require that retroactive adjustments include the time value of money. This Clause applies only to leases and not to purchases, options to purchase, purchase-leaseback arrangements or other arrangements.

11. ***Completion of Mining.***

(a) RGC will send Lessor written notice when it has completed Mining on the Property.

(b) The next Stock Report after such notice will contain a reconciliation comparing (i) the total of all Royalty Payments and Advance Royalty Payments paid to date, with (ii) the product obtained by multiplying the total number of acres of the Property from which RGC removed the topsoil in preparation for Mining times $3,500-per-acre average Minimum Royalty provision in Section 8 (Minimum Royalty) of the Lease.

(c) If that Stock Report reflects that all tons of Minerals attributed to the Property have already been sold, that Stock Report will be Lessor's last Stock Report and final reconciliation, and Lessor will be paid (i) any Royalty Payments payable for that Quarter, and (ii) the final payment, if any, required by the $3,500-per-acre average Minimum Royalty provision (the "Final Payment"). The Final Payment will equal the amount, if any, by which the product described in Clause 11(b)(ii) exceeds the total described in Clause 11(b)(i).

(d) If that Stock Report reflects that any tons of Minerals attributed to the Property have not yet been sold, Lessor will be paid any Royalty Payments payable for that Quarter, and Lessor may elect, by sending written notice to RGC within 30 days, to either: (i) forfeit all rights to future Royalty Payments with regard to all unsold tons and receive the Final Payment, if any, determined in accordance with Clause 11(c) above; or (ii) continue Lessor's Stock Account in existence, and defer the final reconciliation and Final Payment, if any, until all such unsold tons are sold and the final total of all Royalty Payments and Advance Royalty Payments can be used in determining any Final Payment due.

12. ***Advance Royalty Payment: "70% of Estimated Future Royalty Payments".*** At least one year before RGC commences Mining on the Property, RGC will estimate, using the then most current drilling data and survey information, the tons of Minerals located therein. Using the higher of this estimated tonnage or 88,639 tons and applying reasonably expected Recovery Rates and prices, RGC will in good faith estimate the total sales value of the saleable Minerals recoverable from the Mineralized Property. The Advance Royalty Payment equal to "70% of Estimated Future Royalty Payments" set forth in Section 6 (Initial Payment and Advance Royalty Payments) of the Lease will be determined by (a) multiplying the estimated total sales value times the [redacted] (b) multiplying the result by seventy percent (70%), and (c) deducting therefrom all Advance Royalty Payments previously made under the Lease.

13. ***No Reliance on Estimates or Representations.*** Because of the inherent uncertainties in making projections and estimates which may affect Lessor's Royalty Payments, Lessor, in deciding whether to enter into this Lease, should not rely upon any representation, written or oral, as to the likelihood or value of Royalty Payments, and Lessor should bear in mind that the $3,500-per-acre average Minimum Royalty provision contained in Section 8 (Minimum Royalty) of the Lease applies only if RGC engages in Mining on the Property, and even then applies only to the total number of acres from which RGC removes the topsoil in preparation for Mining. Lessor acknowledges that Lessor understands the foregoing sentence and Lessor agrees that Lessor has not relied upon any representation, written or oral, as to the likelihood or value of Royalty Payments.

December 30, 2022

Mailed and sent by process server

To: Iluka Resources Inc. Via registered agent: CT Corporation System 1200 Pine Island Road Plantation, FL 33324

Dear Sir:

The 17740 San Vicente Blvd Ste. 109 #181 Los Angeles, CA 90025 address on the letter served earlier today was an incorrect address so we hereby correct it to 11740 San Vicente Blvd Ste. 109 #181 Los Angeles, CA 90049 and will only mail this letter by certified mail today and will have it served by process server also.

I, Betty P. Graham, hereby notify you that I hereby replace the PO Box 310554 Miami FL 33231 having street address 1101 Brickell Ave #310554 Miami, FL 33231 with 11740 San Vicente Blvd Ste. 109 #181 Los Angeles, CA 90049 and the Boston PO Box 170225 Boson, MA 02117 having street address 133 Clarendon St #170225 Boston MA 02117 with care of Laurence Graham which may be abbreviated Betty P. Graham C/O Laurence Graham PO Box 268 Santa Cruz, CA 95061.

I, Laurence J. Graham, individually, as agent and attorney-in-fact for Betty P. Graham, hereby notify you that I hereby replace the Miami PO Box 310554 Miami FL 33231 having street address 1101 Brickell Ave #310554 Miami, FL 33231 with 11740 San Vicente Blvd Ste. 109 #181 Los Angeles, CA 90049 and replace the Boston PO Box 170225 Boson, MA 02117 having street address 133 Clarendon St #170225 Boston, MA 02117 with PO Box 268 Santa Cruz, CA 95061

Betty P. Graham was a grantee by the DEED OF GIFT dated the 19th Day of May 1997 which grantors George Lee Parson, Jr. and Mary Elizabeth Parson signed before a notary in June of 1997 and which is recorded in the Clerk's Office of Sussex County, VA in Deed Book 155 Page 637 and the Clerk's Office of Dinwiddie County, VA in Deed Book 410 Page 204, hereinafter "the 97 Deed" and I, Laurence J. Graham, and I, Betty P. Graham, hereby agree that you can inform each of us in writing of how many tons of each kind of mineral that you have extracted from the acres of land described in the 97 Deed, the location of each of those tons, and the per ton market value of each kind of mineral that you have extracted from the acres of land described in the 1997 Deed and we hereby demand that you disclose this information to "Betty P. Graham and Laurence J. Graham" in writing at 11740 San Vicente Blvd Ste. 109 #181 Los Angeles CA 90049 and to Laurence Graham also at PO Box 268 Santa Cruz, CA 95061 and I, Laurence J Graham, individually and as attorney-in-fact for Betty P. Graham demand that you disclose this information to me in writing to "Betty P. Graham and Laurence J. Graham" in writing at 11740 San Vicente Blvd Ste. 109 #181 Los Angeles, CA 90049 and also disclose this information to me in writing at PO Box 268 Santa Cruz, CA 95061.

As we previously notified you, the October 13, 1989 Deeds of Mining Lease entered into by George Lee Parson, Jr. and Mary Elizabeth Parson and RGC (USA) Minerals, Inc. maybe rescinded in central Los Angeles, California. For reference, there are ten leases that the minerals conveyed by the 97 Deed were transferred subject to and those leases have memorandums of record in the Clerk's Office of the Circuit Court of Sussex County, Virginia and the Clerk's Office of the Circuit Court of Dinwiddie County, Virginia, and we hereby again notify you that said leases may be rescinded in central Los Angeles California.

This document is not a waiver of any rights held by Betty P. Graham. This document is not a waiver of any claims held by Betty P. Graham This document is not a waiver of any rights held by Laurence J. Graham. This document is not a waiver of any claims held by Laurence J. Graham. All rights are reserved.

Sincerely,

Betty P. Graham for Betty P. Graham: *Betty P. Graham*

Laurence J. Graham for Laurence J. Graham: *[signature]*

Laurence J. Graham as attorney-in-fact for Betty P. Graham: *[signature]*

January 3, 2023

To: Iluka Resources Inc. Via registered agent: CT Corporation System 1200 S Pine Island Road Plantation, FL 33324

Dear Sir:

The 17740 San Vicente Blvd Ste. 109 #181 Los Angeles, CA 90025 address was an incorrect address and we replace it and the Los Angeles addresses, the Santa Cruz PO Box and therefore the preceding PO Box with corresponding street address with the below notified address replacements. Furthermore, Betty's Port St Lucie, FL mailing address was not renewed and is not available for receipt of any mail and there are no other addresses in Florida available for receipt of any mail from you.

I, Betty P. Graham, hereby notify you that I hereby replace all Los Angeles, CA addresses and PO Box 310554 Miami FL 33231 having street address 1101 Brickell Ave #310554 Miami, FL 33231 with PO Box 2016 San Francisco, CA 94126 and replace the PO Box 268 Santa Cruz, CA 95061 and therefore the preceding Boston PO Box 170225 Boson, MA 02117 having street address 133 Clarendon St #170225 Boston MA 02117 with 2625 Alcatraz Ave #179 Berkeley, CA 94705.

I, Laurence J. Graham, individually, as agent for Betty P. Graham, and as attorney-in-fact for Betty P. Graham, hereby notify you that I hereby replace all Los Angeles, CA addresses and PO Box 310554 Miami FL 33231 having street address 1101 Brickell Ave #310554 Miami, FL 33231 with PO Box 2016 San Francisco, CA 94126 and replace the PO Box 268 Santa Cruz, CA 95061 and therefore the preceding Boston PO Box 170225 Boson, MA 02117 having street address 133 Clarendon St #170225 Boston MA 02117 with 2625 Alcatraz Ave #179 Berkeley, CA 94705.

Betty P. Graham was a grantee by the DEED OF GIFT dated the 19th Day of May 1997 which grantors George Lee Parson, Jr. and Mary Elizabeth Parson signed before a notary in June of 1997 and which is recorded in the Clerk's Office of Sussex County, VA in Deed Book 155 Page 637 and the Clerk's Office of Dinwiddie County, VA in Deed Book 410 Page 204, hereinafter "the 97 Deed" and I, Laurence J. Graham, and I, Betty P. Graham, hereby agree that you can inform each of us in writing of how many tons of each kind of mineral that you have extracted from the acres of land described in the 97 Deed, the location of each of those tons, and the per ton market value of each kind of mineral that you have extracted from the acres of land described in the 1997 Deed and we hereby demand that you disclose this information to us in writing by sending it to us at PO Box 2016 San Francisco, CA 94126.

As we previously notified you, the October 13, 1989 Deeds of Mining Lease entered into by George Lee Parson, Jr. and Mary Elizabeth Parson and RGC (USA) Minerals, Inc. may be rescinded in Los Angeles, California which we hereby change to any of the following venues: Culver City, CA, Berkeley, CA, and San Francisco, CA. For reference, there are ten leases that the minerals conveyed by the 97 Deed were conveyed subject to, and said leases have memorandums of record in the Clerk's Office of the Circuit Court of Sussex County, Virginia and the Clerk's Office of the Circuit Court of Dinwiddie County, Virginia, and we hereby again notify you that said leases may be rescinded and hereby notify you that such rescission may be in any of the following venues: Culver City, CA, Berkeley, CA, or San Francisco, CA.

This document is not a waiver of any rights held by Betty P. Graham. This document is not a waiver of any claims held by Betty P. Graham This document is not a waiver of any rights held by Laurence J. Graham. This document is not a waiver of any claims held by Laurence J. Graham. All rights are reserved.

Sincerely,

Betty P. Graham for Betty P. Graham: *Betty P. Graham*

Laurence J. Graham for Laurence J. Graham: *Larry Graham*

Laurence J. Graham as attorney-in-fact for Betty P. Graham: *Larry Graham*

January 5, 2023

To: Iluka Resources, Inc. Via registered agent: CT Corporation System 1200 S Pine Island Road Plantation, FL 33324

Dear Sir:

Please find the attached letter dated 12/30/22 which was mailed on 12/30/22 and delivered by mail to your registered agent CT Corporation System and said 12/30/22 mailed letter corrected the incorrect 17740 San Vicente Blvd Ste. 109 #181 Los Angeles, CA 90025 address to 11740 San Vicente Blvd, Ste. 109 #181 Los Angeles, CA 90049, The incorrect 17740 San Vicente Blvd Ste. 109 #181 Los Angeles, CA 90025 address was on the first letter which was served on 12/30/22 and the incorrect address was discovered prior to mailing the first letter so the first letter was not mailed and the second letter was mailed. On 1/4/23 you received by process server a letter signed and dated on January, 3, 2023 which explained that the 17740 San Vicente Blvd Ste. 109 #181 Los Angeles, CA 90025 address was an incorrect address. That letter notified a replacement of all Los Angeles addresses which also included the 11740 San Vicente Blvd, Ste. 109 #181 Los Angeles, CA 90049 address that replaced the incorrect 17740 San Vicente Blvd Ste. 109 #181 Los Angeles, CA 90025 address. I Betty P. Graham, hereby notify you that my 7548 South US Hwy 1 #198 Port St Lucie, FL 34952 mailing address is closed and terminated and is not available for receipt of any mail; I, Laurence J. Graham, and I, Betty P. Graham, again hereby notify you that there are not any mailing addresses in Florida available for receipt of any mail from you. I, Betty P. Graham, here again notify you that I have replaced the 11740 San Vicente Blvd, Ste. 109 #181 Los Angeles, CA 90049 address with PO Box 2016 San Francisco, CA 94126. Accordingly, my PO Box 310554 Miami, FL 33231 address having street address 1101 Brickell Ave #310554 Miami, FL 3323 was replaced by 11740 San Vicente Blvd, Ste. 109 #181 Los Angeles, CA 90049 and then replaced by PO Box 2016 San Francisco, CA 94126. I, Laurence J. Graham, individually, as agent for Betty P. Graham, and as attorney-in-fact for Betty P. Graham, here again notify you that I have replaced the 11740 San Vicente Blvd, Ste. 109 #181 Los Angeles, CA 90049 with PO Box 2016 San Francisco, CA 94126. Accordingly, my PO Box 310554 Miami, FL 33231 address having street address 1101 Brickell Ave #310554 Miami, FL 3323 was replaced by 11740 San Vicente Blvd, Ste. 109 #181 Los Angeles, CA 90049 and then replaced by PO Box 2016 San Francisco, CA 94126.

Betty P. Graham was a grantee by the DEED OF GIFT dated the 19th Day of May 1997 which grantors George Lee Parson, Jr. and Mary Elizabeth Parson signed before a notary in June of 1997 and which is recorded in the Clerk's Office of Sussex County, VA in Deed Book 155 Page 637 and the Clerk's Office of Dinwiddie County, VA in Deed Book 410 Page 204, hereinafter "the 97 Deed" and I, Laurence J. Graham, and I, Betty P. Graham, hereby agree that you can inform each of us in writing of how many tons of each kind of mineral that you have extracted from the acres of land described in the 97 Deed, the location of each of those tons, and the per ton market value of each kind of mineral that you have extracted from the acres of land described in the 1997 Deed and we hereby demand that you disclose this information to us in writing by sending it to us at PO Box 2016 San Francisco, CA 94126.

As we previously notified you, the October 13, 1989 Deeds of Mining Lease entered into by George Lee Parson, Jr. and Mary Elizabeth Parson and RGC (USA) Minerals, Inc. may be rescinded in central Los Angeles, California which we hereby change to any of the following venues: Culver City, CA, Berkeley, CA, and San Francisco, CA. For reference, there are ten leases that the minerals conveyed by the 97 Deed were conveyed subject to, and said leases have memorandums of record in the Clerk's Office of the Circuit Court of Sussex County, Virginia and the Clerk's Office of the Circuit Court of Dinwiddie County, Virginia, and we hereby again notify you that said leases may be rescinded and hereby notify you that such rescission may be in any of the following venues: Culver City, CA, Berkeley, CA, or San Francisco, CA.

This document is not a waiver of any rights held by Betty P. Graham. This document is not a waiver of any claims held by Betty P. Graham This document is not a waiver of any rights held by Laurence J. Graham. This document is not a waiver of any claims held by Laurence J. Graham. All rights are reserved.

Sincerely,

Betty P. Graham for Betty P. Graham: *Betty P Graham*

Laurence J. Graham for Laurence J. Graham: *Laurence Graham*

Laurence J. Graham as attorney-in-fact for Betty P. Graham: *Laurence Graham*

January 27, 2023

To: Iluka Resources, Inc. Via registered agent: CT Corporation System 1200 S Pine Island Road Plantation, FL 33324

Dear Sir:

I, Betty P. Graham, was a grantee by the DEED OF GIFT dated the 19th Day of May 1997 which grantors George Lee Parson, Jr. and Mary Elizabeth Parson signed before a notary in June of 1997 and which is recorded in the Clerk's Office of Sussex County, VA in Deed Book 155 Page 637 and the Clerk's Office of Dinwiddie County, VA in Deed Book 410 Page 204, hereinafter "the 97 Deed" and I, Laurence J. Graham, and I, Betty P. Graham, hereby agree that you can inform each of us in writing of how many tons of each kind of mineral that you have extracted from the acres of land described in the 97 Deed, the location of each of those tons, and the per ton fair market value of each kind of mineral that you have extracted from the acres of land described in the 97 Deed and we hereby demand that you disclose this information to us in writing by sending it to us at PO Box 720872 San Jose, CA 95172 which we hereby notify you has replaced the PO Box 2016 San Francisco, CA 94126 and we select the Superior Court of California Santa Clara County as the repository for all rescission money involved in the rescission of the October 13, 1989 Deeds of Mining Lease entered into by George Lee Parson, Jr. and Mary Elizabeth Parson and RGC (USA) Minerals, Inc., memorandums of said leases being of record in the Clerk's Office of the Circuit Court of Sussex County, Virginia and the Clerk's Office of the Circuit Court of Dinwiddie County, Virginia and we hereby change the venue for any breach of fiduciary duty torts involving royalties transferred to Betty P. Graham by her parents from Burlington Vermont to Tompkins County NY although any such torts would be in the alternative to rescission of said leases which may be in any of the following venues: Santa Clara County CA, Culver City, CA, San Francisco, CA, and Berkeley CA.

This document is not a waiver of any rights held by Betty P. Graham. This document is not a waiver of any claims held by Betty P. Graham This document is not a waiver of any rights held by Laurence J. Graham. This document is not a waiver of any claims held by Laurence J. Graham. All rights are reserved.

Sincerely,

Betty P. Graham for Betty P. Graham: *Betty P. Graham*

Laurence J. Graham for Laurence J. Graham: *Jay Graham*

Laurence J. Graham as attorney-in-fact for Betty P. Graham: *Jay Graham*

# REED MAYO LAW FIRM, P.C.

(757) 648-1376 – Office
(757) 648-1379 – Fax

4604 Berrywood Road
Virginia Beach, VA 23464

K. Reed Mayo
Rmayo@reedmayolaw.com

February 12, 2023

Mr. Laurence J. Graham
481 N. Santa Cruz Ave. #178
Los Gatos, CA 95030

7548 South US Hwy 1, #198
Port St. Lucie, FL 34952

Re:    Iluka Resources Inc.: Payment of Royalties Held in Escrow

Dear Mr. Graham:

I am writing to see if I can make arrangements to deliver a check to you for over $2.5 million.

As you may know, because of disputes over the ownership of royalties initially assigned to your mother by your grandparents, Iluka Resources Inc. ("Iluka") for many years deposited the royalties into an escrow account. As a result of various interpleader actions, much of those funds were paid out to various creditors and to your brother directly. Last September, the Sussex Circuit Court entered an order holding (among other things) that the balance of royalties being held in escrow belong to you.

Rather than paying those funds over to Florida or some other state as unclaimed property (to be held until you claim them), I would like to see if Iluka can pay those funds to you directly. To ensure that you actually receive the funds, however, Iluka will need to deliver its check to you in person, confirm your identity with a state or federal government issued ID bearing your picture, and have you sign an acknowledgement that you received the check.

Are you willing and able to meet these conditions? Please call ((757 648-1376) or email me at Rmayo@reedmayolaw.com and let me know.

Thank you in advance.

Very truly yours,

K. Reed Mayo

KRM/0200

1  Laurence J. Graham
   4647 Kingswell Ave Suite 105
2  Los Angeles, CA 90027
3  Telephone: (415) 800-4483
   E-mail: courtcase.la@yahoo.com
4  Betty Patrick Graham
   c/o Laurence J. Graham
5  4647 Kingswell Ave Suite 105
6  Los Angeles, CA 90027
   Telephone: (415) 800-4483
7  E-mail: courtcase.la@yahoo.com

8  Pro se,

9         CALIFORNIA SUPERIOR COURT FOR THE COUNTY OF LOS ANGELES

10   VERIFIED COMPLAINT FOR RESCISSION OF CONTRACTS AND DEMAND FOR JURY
11                                    TRIAL

12

13

14   LAURENCE J. GRAHAM AND BETTY          Case No.: Case No:
15   PATRICK GRAHAM

16              Plaintiffs,              COMPLAINT FOR RELIEF UNDER CAL.
                                         CIVIL CODE SEC. 1692 FOR RESCISSION
17   vs.                                 OF CONTRACTS BASED ON BREACH OF
                                         FIDUCIARY DUTIES
18   DuPont de Nemours, Inc., a Delaware
19   Corporation; and, The Dow Chemical
     Company; a Delaware Corporation; and,
20   Dow, Inc., a Delaware Corporation; and,
     Corteva, Inc., a Delaware Corporation; and,
21   The Chemours Company, a Delaware
22   Corporation; and, Occidental Petroleum
     Corporation, a Delaware Corporation; and, Iluka
23   Resources, Inc., a Delaware Corporation; and,
     Iluka Resources Limited, an Australian public
24   company; and, Tronox, LLC, a US limited
     liability company; and, Tronox Holdings plc, an
25   Australian company; and, Tronox Limited, an
     Australian public company; and, Huntsman
26   Corporation, a Delaware Corporation; and,
27   Kronos (US), Inc., a Delaware Corporation;

28                                      I

1  and, Kronos Worldwide, Inc., a Delaware
2  Corporation; and, National Industrialization
   Company, a limited company organized,
3  existing, and doing business under, and by
   virtue of, the laws of the Kingdom of Saudi
4  Arabia; and, Venator Materials, LLC, a US
5  limited liability corporation; and, Venator
   Materials, plc, a United Kingdom company;
6  and, Ineos Limited, a United Kingdom private
   limited company; and, Titanium Metals
7  Corporation, a Delaware Corporation; and,
8  Precision Castparts Corp., a Delaware
   Corporation; and, Ineos Pigments USA Inc., a
9  Delaware Corporation Ineos Pigments USA
   Inc., a Delaware Corporation; and, Ineos
10 Enterprises, LLC, a limited liability corporation
   organized in Delaware; and, INEOS Joliet US
11 Holdco, LLC, a Delaware company; and,
12 Kinder Morgan, Inc., a Delaware Corporation;
   and, Hunton Andrews Kurth, LLP, a Limited
13 Liability Partnership with offices in California
   and Florida and a citizen of both California and
14 Florida; and, JM Eagle, a Delaware Corporation
15 and citizen of California; and, and, DOES 1-25,
   inclusive,
16
            Defendants.
17
18
19
20
21
22
23
24
25
26
27
28
                              II

1  Laurence J. Graham
2  4647 Kingswell Ave Suite 105
   Los Angeles, CA 90027
3  Telephone: (415) 800-4483
   E-mail: courtcase.la@yahoo.com
4  Betty Patrick Graham
5  c/o Laurence J. Graham
   4647 Kingswell Ave Suite 105
6  Los Angeles, CA 90027
   Telephone: (415) 800-4483
7  E-mail: courtcase.la@yahoo.com

8  Pro se,

9
       CALIFORNIA SUPERIOR COURT FOR THE COUNTY OF LOS ANGELES
10
11  VERIFIED COMPLAINT FOR RESCISSION OF CONTRACTS AND DEMAND FOR JURY
                                    TRIAL
12

13

14  LAURENCE J. GRAHAM AND BETTY          | Case No.: Case No:
15  PATRICK GRAHAM

16            Plaintiffs,                 | COMPLAINT FOR RELIEF UNDER CAL.
                                            CIVIL CODE SEC. 1692 FOR RESCISSION
17  vs.                                     OF CONTRACTS BASED ON BREACH OF
                                            FIDUCIARY DUTIES
18  DuPont de Nemours, Inc., a Delaware
19  Corporation; and, The Dow Chemical
    Company; a Delaware Corporation; and,
20  Dow, Inc., a Delaware Corporation; and,
    Corteva, Inc., a Delaware Corporation; and,
21  The Chemours Company, a Delaware
22  Corporation; and, Occidental Petroleum
    Corporation, a Delaware Corporation; and, Iluka
23  Resources, Inc., a Delaware Corporation; and,
    Iluka Resources Limited, an Australian public
24  company; and, Tronox, LLC, a US limited
25  liability company; and, Tronox Holdings plc, an
    Australian company; and, Tronox Limited, an
26  Australian public company; and, Huntsman
    Corporation, a Delaware Corporation; and,
27  Kronos (US), Inc., a Delaware Corporation;

28                                    I

1  and, Kronos Worldwide, Inc., a Delaware
   Corporation; and, National Industrialization
2  Company, a limited company organized,
3  existing, and doing business under, and by
   virtue of, the laws of the Kingdom of Saudi
4  Arabia; and, Venator Materials, LLC, a US
   limited liability corporation; and, Venator
5  Materials, plc, a United Kingdom company;
6  and, Ineos Limited, a United Kingdom private
   limited company; and, Titanium Metals
7  Corporation, a Delaware Corporation; and,
   Precision Castparts Corp., a Delaware
8  Corporation; and, Ineos Pigments USA Inc., a
9  Delaware Corporation Ineos Pigments USA
   Inc., a Delaware Corporation; and, Ineos
10 Enterprises, LLC, a limited liability corporation
   organized in Delaware; and, INEOS Joliet US
11 Holdco, LLC, a Delaware company; and,
12 Kinder Morgan, Inc., a Delaware Corporation;
   and, Hunton Andrews Kurth, LLP, a Limited
13 Liability Partnership with offices in California
   and Florida and a citizen of both California and
14 Florida; and, JM Eagle, a Delaware Corporation
15 and citizen of California; and, and, DOES 1-25,
   inclusive,
16
          Defendants.
17

18

19

20

21

22

23

24

25

26

27

28
                              II

**ILUKA**

June 12, 2023

BY CERTIFIED MAIL/RETURN RECEIPT

Mr. Laurence J. Graham
481 N. Santa Cruz Ave. #178
Las Gatos, CA 95030

### Notice of Termination of Mining Lease

Dear Mr. Graham:

This letter shall serve as formal written notice from Iluka Resources Inc., a Delaware corporation, as successor by merger to RGC (USA) Minerals Inc. ("Iluka"), of its election to terminate that certain Deed of Mining Lease dated October 13, 1989, as amended by First Amendment to Deed of Mining Lease dated June 30, 1994, made by and between G. L. Parson, Jr. and Mary Elizabeth Parson, husband and wife, and RGC (USA) Minerals Inc., as assigned by Assignment of Mineral Leases effective as of October 6, 2006, made by and between G. L. Parson, Jr. and Mary Elizabeth Parson and Ann P. Everett, and as assigned (as to future rents) by Assignment of Mineral Leases dated September 29, 2008, made by and between G. L. Parson, Jr. and Mary Elizabeth Parson and Ann P. Everett and Julia H. Parson (collectively, the "Lease"), such termination to be effective as of September 30, 2023. Enclosed is an executed copy of the Memorandum of Termination of Mining Lease which we plan to record in the Clerk's Office of the Circuit Court of Sussex County, Virginia, within the next few weeks.

We appreciate the opportunity you have given us to do business with you on this parcel over these past several years.

Please don't hesitate to call me if you have any questions or concerns.

Kind Regards,

Ryan Inocco
US Country Manager

Enclosure

Lease No. 961-1033
Parcels 101-A-17 & 101-A-17A

Iluka Resources Inc. – VA Operations

12472 St. John Church Rd., Stony Creek, VA 23882

Phone: 434.348.4300

Approximate location of Parcels 101-A-17 and 101-A-17A based on the Sussex County GIS Map





Prepared by and return to:

Hunton Andrews Kurth LLP
951 East Byrd Street
Richmond, Virginia 23219
Attn: Daniel M. Campbell, Esquire

Tax Map No.:   101-A-17, 101-A-17M and
               101-A-17A

## MEMORANDUM OF TERMINATION OF MINING LEASE

THIS MEMORANDUM OF TERMINATION OF MINING LEASE (this "Memorandum") dated as of June 12, 2023 made by and between ANN P. EVERETT, as the lessor under the Lease and as a mineral rights owner, JULIA H. PARSON also known of record as JULIA P. BOYD, ANN P. EVERETT, TRUSTEE FOR CHRISTOPHER LANCE EVERETT AND LEE RANDOLPH EVERETT UNDER AGREEMENT DATED DECEMBER 12, 1994, LAURENCE J. GRAHAM, and LUKE P. GRAHAM, collectively as mineral rights owners, and ILUKA RESOURCES, INC., a Delaware corporation, as successor by merger to RGC (USA) Minerals Inc. ("Iluka"), recites and provides:

### RECITALS:

WHEREAS, by Deed of Mining Lease dated October 13, 1989, as amended by First Amendment to Deed of Mining Lease dated June 30, 1994, made by and between G. L. Parson, Jr. and Mary Elizabeth Parson, husband and wife, and RGC (USA) Minerals Inc., as assigned to Ann P. Everett by Assignment of Mineral Leases dated October 6, 2006, and as further assigned (as to future rents payable under the Lease) by Assignment of Mineral Leases dated September 29, 2008, made by and between G. L. Parson, Jr. by Christopher L. Everett, his attorney-in-fact, and Mary Elizabeth Parson by Ann P. Everett, her attorney-in-fact, and Ann P. Everett and Julia H. Parson (collectively, the "Lease"), Iluka leased certain real property identified as Tax Map Parcels 101-A-17 and 101-A-17A located in Sussex County, Virginia (the "Property"). The Lease is evidenced by that certain Memorandum of Mining Lease dated October 13, 1989, and recorded in the Clerk's Office of the Circuit Court of Sussex County, Virginia (the "Clerk's Office") on August 17, 1990, in Deed Book 124 at page 513, and by Memorandum of First Amendment to Mining Lease dated June 30, 1994, recorded in the Clerk's Office on August 30, 1994, in Deed Book 141 at page 215, and by Assignment of Mineral Leases dated October 6, 2006, recorded in the Clerk's Office on October 20, 2006 in Deed Book 225 at page 460.

By Deed of Gift dated December 12, 1994, and recorded in the Clerk's Office on December 22, 1994, in Deed Book 143 at page 250, G. L. Parson, Jr. and Mary Elizabeth Parson, conveyed all of their right title and interest in and to a 1.0 acre portion of the Property known as "Dink's House Lot" identified as TM # 101-A-17A to Julia P. Boyd, now known as Julia H. Parson.

By Deed of Gift dated May 19, 1997, and recorded in the Clerk's Office on July 7, 1997, in Deed Book 155 at page 626, George Lee Parson, Jr. and Mary Elizabeth Parson, conveyed all of their right title and interest in and to the minerals underlying the Property, to Betty P. Graham, Ann P. Everett, and Julia P. Boyd, in equal shares, subject to the terms of the Lease.

By Deed dated May 18, 1998, and recorded in the Clerk's Office on May 28, 1998, in Deed Book 160 at page 596, G. L. Parson, Jr. and Mary Elizabeth B. Parson, conveyed the remaining 54 acre portion of the Property to Ann P. Everett, as Trustee for Christopher Lance Everett and Lee Randolph Everett under Agreement dated December 12, 1994.

By Deed of Gift dated October 23, 2000, and recorded in the Clerk's Office on November 2, 2000, in Deed Book 175 at page 181, Betty P. Graham conveyed all of her right title and interest in the minerals to Laurence J. Graham and Luke P. Graham.

WHEREAS, Iluka has terminated the Lease, and by this Memorandum Iluka now desires to provide record notice of the termination of the Lease.

-1-

## TERMINATION:

1.  <u>Recitals.</u>  The foregoing Recitals are hereby incorporated herein and made a part hereof to the same extent as if set forth in full in this Memorandum.

2.  <u>Termination of Lease.</u>  Pursuant to Section 19 of the Lease, Iluka hereby confirms that the Lease and all rights and obligations of the parties thereunder are terminated effective as of September 30, 2023, and hereby provides notice of its release and relinquishment of all right, title, and interest, if any, it has or may have in the Property pursuant to the Lease.

*[Remainder of Page Intentionally Left Blank;*
*Signatures and Notary Acknowledgement Appears on Following Pages.]*

-2-

Iluka:

**ILUKA RESOURCES INC.**, a Delaware corporation, successor by merger to RGC (USA) Minerals Inc., a Delaware corporation.

By: _____

Name:    Ryan Inocco

Title:    US Country Manager

**COMMONWEALTH OF VIRGINIA,**
**COUNTY OF SUSSEX, to-wit:**

The foregoing instrument was acknowledged before me this 12th day of June, 2023, by Ryan Inocco, as US Country Manager of Iluka Resources Inc., a Delaware corporation, successor by merger to RGC (USA) Minerals Inc., a Delaware corporation, on behalf of the corporation.

My commission expires: December 31, 2026

_____
Notary Public

DONNA J. HUFF
NOTARY PUBLIC
MY
COMMISSION
NUMBER
303803
COMMONWEALTH OF VIRGINIA

-3-